



14 CV 9438

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BENJAMIN GROSS, Individually and on Behalf of All Others Similarly Situated, <br><br>            Plaintiff, <br><br> vs. <br><br> GFI GROUP, INC., COLIN HEFFRON, MICHAEL GOOCH, and NICK BROWN, <br><br>            Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |



## CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Plaintiff, by his attorneys, alleges the following upon information and belief, except for those allegations that pertain to Plaintiff and his attorneys, which are based on personal knowledge. Plaintiff's information and belief are based upon, among other things, his Counsel's investigation, which includes, *inter alia*, review and analysis of GFI Group, Inc.'s ("GFI" or the "Company") and other filings with the United States Securities and Exchange Commission ("SEC"), press releases, conference calls, news articles, and analyst reports. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This federal securities class action is brought on behalf of sellers of GFI common stock on the New York Stock Exchange ("NYSE") during the period between July 30, 2014 and September 8, 2014, inclusive (the "Class Period"). This action seeks to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      GFI is a leading intermediary and provider of trading technologies and support services to the global over-the-counter ("OTC") and listed markets. GFI serves as a holding company for its subsidiaries, and provides brokerage and trade execution services, clearing services, market data and trading platforms, and other software products to institutional customers in markets for a range of fixed income, financial, equity, and commodity instruments.

3.      GFI can be essentially separated into two businesses. The first is its wholesale brokerage and clearing business. The second is its software, analytics, and market data business. The latter business hinges primarily on: (1) the Company's Trayport subsidiary, which licenses multi-asset class electronic trading and order management software to brokers, exchanges, and traders in the commodities, fixed income, currencies, and equities markets; and (2) its FENICS

division, for foreign exchange option markets, which provides customers with technology to control and monitor the lifecycle of their foreign exchange options trades.

4.     On July 30, 2014, GFI announced that it had entered into an acquisition agreement with CME Group, Inc. ("CME"). In this deal, CME would acquire all outstanding shares of GFI, but would immediately turn around and sell the largest and most valuable part of GFI's business – its brokerage business – right back to GFI's insiders and fiduciaries.

5.     First, CME would acquire all outstanding shares of GFI stock. In return, each share of GFI would be exchanged for $4.55 worth of CME Class A stock, placing a value of $580 million on GFI's equity. The enterprise value of the transaction, including debt, was $820 million.

6.     Second, CME would immediately sell GFI's over-the-counter and exchange listed derivatives brokerage and trade execution service business (the "Brokerage Business") back to the Management Consortium – Defendants Gooch, Heffron, and Brown – for $165 million in cash, plus assumption of $63 million in related liabilities. CME would retain GFI's auxiliary analytics software business.

7.     Unbeknownst to investors, however, Defendants actually knew, or were reckless in not knowing, that GFI had previously received or could garner offers that valued the Company at a substantially higher price than what was received from CME, and that they disclosed to shareholders.

8.     Specifically, Defendants spurned at least one interested third party suitor: BGC Partners, Inc. ("BGC"), in favor of CME, even though BGC proposed a more favorable deal to shareholders. Defendants, fully aware of BGC's interest *before* announcing the acquisition

agreement with CME on July 30, 2014, improperly refused to discuss a possible sale of GFI to BGC.

9. Moreover, Defendants failed to disclose this material, non-public information to Plaintiff and the other members of the Class.

10. Indeed, even though the Defendants were aware of BGC's interest and the potential offer, on July 30, 2014, Defendant Gooch misled investors by stating that "*Optimizing GFI's value for stockholders has been a goal of management since becoming a public company in 2005 and this transaction represents a singular and unique opportunity to return value.*"

[Emphasis added.]

11. Consistent with its previously stated intentions, on September 9, 2014, BGC announced that it would make a $675 million all-cash offer for GFI. This offer, of $5.25 per share, was 15% higher than the proposed all-stock transaction announced between GFI and CME in July 2014. In its press release announcing this offer, BGC noted that GFI's deal with CME "deprives GFI shareholders of the appropriate value of their investment." Likewise, Plaintiff and the other members of the Class who sold GFI stock between July 30, 2014 and September 8, 2014, did so at an artificially depressed price as Defendants knowingly or recklessly failed to disclose material, non-public information concerning other suitors for GFI to Plaintiff and the Class.

12. On this news, GFI's stock price jumped 20%, from $5.03 on September 8, 2014 to $6.02 on September 12, 2014. Plaintiff and the Class did not, however, get the benefit of this price increase.

13.     As detailed herein, Defendants issued material misrepresentations and failed to disclose to investors like Plaintiff and the other members of the Class material facts indicating that the Company had received superior offers and inquiries from third party purchasers interested in acquiring GFI.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) prior to announcing the proposed acquisition with CME, GFI had received superior offers and/or inquiries from other interested third parties, including BGC; and (2) the CME offer did not optimize GFI's value for stockholders and did not represent a singular and unique opportunity to return value.  Defendants withheld this material, non-public information from, and otherwise misled investors, so that Defendants could pursue and personally profit from a sweetheart deal with CME.

14.     GFI's stock price was, therefore, undervalued throughout the Class Period as a result of Defendants' misrepresentations and omissions.

15.     On the last day of the Class Period, it became publicly knowledge that *before* the Company entered into the acquisition agreement with CME, Defendants had received offers and inquiries for GFI in excess of what the Company would receive from CME.

16.     A number of actions have been filed that seek injunctive relief that would, *inter alia*, block the deal between GFI and CME from concluding.  These cases include: *City of Lakeland Employees Pension Plan v. Gooch*, No. 10136 (Del. Ch.); *Coyne v. GFI Group, Inc.*, No. 652704/2014 (N.Y. Supreme Ct.); *Suprina v. GFI Group, Inc.*, No. 652668/2014 (N.Y. Supreme Ct.); and *Szarek v. GFI Group, Inc.*, No. 14-cv-8228 (S.D.N.Y.).

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by

the SEC (17 C.F.R. §240.10b-5).

18.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

19.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).

20.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NYSE, a national securities exchange located in this District.

## PARTIES

21.    Plaintiff Benjamin Gross sold the common stock of GFI at an artificially low price during the Class Period and has been damaged as a result.  Specifically, Plaintiff sold 770 shares on July 31, 2014 at $4.52 each.

22.    Defendant GFI, together with its subsidiaries, is incorporated in Delaware and headquartered at 55 Water Street, New York, New York  10041.

23.    Defendant Colin Heffron ("Heffron") has served as a director of GFI since 2001, as the Company's president since 2004, and as its CEO since 2013.  Heffron is also the chairman of Trayport.  He is also a member of the Management Consortium that will acquire GFI's brokerage business in connection with the proposed acquisition by CME.

24.    Defendant Michael Gooch ("Gooch") founded GFI in 1987, and served as the Company's CEO from 1987 to 2013.  He also serves on the GFI Board of Directors as its Executive Chairman, and is the beneficial owner of 37.3% of GFI's outstanding stock.

Furthermore, Gooch is a member of the Management Consortium that will acquire GFI's brokerage business in connection with the proposed acquisition by CME.

25.    Defendant Nick Brown ("Brown") has been employed by GFI since 2003 and currently serves as Managing Director – Head of Financial Product Brokerage, Americas. Brown is a member of the Management Consortium that will acquire GFI's brokerage business in connection with the proposed acquisition by CME.

26.    Defendants Heffron, Gooch, and Brown are collectively referred to herein as the "Individual Defendants."

27.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of GFI, possessed the power and authority to control the contents of GFI's annual reports, quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market.  They were provided with copies of the Company's reports and press releases alleged herein to be false or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material, non-public information available to them but not to the public, the Individual Defendants knew or recklessly disregarded that the facts specified herein had not been disclosed to and were being concealed from the public and that the representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

28.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on sellers of GFI common stock over the

NYSE by disseminating materially false and misleading statements and/or concealing material facts. During the Class Period, the scheme: (i) deceived the investing public regarding GFI's business, operations, management, and the intrinsic value of GFI common stock; (ii) misrepresented and/or omitted the fact that GFI had received offers and/or inquiries to acquire the Company superior to the offer contained in the acquisition agreement GFI entered into with CME; and (iii) caused Plaintiff and members of the Class to sell their shares of GFI common stock at artificially low prices.

### CLASS ACTION ALLEGATIONS

29.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who sold the common stock of GFI between July 30, 2014 and September 8, 2014, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

30.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, GFI common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and sellers and other members of the Class may be identified from records maintained by GFI or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

31.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

32.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

33.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements and/or omissions made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and value of GFI;

(c)     whether the price of GFI common stock was artificially low during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

34.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

A.  **Background – The Company**

35.  Defendant GFI is a leading intermediary and provider of trading technologies and support services to global OTC and listed markets.  The Company was founded in 1987 and was incorporated under the laws of the State of Delaware in 2001.  GFI serves as a holding company for its subsidiaries, and provides brokerage and trade execution services, clearing services, market data and trading platforms, and other software products to institutional customers in markets for a range of fixed income, financial, equity, and commodity instruments.

36.  GFI is publicly traded on the New York Stock Exchange, under the ticker symbol "GFIG."

37.  GFI can be essentially separated into two businesses.  The first is its wholesale brokerage and clearing business.  The second is its software, analytics, and market data business. The latter business hinges primarily on: (1) the Company's Trayport subsidiary, which licenses multi-asset class electronic trading and order management software to brokers, exchanges, and traders in the commodities, fixed income, currencies, and equities markets; and (2) its FENICS division, for foreign exchange option markets, which provides customers with technology to control and monitor the lifecycle of their foreign exchange options trades.

38.  In recent years, GFI has developed other businesses that complement their brokerage of OTC derivatives, such as cash bond and futures contracts, brokerage services, clearing services, and analytical and trading software businesses.

39.  In a February 13, 2014 press release, GFI reported that its software businesses had record revenues and profits in 2013, as the Company was able to leverage its customer base and

expand its products and services.  Specifically, Trayport's software revenues grew 7% in the fourth quarter and 9% for the full year in 2013.

40.    For the first quarter of 2014, as reported in its SEC Form 8-K (filed Apr. 29, 2014), GFI's net revenues grew to $202.4 million, compared to $201.5 million from 2013, while non-GAAP revenues grew 1.1% to $202.1 million as compared to $199.8 million from 2013. Furthermore, software, analytics, and market data revenues increased 16.3% to $25.8 million compared to $22.2 million from 2013's first quarter.

41.    Although GFI's wholesale brokerage business has suffered declining revenues in recent years, the Company's clearing services are also included in the Brokerage Business defined above that CME would acquire as a result of the proposed acquisition.  In total, the Brokerage Business accounts for substantially all of GFI's revenues – nearly 90% of GFI's 2013 revenues.  The brokerage segment, alone, accounted for $645.4 million, or 71.6%, of GFI's revenue in 2013.

42.    Accordingly, by virtue of the proposed acquisition and subsequent resale by CME, the Management Consortium is attempting to take the Brokerage Business private while they can claim cheap value, to the detriment of Plaintiff and other members of the Class.

**B.    Summary of the Proposed Transaction**

43.    In a press release dated July 30, 2014, GFI announced that it had entered into the acquisition agreement with CME, through which CME would acquire the Company's software business in an all-stock transaction.  Under the deal, GFI shareholders would receive $4.55 per share in CME Group Class A Common Stock for each share of GFI stock they owned.  The acquisition is therefore valued at approximately $580 million.

44.     Pursuant to the acquisition agreement, CME will also acquire – and then immediately re-sell – GFI's Brokerage Business.  CME will re-sell the Brokerage Business back to the Management Consortium, consisting of Defendants Gooch, Heffron, and Brown, for $165 million in cash and the assumption, at closing, of approximately $63 million of unvested deferred compensation and other liabilities.

45.     This acquisition by CME was approved by the Board of Directors of GFI and CME, and is expected to close in early 2015.

46.     Given GFI's recent strong performance and its overall positioning for growth, the proposed acquisition by CME is inadequate and significantly undervalues the Company.

47.     The value of the consideration to be paid by CME in the proposed acquisition represents almost no premium at all to GFI shareholders, when compared to GFI's approximately 52-week closing price high of $4.53.

48.     It is clear that the second step of the proposed acquisition by CME – the buyback by the Management Consortium – is the real impetus for the proposed acquisition, which has been orchestrated to allow the Management Consortium to take the Brokerage Business private.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

**A.     Statements Concerning the Acquisition by CME**

49.     The Class Period begins on July 30, 2014.  On that date, GFI issued a press release, which provides, in relevant part:

> CME Group, the world's leading and most diverse derivatives marketplace, and GFI Group Inc., a leading intermediary and provider of trading technologies and support services to the global OTC and listed markets, today announced that they have entered into definitive agreements to create value for their respective stockholders through a two-step transaction through which:

- CME Group will acquire Trayport and FENICS. CME Group will purchase these businesses by first acquiring all of the outstanding shares of GFI Group in exchange for $4.55 per share in CME Group Class A Common Stock which represents a 46% premium above yesterday's closing price of $3.11 per share of GFI Group common stock.

- Immediately following the acquisition of GFI Group, a private consortium of GFI Group management, led by current Executive Chairman Michael Gooch, CEO Colin Heffron and Managing Director Nick Brown, will acquire GFI Group's wholesale brokerage and clearing businesses for $165M in cash and the assumption, at closing, of approximately $63M of unvested deferred compensation and other liabilities. After completion of the transaction, the wholesale brokerage business, including the Kyte Group, will continue as a private company with its management and operations largely unchanged. The continuing GFI Group brokerage business will maintain its commitment to both Trayport and FENICS by entering into long-term commercial agreements.

This two-step transaction, which has been approved by the Board of Directors of GFI Group upon the unanimous recommendation of a Special Committee comprised solely of independent and disinterested directors, and by the Board of Directors of CME Group, is expected to create significant stockholder value for both GFI Group and CME Group stockholders and to qualify as tax-free exchanges of equity for both groups. The transaction is subject to the approval of the stockholders of GFI Group as well as customary regulatory review and approvals. It is expected that the transaction will close in early 2015.

50.     Defendant Gooch stated:

We are very pleased to announce this transaction with CME Group and the substantial premium and liquidity it delivers to our stockholders. *Optimizing GFI's value for stockholders has been a goal of management since becoming a public company in 2005 and this transaction represents a singular and unique opportunity to return value.* I am very proud of what our Trayport and FENICS teams have achieved since becoming a part of GFI. We are excited that these businesses will become part of a dynamic and highly-regarded company where their immediate strategic value can be further realized within CME.

[Emphasis added.]

51.     Defendant Heffron added:

Over the past few years, the wholesale brokerage industry has faced challenging market conditions along with increased regulatory requirements. Even with those challenges, we continued to invest in technology to better serve our clients and further increase overall market efficiency. *This transaction unlocks the substantial value of our Trayport and FENICS technology businesses in a tax efficient manner.* Additionally, it will allow our wholesale brokerage and Kyte businesses to continue as a private company, giving them the added flexibility and agility needed to capture future market opportunities. The talents and commitment of our team have made the GFI wholesale brokerage and clearing businesses recognized leaders in their industry. I am proud and excited to continue to work together with them in this next phase of our development.

[Emphasis added.]

52.    Defendants misrepresented GFI's value, the price it could fetch in an arms' length transaction, the opportunity for GFI's shareholders to receive full value for their investment, the value of the proposed acquisition of GFI by CME, and failed to disclose the fact that Defendants had already been contacted by representatives from BGC about pursuing a deal with BGC at a higher valuation.

## THE TRUTH IS FULLY REVEALED

53.    On September 9, 2014, it became public that on July 29, 2014, BGC sent a letter to Defendants Gooch and Heffron indicating BGC's interest in acquiring GFI. This letter, whose existence was not made public until September 9, 2014, and not fully disclosed until even later, provides, in relevant part:

I have always had tremendous respect for you both, your company and the success of your business. It is this respect that leads us to propose discussions concerning our interest in acquiring GFI Group, Inc. ("GFI") by means of an acquisition of all or substantially all of GFI's assets or an acquisition of 100% of GFI's outstanding shares (the "Transaction").

We believe that GFI and BGC Partners, Inc. ("BGC") are an excellent fit together, and that the combination of our businesses is compelling from both an operating synergy and growth perspective. The combined company would offer a larger platform from which we can together grow our wholesale brokerage and electronic trading businesses, and our experience and strong track record of

success with electronic trading and financial services technology provides a compelling rationale for a Transaction.

Based on publicly available information and our knowledge of GFI, we are confident we can offer a price per share substantially in excess of GFI's current trading price, in cash, stock or some combination thereof.

Because we believe we can offer a price per share at a substantial premium to current trading prices, representing an immediate, certain and compelling value to GFI's shareholders, we hope you will share our proposal with your Board of Directors and meet with us to discuss a possible acquisition of GFI by BGC in more detail.  If you would like, we would welcome the opportunity to discuss a potential Transaction with you prior to or contemporaneously with your discussions regarding this letter with your Board of Directors.  (We would also be willing to discuss an acquisition involving solely the stock or assets of Trayport.)

It is our preference to work together with you both and the GFI Board of Directors to reach a mutually agreeable Transaction.  We strongly prefer to conduct our negotiations with you privately and in an expeditious manner.  We ask that BGC's interest in GFI and the existence and contents of this letter be kept confidential and not disclosed without our prior written consent.

I hope that each of you and the GFI Board of Directors will recognize the outstanding opportunity presented by an acquisition of GFI by BGC.  We look forward to discussing a possible transaction with you.

54.    In a September 9, 2014 press release that was filed with the SEC on Form 8-K, it finally became public information that GFI had in fact received an inquiry from BGC on July 29, 2014 – the day before GFI announced the acquisition agreement with CME.  Notably, GFI still had not disclosed this information – the public only learned of it through BGC's press release.  BGC reprinted the following letter it sent to GFI on September 8, 2014, in which BGC declared its potential intent to pursue a hostile takeover of GFI:

To the Board of Directors of GFI Group Inc. ("GFI"):

*As you know, BGC Partners, Inc. ("BGC") has over the course of several years repeatedly expressed an interest in acquiring GFI, and on July 29, 2014 delivered a letter to Messrs. Michael Gooch and Colin Heffron detailing its interest in acquiring 100% of GFI.  We had expected to engage in a discussion, and therefore we were surprised to read the press release announcing your agreement with CME Group Inc. ("CME").*  Your agreement provides for a two-

step transaction in which CME will acquire all of the outstanding shares of GFI in exchange for $4.55 per share in CME Group Class A Common Stock, and immediately sell GFI's wholesale brokerage and clearing businesses (including net cash, cash equivalents and clearing deposits of $191 million) to a private consortium of GFI's management, including Messrs. Gooch and Heffron, for $165 million in cash and the assumption, at closing, of certain unvested deferred compensation and other liabilities.

BGC owns approximately 13.5% of GFI's common stock. We believe that GFI's customers and brokers would benefit from GFI being part of a larger, better capitalized and more diversified company. We are confident that a combination of GFI and BGC will produce increased productivity per broker, meaningful synergies and significant cost savings. We therefore continue to seek a negotiated merger with GFI that would provide superior value to your shareholders, and we are prepared to begin such negotiations immediately. However, given your lack of response to our offers, and our belief that the pending transaction deprives GFI shareholders of the opportunity to realize appropriate value, particularly given the significant discount agreed to with respect to the purchase of the brokerage and clearing business, we intend to make an offer directly to the GFI shareholders.

*Our plan is to commence a cash tender offer to purchase 100% of the outstanding shares of common stock of GFI at $5.25 per share in cash, representing a premium of (i) more than 68% to the price of GFI's common stock on July 29, 2014, the day before announcement of the transaction with CME, and (ii) more than 15% to the price offered by CME.* Our tender offer will be conditioned on the tender of a sufficient number of shares of common stock of GFI such that, when added with the GFI common stock that we own, we would own a majority of the outstanding GFI common stock, on a fully diluted basis. The tender offer will not be subject to any financing contingency. Nor will the offer be subject to the negotiation or execution of any merger agreement or other agreement with GFI or CME.

*This all-cash offer will provide the GFI shareholders with immediate, certain and compelling value, without material contingencies.*

We believe that there should not be any obstacles to completing our tender offer expeditiously. Our antitrust advisors at Wachtell, Lipton, Rosen & Katz have conducted an analysis of the competitive landscape and, based on their extensive experience and knowledge of the industry, have independently determined that there are no material regulatory obstacles to completing the transaction.

Without material contingencies and at a significant all-cash premium to the pending transaction, we believe that our offer constitutes a superior proposal to the pending transaction, and that your shareholders will find our offer extremely compelling.

15

By approving the merger agreement with CME, you, GFI's board of directors, have determined to sell the company for $4.55 per share. Therefore, any action that you take, or allow the company or its management to take, to impair the ability of your shareholders to accept our $5.25 per share offer (such as the adoption of a poison pill), or that would negatively affect the value of the company (including actions outside of the ordinary course of business or inconsistent with past practice), either prior to, or after we commence our offer would be a clear breach of the board's fiduciary duties. We will consider any and all options available to us to halt, block or otherwise limit any such inappropriate actions. *Our proposal is clearly superior to the existing transaction involving CME and GFI's management, a transaction that we believe reflects deep conflicts of interest.*

We are prepared to make the offer to the GFI shareholders, but we continue to be willing to negotiate directly with GFI, Messrs. Gooch and Heffron and CME regarding a consensual transaction among the parties. We are open to discussing and addressing social issues such as senior management team composition and other concerns that you may have. We are available to commence such discussions immediately and hope that you accept our invitation to do so.

Sincerely,

Shaun D. Lynn
President
BGC Partners, Inc.

[Emphasis added.]

55.    On September 9, 2014, BGC announced that it would make a $675 million all-cash offer for GFI. This offer of $5.25 per share, was 15% higher than the proposed all-stock transaction announced between GFI and CME in July 2014. In its press release announcing this offer, BGC noted that GFI's deal with CME "deprives GFI shareholders of the appropriate value of their investment."

56.    On this news, GFI's stock price jumped 20%, from $5.03 on September 8, 2014 to $6.02 on September 12, 2014. Plaintiff and the Class did not, however, get the benefit of this price increase.

57.    Indeed, GFI did not even acknowledge the offer or any communications from BGC until September 15, 2014, when GFI filed a press release with the SEC on Form 8-K announcing that it had received the acquisition proposal from BGC.

## POST-CLASS PERIOD DEVELOPMENTS AND DISCLOSURES

58.    GFI subsequently rebuffed BGC's offer for a negotiated merger, claiming that the two companies could not reach a confidentiality agreement.  In response, BGC's CEO Lutnick lambasted this accusation: "[d]espite our best efforts to engage with GFI regarding a negotiated transaction, we have been met with only unreasonable demands and delay tactics in connection with our attempts to execute even a confidentiality agreement covering information on the Trayport and FENICS businesses with GFI and its management."

59.    On October 16, 2014, CME filed its Registration Statement to acquire GFI. CME's Registration Statement provides, in relevant part:

> At a meeting of the Special Committee held *on March 28, 2014*, representatives of White & Case led the Special Committee in a discussion of the Special Committee's fiduciary duties in light of the comments expressed by Mr. Gooch on behalf of JPI at the March 19, 2014 meeting of the Special Committee, and JPI's intent to vote against a transaction involving GFI with any party other than CME.  Representatives of Greenhill then gave a presentation to the Special Committee regarding their preliminary valuation approach and methodologies. Representatives of Greenhill noted that the existing financial projections provided by GFI management for the IDB Business and for GFI as a whole were of limited duration and that, in order for Greenhill to perform a discounted cash flow analysis, it required financial projections for a longer period. *The representatives of Greenhill also provided an overview of the potential strategic alternatives available to GFI, 13 companies that Greenhill considered to be the most likely potential counterparties for a strategic transaction, including BGC, and various potential strategic transaction structures.*  The Special Committee discussed the financial and business prospects for GFI continuing as a stand-alone company, and whether a strategic transaction would provide more value for GFI Stockholders.

[Emphasis added.]

60.    In the same Registration Statement, CME also disclosed that:

Immediately following the conclusion of the meeting of the Special Committee, the GFI Board met along with certain members of GFI management, financial and legal advisors to the Special Committee and Willkie Farr, and the Special Committee reported that it had unanimously recommended that the GFI Board approve, adopt and declare advisable the GFI Merger Agreement and the GFI Merger and recommend to GFI Stockholders that such stockholders adopt the GFI Merger Agreement and approve the GFI Merger. *The GFI Board also discussed a letter emailed to Mr. Gooch and Mr. Heffron earlier that day from BGC. Mr. Gooch read aloud the letter to the other participants at the meeting, who were previously unaware of the letter. In the letter, BGC expressed an interest in initiating discussions regarding a potential strategic transaction involving GFI, but did not set forth any valuation ranges for GFI. The members of the GFI Board, given their prior experiences with representatives of BGC and familiarity with the industry, concluded that BGC's proposal was highly speculative in nature given its lack of any specificity, and did not ensure that discussions with BGC would result in a definitive proposal. Further, the GFI Board concluded, in its judgment, that BGC was unlikely to pay a higher premium for GFI than CME. In addition, Mr. Gooch, in his capacity as a representative of JPI, noted that JPI intended to vote against any transaction involving GFI with any party other than CME.* After further discussion, the GFI Board moved to vote on the GFI Merger Agreement. Messrs. Gooch and Heffron recused themselves from the vote, and the remaining members of the GFI Board (which consisted of the members of the Special Committee), acting on behalf of the entire GFI Board unanimously voted to approve, adopt and declare advisable the GFI Merger Agreement and the GFI Merger and further to recommend that GFI Stockholders adopt the GFI Merger Agreement and approve the GFI Merger, and that the approval of the GFI Merger be submitted for consideration of GFI Stockholders at a special meeting of such stockholders.

[Emphasis added.]

61.    On October 22, 2014, BGC filed its hostile takeover papers with the SEC. In this filing, there is a section entitled "Have you discussed this Offer with GFI?," which provides:

On July 30, 2014, GFI entered into the CME Merger Agreement. That agreement prohibits GFI from (i) engaging in discussions with third parties (including us) regarding a potential acquisition of Shares unless certain conditions are satisfied or (ii) providing non-public information regarding GFI without the execution of a confidentiality agreement meeting specifications set forth in the CME Merger Agreement. On September 8, 2014, we delivered a letter to the board of directors of GFI indicating our interest in acquiring 100% of the GFI common stock at $5.25 per Share. This letter was made public by BGC on the following morning through a press release announcing its intention to commence an offer for GFI common stock.

Following the delivery of our letter, *on September 15, 2014, GFI announced that the board of directors of GFI, upon the recommendation of the special committee of the GFI board (the "GFI Special Committee"), determined that the offer set forth in our September 8 letter to GFI could reasonably be expected to lead to a "Superior Proposal" as defined in the CME Merger Agreement.* Following such announcement by GFI, counsel for the GFI Special Committee and counsel for BGC negotiated a confidentiality agreement that BGC believed was sufficiently protective of GFI and met the terms of the CME Merger Agreement, and BGC was prepared to execute that agreement. The GFI Special Committee, however, determined that it was unable under the CME Merger Agreement to provide information with respect to its business unless we signed a confidentiality and non-solicitation agreement containing provisions that we found to be unacceptable. As a result, we have not executed a confidentiality agreement, we have not engaged in any significant discussions relating to this Offer, and no agreement has been reached with respect to this Offer. See "The Offer—Section 11—Background of the Offer; Other Transactions with GFI".

[Emphasis added.]

62.    Also in BGC's hostile takeover papers, there is a section entitled "Background of the Offer; Other Transactions with GFI." It provides, in relevant part:

As part of their ongoing evaluation of BGC's business and strategic alternatives, BGC's board of directors and senior management, on occasion with outside legal and financial advisors, have from time to time evaluated strategic opportunities and prospects for acquisitions across the brokerage industry. In the course of its ongoing evaluation, BGC's management team considered and reviewed an acquisition GFI.

*Over the past three years*, Shaun D. Lynn, President of BGC, expressed interest to GFI in a combination of BGC and GFI, including an acquisition by BGC of GFI. During these conversations, Mr. Lynn and GFI management discussed the possibility of a transaction between the two companies and the potential opportunities that combining the businesses could produce. However, a confidentiality agreement was never executed.

*On July 29, 2014, Mr. Lynn sent a letter to Michael Gooch, Executive Chairman of GFI, and Colin Heffron, Chief Executive Officer of GFI. The letter expressed BGC's interest in acquiring GFI by means of an acquisition of all or substantially all of GFI's assets or an acquisition of 100% of GFI's outstanding shares. In the letter, BGC expressed its view that the combination of the two companies was compelling from an operating synergy and growth perspective, and that the combined company would offer a larger platform from which to grow its wholesale brokerage and electronic trading businesses. BGC also expressed its confidence that it could offer a price per share substantially*

*in excess of GFI's current trading price, in cash, stock or some combination thereof and that expressed its desire to discuss a possible acquisition of GFI with both management and the GFI Board.* BGC received no response to its letter.

[Emphasis added.]

63.     On November 12, 2014, BGC issued a letter to GFI shareholders clarifying the terms of its tender offer. In this letter, which was filed with the SEC as an attachment to BGC's Form SC To-T/A filing, BGC wrote:

**BGC Has Long Desired a Transaction with GFI.** Over the course of several years, we have repeatedly expressed an interest in acquiring GFI. We have done this via direct communication with members of GFI's management team, as well as through outside intermediaries. Indeed, on July 29, 2014, the day before the CME transaction was announced, we sent a letter reiterating our interest in a transaction directly to Messrs. Michael Gooch and Colin Heffron. We began to acquire a significant number of shares of GFI common stock more than a year earlier. Our interest in acquiring GFI is therefore neither recent nor did it begin after the CME announcement.

64.     In sum, Defendants misrepresented and/or failed to disclose the following material facts to shareholders during the Class Period: (1) prior to announcing the proposed acquisition with CME, GFI had received superior offers and/or inquiries from other interested third parties, including BGC; and (2) the CME offer did not optimize GFI's value for stockholders and did not represent a singular and unique opportunity to return value. As a result, Defendants' Class Period statements and omissions were false and misleading.

## ADDITIONAL SCIENTER ALLEGATIONS

65.     As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary

violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding GFI, their control over, and/or receipt and/or modification of GFI's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

66.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

67.    The Individual Defendants, because of their positions with GFI, controlled the contents of the Company's public statements during the Class Period.  Each Defendant was provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, these Defendants knew or recklessly disregarded that the facts specified herein had not been disclosed to, and were being concealed from, the public and that the representations that were being made were false and misleading.  As a result, each of these Defendants is responsible for the accuracy of GFI's corporate statements and are therefore responsible and liable for the representations contained therein.

68.    The scienter of the Defendants is underscored by the Sarbanes-Oxley mandated certifications of Defendant Heffron which acknowledged his responsibility to investors for establishing and maintaining controls to ensure that material information about GFI was made known to them and that the Company's disclosure related controls were operating efficiently

## LOSS CAUSATION/ECONOMIC LOSS

69.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially deflated the price of GFI common stock and operated as a fraud or deceit on Class Period sellers of GFI common stock by failing to disclose and misrepresenting the facts detailed herein.   When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, it became clear that Plaintiff and other members of the Class sold their shares of GFI common stock at a value far lower than the true value of GFI stock, in reliance on Defendants' misrepresentations, omissions, and fraudulent conduct.

70.    As a result of their sales of GFI common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.   Defendants' false and misleading statements caused GFI common stock to trade at artificially low levels during the Class Period.

71.    By misrepresenting and failing to disclose to investors the facts detailed herein, Defendants presented a misleading picture of the value of GFI's common stock.   When the truth about the Company was revealed to the market, it became obvious that GFI was being sold to CME for far less money than the Company could have obtained for its shareholders. Accordingly, Defendants' misconduct caused real economic loss to investors who had sold GFI common stock during the Class Period.

72.    The revelations regarding the price that GFI could have and should have obtained for all of its shareholders made in the wake of GFI's decision to accept CME's inferior offer demonstrated that, as a direct result of the nature and extent of Defendants' fraudulent misrepresentations, Plaintiff and the other members of the Class sold their shares at a substantial

discount. The timing and magnitude of the price that GFI accepted for its shareholders negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD-ON-THE-MARKET DOCTRINE

73.    At all relevant times, the market for GFI common stock was an efficient market for the following reasons, among others:

(a)    GFI's stock met the requirements for listing on, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)    as a regulated issuer, GFI filed periodic public reports with the SEC and the NYSE;

(c)    GFI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    GFI was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

74.     As a result of the foregoing, the market for GFI common stock promptly digested current information regarding GFI from all publicly-available sources and reflected such information in the price of GFI common stock.  Under these circumstances, all sellers of GFI common stock during the Class Period suffered similar injury through their sales of GFI common stock at artificially deflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

75.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of GFI who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of
### the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

76.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

77.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they deliberately disregarded or knew were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

78.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or failed to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the sellers of the Company's common stock during the Class Period.

79.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they sold their shares of GFI common stock at artificially low prices.  Plaintiff and the Class would not have sold GFI common stock at the prices they did, if they had been aware that the market prices had been artificially and falsely deflated by Defendants' misleading statements, made to protect the deal Defendants personally favored.

80.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their sales of GFI common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

81.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

82.    The Individual Defendants acted as controlling persons of GFI within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the discussions concerning the sale of the Company and financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be false or misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

83.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

84.    As set forth above, GFI and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts, statements, and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their sales of GFI common stock during the Class Period and revelation of the truth as alleged herein.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure with Plaintiff serving as class representative;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre and post judgment interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  November 26, 2014

Respectfully submitted,

SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
Joseph P. Guglielmo (JG-2447)
Joseph D. Cohen
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, New York 10174
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
jguglielmo@scott-scott.com
jcohen@scott-scott.com

David R. Scott
Stephen J. Teti
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
156 South Main Street
P.O. Box 192
Colchester, Connecticut 06415
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
david.scott@scott-scott.com
steti@scott-scott.com

Jack I. Zwick (JZ-2514)
100 Church Street, Suite 850
New York, New York 10007
Telephone: (212) 385-1900
Facsimile: (212) 385-1911
jack@zwickfirm.com

*Counsel for Plaintiff*

## SWORN CERTIFICATION OF PLAINTIFF

## GFI GROUP, INC. SECURITIES LITIGATION

I, Benjamin Gross, certify that:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase or sell shares of GFI Group, Inc., the security that is the subject of this action, at the direction of plaintiff's counsel or to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in GFI Group, Inc. common stock during the class period referenced in the Complaint are set forth in the attached list of transactions.

5. I have not served as a representative party on behalf of a class under this title during the last three years.

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: November 2*, 2014

_____
Benjamin Gross

### Benjamin Gross' Transactions in GFI Group, Inc. Common Stock

| Date | Transaction Type | Ticker | Company | Shares | Price | Amount |
|------|------------------|--------|---------|--------|-------|--------|
| 01/26/2012 | Purchase | GFIG | GFI Group, Inc. | 770 | $4.58 | ($3,534.60) |
| 07/31/2014 | Sale | GFIG | GFI Group, Inc. | 770 | $4.52 | $3,472.32 |