**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

BENJAMIN GROSS, individually and on
behalf of all others similarly situated,

*Plaintiffs*,

v.

GFI GROUP, INC., COLIN HEFFRON, AND
MICHAEL GOOCH,

*Defendants*.

14 Civ. 9438 (WHP)

---

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
(212) 403-1000

*Attorneys for defendant GFI Group Inc.*

QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
51 Madison Avenue
New York, NY  10010
(212) 849-7000

*Attorneys for defendants Colin Heffron and
Michael Gooch*

Dated:  November 21, 2017

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT .............................................................................................1

FACTS ..............................................................................................................................2

     A.     GFI and CME announce their deal .........................................................3

     B.     Market participants react to the July 30 press release.............................4

     C.     GFI files the merger agreement with the SEC.........................................4

     D.     BGC responds to the CME deal................................................................5

     E.     The proxy statement discloses the background of the CME deal...........6

     F.     GFI shareholders vote down the CME deal..............................................7

ARGUMENT ......................................................................................................................7

I.     THERE IS NO GENUINE DISPUTE OF MATERIAL FACT AS TO FALSITY. ...........7

     A.     Plaintiffs cannot establish falsity on a fair reading of the sentence.......7

     B.     Even on their reading of the sentence, plaintiffs cannot establish it was false.....................................................................................................10

     C.     Defendants had no duty to disclose the allegedly omitted facts............11

II.     THERE IS NO GENUINE DISPUTE OF MATERIAL FACT AS TO SCIENTER. .................................................................................................14

     A.     Plaintiffs cannot establish motive or opportunity...................................14

     B.     Plaintiffs cannot establish scienter through evidence of conscious misbehavior or recklessness...................................................................16

III.     THERE IS NO GENUINE DISPUTE OF MATERIAL FACT AS TO RELIANCE..................................................................................................18

IV.     THERE IS NO GENUINE DISPUTE OF MATERIAL FACT AS TO LOSS CAUSATION. ...........................................................................................19

V.     PLAINTIFFS' CONTROL-PERSON CLAIM FAILS. ..........................................25

CONCLUSION.................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972)..............................................................................18, 19

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988)..............................................................................12, 18

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).....................................................................................7

*Chill v. Gen. Elec. Co.*,
    101 F.3d 263 (2d Cir. 1996)........................................................................14

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)............................................................................*passim*

*Estate of Detwiler v. Offenbecher*,
    728 F. Supp. 103 (S.D.N.Y. 1989)...............................................................14

*Field v. Trump*,
    850 F.2d 938 (2d Cir. 1988)........................................................................14

*Gissin v. Endres*,
    739 F. Supp. 2d 488 (S.D.N.Y. 2010)............................................................8

*Gordon Partners v. Blumenthal*,
    2007 WL 1438753 (S.D.N.Y. May 16, 2007) ...........................................20 n.6

*Grossman v. Novell, Inc.*,
    120 F.3d 1112 (10th Cir. 1997) ...................................................................10

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S. Ct. 2398 (2014)................................................................................18

*In re BP p.l.c. Sec. Litig.*,
    2014 WL 2112823 (S.D. Tex. May 20, 2014) ............................................23-24

*In re GeoPharma, Inc. Sec. Litig.*,
    399 F. Supp. 2d 432 (S.D.N.Y. 2005)...............................................15, 16 & n.3

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014).............................................................17

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
    26 F. Supp. 3d 278 (S.D.N.Y. 2014).............................................................10

*In re N. Telecom Ltd. Sec. Litig.*,
   116 F. Supp. 2d 446 (S.D.N.Y. 2000) ........................................................................ 7, 13, 16

*In re Omnicom Grp., Inc. Sec. Litig.*,
   541 F. Supp. 2d 546 (S.D.N.Y. 2008),
   *aff'd*, 597 F.3d 501 (2d Cir. 2010) ................................................................................ *passim*

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) ................................................................................................ 13

*Lattanzio v. Deloitte & Touche LLP*,
   476 F.3d 147 (2d Cir. 2007) ........................................................................................... 20 n.6

*Lentell v. Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005) ................................................................................................ 19

*Levine v. NL Indus., Inc.*,
   717 F. Supp. 252 (S.D.N.Y. 1989) ...................................................................................... 13

*Mfrs. Hanover Trust v. Drysdale Secs.*,
   801 F.2d 13 (2d Cir. 1986) .................................................................................................. 23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ............................................................................................................ 16

*Melder v. Morris*,
   27 F.3d 1097 (5th Cir. 1994) ................................................................................................ 8

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015) ...................................................................................................... 8, 9

*Phillips v. LCI Int'l, Inc.*,
   190 F.3d 609 (4th Cir. 1999) ................................................................................................ 9

*Santa Fe Indus. v. Green*,
   430 U.S. 462 (1977) ...................................................................................................... 14, 24

*S. Cherry St., LLC v. Hennessee Grp., LLC*,
   573 F.3d 98 (2d Cir. 2009) .............................................................................................. 14, 17

*Shields v. Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir. 1994) ........................................................................................... 15, 16

*Stratte-McClure v. Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015) .................................................................................................. 12

*Tellabs, Inc. v. Makor Issues & Rights*,
   551 U.S. 308 (2007) ............................................................................................................ 14

*Waggoner v. Barclays PLC*,
    --- F.3d ----, 2017 WL 5077355 (2d Cir. Nov. 6, 2017) ...................................................... 18

**<u>Statutes and Codes</u>**

15 U.S.C. § 78t(a) ............................................................................................................. 25

15 U.S.C. § 78u-4(b)(4) .................................................................................................... 19

15 U.S.C. § 78u-5(c)(1) .................................................................................................... 10

17 C.F.R. § 240.14a-101 ............................................................................................ 13, 19

Section 10(b) of the Exchange Act ................................................................................. 1, 25

Section 20(a) of the Exchange Act .................................................................................... 25

## PRELIMINARY STATEMENT

Plaintiffs' claim of securities fraud rests on one sentence on the second page of a press release announcing the acquisition of defendant GFI Group by the CME Group.  The sentence was the second of four attributed to defendant Michael Gooch, GFI's Executive Chairman.  It said, "Optimizing GFI's value for stockholders has been a goal of management since becoming a public company in 2005 and this transaction represents a singular and unique opportunity to return value."  To establish their claim under Section 10(b) of the Securities Exchange Act, plaintiffs have the burden of proving that the statement was false, made with scienter, relied upon by plaintiffs, and the proximate cause of the losses they claim.  After 18 months of discovery — with more than 55,000 documents produced, depositions of Mr. Gooch and defendant Colin Heffron as well as two senior executives of BGC Partners and others, expert reports, and expert depositions — plaintiffs have raised no triable issue on any of these elements.  Their case should be dismissed.

Plaintiffs try to show falsity by twisting the sentence around and lifting it from its context.  Under their interpretation, Mr. Gooch's description of the CME deal as "represent[ing] a singular and unique opportunity to return value" becomes an assurance that the transaction "optimize[d] GFI's value for stockholders."  Even on that reading, however, the sentence was not false because there is no evidence that any more "optimal" deal was available at the time.  So plaintiffs stretch the sentence even farther.  They claim that because it omitted details of the events leading to the CME deal, it implied that GFI's directors ran a competitive bidding process before signing the CME deal.  But the record confirms that market participants did not read the sentence that way.  *See* Point I, *infra*.

As for scienter, plaintiffs assert that defendants included the allegedly false sentence in the press release and omitted details about the background of the CME deal with a motive to

"push through their preferred transaction at a discounted price."  But defendants would not have had any reason to believe this purpose would be served by a false comment in a press release. The CME deal required a shareholder vote; the vote would be preceded by a proxy statement that would describe the background of the merger, including the extent of any competitive bidding; and there was no reason to believe that the challenged sentence would prevent BGC or other bidders from foiling the "preferred transaction" with a topping bid.  There is thus no triable issue on scienter, as discussed below in Point II.

Nor is there any material factual dispute about reliance.  Plaintiffs have invoked presumptions under *Basic v. Levinson* and *Affiliated Ute*, but neither presumption is available because the sentence at issue was neither material nor misleading.  *See* Point III, *infra*.

Plaintiffs have not raised a triable issue on loss causation, either.  They measure their losses by the increase in the GFI stock price that occurred when BGC announced a topping bid at the end of the class period, yet plaintiffs concede GFI could not have disclosed these events in the July 30 press release.  Thus, BGC's topping bid did not "correct" the press release and the resulting increase in GFI's stock price was not a "loss" caused by the alleged fraud.  Under governing law, therefore, they cannot prove loss causation.  *See* Point IV, *infra*.

For each of these independent reasons, defendants respectfully submit that their motion for summary judgment should be granted.

## FACTS

### A.    GFI and CME announce their deal.

On July 30, 2014, GFI and CME issued a joint press release announcing a merger transaction.  The headlines and first paragraph of the press release explained the key features of the two-step deal:

- First, CME would buy all the outstanding shares of GFI for $4.55 per share in CME stock, which was a 46% premium over GFI's closing price the day before. SUF ¶¶ 2-3; Ex. A at 1.[1]

- Second, a consortium of GFI management, including Mr. Gooch and Mr. Heffron, would buy GFI's brokerage business for $165 million and assume roughly $63 million in liabilities, leaving CME with GFI's technology assets called Trayport and FENICS. *Id.*

Plaintiffs claim no fault with anything on the first page of the press release, nor with anything on pages three through seven. Their case is about a single sentence on the second page of the release, which they lift from the middle of an otherwise unchallenged four-sentence comment by Mr. Gooch: "Optimizing GFI's value for stockholders has been a goal of management since becoming a public company in 2005 and this transaction represents a singular and unique opportunity to return value." *Id.* at 2.

Plaintiffs have alleged, argued, and asked their experts to assume that GFI stated that "this transaction" *optimized shareholder value*. *E.g.*, Ex. B ¶ 81; Ex. C at 1, 15, 16, 19; Ex. D at 18; Ex. E ¶¶ 10, 20; Ex. F ¶¶ 12(iv), 90(b); Ex. G at 98:11-23, 178:21-180:12. The press release does not say that. It says on the first page that the CME deal was expected to create "[s]ubstantial" and "significant" stockholder value, and plaintiffs do not claim either statement was false. Ex. A at 1. But it does not say that the transaction created "optimum" shareholder value — not in the single sentence at issue, nor anywhere else.

The press release made clear that more information about the transaction would be forthcoming before the required shareholder vote on the deal. It stated that CME would file a registration statement with the SEC, likely in the third quarter of 2014 (at least a month later); GFI and CME would file a joint proxy statement/prospectus on the proposed transactions; and

---

[1]   As used herein, "SUF ¶ __" refers to the Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment, and "Ex. __" refers to exhibits to the Declaration of John F. Lynch, both filed contemporaneously herewith.

GFI would provide the final joint proxy statement/prospectus to its stockholders. *Id.* at 4, 6. The press release urged investors to read the proxy, along with "other relevant documents filed with the SEC when they become available," "because they will contain important information about GFI Group, CME Group and the proposed transactions." *Id.* at 6.

**B.     Market participants react to the July 30 press release.**

Research analysts and reporters started commenting on the CME transaction immediately after it was announced. SUF ¶ 35. They noted the 46% premium and management's role as a buyer in the transaction. SUF ¶ 36. None quoted the sentence that plaintiffs allege is false, except for those that reproduced the press release in full. *E.g.*, SUF ¶ 39.

Contrary to plaintiffs' assertions, market participants did not read into the press release any representations about the deal process or competitive bids. In fact, one research analyst published a report on July 30, just after the press release was issued, noting that "we don't yet know if a competitive bidding process was run." SUF ¶ 37. And then, during an August 1 earnings call, when the same analyst asked GFI's CEO, Mr. Heffron, to "walk me through the process for the sale" and provide "thoughts on if there were others involved and whatnot," Mr. Heffron asked the analyst to refer to the proxy statement that would be filed "in the coming months, in relation to the transaction with all the details." SUF ¶¶ 41-43.

**C.     GFI files the merger agreement with the SEC.**

GFI publicly filed the merger agreement on July 31, one day after the press release. SUF ¶ 44; Ex. H. The agreement showed that competing proposals were not foreclosed and that CME's offer could be topped. Section 6.5 of the agreement contained a "fiduciary out" provision, permitting the GFI board to engage in discussions with another bidder if the board determined that its competing proposal could reasonably be expected to lead to a "Superior Proposal." SUF ¶¶ 47-49. The agreement further provided that the board could withdraw its

-4-

recommendation of the CME deal in favor of a Superior Proposal from a third party.  SUF ¶ 50.

The market was thus confronted almost immediately with the possibility that CME's offer price

could be topped.  Not that it needed to be reminded:  Mr. Gross himself has acknowledged that

topping bids are always possible.  Ex. C at 19.  Plaintiffs' investment banking expert agrees that

directors can protect shareholders by negotiating a deal with a single bidder and executing an

agreement that contains a fiduciary out.  SUF ¶ 51.

> **D.      BGC responds to the CME deal.**

BGC Partners was a competitor of GFI in the interdealer brokerage (or "IDB") industry

and had an interest in buying GFI before the CME deal was announced.  SUF ¶ 54.  BGC

executives had occasionally reached out to their GFI counterparts about a possible acquisition.

SUF ¶ 55.  BGC President Shaun Lynn sent a letter to Mr. Gooch and Mr. Heffron on July 29,

2014 — the day before the CME deal was announced — proposing discussions toward a possible

acquisition.  Mr. Lynn expressed "confiden[ce] we can offer a price per share substantially in

excess of GFI's current trading price," which was then $3.11 per share, but he did not specify a

price nor suggest BGC was willing to pay more than the $4.55 per share that CME was offering.

SUF ¶¶ 60-63.

When BGC Chairman and Chief Executive Officer Howard Lutnick learned the terms of

the CME deal, he was surprised by the price.  Ex. I at 78:23-79:3, 166:2-22.  He testified that he

"thought it was a good price, more than I was willing to pay for the whole company."  SUF ¶ 68.

As of July 30, according to Mr. Lutnick, BGC would have paid $4.00 to $4.25 per share for GFI

— a premium over the then-current trading price, as the July 29 letter indicated — but BGC

"would not have gotten to 4.55."  SUF ¶ 67-68.  Mr. Lutnick was particularly surprised by the

"excellent price" GFI had gotten for Trayport and FENICS, as BGC would not have valued those

assets so highly.  SUF ¶ 68.

Later, however, BGC realized it could incorporate CME's price for Trayport and FENICS into its own bid for GFI, allowing it to pay more than it would have before.  "[O]nce they announced the transaction with the CME and the CME defined the value of the Trayport and Fenics assets," Mr. Lutnick testified, "it freed me to bid higher than 4.55 for the IDB business."  SUF ¶ 69.

BGC considered a competing bid over the weeks following the July 30 press release.  As later disclosed in SEC filings, BGC bought millions of GFI shares during August and early September 2014, including 3.6 million shares on September 8 alone.  SUF ¶ 71; Ex. J.  By market close on September 8, BGC had accumulated 17.1 million GFI shares, or 13.5% of GFI's outstanding stock.  Ex. J at 13-14.

BGC sent a letter to GFI that day, stating an intention to launch a cash tender offer at $5.25 per GFI share, and advising that it had a 13.5% stake in the company.  SUF ¶¶ 73-78.  GFI shares closed at $5.03 on September 8, up from the previous day's close of $4.55.  SUF ¶¶ 70, 72.

Just after 8:00 p.m. that evening, the *Wall Street Journal* reported that BGC would make an all-cash tender offer for GFI at $5.25 per share.  SUF ¶ 79.  The next day, September 9, BGC publicly announced its willingness to top the CME bid, to pay $5.25 per share for GFI, and to proceed by tender offer.  BGC's press release also disclosed its 13.5% stake in GFI.  SUF ¶¶ 80-83.  Plaintiffs' expert agrees these facts were not known or knowable by GFI during the class period.  SUF ¶¶ 88-91.  The GFI stock price closed at $5.69 that day, reflecting an expectation of further upward bidding.  SUF ¶ 92.

> **E.   The proxy statement discloses the background of the CME deal.**

On October 16, 2014, GFI's proxy statement on the CME deal was filed with the SEC.  SUF ¶ 93.  The proxy included a section titled "Background of the GFI Merger," which provided

a 14-page discussion of the process and events that culminated in the CME merger agreement.

SUF ¶ 94.  Plaintiffs do not claim there was anything misleading about this filing or any later

amendment thereto.

> **F.     GFI shareholders vote down the CME deal.**

After BGC launched its tender offer and a bidding contest ensued, the CME deal was put

to a vote of the GFI shareholders on January 30, 2015.  SUF ¶ 103.  The deal failed to win

approval, a result the July 30 press release had cautioned might occur.  SUF ¶ 104; Ex. A at 6-7.

On January 30, CME and GFI terminated their merger agreement.  SUF ¶ 105.

## ARGUMENT

To establish their claim, plaintiffs must prove, among other things:  (1) a material

misrepresentation or omission; (2) scienter; (3) reliance; and (4) loss causation.  *Dura Pharm.,*

*Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  Plaintiffs' failure to prove any one of these

elements "renders all other facts immaterial" and entitles defendants to judgment as a matter of

law.  *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 455 (S.D.N.Y. 2000) (quoting

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also In re Omnicom Grp., Inc. Sec.*

*Litig.*, 597 F.3d 501, 509 (2d Cir. 2010).  There is no triable issue of fact on any of them.

**I.     THERE IS NO GENUINE DISPUTE OF MATERIAL FACT AS TO FALSITY.**

Plaintiffs accuse defendants of lying in the single sentence at issue, and they claim

defendants fraudulently omitted from the press release various facts about the process that

culminated in the CME deal.  As shown below, there is no triable issue of fact on either theory.

> **A.     Plaintiffs cannot establish falsity on a fair reading of the sentence.**

The sentence at issue here reads, "Optimizing GFI's value for stockholders has been a

goal of management since becoming a public company in 2005 and this transaction represents a

singular and unique opportunity to return value."  Ex. A at 2.  Read plainly, the sentence was

true.  Plaintiffs have no evidence that optimizing shareholder value was not a goal of GFI management over the nine years to which the sentence refers.  And their expert concedes that the CME deal *was* a "singular" and "unique" opportunity to return value, at least in one sense of each adjective.  SUF ¶¶ 22-23.

Rather than addressing what the sentence says, plaintiffs twist it around so that "this transaction" is no longer just a singular and unique opportunity to *return* value, but instead to *optimize* value.  *E.g.*, Ex. B ¶ 81; Ex. G at 49:15-50:24, 143:22-24.  The sentence does not say that, and plaintiffs' contortion of the sentence violates the obligation to read statements "fairly and in context."  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1332 (2015).  Plaintiffs cannot use deceptive allegations and "textual distortions" to reconstruct the language actually used.  *Gissin v. Endres*, 739 F. Supp. 2d 488, 505-06 & nn.102, 106 (S.D.N.Y. 2010); *see also Melder v. Morris*, 27 F.3d 1097, 1100 (5th Cir. 1994) (faulting plaintiff for "selectively distort[ing]" allegedly fraudulent statements).

Plaintiffs distort the sentence not just by rearranging words, but also by detaching it from its context.  The sentence is in the middle of a four-sentence comment on the second page of the press release.  All it says about "this transaction" is that it "represents a singular and unique opportunity to return value."  Ex. A at 2.  What the press release says about the transaction elsewhere, and more prominently, is that it would "Creat[e] Substantial Stockholder Value" for GFI shareholders, and was "expected to create significant stockholder value" for shareholders of both GFI and CME.  *Id.* at 1.  Plaintiffs do not claim those statements were false.

Beyond that, the first page of the press release also identified Mr. Gooch and other members of the GFI management team as buyers of GFI's brokerage business in the two-step transaction.  Plaintiffs' experts concede that readers could reasonably infer from this that the

management group would be motivated to reach a deal price for the GFI brokerage business that left room for later appreciation, if they could.  Ex. A at 1; Ex. G at 117:24-119:13, 121:20-122:15; Ex. K at 41:11-44:4.  That potential conflict explains why the GFI board convened a Special Committee to consider the CME transaction, as was also disclosed on the first page of the press release.  Ex. A at 1.  Plaintiffs' experts conceded this is the purpose of having a special committee, and that readers would understand as much.  SUF ¶ 32.

Reading the "optimizing" sentence "fairly and in context," as *Omnicare* requires, 135 S. Ct. at 1332, the "singular and unique opportunity to return value" refers to what Mr. Gooch described in the preceding sentence of his comment and the two sentences that followed:  the exchange of GFI shares at a "substantial premium" for the concededly "liquid" shares of a "dynamic and highly regarded company" — CME — which could "further realize[]" the "immediate strategic value" of the Trayport and FENICS businesses.  Ex. A at 2; SUF ¶¶ 29-31.  Plaintiffs' interpretation of the sentence as some sort of unspoken representation that the CME deal followed an exhaustive competitive-bidding process such that no topping bid should be expected rests on "mischaracterizations of the public record, exaggeration of a single statement, and isolation of that statement from its context and from the wealth of other information publicly available when it was made."  *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 615 (4th Cir. 1999).  That interpretation cannot support a finding of falsity.

In any event, if plaintiffs wish to read the second sentence of Mr. Gooch's comment in the press release as a "represent[ation] to GFI shareholders that the CME Deal would . . . optimize shareholder value" and an assurance that a topping bid was unlikely to emerge (Ex. B ¶ 81, Ex. C at 19), then their interpretation brings the sentence squarely within the safe harbor for forward-looking statements created by the Private Securities Litigation Reform Act.  The

PSLRA states that a defendant "shall not be liable" under the Exchange Act "with respect to any forward-looking statement" if the statement is "identified as a forward-looking statement" and "is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1). Both elements are satisfied. The press release cautioned that it contained forward-looking statements, including "statements about the benefits of the transaction"; and it warned shareholders that "[a]ctual results, performance or achievements could differ materially from those contemplated, expressed or implied by the forward-looking statements contained herein," including because of "the occurrence of any event, change or other circumstances that could give rise to the termination of the definitive agreements" or "the inability to complete the transactions contemplated by the definitive agreements due to the failure to obtain the required stockholder approval by GFI Group." Ex. A at 6-7. Plaintiffs' claim is thus barred by the PSLRA safe harbor. *See, e.g.*, *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1122 (10th Cir. 1997) (statements concerning "compelling opportunities" available as a result of merger were forward-looking statements under the bespeaks caution doctrine).

### B.      Even on their reading of the sentence, plaintiffs cannot establish it was false.

Even if the single sentence in dispute could be understood as a representation that "this transaction optimizes shareholder value," plaintiffs would still be unable to prove that it was false when the press release was issued. "[W]ithout contemporaneous falsity, there can be no fraud." *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 290 (S.D.N.Y. 2014).

At the time of the press release, there was no contemporaneous deal available to GFI that exceeded the $4.55 per share that CME agreed to pay. BGC topped the CME price five weeks after the press release was issued; but BGC was not willing to pay as much as $4.55 per share for

GFI until *after* the CME deal was announced and BGC saw what CME was paying for Trayport and FENICS.  SUF ¶¶ 67-69.[2]

Even plaintiffs' expert concedes he is "not aware of any evidence suggesting that somebody was ready and willing and able to bid more than $4.55 prior to July 30."  SUF ¶ 24. And while he cites the fact that the GFI management group and CME *later* offered more than $4.55 per share (after BGC made its topping bid) as evidence that the management group valued the brokerage business "much more highly than what the CME deal reflected," he is "not aware of any contemporaneous evidence suggesting that the management consortium wanted to or was willing to bid more than what they did as of July 30th."  SUF ¶ 28.

> **C.**     **Defendants had no duty to disclose the allegedly omitted facts.**

Unable to establish that the sentence at issue was false — even as they interpret it — plaintiffs read into it various tacit assurances about the process that led to the CME deal.  They have argued that the sentence "implied that GFI's directors had engaged in a full and fair sales process in conformity with their duty to maximize shareholder value."  Ex. C at 15.  And their banking expert has opined that the market would read the sentence as an assurance that the GFI board followed what he calls "generally accepted investment banking methodology [] in a merger and acquisition . . . selling process," including the conduct of a "thorough pre-signing 'market check.'"  Ex. F at 1 & ¶ 12(iii).  Plaintiffs thus try to buttress their false-statement allegation with a claim that the press release wrongly omitted details about the background to the CME deal, including BGC's July 29 letter and the fact that GFI did not conduct a full competitive bidding process before signing with CME.  Ex. B ¶ 52.

---

[2]  Notably, the "transaction" to which Mr. Gooch referred in the allegedly false sentence of the July 30 press release was GFI's merger agreement with CME.  Ex. A at 2.  As described above, the merger agreement contained a fiduciary out that allowed GFI to respond to subsequent topping bids under specific circumstances.  SUF ¶¶ 47-49.

Omissions, however, are not actionable in the absence of a duty to disclose. *Basic, Inc. v. Levinson*, 485 U.S. 224, 248 n.27 (1988). And while disclosure is required when necessary to make an affirmative statement not misleading, *e.g.*, *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015), GFI had no duty to divulge details of its deal process in the July 30 press release, because the press release did not mislead the market with regard to that process.

In fact, the press release did not discuss process at all — except for the involvement of a Special Committee, which called attention to the potential conflict that plaintiffs say corrupted the process — but instead "urged [shareholders] to read the registration statement and the joint proxy statement/prospectus . . . when they become available . . . , because they will contain important information about . . . the proposed transactions." Ex. A at 6. And the evidence confirms that investors did not read into the press release any representations about the deal process or competitive bidding. One research analyst issued a report the day of the press release stating, "[W]e don't yet know if a competitive bidding process was run." SUF ¶ 37. Then two days later, when the analyst asked GFI CEO Mr. Heffron during an earnings call to "walk me through the process and your thoughts on if there were others involved and whatnot," Mr. Heffron responded that the "company will be filing a proxy statement in the coming months, in relation to the transaction with all the details" and asked the analyst to "refer to that document." SUF ¶¶ 41-43.

Plaintiffs' banking expert agrees that institutional investors and analysts — the people he believes generally drive stock prices — generally follow earnings calls closely; yet in forming his opinion about what the market would infer from Mr. Gooch's comment in the press release, he did not consider the transcript of the GFI earnings call. Ex. K at 143:17-144:14, 147:10-23. Plaintiffs' other expert admits that the sentence at issue "doesn't provide any information

-12-

specifically" "about how proactive the GFI board was in pursuing a competitive bidding process."  SUF ¶ 21.

As for the July 29 letter from BGC that plaintiffs claim was wrongly omitted from the press release, there was likewise no disclosure duty, because the letter did not specify a price for GFI, but merely proposed discussions toward a possible transaction at an unspecified premium, when GFI already had in hand a 46% premium deal with CME.  *Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001); Ex. A at 1; SUF ¶¶ 60-62.  Even plaintiffs' expert Mr. Purcell agrees the letter "did not need to be disclosed."  SUF ¶ 64.

The background details of the CME merger that plaintiffs allege were wrongly omitted from the July 30 press release were described in the proxy statement that GFI distributed to its shareholders and that the press release urged them to read.  SUF ¶ 94.  This disclosure complied with SEC rules, and plaintiffs' banking expert agrees that the proxy statement is the primary source to which shareholders refer for details of deal negotiations.  17 C.F.R. § 240.14a-101; SUF ¶ 98.  Plaintiffs cannot establish any duty to disclose those details any earlier.  *See In re N. Telecom*, 116 F. Supp. 2d at 459 (noting that "the SEC has promulgated specific rules establishing mandatory disclosure obligations," and granting summary judgment where there was "no dispute that defendants complied with these requirements"); *Levine v. NL Indus.*, 717 F. Supp. 252, 254-55 (S.D.N.Y. 1989) (granting summary judgment where SEC rules did not require disclosure of contested information).

In any event, expert discovery has confirmed that plaintiffs' omission claims are merely fiduciary-duty claims wrapped in 10b-5 clothing.  *See, e.g.*, Ex. F ¶ 12(i) ("The M&A selling process undertaken by GFI and directed by Defendant Gooch was not designed to maximize value for GFI's public shareholders and did not do so."); ¶ 89 (excerpting GFI shareholders'

complaint filed in Delaware Chancery Court); ¶ 78 n.84 (quoting comments from Vice Chancellor Laster during hearing in Delaware Chancery Court); Ex. E ¶ 8 ("An event was identified as a corrective disclosure . . . if . . . it revealed the relevant economic truth about Defendants' attempts to prevent a competitive bidding process.").  This is impermissible under Supreme Court and Second Circuit authority.  *Santa Fe Indus. v. Green*, 430 U.S. 462, 475-80 (1977); *Field v. Trump*, 850 F.2d 938, 948 (2d Cir. 1988); *see also Estate of Detwiler v. Offenbecher*, 728 F. Supp. 103, 142-43 (S.D.N.Y. 1989).

## II.    THERE IS NO GENUINE DISPUTE OF MATERIAL FACT AS TO SCIENTER.

Scienter is an essential element of plaintiffs' claim.  *Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. 308, 318-19 (2007).  Plaintiffs could try to prove scienter with evidence of either a motive and opportunity to commit fraud, or else strong circumstantial evidence of conscious misbehavior or recklessness.  *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996).  Plaintiffs have alleged both, Ex. B ¶¶ 93-98, but can establish neither.

### A.    Plaintiffs cannot establish motive or opportunity.

To establish motive and opportunity, plaintiffs must show there were "concrete benefits that *could be realized*" by the fraud they allege, and that defendants had a "*likely prospect* of achieving" those benefits by means of the alleged deception.  *S. Cherry St., LLC v. Hennessee Grp., LLC*, 573 F.3d 98, 108 (2d Cir. 2009) (emphasis added).  They cannot do so here.

Plaintiffs posit that defendants' motive was to "push through their preferred transaction with CME" at a "discounted price."  Ex. B ¶ 97.  But defendants did not have any "likely prospect of achieving" that goal by including the allegedly false sentence in the press release or omitting details of the preceding negotiation process from that announcement.  The CME deal could not close without an approving vote of a majority of disinterested shareholders, no such

vote could occur before GFI sent its shareholders a proxy statement that they were urged to read, and SEC rules mandated that the proxy statement describe the background of the CME deal. If the disinterested shareholders thought CME and the GFI management group were paying too little, or that the background of the CME merger did not involve enough competitive bidding, then they could vote down the deal. A press release could not "push it through." And if BGC or anyone else thought the CME deal was below market, they could make a topping bid. As real-world events demonstrated, neither the comment about "optimizing shareholder value" nor the omission from the press release of BGC's previous overtures or other background details had any "likely prospect" of preventing that. Accordingly, motive and opportunity do not establish scienter here. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) ("It is hard to see what benefits accrue from a short respite from an inevitable day of reckoning": claim that defendants falsely touted the quality of loan portfolios does not allege "a sufficient opportunity to derive a benefit from the alleged misstatements and nondisclosures" because "the ordinary course of bank business would lead to the review of the loan portfolios" and an increase in loss reserves).

The case of *In re GeoPharma, Inc. Securities Litigation*, 399 F. Supp. 2d 432 (S.D.N.Y. 2005), underscores the failure of plaintiffs' motive-and-opportunity claim. There, the plaintiffs alleged that when defendants announced that the FDA had approved their "prescription product," they deceived the market into believing the product was a drug when it was actually a less lucrative medical device. *Id.* at 437-38. But because information about what the FDA approved was available from the FDA itself, the court found the motive-and-opportunity allegations "insufficient for a fundamental reason — the alleged scheme could not possibly have succeeded." *Id.* at 449.

The same is true here.  If defendants had a motive to "push through" the CME deal at a "discounted price," they could not stop shareholders from receiving information about better prices from potential topping bidders like BGC, just as the *GeoPharma* defendants could not stop shareholders from learning about the "prescription product" approval from the FDA.[3]  And if the CME deal were below market, deceiving shareholders into believing otherwise would merely create a "short respite from an inevitable day of reckoning."  *Shields*, 25 F.3d at 1130.

> **B.    Plaintiffs cannot establish scienter through evidence of conscious misbehavior or recklessness.**

Because defendants could not have expected that the alleged misrepresentation in the July 30 press release had any likely prospect of achieving the scheme that plaintiffs allege, the scienter element of their claim should fail regardless of any evidence of recklessness.  In *Northern Telecom*, the court rejected the plaintiffs' assertion of conscious misbehavior or recklessness at the summary judgment stage on the ground that there was "no evidence of any 'concrete benefits that could [have been realized] by one or more of the false statements and wrongful nondisclosures alleged'" — *i.e.*, the same ground that negates motive and opportunity, as discussed above.  116 F. Supp. 2d at 462 (quoting *Shields*, 25 F.3d at 1130); *see also In re GeoPharma*, 399 F. Supp. 2d at 451-52;[4] *cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 593 (1986).

---

[3]  Plaintiffs concede that topping bids are always possible, and their experts have admitted that deal announcements can have the effect of drawing attention from possible competing bidders, reducing uncertainty about a company's value, and potentially attracting competing bids.  Ex. C at 19; SUF ¶¶ 65-66.

[4]  After rejecting the motive-and-opportunity claim in *GeoPharma*, the court considered the defendants' argument that "because the alleged scheme could not have succeeded, this alone precludes a finding of the required strong inference of scienter, even when plaintiffs attempt to prove scienter by alleging conscious misbehavior or recklessness."  399 F. Supp. 2d at 451-52.  The court found that the "novel argument had merit."  *Id.* at 451.

But plaintiffs have created no triable issue of recklessness in any event.  "Recklessness requires allegations that a defendant's conduct was 'highly unreasonable' and constituted 'an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 573 (S.D.N.Y. 2014) (quoting *S. Cherry St.*, 573 F.3d at 109).  Plaintiffs cannot satisfy this standard based on a single sentence in a press release that they need to split apart, rearrange, and splice back together out of order before they can try to claim it is false; nor based on a failure to disclose background details that the market understood would be disclosed weeks later in a proxy statement that the press release urged shareholders to read.  SUF ¶¶ 95-96; *see* Points I.A and I.C, *supra*.  And even if one accepts plaintiffs' interpretation of the allegedly false sentence as an assurance that the CME deal "optimized" GFI's value, any claim of "extreme departure from standards of ordinary care" in issuing the sentence is futile when the background details include the involvement of a Special Committee of independent directors who plaintiffs' banking expert agrees did nothing wrong; active negotiation by the Special Committee with CME and the management group; a fairness opinion from an investment bank that plaintiffs' expert says is "excellent"; engagement with other potential bidders who did not indicate they were willing to pay anything close to $4.55 per share; and the execution of a merger agreement with a fiduciary out that would permit GFI to respond to a superior proposal in case one emerged later.  *See* Points I.A and I.B, *supra*; SUF ¶¶ 26, 27, 33, 51; Ex. L at 63-72.

Plaintiffs accordingly have created no genuine dispute about scienter, and defendants' motion for summary judgment should be granted for this reason as well.

**III.    THERE IS NO GENUINE DISPUTE OF MATERIAL
          FACT AS TO RELIANCE.**

Plaintiffs have the burden of proving reliance on the misrepresentations they allege.

*Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014).  They have invoked

the fraud-on-the-market presumption as a means to carry that burden.  Ex. B ¶¶ 104-05.  But the

presumption cannot apply if plaintiffs do not establish that the allegedly false sentence in the

press release was material.  *Basic*, 485 U.S. at 248 n.27.  Plaintiffs have not come forward with

any evidence on that score.  Their expert Mr. Coffman has not opined that the sentence itself was

material, and there is no other evidence creating any genuine dispute that it was.[5]  The *Basic*

presumption therefore does not apply.

Plaintiffs have previously invoked not only the *Basic* presumption, but also the

presumption of reliance that can apply with respect to omissions under *Affiliated Ute Citizens of*

*Utah v. United States*, 406 U.S. 128, 153-54 (1972), *cited in* Mem. in Supp. of Class Cert. (Dkt.

No. 81) at 16, 23-24.  But the Second Circuit just this month confirmed that *Affiliated Ute* does

not apply in cases like this one where the claims of fraud are "not primarily omission claims,"

but instead "focus[] on misleading statements that were not corrected."  *Waggoner v. Barclays*

*PLC*, --- F.3d ----, 2017 WL 5077355, at *11 (2d Cir. Nov. 6, 2017) (citations and quotations

omitted); *see also* Ex. B ¶¶ 51, 92 and Ex. C at 16 (expressing plaintiffs' theory that the omitted

deal-process details demonstrate the falsity of the sentence they challenge).

But even if *Affiliated Ute* could apply to the fraud that plaintiffs allege here, plaintiffs

have not satisfied the prerequisites for invoking it.  Their evidence of materiality, as articulated

by their expert Mr. Coffman, is limited to analyst reports, excerpts of deposition testimony, and

academic literature that he believes demonstrate the importance of the deal-process details that

---

[5]  *See also* Ex. G at 217:19-218:16 ("I have not formed a view as to what the — if you simply
remove that sentence from the press release what the stock price impact would have been.").

plaintiffs claim were wrongly omitted from the press release — evidence, as Mr. Coffman puts it, that shows "why a reasonable investor would find it important to receive accurate information regarding a competitive bidding process (or lack thereof) and know of BGC's interests in acquiring GFI Group before the announcement of the CME deal." Ex. E ¶ 25; *see also id.* at ¶¶ 32, 42. Under *Affiliated Ute*, however, whether or not an investor might find omitted information important has no bearing on reliance unless a plaintiff can establish a duty to disclose what was omitted. 406 U.S. at 153-54.

As discussed above in Point I.C, plaintiffs have not shown any such duty. Their banking expert Mr. Purcell concedes the BGC's July 29 letter "did not need to be disclosed." Ex. K at 266:8-14. Market evidence confirms the press release did not mislead the market about the background of the CME deal. SUF ¶¶ 41-43. And again, disclosure of the process leading to the agreement with CME, including the extent of any competitive bidding, was not required by SEC disclosure rules until the merger proxy was filed several weeks after the press release. *See* 17 C.F.R. § 240.14a-101; *see also* SUF ¶¶ 95-96.

In sum, plaintiffs have not shown materiality of the allegedly false sentence nor any duty to disclose the background details of the merger, so there is no triable issue of reliance.

## IV.   THERE IS NO GENUINE DISPUTE OF MATERIAL FACT AS TO LOSS CAUSATION.

Plaintiffs must prove, in addition to falsity, scienter, and reliance, that the misstatements and omissions they allege were the proximate cause of the losses they claim. *Dura*, 544 U.S. at 346; *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174 (2d Cir. 2005); 15 U.S.C. § 78u-4(b)(4). This means they must distinguish losses caused by "new industry-specific or firm-specific facts, conditions, or other events" from disclosures of the truth behind alleged

misstatements.  *Dura*, 544 U.S. at 342-43; *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 551 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010).[6]

Plaintiffs cannot carry this burden.  According to their expert, their loss is based on the market-adjusted increase in the GFI stock price on September 8 and 9 — days when BGC bought 3.6 million shares of GFI and announced it (a) was making a bid of $5.25 per share, (b) had accumulated a 13.5% position in GFI (the kind of stake that, according to unchallenged empirical research, causes bidders to bid more aggressively and increases the likelihood that a transaction will be consummated), and (c) was willing to take its bid directly to GFI shareholders.  Ex. E ¶¶ 8-12; SUF ¶¶ 71, 80-84.  Plaintiffs' expert agrees these facts contributed to the GFI stock price increase on those days, and that GFI could not have disclosed any of these facts during the class period.  SUF ¶¶ 84-91.  In the language of *Dura*, these were "new . . . firm-specific facts."  544 U.S. at 343.  Plaintiffs cannot untangle the price effect of these new facts from whatever impact any "correction" of the July 30 press release may have had.

This Court's decision in *Omnicom* illustrates the inadequacy of plaintiffs' claim of loss causation.  *In re Omnicom*, 541 F. Supp. 2d at 548.  In 2001, Omnicom transferred interests in various internet ventures to a new entity called Seneca.  *Id.*  Shareholders filed a securities-fraud claim a year later, following stock drops that occurred after news reports criticized Omnicom's accounting for the Seneca transaction and revealed that Omnicom's CEO had proposed to unwind part of the deal, prompting a board member to resign over concerns about the purpose and approval of the deal.  *Id.* at 549.

---

[6]  *See also, e.g.*, *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007) (plaintiffs failed to show that certain "misstatements, among others . . . that were much more consequential and numerous, were the proximate cause of plaintiff's loss"); *Gordon Partners v. Blumenthal*, 2007 WL 1438753, at *2 (S.D.N.Y. May 16, 2007) (granting summary judgment where there was no evidence demonstrating that any loss "was caused by defendants' conduct as opposed to other market factors").

This Court granted defendants' motion for summary judgment on grounds of loss causation. *Id.* at 554-55. It ruled that the stock drops that followed the news reports on Seneca were caused by the critical commentary itself rather than a correction of earlier disclosures; the decision to unwind part of the deal did not reveal that the deal was a sham; and the resigning director's concern that Seneca may have had an improper purpose was likewise not corrective of earlier disclosures. *Id.* at 552-53. And even if the director resignation or the Seneca unwind could be deemed corrective disclosures, the Court held that the plaintiffs could not "demonstrate that the market reacted negatively to the disclosures, rather than to other information simultaneously released to the market" because their expert had not isolated the effect of the corrections from other factors that affected the stock. *Id.* at 553-54 (citations omitted).

The same reasoning applies here. Plaintiffs' alleged corrective disclosure was BGC's September 9 announcement that it had a 13.5% stake in the company and would launch a tender offer for GFI at $5.25 per share; and their expert measures their losses based on the GFI stock price increase over September 8 and 9, when BGC was also in the market buying 3.6 million GFI shares. Ex. B ¶¶ 53-54, 56; Ex. C at 23; Ex. E ¶¶ 59-60; Ex. J. But plaintiffs' expert concedes those facts could not have been disclosed during the class period, SUF ¶¶ 88-89, 91, so they cannot be considered corrective. And even if BGC's disclosure on September 9 of its earlier overtures to GFI could be viewed as correcting a July 30 press release that did not describe GFI's process in reaching the CME deal, nothing in this record would allow jurors to distinguish any such correction about the earlier process from the "tangle of [other] factors" that affected GFI's stock price when BGC announced its bid. *Omnicom*, 541 F. Supp. 2d at 553 (quoting *Dura*, 544 U.S. at 343).

Plaintiffs have suggested that BGC's topping bid was not confounding information and need not be untangled from any correction of the alleged fraud because BGC's bid reflected the materialization of a risk that the alleged fraud concealed.  Ex. C at 24.  But the materialization-of-risk approach to loss causation does not excuse plaintiffs from their burden to prove that the alleged fraud was the proximate cause of their claimed loss.  The Second Circuit's affirmance of this Court's decision in *Omnicom* confirms this.  597 F.3d at 513-14.  The plaintiffs in *Omnicom* argued that the director's resignation and the resulting negative press coverage were "foreseeable risks" of the allegedly fraudulent Seneca transaction, *id.* at 513, just as plaintiffs here have argued that BGC's topping bid was within the "zone of risk" allegedly concealed by the one sentence in the July 30 press release.  Ex. C at 24.  But the Second Circuit, while recognizing that the director's resignation was related to the Seneca transaction, held that the "generalized investor reaction of concern" to the resignation was "far too tenuously connected . . . to the Seneca transaction to support liability."  597 F.3d at 514.

Here, the alleged connection between the alleged fraud in July and the September spike in GFI's stock price is even more tenuous.  For starters, the July 30 press release did not "conceal" the risk of a topping bid:  plaintiffs have conceded that topping bids are always possible; their experts agree that deal announcements can attract topping bids and that market participants understand they can happen; and if the market had any doubt about that, it should have been dispelled the next day, when GFI disclosed the CME merger agreement with fiduciary out language contemplating a "Superior Proposal."  Ex. C at 19; SUF ¶¶ 44-50, 52, 65-66.

More importantly, BGC's topping bid depended on the intervening and independent decision by BGC to make it.  Unlike the resignation of the Omnicom director, which at least had something to do with the allegedly fraudulent Seneca deal, 597 F.3d at 514, there is no evidence

that the allegedly false sentence in the July 30 press release had any causal connection to BGC's topping bid.  *See Mfrs. Hanover Trust v. Drysdale Secs.*, 801 F.2d 13, 21 (2d Cir. 1986) (loss causation "requires that the damage complained of be one of the *foreseeable consequences of the misrepresentation*") (emphasis added, quotations omitted).

Similar reasoning resulted in denial of class certification in a securities-fraud case against British Petroleum following the Deepwater Horizon explosion.  The plaintiffs there sought to certify a "pre-explosion" or "process safety" subclass of BP shareholders who claimed they were misled by statements that exaggerated BP's efforts to improve the safety of its operations and downplayed the risk of a blowout.  *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *2 (S.D. Tex. May 20, 2014).  Mr. Coffman, opining for the *BP* plaintiffs at the class certification stage, sought to measure the losses caused by the pre-explosion misstatements about safety based on the stock drop that occurred after the oil rig exploded and BP failed to contain the spill.  *Id.* at *3.  Mr. Coffman called these the "corrective events."  *Id.*  And while the *BP* plaintiffs conceded that the losses that followed the explosion exceeded whatever price distortion was caused by the pre-explosion safety misstatements, they argued they could recover for the post-explosion stock drops as consequential damages because the drops were proximately caused by BP's failure to implement the safety improvements it had disclosed.  *Id.* at *4, *11.

The *BP* court rejected this argument on the ground that the post-explosion losses were not attributable to the alleged misstatements.  *Id.* at *10-11.  It reasoned that a "distinction must be drawn between the alleged misrepresentation and the subject matter allegedly misrepresented" — in other words, between BP's misrepresentations about safety reforms on the one hand and its "underlying failure to institute process safety reforms" on the other.  *Id.* at *11.  The court cited

*Santa Fe Industries* for the proposition that the "Exchange Act provides compensation for losses caused by the former," while "losses caused by the latter are beyond the scope of the Act." *Id.*

There was no misstatement in this case, as demonstrated above, nor any misconduct by GFI in entering a deal at a 46% premium with a fiduciary out. But if the upward spike in the GFI stock price that followed BGC's topping bid could ever be called a loss, the *BP* decision shows it was not a loss that was proximately caused by an allegedly false sentence five weeks before. Plaintiffs, accordingly, have created no triable issue of material fact on loss causation.

\*   \*   \*

Mr. Coffman testified that the GFI stock price increase that followed BGC's topping bid is the "most reliable proxy" for the price that would have prevailed, even without the bid, if GFI's press release had not contained the alleged misrepresentation. Ex. G at 224:2-227:10. He opines that a corrected press release "would have prompted more questions by analysts to BGC itself and over some reasonably short period of time . . . , the market price would have reflected . . . the value of the underlying assets . . . as the market learned more about what potential deals there might have been out there." *Id.* at 225:2-22. Putting aside the unreliability of Mr. Coffman's speculation about questions that might have been asked and answers that might have been provided, his view of the "value of the underlying assets" is still based on the market price that GFI fetched after BGC announced its topping bid and toehold. *Id.* at 180:3-12. And even though that announcement did not happen for five weeks after the July 30 press release, Mr. Coffman speculates that a corrected press release would have caused the market to divine the later price effect of that announcement sooner. But he cannot say how much sooner. "A reasonably short period of time," he says. "Days, a week. Somewhere in that range." *Id.* at 225:23-227:10. This is a problem for lead plaintiff Mr. Gross, who sold his GFI shares on July

31, just one day after the CME deal was announced.  SUF ¶ 40.  Besides the other defects in his claim discussed herein, Mr. Gross cannot prove he suffered any loss at all.

## V.      PLAINTIFFS' CONTROL-PERSON CLAIM FAILS.

Because there are no triable issues on plaintiffs' allegations of a primary violation of Section 10(b) of the Exchange Act, summary judgment should also be granted on plaintiffs' claim under Section 20(a).  *Omnicom*, 541 F. Supp. 2d at 554; 15 U.S.C. § 78t(a).

**CONCLUSION**

For the foregoing reasons, defendants respectfully request that this Court grant their motion for summary judgment.

Dated:  November 21, 2017

WACHTELL, LIPTON, ROSEN & KATZ

John F. Lynch
Kim B. Goldberg
Joshua J. Card
51 West 52nd Street
New York, New York  10019
(212) 403-1000

*Attorneys for defendant GFI Group Inc.*

*Of counsel*

Michael S. Popok
Nirav S. Shah
CANTOR FITZGERALD
110 East 59th Street
New York, New York  10022

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

Christopher D. Kercher
Rollo C. Baker
51 Madison Avenue
New York, New York  10010
(212) 849-7000

*Attorneys for defendants Colin Heffron and
Michael Gooch*