# EXHIBIT D

Fc4WgroC

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    BENJAMIN GROSS, individually,
     and on behalf of all others
4    similarly situated,

5                   Plaintiff,

6         v.                              14 Civ. 9438 (WHP)

7

     GFI GROUP, INC., et al.,
8

9                   Defendants.

10   ------------------------------x
                                          New York, N.Y.
11                                        December 4, 2015
                                          12:00 p.m.
12
     Before:
13
                    HON. WILLIAM H. PAULEY III,
14
                                          District Judge
15
                           APPEARANCES
16
     JACK I. ZWICK
17        Attorney for Plaintiff
          -and-
18   SCOTT AND SCOTT LLP
     BY:  JOSEPH P. GUGLIELMO
19        STEPHEN J. TETI

20   WACHTELL, LIPTON, ROSEN & KATZ
          Attorneys for Defendant GFI
21   BY:  PAUL K. ROWE
          ADAM S. HOBSON
22        -and-
     WILLKIE FARR & GALLAGHER LLP
23        Attorneys for Defendants
          Heffron and Gooch
24   BY:  TODD G. COSENZA

25
```

Case 1:14-cv-09438-WHP Document 118-4 Filed 10/31/17 Page 3 of 23
Case 1:14-cv-09438-WHP Document 44 Filed 01/06/16 Page 2 of 22      2
Fc4WgroC

1            (Case called)

2            MR. ZWICK:  Good afternoon, your Honor.  Jack Zwick.

3    With me are Steve Teti and Joseph Guglielmo, from the Scott and

4    Scott firm.

5            MR. ROWE:  Your Honor, Paul Rowe of the Wachtell

6    Lipton firm, for defendant GFI Group Inc., and with me is my

7    colleague Adam Hobson.  Also at counsel table is Todd Cosenza

8    of the Willkie Farr firm, representing the individual

9    defendants.

10           THE COURT:  Good afternoon.  This is oral argument.

11   Do you want to be heard, Mr. Rowe?

12           MR. ROWE:  Yes, I do, your Honor.  Thank you.

13           Your Honor, as our papers indicated, we have four

14   grounds on which we seek dismissal.  Just to recount them

15   quickly.  One is a failure of the plaintiffs to plead loss

16   causation.  One is failure to properly identify and explain why

17   the three statements they identify as supposedly being

18   misleading are actually misleading.  The third is a reliance

19   point, which sometimes is called for shorthand purposes

20   puffery, but I think it's more accurate to describe it as part

21   of the long line of Second Circuit cases that simply say that

22   some statements by corporate defendants are too general and too

23   vague and do not refer to specific external facts and so can't

24   support an inference of reliance.  The fourth ground I would

25   generally call the Santa Fe ground.  In the Second Circuit, the

Case 1:14-cv-09438-WHP Document 118-4 Filed 01/04/17 Page 4 of 23
Case 1:14-cv-09438-WHP Document 44 Filed 01/06/16 Page 3 of 22        3
Fc4WgroC

1   case that most closely resembles the application of the Supreme

2   Court's 1977 decision in <u>Santa Fe</u> to a case like this is the

3   <u>Field v. Trump</u> case.  And I'd like to address each of them, but

4   of course, if your Honor wants me to focus on one or two, I'm

5   happy to do that.

6          On July 30 of last year, GFI announced that it had

7   entered into a merger agreement in which all GFI shares would

8   be exchanged for shares of the company that owns the Chicago

9   Mercantile Exchange, a large public company, known as the CME

10  Group.  This transaction was done or was going to be done, the

11  contract to do it was signed at a price, if you will, in terms

12  of an exchange ratio for the Chicago Merc shares that

13  represented a 46 percent premium to the trading price of GFI

14  shares.

15         Five weeks later, a third party, BGC Partners Inc.,

16  announced that it would make a hostile competing bid at a 15

17  percent premium in cash to Chicago's price.  The plaintiffs

18  have pleaded a seller class during the period from the first

19  announcement to the second announcement, and they identify

20  three statements that they claim give rise to a claim under the

21  antifraud statutes rules and regulations.  I'm quoting from

22  their brief:  Plaintiff alleges that defendants issued two --

23  well, they say it's two, but you can divide that into two or

24  three -- two materially false and/or misleading statements, one

25  by Mr. Gooch, who was the chairman of GFI, and that statement

Case 1:14-cv-09438-WHP Document 118-4 Filed 10/24/17 Page 5 of 23
Case 1:14-cv-09438-WHP Document 44 Filed 01/06/16 Page 4 of 22      4
Fc4WgroC

1    was that GFI's board had had a goal since GFI went public to

2    optimize GFI's value for stockholders and "that this

3    transaction represents a singular and unique opportunity to

4    return value."

5         The other statement is a statement by Colin Heffron,

6    the other individual defendant, who was president of GFI, that

7    this transaction unlocks the substantial value of our Trayport

8    and FENICS Technologies businesses.  And that's it.  There are

9    118 paragraphs, 48 pages, and two or three, if you will,

10   statements.  So compared to some 10b-5 pleadings, I think we

11   have a fairly clear idea of what it is we're dealing with.

12        The claim comes down to the idea that the statements

13   about the CME merger agreement, at a time when it had been

14   signed but not yet accomplished, the merger hadn't been

15   consummated, that that was a singular and unique opportunity to

16   return value to shareholders and Mr. Heffron's statement that

17   it would unlock the value of two particular business units and

18   that management had had a goal over the years since they went

19   public of optimizing GFI's value.  To make perhaps an obvious

20   point, this is not a case about accounting or financial fraud

21   or a business that was run or had a business model that was

22   inherently deceptive or fraudulent.  It's not a case in which

23   shareholders were hurt because management told them things were

24   better than they were and at some point later it turned out

25   they weren't that good.

Case 1:14-cv-09438-WHP Document 118-4 Filed 10/24/17 Page 6 of 23
Case 1:14-cv-09438-WHP Document 44 Filed 01/06/16 Page 6 of 22      5
Fc4WgroC

1          THE COURT:  How is this case different from Virginia

2    Bankshares?

3          MR. ROWE:  Virginia Bankshares is a case where

4    specific representations were made.  They were in the form,

5    yes, of an opinion, in particular, a fairness opinion, by the

6    investment bankers, and as Judge Kaplan recently had the

7    opportunity to observe in the City of Westland case in this

8    court in September, an investment banker's fairness opinion is

9    a term of art and is something that carries with it all the

10   indicia that people should rely on it.  It is something that

11   the company hires an investment banker to deliver.  The

12   investment banker is expected to follow, as Judge Kaplan said,

13   a series of generally accepted investment banking valuation

14   principles, the same way an accountant when delivering an

15   opinion on a set of statements is expected to follow GAAP.

16         THE COURT:  But isn't an executive's opinion that a

17   transaction is unique in returning value to shareholders the

18   same as an executive's opinion that a transaction is fair or

19   high?

20         MR. ROWE:  I don't think so, your Honor, for the

21   following reasons:  No. 1, not every expression of opinion is

22   something that shareholders can reasonably rely on.  The Second

23   Circuit's cases that throw out claims because the opinions

24   expressed are too vague –– for example, the case where the

25   chairman of the board on a conference call said that the merger

Case 1:14-cv-09438-WHP Document 118-4 Filed 10/04/17 Page 7 of 23
Case 1:14-cv-09438-WHP Document 44 Filed 01/06/16 Page 6 of 22      6
Fc4WgroC

1   that they were entering into was a grand slam home run and it

2   turned out to be something that two or three months later

3   looked like the opposite of a grand slam home run -- in other

4   words, it was in some sense objectively false or it turned out

5   to be, the Second Circuit -- I'm sorry, this Court agreed that

6   that statement was just not the kind of statement that

7   shareholders rely on, very different, I think, from a statement

8   that this investment bank has opined that it's fair or for that

9   matter a statement that is in some sense quantitative, like

10  it's high.  And all these Second Circuit cases we cite, the ECA

11  case, the San Leandro case, Lasker case, postdate Virginia

12  Bankshares, sometimes by 10 and by 15 years.  If Virginia

13  Bankshares meant that any expression of opinion, however broad,

14  however vague, however not touching a verifiable, quantifiable

15  issue, was actionable, it's difficult to see how those three

16  Second Circuit opinions could have come out the way they came

17  out and all the district court opinions following them, so

18  there has to be a line between the view that Virginia

19  Bankshares says that any expression of opinion by a corporate

20  executive, even if it's saying something like "I just think

21  this transaction is the greatest, it's a grand slam home run,

22  it's singular, it's unique, it's an opportunity," the point is

23  those things don't really tell shareholders anything other than

24  that management is enthusiastic about the transaction.

25          But there's another answer.  The other answer is the

Case 1:14-cv-09438-WHP Document 118-4 Filed 11/01/17 Page 8 of 23
Case 1:14-cv-09438-WHP Document 44 Filed 01/06/16 Page 7 of 22        7
Fc4WgroC

1    plaintiffs have not identified what's fraudulent about a

2    statement that this is a singular and unique opportunity.  It

3    certainly was an opportunity.  It certainly was singular in the

4    sense that only one company had gotten to the stage of signing

5    a merger agreement.  It was unique in the sense that the merger

6    consideration were shares of a specific company, shares of the

7    Chicago Mercantile Exchange.  No other company could offer GFI

8    Group shares of the Chicago Mercantile Exchange.  It was

9    unique.  They have to go further.

10        THE COURT:  What about reading it in context with the

11   other portion of the statement, optimizing GFI's value for

12   shareholders, for stockholders?

13        MR. ROWE:  Optimizing GFI's value for stockholders

14   goes to whether or not a process was followed that is a typical

15   or tailored process to accomplish a transaction that was doable

16   and that was available and that increased shareholder value,

17   with the understanding, as plaintiffs concede on pages 18 and

18   19 of their brief, because we raised this in a sense in our

19   opening brief, if the plaintiffs had an argument that the

20   statements here were a kind of guarantee or a representation

21   that this was the highest price shareholders could expect to

22   receive, then I could understand the claim.  But they admit two

23   things.  One, they admit, or they concede in their brief, pages

24   18 to 19, that they are not arguing this case on the theory

25   that these statements amount to a representation this was the

Case 1:14-cv-09438-WHP Document 118-4 Filed 10/04/17 Page 9 of 23
Case 1:14-cv-09438-WHP Document 44 Filed 01/06/16 Page 8 of 22    8
Fc4WgroC

1    best price, that it was the highest possible price, and they

2    also admit or concede that the entire world knows, they say

3    that it is obvious to everyone, that a higher bid might

4    materialize.  So the very thing they're complaining about here,

5    and this goes to loss causation, which I think is a very

6    interesting point we make, because you could think that they

7    have pleaded a case about the falsity or misrepresentation

8    nature of the statements and yet if they don't have a loss

9    causation theory that passes muster, the complaint still fails,

10   because loss causation is an independent element.

11          And the reason why they haven't met the loss causation

12   leg of the set of elements they must plead, and that's a

13   Supreme Court concept that comes from Dura Pharmaceuticals v.

14   Broudo and in the Second Circuit as well, the idea is that

15   there has to have been something concealed, and when the thing

16   that was concealed wasn't revealed, damage occurred, damage

17   usually being the stock price goes down or in the case here

18   with the seller class the stock price goes up.  So there has to

19   be a link between what it is they're saying was false and the

20   damage to shareholders.  That link doesn't exist here, and it's

21   our position, your Honor, that they basically conceded, and

22   it's conceded in two ways:  No. 1, it's conceded because they

23   say on page 19 that it was always obvious to all investors that

24   a higher bid might be made.

25          Well, the thing that they say is the corrective

Case 1:14-cv-09438-WHP Document 118-4 Filed 11/21/17 Page 10 of 23
Case 1:14-cv-09438-WHP Document 44 Filed 01/06/16 Page 9 of 22     9
Fc4WgroC

disclosure here is not a corrective disclosure by any of the
executives that they in fact were relying on when they said it
was a unique opportunity.  The thing they say was a corrective
disclosure was a disclosure by BGC, a third party, and there's
no allegation, and there can't be, that the GFI people who made
the statement knew that BGC was going to do something that was
going to cost BGC a lot of time and evidence and money, which
was to top a bid, and the topping bid is what caused the damage
here.

It's the fact that on September 9, BGC announced that
it would offer 15 percent more than Chicago Mercantile which
had already offered a 46 percent premium.  The fact that BGC
was going to make that offer is what caused the damage, what
caused the alleged loss.  But the plaintiffs concede on page 19
that the market always knew that essentially investors are
presumed to know that there can be a topping bid.  Why is this?
Because a merger is not like a sale of a building or something
where the company signs a contract and it's obligated to sell.
When you sign a merger agreement, there's a period of time,
usually three to six months, when you have to go out and get
stockholder approval on the basis of a detailed proxy
statement, and in the course of the effort to get stockholder
approval at the vote, it is not at all uncommon, and it is
always possible, that someone will make a topping bid, and
that's just what happened here.  And the vote on the Chicago

Case 1:14-cv-09438-WHP Document 118-4 Filed 11/03/17 Page 11 of 23
Case 1:14-cv-09438-WHP Document 44 Filed 01/06/16 Page 10 of 22    10
Fc4WgroC

Mercantile transaction, it happened and the shareholders turned

it down because a higher bid had been made, but the plaintiffs

have conceded that that is something that investors always knew

about.

So there are two things going on with loss causation.

On the one hand, we know that a topping bid can always be made,

and that's what caused the loss here.  On the other hand, the

fact that a topping bid would in fact be made here was never

concealed, not for one minute, because it was not a fact in

existence.  There had been no BGC decision to top that bid when

this July 30 announcement was made, and certainly GFI was not

in a position to know about it if one had.  It was only when

this third party came into the market.  The phrase Dura uses is

"when truth comes into the market," and the truth that came

into the market was a new piece of truth.  And the case law is

very clear.

THE COURT:  Don't the plaintiffs plead that that truth

would have come into the market back in July?

MR. ROWE:  No, I don't think they do, your Honor.

What they're referring to when they say that there was BGC

interest was that BGC indicated without naming a price, without

remotely saying they would take the step of doing a hostile

offer, BGC indicated that it wanted to have conversations.  It

wanted to have a dialogue.  No price was mentioned, no

commitment was made.  That is not at all the same thing as

1    saying, We're going to commence a tender offer in cash at

2    $5.25.  And it's that that moved the market and caused the

3    loss, so we believe that there's no allegation of anything that

4    was concealed that then later came into the market.  What came

5    into the market and moved the market and caused the loss was a

6    decision made later on by BGC after seeing the Chicago

7    Mercantile price that they were willing to beat the Chicago

8    Mercantile price.  And the case law is very clear that you

9    cannot presume loss causation based on extrinsic market

10   factors.  The loss causation has to stem from the revelation of

11   a previously known, disclosed fact and there has to be a direct

12   link between the fact that was concealed, the fact that was

13   disclosed, and that has to be what causes the loss.

14           THE COURT:  Isn't loss causation oftentimes a fact

15   issue?

16           MR. ROWE:  I suppose it can be a fact issue.

17           THE COURT:  Isn't it raised most of the time on

18   summary judgment and rarely on motions to dismiss?

19           MR. ROWE:  Similarly, your Honor, the plaintiffs make

20   the comment that a number of our arguments, for example,

21   relating to materiality, are mixed questions of law and fact,

22   and there may be indeed some cases where loss causation is a

23   mixed question of law and fact.  Here, the reason I don't think

24   it is is because most cases are cases where the corrective

25   disclosure is made by the defendant.  In other words, you're

Case 1:14-cv-09438-WHP Document 118-4 Filed 10/31/17 Page 13 of 23
Case 1:14-cv-09438-WHP Document 44 Filed 01/06/16 Page 12 of 22      12
Fc4WgroC

1    looking at a statement by a company and then later on that

2    company makes a disclosure that something happened.  And here,

3    we're dealing with something very different.

4            My colleagues have pointed out that Judge Kaplan's

5    recent case, the <u>City of Westland</u> case, which addressed loss

6    causation, was a motion to dismiss.  I'm not saying every loss

7    causation claim is appropriate.

8            THE COURT:  You rely in your brief on <u>Gordon Partners</u>

9    <u>v. Blumenthal</u>, right, for your loss causation argument?

10           MR. ROWE:  It's one of the cases, your Honor.

11           THE COURT:  It's the only case in your moving brief,

12   and you made a reference to <u>Dura</u> in your reply brief, but you

13   also relied on <u>Gordon Partners</u> in your reply brief.  Tell me if

14   I've missed something.

15           MR. ROWE:  No, your Honor.

16           THE COURT:  First of all, <u>Gordon Partners v.</u>

17   <u>Blumenthal</u> is a summary judgment case, right?

18           MR. ROWE:  Yes.

19           THE COURT:  Not a motion to dismiss.

20           MR. ROWE:  Yes.

21           THE COURT:  And I just would wonder why you would

22   offer a summary order from the Federal Appendix as your

23   principal authority for this argument on loss causation without

24   making any reference to the Second Circuit's decisions in

25   <u>Carpenters Pension</u>, this year, and <u>Loreley Financing</u>, and

Fc4WgroC

1    <u>Omnicom</u>, all subsequent opinions of the Second Circuit, that

2    are directly contrary to the summary order that you rely upon

3    for your loss causation argument, which I think you misstate

4    the law.  So tell me why you put that before the Court, if you

5    can.

6              MR. ROWE:  Your Honor, I don't have any response to

7    your Honor's comments other than to say that we cited <u>Gordon</u> --

8              THE COURT:  Then I will express my shock that a firm

9    of your caliber, with all the resources that you have, would

10   center an argument around a summary order that is squarely not

11   the law in this circuit.  It's squarely not the law, and I

12   think you have a duty to the Court to provide the Court with

13   the authorities as you understand them, and <u>Gordon Partners</u> is

14   not the authority in this court.  The authority is directly to

15   the contrary.

16             MR. ROWE:  Your Honor, I apologize for that.

17             THE COURT:  Of course, "I'm sorry" are, as one

18   commentator once said, the saddest words in the English

19   lexicon.

20             MR. ROWE:  We based our point on the most general view

21   of <u>Dura</u>, and I apologize again if we relied on a case that --

22             THE COURT:  You relied on a summary order.

23             MR. ROWE:  -- we shouldn't have.

24             THE COURT:  There are written opinions by remarkable

25   Second Circuit judges, this year, that aren't mentioned.  Let

Fc4WgroC

 1  me just make the point to you.  No mention of Judge Berman's

 2  opinion in <u>Carpenters Pension</u> where he was sitting by

 3  designation with a very thoughtful panel; Judge Winters'

 4  opinion in <u>Omnicom</u>, affirming my earlier decision in <u>Omnicom</u>;

 5  or Judge Calabresi's lengthy study of loss causation in <u>Loreley</u>

 6  <u>Financing</u>.  Judge Calabresi's opinion and Judge Berman's

 7  opinion sitting by designation are both 2015, and I think

 8  <u>Omnicom</u> was back in 2010.  So to dig out a summary order from

 9  the Federal Appendix in 2008 is to lose credibility with the

10  Court.  Say nothing more on loss causation, because that's a

11  total loser, and I do find that it was remarkable when you

12  started your remarks that there were various points you were

13  making to challenge this complaint.  The first thing you

14  mentioned was loss causation.  Maybe I should have jumped on

15  you then.

16           What else do you have on puffery and --

17           MR. ROWE:  <u>Santa Fe</u>, your Honor.

18           THE COURT:  Right, and <u>Santa Fe</u>, because what you had

19  on loss causation, that's puffery.  OK?

20           MR. ROWE:  Your Honor, on <u>Santa Fe</u> and puffery, I

21  think I've addressed puffery to some extent --

22           THE COURT:  Your <u>Santa Fe</u> argument really depends upon

23  the Court finding that the statements are puffery.  Doesn't it?

24  I mean, if I find that they're not, if I were to find that the

25  statements are not puffery, doesn't your <u>Santa Fe</u> argument

Case 1:14-cv-09438-WHP Document 119-4 Filed 11/03/17 Page 16 of 23    15
Case 1:14-cv-09438-WHP Document 44 Filed 01/06/16 Page 15 of 22
Fc4WgroC

1    dissolve, because it's not a breach of fiduciary duty; there

2    are statements?  That's clearly a 10b-5 claim.

3         MR. ROWE:  Your Honor, Santa Fe is an interesting,

4    doctrine as reflected in part by the Field v. Trump case,

5    because I think there is a recognition that there is or there

6    can be an overlap, if you will, between the point that what the

7    plaintiffs are really trying to do is to circumvent and plead

8    in federal clothes a state law cause of action for fiduciary

9    duty, which is the fundamental thing that Santa Fe in 1977 was

10   trying to draw a line about.  And yes, sometimes the facts and

11   sometimes statements overlap, but what I would say is that if

12   you read this 48-page complaint, 115 paragraphs, and you

13   compare the amount of effort and the use of the allegations

14   that go to fiduciary duty issues, how the sale process was

15   conducted, what motives were, I mean, the point of Santa Fe and

16   the point of this circuit's antiself-flagellation doctrine is

17   that you can't take a single innocuous statement and say that

18   it can be the basis of a federal claim because the defendants

19   had improper motives, those improper motives usually being some

20   effort to self-deal or entrench themselves or in some other way

21   misbehave.

22        And yes, in each case, the court has to make a

23   determination whether that is or is not in fact what the

24   plaintiffs are trying to do.  But it seems to me an unusual

25   situation where such a large percentage of the pleading is

Case 1:14-cv-09438-WHP Document 112-4 Filed 11/03/17 Page 17 of 23
Case 1:14-cv-09438-WHP Document 44 Filed 01/08/16 Page 16 of 22          16
Fc4WgroC

1    devoted to things that are basically the background of the

2    merger transaction and that go to breaches of fiduciary duty

3    and where the plaintiffs say that the problem with the

4    statements made by the individual defendants is that there was

5    an implicit representation they had upheld their fiduciary

6    duty.  When plaintiffs choose to plead that way, and of course,

7    all the information comes from a companion proceeding in state

8    court under state law, it seems to us that you're dealing with

9    the core situation that <u>Santa Fe</u> was intended to address, which

10   is, Can plaintiffs plead around the intention of the Supreme

11   Court in <u>Santa Fe</u> by saying, All right, here's the statement,

12   but what you didn't say was it's the product of fiduciary

13   breach.  So that's why we think <u>Santa Fe</u> is relevant here, your

14   Honor.

15             THE COURT:  Anything further?

16             MR. ROWE:  No, your Honor.  Thank you.

17             THE COURT:  What's the status of the Delaware matter?

18             MR. ROWE:  The Delaware case was heavily litigated.

19             THE COURT:  I know.  The last time I looked, there's a

20   notice of a proposed -- there's a motion for a settlement,

21   right?

22             MR. ROWE:  That's correct, and the court heard that

23   motion last Tuesday, November 24, and suggested -- there are

24   various ways to characterize what he said, but among other

25   things he suggested a change in the class period, and the

Case 1:14-cv-09438-WHP Document 118-4 Filed 10/31/17 Page 18 of 23    17
Case 1:14-cv-09438-WHP Document 44 Filed 01/06/16 Page 18 of 22
Fc4WgroC

1    defendants and the plaintiffs are discussing how to accomplish

2    that and to go back before that court.

3            THE COURT:  All right.  Thank you.

4            MR. ROWE:  Thank you, your Honor.

5            THE COURT:  Mr. Zwick.

6            MR. ZWICK:  Your Honor, I don't have a lot to say,

7    especially about loss causation, other than to point out that

8    your Honor's SLM decision makes clear that it's a modest

9    pleading requirement, and I don't think there's any doubt that

10   we've met it.

11           THE COURT:  What facts in the complaint suggest that

12   Heffron's statement that the CME transaction unlocked value was

13   false?

14           MR. ZWICK:  That statement was false, your Honor,

15   because if I tell you that I'm going to sell an asset that you

16   own and I get you $5 when the asset is worth $10, I didn't give

17   you $5 in value, I didn't unlock any value, I deprived you of

18   value.

19           THE COURT:  No, but if in your example my asset is

20   worth $3 and you tell me that you're going to unlock value and

21   I'm going to get $5, isn't that literally true?

22           MR. ZWICK:  No.  It wasn't worth $3, it was trading at

23   $3.  What the value of an asset is is what it will bring in a

24   sale.  They undertook to do a merger, and, your Honor, I just

25   want to make clear we are not pleading a breach of fiduciary

Fc4WgroC

1    duty saying they didn't get enough.  We're saying they lied

2    about what they got and the process.

3             THE COURT:  I understand all of that.

4             MR. ZWICK:  Your Honor, the stock is trading at $3.

5    They say, Look, we have this great offer, it's 4.55, singular

6    and unique opportunity, basically you're not going to do better

7    than this, when they knew from their own bankers that the

8    company had a value of at least 5.41 a share.  The investment

9    bankers told them, If you sell this company properly, which is

10   to split up the IBD, which is the brokerage division, and

11   Trayport and FENICS, which is the software business, sell the

12   IBD to a competitor so that synergies are unlocked, you will

13   get more money for the whole company, way more than it's

14   trading at.  So, your Honor, the fact that it was trading at $3

15   and they got an offer for 4.55, internally you haven't heard a

16   word about that, internally they have documents and information

17   from their investment bankers that told them that the stock was

18   worth at least 5.41 a share when properly sold.

19             So back to my example, if I tell you that I'm going to

20   sell an asset of yours and I got a great deal, I got you $5 of

21   value, but I know that the value in the asset is $10, I haven't

22   gotten you $5 in value, I've deprived you of $5 in value.  And,

23   your Honor, this case is not about a breach of fiduciary duty.

24   It's not about a failure to plead bad motives.  It's about a

25   misrepresentation or omissions of material facts, facts that

Case 1:14-cv-09438-WHP Document 118-4 Filed 11/21/17 Page 20 of 23
Case 1:14-cv-09438-WHP Document 44 Filed 01/06/16 Page 19 of 22          19
Fc4WgroC

1    were absolutely known to these defendants when they went out

2    and made the statement.

3           Your Honor, on July 30, when they chose to speak, they

4    didn't have to speak.  They didn't have to editorialize.  They

5    decided to characterize the merger.

6           THE COURT:  Mr. Gooch's statement that it was a unique

7    opportunity sounds a lot like the statement in <u>Rombach v.</u>

8    <u>Chang</u>, the golf center acquisition case, in which Judge Jacobs

9    ultimately affirmed Sterling Johnson's decision finding that

10   that was puffery.

11          MR. ZWICK:  Your Honor, the general rule is that these

12   materiality arguments can't be decided at a motion to dismiss

13   because each case is different and there are no magic words.

14   There's no list of kosher words for conveying a certain point

15   and words that you can't use.  You've got to look at everything

16   in context.  In the context of this case, the statements that

17   were made need to be viewed against the information that

18   defendants had which completely contradicted what they said,

19   and there was only one reason they did it, because they were

20   financially self-interested.  I suspect that's why the scienter

21   argument was dropped.  I don't think they want you to look at

22   the information that they had but didn't disclose to

23   shareholders.  People who sold their stock after the

24   announcements were in the dark, in the dark about the Jeffries

25   opinion, in the dark about the calling off of the market check,

Case 1:14-cv-09438-WHP Document 118-4 Filed 11/03/17 Page 21 of 23
Case 1:14-cv-09438-WHP Document 44 Filed 01/06/16 Page 20 of 22          20
Fc4WgroC

1    in the dark about the fact that they insisted on only doing a

2    transaction that would benefit themselves.  Nobody knew any of

3    that until BGC came forward.  And in fact when BGC came

4    forward, they said, We could pay you more because of synergies,

5    which is the fact that underlies our loss causation argument.

6    So the context, the specific information they had, your Honor,

7    the Bank of America case they cite, if I can read one paragraph

8    to you:

9              "Defendants also contend that both its representations

10   concerning its due diligence amounted to nonactionable

11   statements of opinion and broad generalizations that cannot be

12   a basis for shareholder reliance."  And they rely on ECA, the

13   same case that defendants rely on here, but the court went on

14   to say, "But there is a difference between enthusiastic

15   statements amounting to general puffery and opinion-based

16   statements that are anchored in misrepresentations of existing

17   fact.  The *sine qua non* securities fraud claim based on false

18   opinion is that defendants deliberately misrepresented a truly

19   held opinion."

20             Here, they not only misrepresented truly held

21   opinions, they didn't disclose facts.  They knew from the

22   investment bankers that this company was worth more money and

23   that it would bring more money.  The investment bankers

24   identified competing IBDs as being able to pay more money,

25   including BGC.  They told them:  Go out and sell this company

Case 1:14-cv-09438-WHP Document 44 Filed 01/06/16 Page 21 of 22

Fc4WgroC

1    in parts.  Sell the IBD to a competitor and you'll get more

2    money.  Your Honor, if they had done that, if they had sold the

3    IBD to a competitor and achieved even a 5.41 price, people

4    would have had more money to go out and they could have bought

5    as much as CME stock as they want, so this argue about the

6    uniqueness of the CME stock, I don't even understand it.  If

7    the total price had been what the investment bankers told them

8    and had people known when they were selling their stock that

9    investment bankers said, You're going to get more money if you

10   sell it the way we do, they were misled.

11              THE COURT:  All right.  Anything else?

12              MR. ZWICK:  That's it.  Thank you, your Honor.

13              THE COURT:  Anything further, Mr. Rowe?

14              MR. ROWE:  If I may, just briefly, your Honor.  The

15   colloquy you just had was one which was something I addressed

16   briefly but would come back to, which is obviously there are

17   cases where a statement is made about whether or not a

18   company's policies are in compliance with law, about what a

19   company expects to do with respect to some contingent liability

20   claims, whether or not the company's difficulties in a certain

21   business area are about to come to an end.  I'm just a little

22   bit free-associating with some of the things I remember from

23   the case law, but the statements here, and at the outset, I

24   focused on exactly how short the statements are and what they

25   actually say, words like "singular" and "unique," it's not even

Fc4WgroC

1    so much that they're vague, it's also that the plaintiffs

2    haven't really said what's affirmatively false about them.

3    This was one transaction in the sense that it was singular.  I

4    heard the comment that you could go out and buy Chicago Merc

5    stock, but the fact is the consideration in the merger was in a

6    unique form.  And the fact that it unlocked value, that's not

7    the same as saying the highest value ever was achieved.  Value

8    was clearly unlocked.  That's all, your Honor.

9            THE COURT:  Thank you for your arguments.  Decision

10    reserved.  Have a good holiday.

11            (Adjourned)