# EXHIBIT G

US District Court - New York
Gross v. GFI Group

FINAL - CONFIDENTIAL
Chad Coffman - Sept. 27, 2017

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------
BENJAMIN GROSS, Individually and on
Behalf of All Others Similarly Situated,
                Plaintiffs,
v.
GFI GROUP, INC., COLIN HEFFRON,
and MICHAEL GOOCH,
                Defendants.

Case No.:  1:14-CV-09438-WHP
----------------------------------------

VIDEO DEPOSITION OF
Chad Coffman
September 27, 2017
New York, New York
Lead: John Lynch, Esquire
Firm: Wachtell Lipton Rosen & Katz

FINAL COPY - CONFIDENTIAL
JANE ROSE REPORTING   1-800-825-3341

US District Court - New York                FINAL - CONFIDENTIAL
Gross v. GFI Group                    Chad Coffman - Sept. 27, 2017

Page 49

1      Q.    Do you recognize this as the press
2  release that's at issue in this litigation?
3      A.    (Witness reviewing document).
4            Yes.  This is my understanding of
5  the press release that contains what
6  plaintiffs allege is the false and misleading
7  statement by Mr. Gooch -- or by the company.
8      Q.    Have you ever seen it before today?
9      A.    Yes.
10      Q.    Why don't we take a look at --
11  while you have that in front of you, let me
12  just ask you.  If we take a look at paragraph
13  20 of your opening report --
14      A.    Okay.
15      Q.    -- the first sentence of paragraph
16  20 says, "According to the complaint, this
17  deal was not a singular and unique
18  opportunity to return value and did not
19  maximize shareholder value as stated by
20  defendants."
21            Now, let me ask you, is it your
22  understanding that defendants stated that
23  this transaction maximized shareholder value,
24  or is that just an allusion to something
25  that's been alleged by the plaintiffs?

JANE ROSE REPORTING              National Court-Reporting Coverage
1-800-825-3341                   janerose@janerosereporting.com

US District Court - New York                 FINAL - CONFIDENTIAL
Gross v. GFI Group                    Chad Coffman - Sept. 27, 2017

Page 50

1      A.    No.  That's something that I read
2  from the statement as well.  So in my reading
3  of the statement, I understand the company
4  and Mr. Gooch to be saying that they have
5  optimized value for shareholders.
6      Q.    **That's not what this says, though,**
7  **right?**
8      A.    Well, no.  It says -- let me read
9  the quote.  It says, "We are very pleased to
10  announce this transaction with CME Group and
11  the substantial premium and liquidity it
12  delivers to our stockholders.  Optimizing
13  GFI's value" -- which to me implies
14  maximizing value for stock -- it says,
15  "optimizing GFI's value for stockholders" --
16  which I read as maximizing the attainable
17  value for stockholders -- "has been a goal of
18  management since becoming a public company in
19  2005, and this transaction represents a
20  singular and unique opportunity to return
21  value."
22          So I am reading this as saying we
23  have accomplished our goal of optimizing
24  GFI's value for stockholders.
25      Q.    **It doesn't say that, doesn't it?**

US District Court - New York          FINAL - CONFIDENTIAL
Gross v. GFI Group                    Chad Coffman - Sept. 27, 2017

Page 75

1    optimization of shareholder value because
2    there was clear evidence that there was
3    another bidder willing to offer more and the
4    management consortium itself was willing to
5    offer more than they did as part of the
6    original proposal, right?  That's your
7    testimony?
8         A.    Yes.  Yes.
9         Q.    Do you have any evidence at all
10   that there was another willing bidder willing
11   to offer more for GFI than $4.55 a share on
12   July 30th, 2014?
13        A.    You mean prior to the announcement
14   of the CME offer?
15        Q.    I mean on July 30th, 2014.  Yes,
16   prior to the announcement of the CME offer --
17   thank you -- on July 30th, 2014.
18             THE WITNESS:  Could I have that
19        read back, please.
20   BY MR. LYNCH:
21        Q.    I will ask it again.
22        A.    Okay.
23        Q.    I think your clarification was
24   helpful.  I am asking about the date of July
25   30th, but I am asking about the period of

US District Court - New York             FINAL - CONFIDENTIAL
Gross v. GFI Group               Chad Coffman - Sept. 27, 2017

Page 76

1   **July 30 before the press release was**
2   **announced.**
3        A.    (Nodding affirmatively).
4        **Q.    Do you have any evidence at all**
5   **that there was another willing bidder willing**
6   **to offer more for GFI than $4.55 a share at**
7   **that time?**
8        A.    I'm not aware of any direct
9   evidence that before the press release on
10  July 30th that there was someone willing,
11  independent of -- to offer more than $4.55.
12  I think that's fair.  I am not aware of any
13  evidence suggesting that somebody was ready
14  and willing and able to bid more than $4.55
15  prior to July 30th.
16       **Q.    Do you have any indirect evidence**
17  **of that?**
18       A.    Well, my understanding of what --
19  of the reason that BGC was ultimately
20  offering more was that they had gained an
21  understanding from the July 30th announcement
22  how much a third party was willing to pay for
23  the Trayport and Fenics portion of GFI's
24  business.  And then once that was known, that
25  they would have been willing to bid more as a

US District Court - New York                FINAL - CONFIDENTIAL
Gross v. GFI Group                   Chad Coffman - Sept. 27, 2017

Page 78

1   consortium wanted to bid more than what they
2   bid as of July 30th, but certainly they were
3   willing -- later actions showed that they
4   were willing to bid more than what was
5   offered in the original CME deal.
6        Q.     I think you foresaw where my next
7   question was going.
8             Do you have any evidence at all to
9   suggest that the management consortium was
10  willing to pay more as of the time of the
11  press release on July 30th for the
12  inter-dealer broker business than the amount
13  that it had agreed to pay in the deal with
14  CME?
15       A.     I am not aware of any
16  contemporaneous evidence as of July 30 of
17  that.  But I think the fact that they were
18  willing to bid substantially more and what I
19  understand is, roughly, double the amount for
20  the IDB assets once competition was
21  introduced into the process, that that
22  implies that they were willing to pay more if
23  forced as of -- there is no reason that -- in
24  other words, to answer your question
25  directly, I am not aware of any

JANE ROSE REPORTING              National Court-Reporting Coverage
1-800-825-3341                   janerose@janerosereporting.com

US District Court - New York          FINAL - CONFIDENTIAL
Gross v. GFI Group                    Chad Coffman - Sept. 27, 2017

Page 79

1    contemporaneous evidence suggesting that the
2    management consortium wanted to or was
3    willing to bid more than what they did as of
4    July 30th, but later actions suggested they
5    valued the assets much more highly than what
6    the CME deal reflected.
7        Q.    Any evidence that you are aware of
8    that suggests that the management consortium,
9    whether they wanted to or not, were willing
10   to pay -- sorry.  I will start again.
11           Do you have any evidence at all
12   that the management consortium as of the time
13   of the press release, whether they were
14   willing to or not, had the ability to pay
15   more for the inter-dealer broker business
16   than they had agreed to pay in the
17   transaction with CME?
18           MR. ROTTER:  Objection.
19       A.    Now, when you say ability, are you
20   -- I understand that their -- and I don't
21   have deep knowledge of this, but my general
22   understanding is that they were making offers
23   based on financing that had been arranged in
24   order to be able to make those offers, and so
25   I am not aware that financing to support a

US District Court - New York          FINAL - CONFIDENTIAL
Gross v. GFI Group                    Chad Coffman - Sept. 27, 2017

Page 98

1   literature itself.  What I have is a -- what
2   I have a problem with is saying that it's
3   applicable and to think of that as evidence
4   for what you would expect to see when a
5   proposed deal substantially undervalues the
6   assets at issue, as the plaintiffs are
7   alleging here.  So its applicability, not the
8   findings of the literature itself.  Its
9   applicability to the facts in this case.
10  BY MR. LYNCH:
11       Q.    And I guess the reason you reached
12  that conclusion is because you are accepting
13  the plaintiffs' allegations concerning the
14  truth or falsity of the July 30 press
15  release, right?
16            MR. ROTTER:  Objection.
17       A.    I am accepting plaintiffs'
18  allegation that this was a false and
19  misleading statement and that this deal did
20  not optimize the value for shareholders, and
21  defendants understood that this -- they had
22  concealed from the market facts that made
23  that statement false and misleading.
24  BY MR. LYNCH:
25       Q.    And just so we are clear, do you

JANE ROSE REPORTING          National Court-Reporting Coverage
1-800-825-3341               janerose@janerosereporting.com

US District Court - New York      FINAL - CONFIDENTIAL
Gross v. GFI Group      Chad Coffman - Sept. 27, 2017

Page 101

1  evaluated.
2  BY MR. LYNCH:
3      Q.    Would you agree that providing GFI
4  shareholders with CME stock at a premium
5  price to the then current trading value in
6  connection with the sale of Trayport and
7  Fenics to CME was a way to return value to
8  GFI shareholders?
9      A.    That was a way to return value to
10  shareholders, yes.
11      Q.    Would you agree that it was a
12  unique way to return value to shareholders?
13          MR. ROTTER:  Objection.
14      A.    I guess it depends on what you mean
15  by "unique."  Is it the only way you could,
16  in that sense is it unique?  No.  Is every
17  potential alternative transaction unique in
18  the sense they are different?  Yes.  So I
19  guess it depends how you are using the word
20  "unique" there.
21  BY MR. LYNCH:
22      Q.    In your understanding of the word
23  unique, was a deal in which GFI shareholders
24  received CME stock at a premium price to the
25  then current trading value in connection with

JANE ROSE REPORTING      National Court-Reporting Coverage
1-800-825-3341      janerose@janerosereporting.com

US District Court - New York          FINAL - CONFIDENTIAL
Gross v. GFI Group                    Chad Coffman - Sept. 27, 2017

```
                                            Page 102
 1    the sale of Trayport and Fenics, the unique
 2    way to return value in the way that you use
 3    the word "unique"?
 4             MR. ROTTER:  Objection.
 5       A.    I am very confused on where I use
 6    the word "unique" in the way you are
 7    suggesting.  Maybe I am just lost in your
 8    question.
 9    BY MR. LYNCH:
10       Q.    You understand English, right?
11       A.    Yes.
12       Q.    And I don't mean to be offensive.
13    You are a native English speaker?
14       A.    Yes.
15       Q.    You have used the word "unique" in
16    the past, right?
17       A.    I have, yes.
18       Q.    Would you agree that a transaction
19    in which GFI shareholders would receive CME
20    stock at a premium price to the then current
21    trading value in connection with a sale of
22    Trayport and Fenics to CME was a unique way
23    to return value?
24             MR. ROTTER:  Objection.
25       A.    Again, I think I have been -- you
```

US District Court - New York                    FINAL - CONFIDENTIAL
Gross v. GFI Group                              Chad Coffman - Sept. 27, 2017

Page 103

1   are not asking me to interpret the word
2   "unique" in a misstatement at this point.
3   You are asking me a general question of is
4   that a unique way to return value, and I am
5   saying in the sense of the word "unique," is
6   it the only way value could have been
7   returned?  No.  Is it unique in the sense
8   that every single deal -- alternative deal is
9   somewhat different from each other, in that
10  sense, it's a unique deal.
11          So it depends on the context of the
12  use of the word "unique."  So that's why it's
13  hard to give just a plain yes-or-no answer
14  and given that there was the use of the word
15  "unique" in the alleged misstatement, I don't
16  want it to be interpreted one way in one
17  context and another way in my separate answer
18  to this question.
19  BY MR. LYNCH:
20      Q.    And that's because you think it
21  means two different things according to which
22  sentence it's used in?
23      A.    Words can have different meaning
24  depending on the context they are used in,
25  yes.

US District Court - New York               FINAL - CONFIDENTIAL
Gross v. GFI Group                    Chad Coffman - Sept. 27, 2017

Page 104

1        Q.    You agree that every alternative
2   transaction is unique, right?
3             MR. ROTTER:   Objection.
4        A.    In some sense, every transaction is
5   unique, yes.  When you are talking about
6   alternative transactions of the types we are
7   talking about.  If you are talking about
8   trading commodities, you might be able to say
9   different transactions are essentially
10  identical.  But in the case of sales of
11  businesses to third parties, each alternative
12  transaction is, in some sense, unique, yes.
13  That's I think self evident.
14  BY MR. LYNCH:
15       Q.    Would you agree that providing GFI
16  shareholders with CME stock at a premium in
17  connection with the sale of Trayport and
18  Fenics was a singular way to return value to
19  GFI shareholders?
20            MR. ROTTER:   Objection.
21       A.    Again, I think I would answer the
22  same way.  If singular is meant -- is it the
23  only way one could, the answer is no.  If
24  singular is interpreted as meaning is this
25  deal not identical to an alternative deal,

JANE ROSE REPORTING              National Court-Reporting Coverage
1-800-825-3341                   janerose@janerosereporting.com

US District Court - New York              FINAL - CONFIDENTIAL
Gross v. GFI Group                Chad Coffman - Sept. 27, 2017

Page 105

1    then, yes.

2    BY MR. LYNCH:

3        Q.    Let's take a look back at the press

4    release, Exhibit 13, please.

5            Do you have that in front of you?

6        A.    I do, yes.

7        Q.    I am going to ask you about the

8    first page.

9        A.    The first page?

10       Q.    The first page under "For Immediate

11   Release," not the SEC stuff.  The headline

12   there says, "CME Group and GFI Group Announce

13   Plan for Strategic Transactions," right?

14           Do you see that?

15       A.    Yes.

16       Q.    It was an accurate statement, as

17   far as you know, right?

18       A.    Yes.  And there was something that

19   bothered me about your prior question that I

20   just want to go back to that I want to make

21   sure I am not implicitly agreeing to.  You

22   characterized the transaction as the sale of

23   Trayport and Fenics to CME, and that's

24   certainly part of the deal, but there is more

25   to it than that.  There is also the

JANE ROSE REPORTING              National Court-Reporting Coverage
1-800-825-3341                   janerose@janerosereporting.com

US District Court - New York            FINAL - CONFIDENTIAL
Gross v. GFI Group                      Chad Coffman - Sept. 27, 2017

Page 106

1  management consortium taking control of the
2  IDB business.
3          So I just want to make sure that I
4  am not characterizing the transaction as
5  solely limited to the sale of Trayport
6  defendants.
7      Q.    I appreciate that.  Thank you.
8            Would you agree that providing GFI
9  shareholders with CME stock at a premium was
10 a singular way to return value?
11          MR. ROTTER:  Objection.
12     A.    Again, I will give the same answer
13 I gave before.  If you are interpreting
14 singular to mean the only possible way to
15 return value, the answer is no.  If you are
16 interpreting singular to mean it's
17 distinguishable from other potential deals
18 and no other deal would be identical to that,
19 then yes.
20 BY MR. LYNCH:
21     Q.    You are aware it was a 46 percent
22 premium to the then current trading price,
23 right, for GFI, the CME deal when announced?
24     A.    I don't recall if I calculated it
25 myself, but I recall seeing reference to

JANE ROSE REPORTING          National Court-Reporting Coverage
1-800-825-3341               janerose@janerosereporting.com

US District Court - New York                    FINAL - CONFIDENTIAL
Gross v. GFI Group                    Chad Coffman - Sept. 27, 2017

Page 117

1          A.    I don't know exactly what was in
2     their mind, but the fact that they did the
3     deal, to an economist, that would suggest
4     they thought it was a profitable deal, yes.
5     BY MR. LYNCH:
6          Q.    And the "they" there is the CME
7     just for the record?
8          A.    The CME, yes.
9          Q.    And a reasonable investor would
10    infer that CME thought it was a good deal,
11    right?
12         A.    A reasonable investor would infer
13    that CME sought to profit from it, yes, and
14    believed it was a deal that they could profit
15    from.
16         Q.    Believed it was an advantageous
17    price from CME's perspective, right?
18         A.    Again, I just want to make sure
19    advantageous is not over interpreted.  They
20    were going to derive at least as much value,
21    if not more, from acquiring the asset at that
22    price, and so it was in their economic
23    advantage to do it, yes.
24         Q.    As an economist, you would agree
25    that readers of the press release would be

US District Court - New York        FINAL - CONFIDENTIAL
Gross v. GFI Group                  Chad Coffman - Sept. 27, 2017

Page 118

1    **able to infer as of July 30th that the**
2    **management consortium, Mr. Gooch and**
3    **Mr. Heffron and others, considered the price**
4    **that they were paying for the IDB business to**
5    **be favorable, right?**
6              MR. ROTTER:  Objection.
7         A.    That's a complicated question
8    because they are on both sides of the
9    transaction.  I think it's fair to say no
10   reader of this thought that they were taking
11   the business at a loss.  But given what I
12   understand are other obligations of
13   management of a company to stand in the
14   interests of shareholders, I think where the
15   deal ultimately fell in terms of distribution
16   of benefits between shareholders and the
17   management consortium is -- it's not
18   clear one could infer anything specifically
19   from this other than that they wouldn't pay
20   more than it was worth, but it's an open
21   question of whether they were paying up to
22   the amount it was worth or whether the -- how
23   the benefits of the deal were spread between
24   shareholders and the management consortium.
25   So, in other words, you could hypothesize a

JANE ROSE REPORTING          National Court-Reporting Coverage
1-800-825-3341               janerose@janerosereporting.com

US District Court - New York      FINAL - CONFIDENTIAL
Gross v. GFI Group      Chad Coffman - Sept. 27, 2017

Page 119

1  deal where the management consortium is
2  essentially paying the reservation price,
3  which is the highest they would go and what
4  the fair value of the asset was and giving
5  essentially all the benefit of the
6  transaction to the shareholders.  It could
7  also go the other way.  So I don't think you
8  could infer from this directly that they
9  viewed -- they certainly wouldn't have done
10  it at a loss, but there is enough conflicting
11  incentives here that it's not clear how much
12  private benefit a reader of this would assume
13  that the management consortium was getting.
14  **Q.    And that's because of obligations**
15  **that you think that they owed to shareholders**
16  **of GFI in their capacity as private buyers of**
17  **the management consortium -- sorry, private**
18  **buyers of the IDB?  Do I understand that**
19  **right?**
20  A.    No.  I think you are misstating
21  what I am saying, because I am not saying
22  that as buyers of the IDB business that they
23  have -- in that role alone, I don't think
24  they have any obligation to GFI shareholders.
25  In other words, if they were an unrelated

US District Court - New York            FINAL - CONFIDENTIAL
Gross v. GFI Group                  Chad Coffman - Sept. 27, 2017

Page 120

1  third party, the fact that they were buying
2  wouldn't create an obligation on their part
3  to do anything other than try to do the best
4  deal they can.
5      Q.    For themselves, right?
6      A.    For themselves, correct.  But I'm
7  saying a reader of this press release also
8  understands that in his role as CEO and other
9  management also has some level of duty to the
10 shareholders.  And I am not a lawyer who
11 understands exactly what all those things
12 are, but my understanding is they also have
13 conflicting duties to their shareholders as
14 management in GFI.  And so a reader of this
15 press release might question to what extent
16 they are benefiting privately versus
17 benefiting the shareholders.
18     Q.    A reader of the press release would
19 understand that the special committee is
20 created in most circumstances to address the
21 possibility of a conflict of interest between
22 insiders who stand on both sides of a
23 transaction, right?
24          MR. ROTTER:  Objection.
25     A.    Again, I am not a lawyer, but

JANE ROSE REPORTING            National Court-Reporting Coverage
1-800-825-3341                 janerose@janerosereporting.com

US District Court - New York          FINAL - CONFIDENTIAL
Gross v. GFI Group                    Chad Coffman - Sept. 27, 2017

Page 121
1  that's my general understanding of how this
2  is supposed to work, yes, is that there is
3  supposed to be an independent committee whose
4  sole focus is trying to represent the
5  interests of the shareholders.
6  BY MR. LYNCH:
7       Q.    And a reader of the press release
8  would see that there was a special committee
9  involved in the negotiation of the CME deal
10 for GFI, right?  If it will help, I am happy
11 to point -- there is a paragraph just below
12 the two bullet points that we have been
13 discussing.
14      A.    Yes.  There is another place, too.
15 That's why I am -- yes, it makes reference to
16 a special committee, which a reader of this
17 would then, I think, be entitled to infer
18 that there was a special committee process
19 here.
20      Q.    And so a reasonable reader of the
21 press release would understand that, as
22 buyers of the IDB business in the two-step
23 transaction with the CME Group, that the
24 members of the management consortium
25 considered the price that they were paying

US District Court - New York          FINAL - CONFIDENTIAL
Gross v. GFI Group                    Chad Coffman - Sept. 27, 2017

Page 122

1  **for the IDB business to be favorable, right?**
2          MR. ROTTER:  Objection.
3          THE WITNESS:  Could I have that
4      read back, please.
5          (Question read)
6      A.    I think the reader could infer that
7  they thought this was a good deal for them,
8  yes.  A favorable deal.
9  BY MR. LYNCH:
10     **Q.    And a reasonable reader could infer**
11 **that the management consortium expected to**
12 **derive a profit on the deal, right, or as a**
13 **result of doing the deal?  Put it that way.**
14     A.    I think that would be a fair
15 reading, yes.
16     **Q.    Let's go to paragraph 6 of your**
17 **opening report, please.  Please read as much**
18 **of it as you need, but I am going to ask you**
19 **about the last sentence of paragraph 6.  It**
20 **carries over onto the top of page 3.**
21     A.    Okay.
22     **Q.    It says, "When the board and**
23 **Greenhill & Company ('Greenhill'), an**
24 **investment bank hired to advise the GFI**
25 **special committee, tried to find a better**

US District Court - New York                    FINAL - CONFIDENTIAL
Gross v. GFI Group                    Chad Coffman - Sept. 27, 2017

Page 141

1    that.
2         Q.    In your earlier answer -- let me
3    make sure I have the length of time covered.
4    You would agree that during the class period
5    that multiple potential acquirers had an
6    opportunity to bid on GFI, right?
7                MR. ROTTER:   Objection.
8         A.    So during the class period, there
9    is nothing, in theory, preventing a third
10   party from coming in and putting in a tender
11   offer or bidding for the company.  I think
12   that's a fair statement.  I don't think there
13   was a process at that point seeking out
14   additional or alternative bids, as far as I
15   know, but if you are saying was there
16   anything I am aware of that precludes
17   somebody from throwing in an offer, I don't
18   believe there was.
19   BY MR. LYNCH:
20        Q.    As an economist, you would agree
21   that an announcement of a merger agreement at
22   a -- an announcement of a merger agreement at
23   a particular price has the effect of
24   attracting interest in the target company by
25   other potential acquirers, right?

JANE ROSE REPORTING              National Court-Reporting Coverage
1-800-825-3341                   janerose@janerosereporting.com

Page 142

1      A.    I would say it has the potential to
2   do that, sure.
3      Q.    It eliminates some of the
4   uncertainty that potential acquirers might
5   otherwise have confronted in considering an
6   acquisition of the target company, right?
7            MR. ROTTER:  Objection.
8      A.    Certain types of uncertainty, sure.
9   BY MR. LYNCH:
10     Q.    It has the effect of clarifying the
11  value of the target company for potential
12  acquirers, right?
13           MR. ROTTER:  Objection.
14     A.    It could potentially do that, yes.
15           Well, let me -- I will leave it at
16  that.
17  BY MR. LYNCH:
18     Q.    Let's take a look again at the July
19  30 press release and the statement that's
20  attributed -- you can read as much of it as
21  you like.  I am mostly focused on the one
22  sentence that plaintiffs are alleging was
23  false.
24     A.    Okay.
25     Q.    So we are focusing on the

US District Court - New York                FINAL - CONFIDENTIAL
Gross v. GFI Group                    Chad Coffman - Sept. 27, 2017

Page 143

1  optimizing sentence, right?  You have it in

2  front of you?

3       A.    Yes.

4       Q.    In your view, does that optimizing

5  sentence communicate to reasonable investors

6  anything about how proactive the GFI board

7  was in pursuing a competitive bidding

8  process?

9       A.    It doesn't provide any information

10 specifically on that, no.

11      Q.    Whether it provides information

12 specifically or not, did it communicate to

13 reasonable readers of the press release

14 anything about how proactive the -- a

15 competitive bidding process had been in in

16 the lead up to the entry into the CME deal?

17           MR. ROTTER:  Objection.

18      A.    I don't think it said -- you could

19 read into it any specificity about the

20 proactiveness of any particular party,

21 including the special committee, other than

22 that -- other than what Mr. Gooch was telling

23 shareholders is that whatever the process

24 was, it optimized GFI's value.

25           MR. LYNCH:  I think we will take a

US District Court - New York          FINAL - CONFIDENTIAL
Gross v. GFI Group                    Chad Coffman - Sept. 27, 2017

Page 147

1  **announcement, partially revealing the**
2  **relevant truth that had been concealed by the**
3  **alleged misrepresentations and/or omissions."**
4          **Why do you believe that BGC's**
5  **intent to acquire GFI partially revealed the**
6  **relevant truth that had been concealed by the**
7  **alleged misrepresentations and/or omissions?**
8       A.    Because plaintiffs allege that
9  defendants misrepresented the CME deal as
10 having optimized value and omitted to
11 disclose the underlying facts that made that
12 misstatement -- alleged misstatement false
13 and misleading, and the economic import of
14 those misstatements was that it conveyed to
15 the market that 4.55 was an optimized value
16 and this was a bidder coming in.  So BGC's
17 intent to acquire GFI at a much higher value,
18 if plaintiffs' allegations are correct,
19 provided the market the information it needed
20 to more properly value GFI common stock.
21      Q.    **You are not aware of any evidence**
22 **that BGC had any intent to acquire GFI at any**
23 **value higher than 4.55 as of the time that**
24 **the press release was announced on July 30th,**
25 **right?**

JANE ROSE REPORTING              National Court-Reporting Coverage
1-800-825-3341                   janerose@janerosereporting.com

US District Court - New York          FINAL - CONFIDENTIAL
Gross v. GFI Group                    Chad Coffman - Sept. 27, 2017

Page 148

 1          MR. ROTTER:  Objection.
 2      A.    I am not aware of any evidence
 3  specifically suggesting that BGC intended
 4  to offer more than 4.55 before it learned
 5  more about the underlying value of Trayport
 6  and Fenics that was contained in the
 7  September -- I'm sorry, the July 30th press
 8  release.
 9  BY MR. LYNCH:
10      Q.    **And you have read Mr. Lutnick's**
11  **testimony, right?**
12      A.    I don't know if I have read all of
13  his testimony, but I have certainly read
14  parts of his testimony, yes.
15      Q.    **You read the part of his testimony**
16  **where he testified, in effect, that he was**
17  **not willing to bid more than -- anything more**
18  **than $4.55 until he learned what CME had**
19  **agreed to pay for GFI, right?**
20          MR. ROTTER:  Objection to the
21      mischaracterization of Mr. Lutnick's
22      testimony.
23  BY MR. LYNCH:
24      Q.    **Do you believe that**
25  **mischaracterizes Mr. Lutnick's testimony?**

US District Court - New York          FINAL - CONFIDENTIAL
Gross v. GFI Group                    Chad Coffman - Sept. 27, 2017

Page 167

1        A.    I am sorry.  Maybe I didn't focus
2   on your question carefully enough, so can we
3   go back and either reread or restate the
4   question to me because I realize now you are
5   asking me about what was in the text of the
6   article.
7        Q.    Yes.
8        A.    And I sort of lost the rest --
9        Q.    **The text of the article is one of**
10  **the things that you use as support for your**
11  **view that September 8th and 9th were a**
12  **corrective event, right?**
13       A.    Yes.  Because there is specific new
14  information the market is learning on that
15  date that was conveyed in this article.
16       Q.    **But nothing in the article**
17  **suggested that BGC was willing to pay more**
18  **than -- had any information available to it**
19  **that would have made it willing to pay more**
20  **for GFI than CME, right?**
21            MR. ROTTER:  Objection.
22            MR. LYNCH:  Thank you, Josh.
23  BY MR. LYNCH:
24       Q.    **Nothing in the article suggested**
25  **that BGC as of the time that the CME deal was**

JANE ROSE REPORTING              National Court-Reporting Coverage
1-800-825-3341                   janerose@janerosereporting.com

US District Court - New York          FINAL - CONFIDENTIAL
Gross v. GFI Group            Chad Coffman - Sept. 27, 2017

Page 168

1    **announced had information available to it**
2    **that would have persuaded it that it was**
3    **willing to pay more than CME for GFI, right?**
4        A.    There is nothing in the text of the
5    article that's that specific of allowing one
6    to draw the conclusion that he was willing to
7    pay more as of July 30th based on pre-July
8    30th information, that's correct.
9                   ----
10               (Exhibit 126, Form 8-K filed by BGC
11        Partners with attached press release
12        dated September 9, 2014, was marked for
13        identification)
14                   ----
15   BY MR. LYNCH:
16        Q.    **Let's take a look at Exhibit 126,**
17   **and this is a Form 8-K filed by BGC Partners.**
18   **It's previously marked as Exhibit 126.   It**
19   **attaches a press release dated September 9,**
20   **2014.**
21           **I'm sorry.   Before we do that, I**
22   **should follow up with one -- a couple of**
23   **questions on The Wall Street Journal news**
24   **story.   I asked you where in the article it**
25   **provides -- I think I asked you, anyway -- it**

US District Court - New York                    FINAL - CONFIDENTIAL
Gross v. GFI Group                       Chad Coffman - Sept. 27, 2017

Page 178

1   significant discount agreed to with respect
2   to the purchase of the brokerage and the
3   clearing business, we intend to make an offer
4   directly to the GFI shareholders."
5           It then reiterates what was said in
6   the press release about the premium that was
7   being offered and also focuses on the ability
8   to provide immediate, certain and compelling
9   value without material contingencies.
10          A statement that "Without material
11  contingencies and at a significant all-cash
12  premium to the pending transaction, we
13  believe that our offer constitutes a superior
14  proposal to the pending transaction and that
15  your shareholders will find our offer
16  extremely compelling."
17          (Witness reviewing document)
18          I think that reflects what, in my
19  view, is the portions of this that are
20  corrective in nature.
21      Q.    What does any of that reveal about
22  the -- about what you call the relevant
23  economic truth about defendants' attempts to
24  prevent a competitive bidding process in the
25  lead up to the announcement of the CME deal?

JANE ROSE REPORTING              National Court-Reporting Coverage
1-800-825-3341                   janerose@janerosereporting.com

US District Court - New York          FINAL - CONFIDENTIAL
Gross v. GFI Group                    Chad Coffman - Sept. 27, 2017

Page 179

1      A.    Again, my understanding of
2   plaintiffs' allegations are that Mr. Gooch
3   had made a statement and the company had made
4   a statement suggesting that the deal -- the
5   CME deal optimized shareholder value when, in
6   fact, they allege that the process for
7   arriving at that value was flawed in a number
8   of ways, including that the process was
9   steered to exclude competitive bidding, that
10  the defendants interfered with the special
11  committee's attempt to do a market check and
12  that the previous overtures by BGC had not
13  been sufficiently explored and, therefore,
14  the deal price that was agreed to, as an
15  economic matter, undervalued the assets and
16  in reliance on -- and the market's reliance
17  on Mr. Gooch's statement and the market price
18  that prevailed as a result of those
19  statements did not reflect the true
20  underlying value of the assets that would
21  have been -- that those assets had, and so
22  what the economic information that was
23  concealed from the market was the true
24  underlying value of those assets and how that
25  had been -- and that that had been concealed

US District Court - New York          FINAL - CONFIDENTIAL
Gross v. GFI Group               Chad Coffman - Sept. 27, 2017

Page 180

1   from the market by the failure -- as a result
2   of the alleged misstatement.
3           So when BGC comes in and states
4   that the value of the underlying assets is
5   higher, offers to bid for those assets and
6   directly states that they view the price
7   that's contemplated by the CME deal as
8   containing a discount on the value of the IDB
9   assets, that that's providing corrective
10  information to the market that dispelled the
11  prior view given by Mr. Gooch that the 4.55
12  optimized shareholder value.
13      Q.     **But you have defined corrective**
14  **disclosure as something that reveals the**
15  **relevant economic truth about an attempt to**
16  **prevent a competitive bidding process, and**
17  **what it sounds like you just described**
18  **instead is information that you think**
19  **revealed some truth about value, right?**
20           MR. ROTTER:  Objection.
21      A.     Well, I don't think those two are
22  mutually exclusive.  I think what I am saying
23  is the entire nature of plaintiffs' claim is
24  that they engaged -- there was a statement
25  made to the market by the company and Gooch

US District Court - New York          FINAL - CONFIDENTIAL
Gross v. GFI Group                    Chad Coffman - Sept. 27, 2017

Page 192

1  exclusive.
2       **Q.    Do you agree that BGC's**
3  **announcement of a $5.25 offer on September**
4  **9th had a causal effect on the combined price**
5  **increase in GFI stock on September 8th and**
6  **9th?**
7       A.    When you use the word "combined" in
8  that question, are you referring to the two
9  days?  I just want to make sure.
10      **Q.    I will ask it a different way.**
11 **Thank you.**
12           **Do you agree that BGC's**
13 **announcement of a $5.25 per share offer on**
14 **September 9th had a causal effect on the**
15 **price increase in GFI stock on September 9th?**
16      A.    Yes.
17      **Q.    What evidence can you point to to**
18 **suggest that BGC was prepared to bid $5.25**
19 **per share on July 30th?**
20      A.    I think the -- again, I think we
21 have talked about this several times.  I am
22 not suggesting that there is any specific
23 evidence to suggest that they had all the
24 information in order to be able to convey
25 that offer for GFI as a whole on -- or prior

US District Court - New York          FINAL - CONFIDENTIAL
Gross v. GFI Group               Chad Coffman - Sept. 27, 2017

Page 193

1  to the CME deal being disclosed.  That's not
2  to say they wouldn't have.  I don't know if
3  they would or wouldn't have.  I am not aware
4  of any specific evidence.  But what I
5  understand plaintiffs' claim is, is that it's
6  the flawed process of getting to the CME deal
7  that failed to reveal the true value of the
8  underlying assets and that Mr. Gooch's
9  statement was -- that that optimized value
10 was false and misleading.  And the GFI offer
11 is information that corrected that impression
12 that was in the market.
13     Q.    And was the $5.25 offer by BGC on
14 September 9th material to GFI shareholders at
15 that time, on September 9th?
16     A.    Yes.
17     Q.    Have you made any attempt to
18 calculate -- you have calculated there is
19 $1.13 price difference that's created on
20 September -- over the course of September 8th
21 and September 9th?
22     A.    I guess the way I would say it is
23 after controlling for -- or what I controlled
24 for, there was an unexpected price movement
25 of $1.13 on those -- combined on those two

US District Court - New York                    FINAL - CONFIDENTIAL
Gross v. GFI Group                        Chad Coffman - Sept. 27, 2017

Page 194

 1  days.
 2       Q.     Fair enough.   Thank you.
 3              Have you made any attempt to
 4  calculate how much of that $1.13 unexpected
 5  price movement was attributable to the $5.25
 6  offer that BGC made on September 9th?
 7              MR. ROTTER:   Objection.
 8       A.     Well, I think that's the primary
 9  motivating factor.   And also how that -- the
10  arrival of that offer also revealed that -- a
11  greater chance of a more competitive bidding
12  process to ensue because the stock price
13  actually rose above the $5.25 offer.   So I
14  think -- but I attribute the movement in the
15  price to the offer and the markets
16  understanding that there might be continued
17  bidding after that.
18  BY MR. LYNCH:
19       Q.     Is it your opinion that if
20  plaintiffs' allegations were -- are -- strike
21  that.
22              Is it your opinion that if a
23  competitive bidding process had been allowed
24  to proceed in sort of the view of plaintiffs'
25  take on this case, that a $5.25 offer from

JANE ROSE REPORTING              National Court-Reporting Coverage
1-800-825-3341                   janerose@janerosereporting.com

US District Court - New York                FINAL - CONFIDENTIAL
Gross v. GFI Group                    Chad Coffman - Sept. 27, 2017

Page 195

1   **BGC would have occurred at any time before**
2   **the announcement of the CME deal?**
3           MR. ROTTER:   Objection.
4       A.    I think that's plausible, but I
5   don't think that's a specific opinion that I
6   am offering would have been the outcome.
7   BY MR. LYNCH:
8       Q.    **And if it hadn't -- if there had**
9   **been no $5.25 offer from BGC for GFI shares**
10  **as of July 30th, then there is no way that**
11  **GFI could have announced the $5.25 offer from**
12  **BGC on July 30th, right?**
13      A.    That's fair, yes.
14      Q.    **Is there any other time during the**
15  **class period that you are aware that GFI**
16  **could have announced that BGC was prepared to**
17  **bid $5.25 per share for GFI shares?**
18      A.    I am not aware of anytime before
19  September 9th that GFI was specifically aware
20  of the $5.25 offer, so I don't think they
21  could have disclosed that prior to that date.
22  Again, I don't think that's the relevant
23  question, but I don't think they could have
24  disclosed that specific thing, no.
25      Q.    **Is it your opinion that had BGC**

JANE ROSE REPORTING               National Court-Reporting Coverage
1-800-825-3341                    janerose@janerosereporting.com

US District Court - New York                    FINAL - CONFIDENTIAL
Gross v. GFI Group                       Chad Coffman - Sept. 27, 2017

Page 201

1   been the result earlier, prior to July 30th,
2   I am not certain.  That's really not the
3   question I was asked to evaluate.
4   BY MR. LYNCH:
5        Q.    Do you agree that BGC's purchase of
6   GFI shares on September 8th had anything to
7   do with the increase in the GFI stock price
8   that occurred on September 8, 2014?
9        A.    I just -- I want to make sure that
10  I understand your question.  So you are
11  talking about BGC's open market purchases of
12  GFI shares?
13       Q.    Correct, their qualification.
14       A.    Do I believe that influenced the
15  market price on September 8th?  I believe it
16  could have, yes.
17       Q.    Do you have a view one way or the
18  other?
19       A.    I think between Professor Jarrell
20  and I, we have identified two potential
21  movements -- two potential underlying causal
22  factors that could have caused the movement
23  on September 8th:  BGC purchasing shares in
24  the open market to further establish their
25  total and position; and the potential leakage

JANE ROSE REPORTING                  National Court-Reporting Coverage
1-800-825-3341                       janerose@janerosereporting.com

US District Court - New York          FINAL - CONFIDENTIAL
Gross v. GFI Group               Chad Coffman - Sept. 27, 2017

Page 202

1   of information about the offer itself into

2   the market.

3          I think either one of those -- and

4   I am clear in my report about -- in my

5   rebuttal report about this -- either one of

6   those reflects the market's updated

7   understanding about what people are willing

8   to pay for GFI shares.  Therefore, it doesn't

9   matter to me which of those two explanations

10  is right.  It could be one.  It could be the

11  other.  It could be a combination of the two.

12  But for my opinions, it doesn't matter.

13     **Q.    As far as you are concerned, the**

14  **price increase on September 8th, excluding**

15  **general market effects, was caused by either**

16  **BGC's purchase of shares or the leakage of**

17  **news of a possible topping bid for GFI,**

18  **right?**

19     A.    Or some combination of those two,

20  yes.

21     **Q.    Anything else, apart from general**

22  **market effects, that might have contributed**

23  **to the stock price increase on September 8th?**

24     A.    I am not aware of any information

25  that, in my view, would have caused that

JANE ROSE REPORTING          National Court-Reporting Coverage
1-800-825-3341               janerose@janerosereporting.com

US District Court - New York          FINAL - CONFIDENTIAL
Gross v. GFI Group            Chad Coffman - Sept. 27, 2017

Page 205

1   than the total position, but again, because
2   it was unnecessary for the purpose of my
3   opinion to separate between the two, I
4   haven't formed a definitive view as to which
5   it was other than that the combination of the
6   two clearly was material to investors.
7        **Q.    GFI's open market -- sorry.  BGC's**
8   **open market purchases of GFI shares on**
9   **September 8th, 2014 could not have been**
10  **announced on July 30th, right?**
11       A.    That's correct.
12       **Q.    And leakage of BGC's willingness to**
13  **pay 5.25 -- or leakage of BGC's willingness**
14  **to make a topping bid for GFI, if there was**
15  **any such leakage, that also could not have**
16  **happened on July 30th, right?**
17            MR. ROTTER:  Objection.
18       A.    I think that would depend on when
19  exactly BGC had made the decision that it was
20  going to or was likely to make that topping
21  bid, but I don't have any evidence to suggest
22  that they had made that decision as of July
23  30th.
24  BY MR. LYNCH:
25       **Q.    So that's July 30th.  Was there any**

JANE ROSE REPORTING          National Court-Reporting Coverage
1-800-825-3341            janerose@janerosereporting.com

US District Court - New York                FINAL - CONFIDENTIAL
Gross v. GFI Group                   Chad Coffman - Sept. 27, 2017

Page 206

1    other time in the class period at any time
2    before September 8th that GFI could have
3    disclosed purchases of GFI shares by BGC on
4    the open market on September 8th?
5         A.    No.  If you are talking about the
6    actual purchases of BGC shares on September
7    8th, no.
8         Q.    Are you aware of any basis that GFI
9    had to disclose at any time during the class
10   period that it expected GFI to make a topping
11   bid?
12             MR. ROTTER:  Objection.
13        A.    No.
14   BY MR. LYNCH:
15        Q.    We took a look at Exhibit 126 --
16             MR. ROTTER:  That last question, do
17        you want to just read it to yourself.
18   BY MR. LYNCH:
19        Q.    Are you aware of any basis -- thank
20   you very much, Mr. Rotter.
21             Do you have any basis, Mr. Coffman,
22   to believe that GFI -- strike that.
23             Are you aware of any basis that GFI
24   had at any time during the class period to
25   disclose that it expected BGC to make a

US District Court - New York                FINAL - CONFIDENTIAL
Gross v. GFI Group                    Chad Coffman - Sept. 27, 2017

Page 207

1   topping bid?
2        A.    I am sorry.  Could I have that read
3   back?  I want to make sure I got it right.
4              (Question read)
5        A.    I am not aware of anything that
6   suggests that.
7   BY MR. LYNCH:
8        Q.    You understand BGC announced on
9   September 9th that it had accumulated a 13.5
10  percent toe hold in GFI, right?
11       A.    I believe that's right.  I just
12  want to verify the number, but I believe
13  that's right, yes.  Yes.  13.5 percent, yes.
14       Q.    And that was disclosed in the
15  September 9th press release, right?
16       A.    Yes.
17       Q.    Do you agree that the accumulation
18  of a toe hold position of that size would
19  signal to GFI shareholders that BGC had a
20  level of commitment to the transaction?
21       A.    I think the letter itself states
22  that, yes, or the press release and letter
23  itself state that.
24       Q.    Fair enough.
25              Are you familiar with the

JANE ROSE REPORTING               National Court-Reporting Coverage
1-800-825-3341                    janerose@janerosereporting.com

US District Court - New York                FINAL - CONFIDENTIAL
Gross v. GFI Group                   Chad Coffman - Sept. 27, 2017

Page 208

1    literature that Professor Jarrell cited in
2    his reports finding the toe hold positions
3    cause bidders to bid more aggressively?
4          A.     I am aware of that literature, yes.
5          Q.     Do you agree with it?
6          A.     I have no reason to dispute any of
7    what Dr. Jarrell claims that literature says
8    in his report.
9          Q.     And you are familiar with the
10   research that Professor Jarrell cites finding
11   that toe hold positions increase the
12   likelihood that a merger will be consummated;
13   is that right?
14               Or let me put it this way:  You are
15   aware that Professor Jarrell cited academic
16   research finding that toe hold positions
17   increase the likelihood that a merger will be
18   consummated?
19         A.     I believe that's right, yes.
20         Q.     Do you have any basis to dispute
21   any of what Dr. Jarrell -- Professor Jarrell
22   claims that literature says in his report?
23         A.     I don't have any basis to dispute
24   his description of what the literature says,
25   no.

JANE ROSE REPORTING                 National Court-Reporting Coverage
1-800-825-3341                      janerose@janerosereporting.com

US District Court - New York
Gross v. GFI Group

FINAL - CONFIDENTIAL
Chad Coffman - Sept. 27, 2017

Page 209

1     **Q.     In your opinion, had BGC not**
2  **accumulated and disclosed its 13.5 percent**
3  **toe hold in GFI, would GFI stock price still**
4  **have increased by $1.13 net of market effects**
5  **on September 8th and September 9th?**
6     A.    I don't know.
7     **Q.     It might have, right?**
8     A.    I am sorry?
9     **Q.     It's possible that it would not**
10 **have, right?**
11    A.    Well, I think given that the offer
12 itself separate from the toe hold was for
13 5.25, I think certainly a substantial portion
14 of the price movement from around 4.55 up to
15 5.25 would have occurred whether or not they
16 did the toe hold anyway, if not all of it.  I
17 think the toe hold may have signaled
18 additional commitment on BGC's part and also
19 may have conveyed a higher probability of
20 there being a bidding war and a consummated
21 transaction.  So it may have contributed
22 somewhat to the price movement on the 8th and
23 9th.  I think I have acknowledged that in my
24 report.  But even absent that fact, I think
25 the stock price would have risen from near

US District Court - New York      FINAL - CONFIDENTIAL
Gross v. GFI Group      Chad Coffman - Sept. 27, 2017

```
                                              Page 210
 1   4.55 to something close to 5.25, just based
 2   on the dollar value of the offer itself.
 3        Q.     You don't believe that GFI could
 4   have disclosed BGC's 13.5 percent toe hold on
 5   July 30th, do you?
 6        A.     No.
 7        Q.     You don't believe GFI could have
 8   disclosed BGC's 13.5 percent toe hold at any
 9   time during the class period, do you?
10        A.     I don't believe so, no.
11             MR. LYNCH:  Why don't we take a
12        five-minute break?
13             THE VIDEOGRAPHER:  Stand by,
14        please.  The time is 4:04 p.m.  Going
15        off the record.
16             (Recess)
17             THE VIDEOGRAPHER:  Okay.  We are
18        back on the record.  The time is 4:23
19        p.m.
20   BY MR. LYNCH:
21        Q.     Mr. Coffman, do you have -- we were
22   talking before the break about BGC's
23   accumulation of a toe hold.  Do you have any
24   basis on which to conclude that GFI of any
25   basis to disclose any ownership of BGC shares
```

US District Court - New York            FINAL - CONFIDENTIAL
Gross v. GFI Group                 Chad Coffman - Sept. 27, 2017

Page 217

1   underlying assets changed at all over the
2   course of the class period?
3        A.    I don't recall -- I didn't do any
4   of my own specific analysis, but I also don't
5   recall reviewing any evidence that I have
6   seen in the record to suggest that there was
7   a fundamental change in the business over
8   that period of time.
9        Q.    Did you go looking at that
10  question?
11       A.    No.
12       Q.    Going back to paragraph 8 of your
13  opening report.
14       A.    Okay.
15       Q.    Let's assume that -- why don't we
16  focus on the press release at the same time,
17  which is the July 30th press release.
18       A.    Okay.
19       Q.    Let's assume that CME and GFI
20  issued a press release on July 30th
21  announcing the CME deal that was precisely
22  like this one except for the fact that it did
23  not include the sentence that reads,
24  "Optimizing GFI's value for stockholders has
25  been a goal of management since becoming a

US District Court - New York            FINAL - CONFIDENTIAL
Gross v. GFI Group                   Chad Coffman - Sept. 27, 2017

---

Page 218

1   public company in 2005, and this transaction
2   represents a singular and unique opportunity
3   to return value."
4           What's your view -- do you believe
5   that had that press release excluding that
6   sentence been issued on July 30 that the
7   stock price of GFI would have increased by an
8   additional $1.13 beyond the increase that
9   took place on that day excluding market
10  effects?
11          MR. ROTTER:  Objection.
12      A.    I don't think that's the relevant
13  question, but that's not -- I have not formed
14  a view as to what the -- if you simply remove
15  that sentence from the press release what the
16  stock price impact would have been.
17  BY MR. LYNCH:
18      Q.    Do you believe it would have been
19  different at all?  To be clear, different --
20  that the change in the stock price on GFI
21  would have been any different than it was
22  following the announcement of the July 30th
23  press release?
24      A.    That's just not a subject that I
25  have formed an opinion on.  I think it's

---

US District Court - New York                FINAL - CONFIDENTIAL
Gross v. GFI Group                 Chad Coffman - Sept. 27, 2017

Page 224

1   30th press release.
2        Q.    Let's assume, then, that on
3   July 30, 2014 defendants issued a press
4   release precisely like this one except
5   it did not conceal the information that you
6   describe as having been concealed in
7   paragraph 20, and it did not include the
8   misstatements that you allege were made or
9   misrepresentations that you allege were made
10  in paragraph 20.
11           Is it your view that the increase
12  in the GFI stock price on that day would have
13  been greater than it was by $1.13 excluding
14  market effects?
15           MR. ROTTER:  Objection.
16       A.    I want to make sure I am
17  interpreting your question properly.  You are
18  asking me would the increase observed on that
19  day, July 30th, have been greater had this
20  information that's alleged to have been
21  omitted been incorporated into the press
22  release and the positive statement or the
23  alleged misleading statement was deleted from
24  the press release, would the stock price have
25  been greater?

US District Court - New York      FINAL - CONFIDENTIAL
Gross v. GFI Group      Chad Coffman - Sept. 27, 2017

Page 225

1   BY MR. LYNCH:

2       Q.     **By $1.13 net of market effects,**

3   **that's the question.**

4       A.     My opinion is that I can't claim

5   that it instantaneously would have gone up by

6   more than $1.13 on that day.  We don't have

7   direct evidence to estimate precisely by how

8   much it would have gone up above $4.55 or

9   wherever roughly it closed that day.  But I

10  do think it would have signaled to the market

11  that there was -- there were lots more

12  questions to be asked about the process and

13  what BGC's interest might be.

14          I think it would have prompted more

15  questions by analysts to BGC itself and over

16  some reasonably short period of time, maybe

17  not on that day but over some reasonably

18  short period of time, the market price would

19  have reflected the underlying assets -- the

20  value of the underlying assets as the market

21  learned more about what potential deals there

22  might have been out there.

23      Q.     **What's the reasonably short period**

24  **of time that it would -- that, in your view,**

25  **it would take for the increase in the GFI**

US District Court - New York          FINAL - CONFIDENTIAL
Gross v. GFI Group                  Chad Coffman - Sept. 27, 2017

Page 226

1  **stock price to equal the $1.13 net of market**
2  **effects that you have opined on in your**
3  **opinion had the press release been, to use**
4  **your term, corrected in the way that you**
5  **think it should have been or that you**
6  **interpret plaintiffs' allegations as**
7  **expressing that it should have been?**
8           MR. ROTTER:  Objection.
9      A.    Again, it's hard to say because of
10  the misrepresentation itself, we can't
11  observe directly how that would have played
12  out but given that the underlying value of
13  the assets was much higher than the 4.55 and
14  ultimately 30 to 40 days later led to a bid
15  of 5.25 a share, I think it's entirely
16  reasonable to look at the value in the wake
17  of -- the price movement in the wake of that
18  disclosure as the most reliable economic
19  proxy for what the market -- how the market
20  would have valued full and complete
21  information about the value of the assets and
22  that through some reasonably rapid process as
23  a result of the disclosures we are talking
24  about would have caused the market to come to
25  its own evaluation of what the value of those

JANE ROSE REPORTING          National Court-Reporting Coverage
1-800-825-3341               janerose@janerosereporting.com

US District Court - New York          FINAL - CONFIDENTIAL
Gross v. GFI Group                    Chad Coffman - Sept. 27, 2017

Page 227

1    assets were that was not limited to the deal
2    price of 4.55.
3              So your question is precisely how
4    quickly would it have done that, and I am
5    saying given that we don't directly observe
6    the process I am describing taking place, I
7    don't have a clear answer for you as to what
8    -- but I would think a reasonably short
9    period of time.  Days, a week.  Somewhere in
10   that range.
11   BY MR. LYNCH:
12       Q.    **Just so I am clear, in your view,**
13   **within days or a week, the stock price of GFI**
14   **would have risen by an additional $1.13 net**
15   **of market effects above where it rose on July**
16   **30th --**
17             MR. ROTTER:  Objection.
18   BY MR. LYNCH:
19       Q.    **-- is that right?  Do I have that**
20   **right?**
21       A.    Let me put it this way.  We are now
22   faced with estimating damages assuming
23   plaintiffs' allegations are correct and
24   assuming that the 4.55 reflects a substantial
25   undervaluation of the underlying assets and