# EXHIBIT K

US District Court - New York                    FINAL - CONFIDENTIAL
Gross v. GFI Group                      William Purcell - Sept. 25, 2017

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------
BENJAMIN GROSS, Individually and on
Behalf of All Others Similarly Situated,
            Plaintiffs,
v.
GFI GROUP, INC., COLIN HEFFRON,
and MICHAEL GOOCH,
            Defendants.

Case No.:  1:14-CV-09438-WHP
----------------------------------------

VIDEO DEPOSITION OF
William Purcell
September 25, 2017
New York, New York
Lead:  John Lynch, Esquire
Firm:  Wachtell Lipton Rosen & Katz

FINAL COPY - CONFIDENTIAL
JANE ROSE REPORTING   1-800-825-3341

US District Court - New York          FINAL - CONFIDENTIAL
Gross v. GFI Group                 William Purcell - Sept. 25, 2017

Page 41

1    price, and I think through the efforts of the
2    special committee and what have you, they got
3    him up to 165, plus the assumption of the
4    RSUs, but I think at one point it was at 145
5    and even a little bit lower at one point.  So
6    they did get him up from what he wanted to do
7    initially.
8         **Q.    And the "they" there is the special**
9    **committee, right?**
10        A.    Yes.
11        **Q.    And so if you testified early that**
12   **Mr. Gooch paid the absolute minimum for the**
13   **IDB that he could pay, that's not correct,**
14   **right?**
15             MR. ZWICK:  Objection.
16        A.    I did not say that.
17             MR. ZWICK:  Let me just get my
18        objections in.
19             THE WITNESS:  I'm sorry.
20             MR. ZWICK:  Go ahead.
21        A.    I did not say that.  I said based
22   on the evidence, his intent was to always be
23   able to pay as little as possible, and he got
24   negotiated up somewhat.  But his intent was
25   to always pay -- to own the IDB for as least

US District Court - New York                FINAL - CONFIDENTIAL
Gross v. GFI Group                 William Purcell - Sept. 25, 2017

```
                                              Page 42
 1   money as possible.
 2   BY MR. LYNCH:
 3        Q.     He was a buyer, right?
 4        A.     Yes.
 5        Q.     And that was obvious from the face
 6   of the press release that he was a buyer of
 7   the brokerage business, right?
 8               MR. ZWICK:   Objection.
 9        A.     That's correct, from the press
10   release, yes.
11   BY MR. LYNCH:
12        Q.     And as a matter of pure economics,
13   it's perfectly obvious that a buyer would
14   prefer to pay as little as possible for
15   assets that he was to acquire, correct?
16        A.     It's correct with an expanded
17   answer.
18        Q.     Sure.   What's your expanded answer?
19        A.     Given the press release and the
20   fact that a special committee was there and a
21   special committee unanimously approved it,
22   any reasonable investor would assume that a
23   normal process had gone on with a special
24   committee because there were many special
25   committees, and that process is reasonably
```

JANE ROSE REPORTING              National Court-Reporting Coverage
1-800-825-3341                   janerose@janerosereporting.com

US District Court - New York          FINAL - CONFIDENTIAL
Gross v. GFI Group              William Purcell - Sept. 25, 2017

Page 43

 1   well known.  The role of the special
 2   committee is to try and create, in effect, an
 3   arm's length transaction of all the parties
 4   to get the highest price possible for the
 5   shareholders of the company.  And the press
 6   release didn't say the special committee
 7   had -- or even the fairness opinion of
 8   Greenhill was subject to certain limitations,
 9   which were evident when the proxy came out,
10   that all the things the special committees
11   considered and the interference with Gooch
12   and the special committee and the fact that
13   Gooch said he wouldn't sell to anybody else,
14   none of that was disclosed in the press
15   release.  It wasn't even disclosed in the
16   press release that there were certain
17   limitations on the fairness opinion or the
18   work of the special committee.  So a
19   reasonable investor would have no reason to
20   believe, other than the fact that a normal
21   special committee process had gone forward
22   and that everybody was satisfied that -- for
23   instance, there was no fairness opinion on
24   the IDB, even though CME had asked for one
25   late in the process.  But most reasonable

US District Court - New York                FINAL - CONFIDENTIAL
Gross v. GFI Group                  William Purcell - Sept. 25, 2017

Page 44

1   investors would assume a complete process had

2   been done and there was no interference or

3   limitations on the work of the special

4   committee.

5        **Q.    You referred a few times there to a**

6   **normal special committee process.  What's a**

7   **normal special committee process, for you?**

8        A.    A normal special committee process

9   is, as I said before, to create an arm's

10  length type of transaction, which means there

11  will be no conflicts.  And even if the

12  management wants to buy the company, the

13  special committee has done everything

14  possible to make sure that that price is as

15  high as possible, including talking to other

16  people and trying to set up a competitive

17  situation to make sure that the price is as

18  high as they can possibly get it.

19       **Q.    Is it your view that under**

20  **generally accepted investment banking**

21  **methodologies in an M&A selling process that**

22  **there needs to be a market check?**

23       A.    Again, it was one of the comments

24  that Mr. Fisher made.  On rare occasions,

25  sometimes there are situations -- and an

JANE ROSE REPORTING            National Court-Reporting Coverage
1-800-825-3341                 janerose@janerosereporting.com

US District Court - New York             FINAL - CONFIDENTIAL
Gross v. GFI Group                  William Purcell - Sept. 25, 2017

```
                                                  Page 48
 1   when the company -- when management says that
 2   they may want to buy the company, but it can
 3   go either way.  You know, it depends when
 4   that special committee is formed.
 5        Q.    I will just ask the question again.
 6   Have you ever done any empirical analysis or
 7   seen any empirical analysis that measures how
 8   frequently pre-signing market checks are
 9   conducted in special committee M&A selling
10   processes as opposed to pursuing a single
11   bidder strategy?
12        A.    I haven't seen such a setting.
13        Q.    Well, one of the ways that a
14   special committee can protect shareholders is
15   to negotiate a deal with a single bidder and
16   execute a merger agreement that contains a
17   fiduciary out provision, right?
18        A.    Yes.
19              MR. ZWICK:  Objection.
20              THE WITNESS:  I'm sorry.
21        A.    I mean, generally speaking, you
22   know, it's rare to see no fiduciary out in an
23   agreement.
24   BY MR. LYNCH:
25        Q.    But that's one of the ways that a
```

JANE ROSE REPORTING              National Court-Reporting Coverage
1-800-825-3341                   janerose@janerosereporting.com

Page 49

1  **special committee can protect shareholders,**
2  **right?**
3       A.    Well, yes.  But before they do
4  that, they feel comfortable that they have
5  done everything possible to get the highest
6  price possible, and they have a fiduciary out
7  in case somebody comes along.  I think there
8  have been plenty of studies done that
9  indicate that as a percent of total deals,
10  the number of deals that come in on a basis
11  of a fiduciary out is a rather small
12  percentage.  I don't know whether it's 15
13  percent, what have you.  I can't remember.
14  But it's -- once they have done their job,
15  it's more common that no competing deal comes
16  in than it is that a competing deal does come
17  in.
18       **Q.    Have you ever seen any empirical**
19  **analysis or research or conducted any**
20  **analysis yourself that persuades you or**
21  **convinces you that conducting a pre-signing**
22  **market check leads to superior pricing on**
23  **sell-side assignments than following a**
24  **strategy of negotiating with a single bidder**
25  **and including a fiduciary out?**

US District Court - New York                FINAL - CONFIDENTIAL
Gross v. GFI Group                  William Purcell - Sept. 25, 2017

Page 87

1    BY MR. LYNCH:
2         Q.    And that's the sentence that you
3    are opining is misleading, correct?
4         A.    Correct.
5         Q.    And just for the record, it reads,
6    "Optimizing GFI's value for stockholders has
7    been a goal of management since becoming a
8    public company in 2005, and this transaction
9    represents a singular and unique opportunity
10   to return value."
11              Have I read that right?
12        A.    Yes.
13        Q.    Okay.  The sentence before that,
14   the first sentence that's attributed to
15   Mr. Gooch, reads, "We are very pleased to
16   announce this transaction with CME Group and
17   the substantial premium and liquidity it
18   delivers to our stockholders."
19              Do you see that?
20        A.    Yes.
21        Q.    Do you believe that's false?
22        A.    No.
23        Q.    No reason to believe that's false,
24   correct?
25        A.    No.  It was, quote, a substantial

JANE ROSE REPORTING              National Court-Reporting Coverage
1-800-825-3341                   janerose@janerosereporting.com

Page 88

1    premium, about 46 percent, and CME was a very
2    liquid stock.
3         Q.    More liquid than the GFI Group
4    stock, right?
5         A.    Yes.
6         Q.    So a stock deal with the CME Group,
7    if it closed, would have delivered liquidity
8    to GFI shareholders, right?
9         A.    Yes.
10        Q.    As well as a substantial premium,
11   right?
12        A.    Yes.
13        Q.    The third sentence of the comment
14   reads, "I am very proud of what our Trayport
15   and Fenics teams have achieved since becoming
16   a part of GFI."
17             Do you see that?
18        A.    Yes.
19        Q.    And those are the -- Trayport and
20   Fenics are the two software businesses that
21   were being sold to CME in a two-step
22   transaction, right?
23        A.    Yes.
24        Q.    The sale of those businesses to CME
25   Group in exchange for CME stock was a way of

US District Court - New York          FINAL - CONFIDENTIAL
Gross v. GFI Group                William Purcell - Sept. 25, 2017

Page 90

1   reasonable statement.
2        Q.     Okay.  The fourth sentence of the
3   comment that's attributed to Mr. Gooch reads,
4   "We are excited that these businesses will
5   become part of a dynamic and highly regarded
6   company where their immediate strategic value
7   can be further realized within CME."
8              Do you see that?
9        A.    Yes.
10       Q.     That's a true statement, right?
11       A.    I mean, it's a reasonable
12  statement.  I assume that's what he believed.
13  And there is no reason to believe that would
14  not be correct.
15       Q.     Okay.  And the two businesses that
16  are referred to there are Trayport and
17  Fenics, right?
18       A.    Yes.
19       Q.     And the CME Group, that's the
20  business that owns the Chicago Mercantile
21  Exchange, right?
22       A.    Yes.  That's what CME stands for,
23  so, yes.
24       Q.     And that's a highly regarded
25  company, right?

JANE ROSE REPORTING          National Court-Reporting Coverage
1-800-825-3341               janerose@janerosereporting.com

US District Court - New York                    FINAL - CONFIDENTIAL
Gross v. GFI Group                    William Purcell - Sept. 25, 2017

```
                                                       Page 91
 1        A.     It is.
 2        Q.     And it's a dynamic company, right?
 3               MR. ZWICK:  Objection.
 4        A.     I mean, that's a point of view.  I
 5   mean, it's an aggressive company.  It's done
 6   very well.  So I have no problem with the
 7   word "dynamic."
 8   BY MR. LYNCH:
 9        Q.     If you go back to the first page of
10   the press release, the very first bullet
11   underneath the headline reads, "CME Group to
12   acquire Trayport and Fenics from GFI Group,"
13   right?
14        A.     Well, it just ended with a period
15   there.  It didn't say --
16        Q.     "For media release" -- there's a
17   headline --
18        A.     Oh, I'm sorry.  I thought you meant
19   the first bullet under that.
20        Q.     I see what you mean.
21        A.     Okay.  Yes.
22        Q.     There is a set of three bullets
23   towards the top of the page.
24        A.     Right.  Okay.
25        Q.     The first bullet reads, "CME Group
```

JANE ROSE REPORTING                National Court-Reporting Coverage
1-800-825-3341                     janerose@janerosereporting.com

US District Court - New York                FINAL - CONFIDENTIAL
Gross v. GFI Group                   William Purcell - Sept. 25, 2017

Page 98

1       A.      Yes.
2       Q.      Okay.  We are still on the first
3    paragraph of the text of the press release,
4    right?
5       A.      Right.  The second bullet, though.
6       Q.      The second bullet of the first
7    paragraph.
8       A.      Right.
9       Q.      And it was clear from the text that
10   we have just read that Mr. Gooch and
11   Mr. Heffron had an interest in the
12   transaction, right?
13      A.      Correct.
14      Q.      It was clear from that text that
15   Mr. Gooch and Mr. Heffron stood on both sides
16   of the transaction, right?
17      A.      Correct.
18      Q.      Both as sellers of their GFI stock
19   and buyers of the IDB business, right?
20      A.      Yes.  And that's why there was a
21   special committee, which was also mentioned
22   in the press release.
23      Q.      Right.  And so it was clear also
24   that the special committee -- from the
25   involvement -- clear to investors, anyway,

US District Court - New York                 FINAL - CONFIDENTIAL
Gross v. GFI Group                    William Purcell - Sept. 25, 2017

Page 99

1    **from the involvement of the special committee**
2    **that there was some attempt to address the**
3    **fact that there were directors on both sides**
4    **of the transaction, right?**
5         A.    Yes.
6         **Q.    And that would be clear to GFI**
7    **stockholders in reading the press release,**
8    **right?**
9         A.    Yes, because the special committee
10   was mentioned.
11        **Q.    You have had experience in the**
12   **drafting of press releases that announce**
13   **merger agreements, right?**
14        A.    Yes.  I mean, I have read them.
15   Usually the investment banker does not get
16   involved in the actual language.
17        **Q.    Have you ever been involved in the**
18   **drafting of a press release?**
19        A.    Other than reviewing it, no.
20   Because most people have, as in this case,
21   their public relations department or whatever
22   you want to call them that work on press
23   releases.
24        **Q.    But bankers do review them?**
25        A.    If they are mentioned and they are

JANE ROSE REPORTING              National Court-Reporting Coverage
1-800-825-3341                   janerose@janerosereporting.com

US District Court - New York                FINAL - CONFIDENTIAL
Gross v. GFI Group                    William Purcell - Sept. 25, 2017

Page 122

1  process to maximize or optimize the value
2  being obtained for the IDB.  In fact, it was
3  just the opposite.
4       Q.    Do you believe the special
5  committee in the CME deal or in the process
6  leading up to the CME deal did the best they
7  could to achieve value for GFI shareholders
8  under the circumstances that they confronted?
9       A.    I believe so and that's so stated
10 in the proxy and so stated in the Greenhill
11 fairness opinion.  Given both the assumptions
12 and limitations that were before them in
13 terms of limiting the number of strategic
14 alternatives that they could pursue, they
15 believe they had basically done the best they
16 could do given Gooch's position and
17 interference.
18      Q.    And you agree with that, right?
19      A.    I didn't see anything that would be
20 negative reflecting on either Greenhill or
21 the special committee.  They did the best
22 they could under the circumstances it
23 appeared.
24      Q.    Throughout -- we have done a little
25 bit of talking about the word "optimizing" in

US District Court - New York                FINAL - CONFIDENTIAL
Gross v. GFI Group                   William Purcell - Sept. 25, 2017

```
                                              Page 141
 1        A.    The book that lists synonyms -- I'm
 2   not sure -- I will take your word for it.
 3        Q.    Forget about Thesaurus' for the
 4   moment.  You said you looked at dictionaries
 5   too, right?
 6        A.    Yes.
 7        Q.    What dictionaries did you look at?
 8        A.    I have Websters and Colliers.  I
 9   don't have more than two dictionaries.  Most
10   people don't.
11        Q.    I may have asked you this earlier,
12   but we were talking a little bit about the
13   possibility that M&A transactions, once they
14   are announced, can get topped.
15              Do you remember that testimony?
16        A.    Yes.
17        Q.    And you agreed that it's always
18   possible that an announced merger transaction
19   might be topped by an alternative bidder.
20              Do you remember that?
21        A.    Yes.
22        Q.    Reasonable investors understand
23   that, right?
24        A.    That that could happen, yes.  In
25   this case, I don't think they thought that
```

JANE ROSE REPORTING          National Court-Reporting Coverage
1-800-825-3341               janerose@janerosereporting.com

US District Court - New York                FINAL - CONFIDENTIAL
Gross v. GFI Group                    William Purcell - Sept. 25, 2017

Page 142

1  would happen, as I say, because of the
2  special committee and their control
3  shareholder, and there wouldn't be any
4  conflicts in his strong statement in the
5  press release.  I believe most reasonable
6  investors did not think that.
7          As I said, the stock pattern all
8  the way up to September 8th indicated that.
9  Very little change in any single day.
10     Q.     Back to the "optimize" and
11 "maximize" and your consultation of books
12 that told you that they were synonyms.  What
13 books were those?
14     A.     Oh, my goodness, I couldn't
15 remember.  You say they call it -- it's a
16 book of synonyms and antonyms.  I don't know
17 if it was called a Thesaurus or not on the
18 cover page.
19     Q.     You mentioned the Tropicana
20 transaction that you were involved in this
21 morning?
22     A.     Yes.  As an example.
23     Q.     What transaction is that?
24     A.     The sale of Tropicana to Coca-Cola.
25     Q.     What year did that take place?

JANE ROSE REPORTING              National Court-Reporting Coverage
1-800-825-3341                   janerose@janerosereporting.com

US District Court - New York          FINAL - CONFIDENTIAL
Gross v. GFI Group                    William Purcell - Sept. 25, 2017

Page 143

1      A.    Oh, my goodness.  It was a number
2  of years ago, but I am using it just as an
3  example.  It's not a recent transaction.
4      Q.    **What was your role in that**
5  **transaction?**
6      A.    Dillon, Read, we were representing
7  Tropicana.
8      Q.    **What was your role?**
9      A.    I was one of the investment bankers
10 giving advice to Tropicana in dealing with
11 Coca-Cola.
12     Q.    **Were you on the deal teem?**
13     A.    Yes.
14     Q.    **And you don't recall the year you**
15 **said, right?**
16     A.    I just don't.
17     Q.    **Let's take a look at what's been**
18 **marked as Exhibit 194, which is a Bloomberg**
19 **transcript of a Q2 2014 earnings call dated**
20 **August 1, 2014.**
21        **Do you have that in front of you?**
22     A.    I do.
23     Q.    **You have seen this before, right?**
24     A.    I have not seen this before, but I
25 have heard -- I read it being referred to in

JANE ROSE REPORTING          National Court-Reporting Coverage
1-800-825-3341               janerose@janerosereporting.com

US District Court - New York               FINAL - CONFIDENTIAL
Gross v. GFI Group                  William Purcell - Sept. 25, 2017

Page 144

1    terms of -- I think it was in one of the
2    expert reports of Mr. Hefron saying in this
3    earnings call, proxy will be coming out and
4    read it, et cetera, for important
5    information.
6         Q.    I missed that.  You said -- thank
7    you.
8              You didn't consider this transcript
9    in the formation of your opinions at all,
10   correct?
11        A.    I did not read the -- I did not
12   receive nor did I read the actual earnings
13   call other than what I had read about it
14   elsewhere.
15        Q.    Okay.  Thank you.
16              Based on your experience, you are
17   aware -- and this is dated August 1, 2014,
18   right?
19              Do you see that?
20        A.    I don't see the date actually.
21        Q.    But you will accept that?
22        A.    Yes.
23        Q.    It's at the very top.  I don't want
24   to belabor it.
25        A.    I do see it now.

US District Court - New York      FINAL - CONFIDENTIAL
Gross v. GFI Group      William Purcell - Sept. 25, 2017

Page 147

1      A.    I mean, I know he is a defendant.
2  The main issues here, from my perspective,
3  Mr. Gooch has been the main person involved,
4  at least in everything I have read.
5      Q.    Mr. Hefron doesn't refer back to
6  the statement that you have opined is
7  misleading here in the earnings call, does
8  he?
9      A.    He does not.
10      Q.    And in your experience, these
11  earnings calls are followed closely by
12  sophisticated investors, right?
13      A.    Institutional investors generally
14  and analysts.  I am not sure how many retail
15  investors are on there, but they are
16  generally followed.
17      Q.    Would you agree, based on your
18  experience, that the market price of a stock
19  is generally driven by the views of
20  institutional investors and research
21  analysts?
22          MR. ZWICK:  Objection.
23      A.    I would say generally, yes.
24  BY MR. LYNCH:
25      Q.    And research analysts and

JANE ROSE REPORTING    National Court-Reporting Coverage
1-800-825-3341    janerose@janerosereporting.com

US District Court - New York          FINAL - CONFIDENTIAL
Gross v. GFI Group                    William Purcell - Sept. 25, 2017

Page 148

1   institutional investors closely follow
2   earnings calls, right?
3        A.    They do.
4        Q.    I think you testified earlier you
5   have worked on proxy statements?
6        A.    I'm sorry?  Proxy statements.
7        Q.    You have worked on proxy statements
8   before, right?
9        A.    Yes.
10       Q.    Proxy statements that are issued in
11  connection with merger transactions, right?
12       A.    Yes.
13       Q.    You agree they are typically filed
14  sometime after a deal is announced, right?
15       A.    Yes.
16       Q.    About how long after, in your
17  experience?
18       A.    They are detailed documents.  It
19  takes a lot of drafting.  I would say two
20  months plus.
21       Q.    I think we may have touched on this
22  this morning.  You agree that proxy
23  statements typically contain information on
24  the process that leads up to the execution of
25  a merger agreement, right?

US District Court - New York                    FINAL - CONFIDENTIAL
Gross v. GFI Group                       William Purcell - Sept. 25, 2017

```
                                              Page 149
 1        A.    Yes.
 2        Q.    And the fact that merger proxies
 3   contain that information is commonly known to
 4   institutional investors, right?
 5        A.    That's correct.
 6        Q.    Commonly known to research analysts
 7   as well, right?
 8        A.    Correct.
 9        Q.    If one wants to learn about the
10   process that a board followed leading up to a
11   transaction, one would look first at the
12   proxy statement, right?
13             MR. ZWICK:  Objection.
14        A.    That would be correct.  One does
15   not expect to find surprises in the proxy
16   statement of the nature here.
17   BY MR. LYNCH:
18        Q.    You don't believe there is anything
19   misleading about the GFI merger proxy, do
20   you?
21        A.    Not that I see.  It's quite
22   detailed.
23        Q.    Let me just ask you:  If there was
24   any intention on the part of -- well -- if
25   one were to assume that the statement that
```

JANE ROSE REPORTING                National Court-Reporting Coverage
1-800-825-3341                     janerose@janerosereporting.com

US District Court - New York                FINAL - CONFIDENTIAL
Gross v. GFI Group                   William Purcell - Sept. 25, 2017

Page 154

1   experience, that to then tell that potential
2   acquirer that, Oh, hang on a minute, we are
3   going to go conduct a market check, that
4   might have the effect of alienating that
5   potential acquirer, right?
6        A.    Yes, but that applies more to the
7   first scenario I mentioned, the Coca-Cola
8   scenario, as distinct from the others because
9   you are talking to these people at the same
10  general period of time, and one or two are
11  emerging as the front-runners.  So when
12  you have picked the front-runner and the
13  best proposal, obviously, then you don't
14  go out and do a second, you know, market
15  check.
16       Q.    My question is different, and I
17  think I have an answer to it, but let me just
18  confirm.  If you are negotiating with a
19  single party on the other side, a single
20  potential acquirer, and those negotiations
21  have advanced to a certain degree, you would
22  agree that to announce to that single party,
23  your single potential acquirer, that you
24  would like to conduct a market check would
25  create the risk of alienating that single

Page 155
1   **potential acquirer, right?**
2               MR. ZWICK:  Objection.
3       A.      Yes, that could be the case, but it
4   also gets right to this process, because
5   Gooch had been working practically -- for a
6   number of months without informing the board
7   on a CME deal.  So by the time the special
8   committee got involved, CME, in effect, had
9   already put a proposal on the table, which
10  shouldn't have been the case if the board and
11  the special committee had been formed earlier
12  because they would have been talking to other
13  people at the same time with CME, so they
14  wouldn't have been boxed into that situation.
15  But, nevertheless, Greenhill still was
16  recommending that they perform a market
17  check, and that was their advice, and
18  Greenhill is an excellent investment banking
19  firm.
20  BY MR. LYNCH:
21      Q.      **You would agree that in a deal**
22  **process, market checks can pose a risk of**
23  **diminishing the value that the company might**
24  **receive in a merger transaction --**
25              MR. ZWICK:  Objection.

US District Court - New York             FINAL - CONFIDENTIAL
Gross v. GFI Group                William Purcell - Sept. 25, 2017

Page 168

1    **minutes were not sincerely held by him?**
2          A.      He may have believed them, but I
3    would certainly take the advice of Greenhill
4    over that of Mr. Gooch almost any day in the
5    area of M&A strategy and process and
6    procedure.
7          **Q.      Do you think Greenhill knew more**
8    **about GFI and the risks that GFI faced than**
9    **Mr. Gooch?**
10               MR. ZWICK:  Objection.
11         A.      Greenhill is very sophisticated in
12   the area of M&A.  They are a top investment
13   banking firm.
14   BY MR. LYNCH:
15         **Q.      You would agree, though, that**
16   **managers and directors and executives of a**
17   **company typically know more about the company**
18   **than investment bankers advising that**
19   **company, right?**
20               MR. ZWICK:  Objection.
21         A.      More about the company, not about
22   the M&A process.  And here we have a
23   management with a known agenda of wanting
24   to buy the IDB at the lowest price
25   possible.

US District Court - New York                    FINAL - CONFIDENTIAL
Gross v. GFI Group                      William Purcell - Sept. 25, 2017

Page 178

1   **likely?**
2         A.    Just plain statistics unless it's
3   clearly perceived by people to be an
4   undervalued transaction.
5         **Q.    But announcing a deal gives other**
6   **potential acquirers the opportunity to**
7   **perceive the value that others place on the**
8   **target company?**
9         A.    Yes and no.  Some may have
10  particular knowledge of a company, but they
11  still can't get confidential information from
12  the company unless they, under the fiduciary
13  outs, unless they put forward what seems to
14  be a bona fide deal that could be deemed by a
15  board or a special committee to be a superior
16  proposal, and then they are entitled to get
17  confidential information or what have you but
18  not before that.
19              So there is a lot of information
20  they don't have to make an assessment.
21        **Q.    But announcing a deal with a**
22  **fiduciary out in it allows other interested**
23  **parties to make better offers for the target**
24  **company if they were interested in doing so,**
25  **right?**

JANE ROSE REPORTING              National Court-Reporting Coverage
1-800-825-3341                   janerose@janerosereporting.com

US District Court - New York                FINAL - CONFIDENTIAL
Gross v. GFI Group                    William Purcell - Sept. 25, 2017

Page 179

1              MR. ZWICK:  Objection.
2      A.      Possibly with the caveats that I
3  just mentioned that they may not have the
4  inside information which would be critical
5  for them to come to that conclusion.
6  BY MR. LYNCH:
7      Q.      Let's take a look at your report,
8  please, Mr. Purcell, Exhibit 191, and I would
9  ask you to turn to page 7.
10             Do you have that in front of you?
11     A.      Yes.
12     Q.      I will focus your attention on
13  subparagraph 4 and the last sentence of that
14  subparagraph.
15     A.      The last sentence.
16     Q.      I will read it, but let me know if
17  you are not there yet.
18     A.      The one that begins "in addition"?
19     Q.      Yes.
20             "In addition, the winning bid by
21  BGC was, in part, possible because BGC was
22  able to take advantage of the significant
23  cost savings synergy of approximately 90
24  million per year which the financial adviser
25  to Gooch, Jefferies & Company ('Jefferies'),

Page 266

1   BY MR. LYNCH:

2       Q.    Mr. Purcell, please turn to

3   paragraph 51 of your opening report.  I asked

4   you a few questions about this earlier.  But

5   it references a letter that GFI received on

6   July 29th from BGC, right?

7       A.    Yes.

8       Q.    Are you offering any opinion on

9   whether that letter should have been

10  disclosed to GFI shareholders in connection

11  with the CME deal?

12      A.    No.  I don't think -- it did not

13  need to be disclosed.  I just listed it as a

14  fact.

15      Q.    And if you go to page 22 --

16      A.    I am just looking at this too,

17  paragraph 51, just started to read it again.

18  And as I am looking at this, I think I

19  misstated because you asked me the question

20  and now I am -- when you referred me back to

21  this question -- this paragraph, I think -- I

22  can't remember exactly what I said, but I

23  think I misstated to you that my recollection

24  was that he owned the entire 13 1/2 percent

25  at July 29th, and I think it was only a