# EXHIBIT 9

```
                                              Page 1

 1        * * * C O N F I D E N T I A L * * *
 2           UNITED STATES DISTRICT COURT
 3           SOUTHERN DISTRICT OF NEW YORK
 4
 5   BENJAMIN GROSS,            )
     Individually and on        )
 6   Behalf of All Others       )
     Similarly Situated,        )
 7                              )
               Plaintiff,       )
 8                              )
           vs.                  )    No.
 9                              )    1:14-cv-09438-WHP
     GFI GROUP, INC., COLIN     )
10   HEFFRON, and MICHAEL       )
     GOOCH,                     )
11                              )
               Defendants.      )
12   ------------------------   )
13
14
15
16                   June 22, 2017
17                   10:23 a.m.
18
19        Videotaped Deposition of ALEXANDER YAVORSKY,
20      helda t the offices of Herbert Smith Freehills,
21      450 Lexington Avenue, New York, New York, before
22      Laurie A. Collins, a Registered Professional
23      Reporter and Notary Public of the State of New
24      York.
25
```

```
                                          Page 18
```

1                    Yavorsky - Confidential

2        A.    It's a little bit difficult to answer,

3    again, given the nature of how these things work,

4    but I began to discuss the idea of -- or the idea

5    around the sale of the company probably in two

6    thousand -- maybe late 2012/early 2013, in that

7    kind of period.

8        Q.    When you say "discussed," discussed

9    with -- let me finish -- discussed with whom?

10        A.    With Mickey.

11        Q.    Did you know Mr. Gooch prior to your

12    discussions at the end of 2012 or 2013?

13        A.    I did, from the bond deal that we

14    discussed earlier.

15        Q.    Do you recall your first meeting with

16    him to discuss advisory services in 2013?

17        A.    I recall the first time that I

18    introduced the idea at a very early stage to see

19    what his views on it might be.  I wouldn't

20    describe it that as a discussion of our advisory

21    services.

22        Q.    When was that?

23        A.    Again, it would have been in that

24    general period that I mentioned to you earlier, I

25    think late '12/early '13, and it was at a

```
 1                 Yavorsky - Confidential
 2    restaurant.
 3        Q.    Can you generally describe the idea
 4    that you presented at that meeting?
 5        A.    In -- again, only at a very high level
 6    given the passage of time, and it was along the
 7    lines of the fact that GFI, which consisted then
 8    of several segments, that the stock price did not
 9    reflect the value that was embedded in those
10    different businesses and that it was unlikely, in
11    my opinion, that in the foreseeable future the
12    stock market was going to change its opinion about
13    how to value the businesses and that, you know,
14    one ought to give serious consideration to a
15    transaction that were to separate the various
16    businesses so that specific buyers that were
17    interested in those specific types of businesses
18    can pay an appropriate price that when added
19    together would represent a premium to where GFI
20    was then rating.
21        Q.    What was the business segments you were
22    referring to?
23        A.    Broadly speaking three, although you
24    can simplify them down to two:  one, the core
25    interdealer broker business; and then what I would
```

1                    Yavorsky - Confidential

2       Q.      What about after that first meeting?

3               MR. LYNCH:  Objection.

4       A.      I went home.

5       Q.      Was Mr. Gooch interested in your idea?

6       A.      He didn't seem terribly interested as

7   he sat there, was my impression.

8       Q.      Can you tell me a little bit about --

9   you mentioned a high-level -- a high-level

10  presentation about your thoughts or ideas.  Can

11  you share that with me?

12      A.      It was along the lines of -- and I had

13  to be delicate about it, since, you know, he was

14  the CEO and a large shareholder of this company

15  and I didn't know how he might react to it.  So I

16  was relatively benign in my description.

17              But I said, Look, the stock price has

18  come off significantly since the highs, you know,

19  precrisis.  There's not a lot of liquidity in the

20  stock.  The multiples -- the multiple at which it

21  trades is, you know, not particularly attractive.

22              You know, the operating environment in

23  the industry is difficult, and that was mainly a

24  reference to the interdealer -- the first segment,

25  the interdealer broker segment.  And I expected

```
                                          Page 25
 1                  Yavorsky - Confidential
 2      that there would be and certainly should be
 3      consolidation in the IDB space and that, you know,
 4      he was lucky to have these technology assets and
 5      there was enough there that, you know, it merited
 6      exploration of, as I said, strategic alternatives
 7      to unlock that value that I felt was not reflected
 8      in the stock price.
 9           Q.    What is a multiple?
10           A.    How I was using it?
11           Q.    Yes.
12           A.    A multiple is the ratio -- if you like,
13      the ratio of, let's say, the stock price to
14      something that you might compare it to.  It could
15      be revenues, it could be earnings, it could be
16      book value.  Those are the typical ones.
17           Q.    When you mentioned the multiples in
18      your previous answer, what were you referring to?
19      What ratio were you referring to?
20           A.    Probably EBITDA would be most likely.
21           Q.    So the stock price as compared to
22      EBITDA?
23           A.    They're not like-for-like concepts, so
24      it's one -- one way to look at the value of a
25      company or whether a stock is expensive or not is
```

```
                                                  Page 39
```

 1                    Yavorsky - Confidential

 2          Q.     And the other firm you mentioned,

 3    Wachtell?

 4          A.     Also a law firm.

 5          Q.     Who were they representing?

 6          A.     They weren't representing anyone.  I

 7    invited them to, with the company's permission, to

 8    help us with analyzing a particular aspect of the

 9    structuring of this.

10          Q.     When you say "the company's

11    permission," are you referring to Jefferies or to

12    GFI?

13          A.     GFI.

14          Q.     What particular aspect are you talking

15    about?

16                 MR. BALBER:  I just want you to pause

17          for a second and get some clarity from the

18          company as to whether they're taking a

19          position on privilege on any of these issues,

20          specifically to the extent which Wachtell was

21          present for meetings in which legal advice was

22          sought or rendered and/or Willkie Farr.  I

23          just want to make sure we're respectful of the

24          company's privilege assertions.

25                 MR. POPOK:  Let's take a break for a

```
                                        Page 40
 1                   Yavorsky - Confidential
 2        second.
 3             MR. BALBER:  Sure.  Let's take a break.
 4             THE VIDEOGRAPHER:  Going off the
 5        record.  The time is 11:01.
 6             (Recess taken from 11:01 to 11:08.)
 7             THE VIDEOGRAPHER:  We are back on the
 8        record.  The time is 11:08.
 9             MR. LYNCH:  This is John Lynch.  GFI
10        claims privilege over advice it received from
11        Willkie.  It does not claim privilege over any
12        communications with Wachtell, Lipton.  I think
13        the pending question, therefore, does not
14        implicate attorney-client privilege for GFI.
15             MR. ZWICK:  Thank you.
16             Can you read back the last question.
17             (Record read.)
18        A.    I am talking about mainly tax -- mainly
19    taxes, devising a structure that avoided as much
20    as possible tax leakage.
21        Q.    What is tax leakage?
22        A.    Tax leakage is effectively having --
23    paying taxes where a structure can otherwise be
24    devised to not have to pay as much taxes.
25        Q.    When you say "structure," you mean deal
```

```
                                         Page 41
 1              Yavorsky - Confidential
 2   structure?
 3        A.    Yeah.
 4        Q.    Who was Wachtell going to provide this
 5   advice to?
 6        A.    The tense in which you're asking the
 7   question, who were -- who did they provide it to?
 8        Q.    Did you testify that you invited
 9   Wachtell to this meeting in order to provide
10   advice on what you called tax leakage?
11        A.    Yes.
12        Q.    Who was Wachtell going to provide this
13   advice to?
14        A.    It was going to be discussed with GFI
15   and with Jefferies, so it was -- it was a
16   contribution to both the company and to Jefferies,
17   if you like.
18        Q.    Did Wachtell provide tax advice in this
19   matter?
20             MR. LYNCH:  Objection to form.
21        A.    I can't speak to the legal meaning of
22   advice in the manner that, you know, law firms do,
23   but, yes, they were helpful.
24        Q.    Did they provide Jefferies with advice?
25             MR. LYNCH:  Objection.
```

```
                                          Page 64
 1               Yavorsky - Confidential
 2       A.    I don't -- is it a fact?  I don't think
 3   it is.  That's not my recollection.
 4       Q.    You mentioned that JPI's cost basis in
 5   GFI --
 6       A.    Tax basis?
 7       Q.    Cost basis or tax basis, was very low.
 8   Do you remember what the number was?
 9               MR. LYNCH:  Objection.
10       A.    I don't exactly, but if memory serves
11   the tax basis would have been -- in the equity of
12   Trayport, the roughly 140 million they paid for it
13   when they acquired it back in the late 2000s.
14       Q.    Well, does that translate into a per
15   share tax basis for JPI's ownership of GFI stock?
16               MR. BALBER:  Object to the form of the
17       question.
18       Q.    Do you understand the question?
19       A.    Candidly, no.
20       Q.    What was JPI's basis --
21       A.    JPI, we're talking about now?
22       Q.    That's what I said.  What was JPI's
23   basis for its shares in GFI stock?
24       A.    A few cents a share.
25       Q.    Did you ever calculate what the public
```

```
                                        Page 65

1                  Yavorsky - Confidential
2    shareholders' basis was for their shares of GFI
3    stock?
4                  MR. BALBER:  Object to the form of the
5           question.
6                  MR. LYNCH:  Objection.
7           A.    Well, it's of course impossible to
8    calculate, but we did at some point look at the
9    largest shareholders of GFI, where you had
10   information on that, to see -- to try and estimate
11   where their cost basis might have been.
12          Q.    And what did you learn?
13          A.    I don't -- I don't think there was a
14   particular commonality amongst them, so we
15   learned -- I think Fidelity -- I just remember
16   sort of remarking that, you know, Fidelity was --
17   and I don't remember what it is about Fidelity,
18   but I just remember there was something about
19   them.
20                 And that's basically all that I
21   remember.  I don't remember coming back to it sort
22   of ever again, and so it just didn't stick in my
23   memory.
24          Q.    Do you remember if the list of largest
25   shareholders, whether many of them in fact had a
```

                                                      Page 66

1                    Yavorsky - Confidential
2     basis in their GFI stock above 4.55 a share?
3          A.    I don't remember -- I don't remember
4     knowing that one way or another.
5          Q.    Isn't that something you would have
6     considered when addressing the tax leakage
7     question for the purposes of structuring a deal on
8     behalf of GFI's public shareholders?
9                MR. LYNCH:  Objection.
10         A.    I think we're hopelessly mixing things
11    here.  I would have considered the cost basis of
12    GFI's public shareholders or anybody's any
13    shareholders in order to determine not to such --
14    not dispositively determine but it's an input into
15    what price might be -- for their shares might be
16    acceptable to them.
17         Q.    Would it also be an input to determine
18    the form of consideration that would be acceptable
19    to them in the sale?
20         A.    As a kind of second derivative matter,
21    yes.
22         Q.    So the answer is yes?
23               MR. LYNCH:  Objection.
24               MR. BALBER:  The answer is the answer.
25         A.    Can you repeat your question, sorry.

```
                                          Page 67

 1                 Yavorsky - Confidential

 2            MR. ZWICK:  Can you read back the

 3      question.

 4      Q.    I may have missed something in your

 5   answer.  I just...

 6            (Record read.)

 7      A.    Yes, a small one.

 8      Q.    Can you tell me generally whether a

 9   stock-for-stock deal is better for the

10   shareholders of a public company or a cash deal is

11   better for the public shareholders of a company?

12            MR. BALBER:  Object to the form of the

13      question.

14            MR. LYNCH:  Objection.

15      A.    There's no general answer to that.

16            MR. LYNCH:  Any attempt to solicit

17      expert advice from a lay witness.

18      Q.    Well, in negotiating a deal on behalf

19   of public shareholders and in deciding whether or

20   not stock would be better for them or cash would

21   be better for them, wouldn't you have to analyze

22   the tax basis of the public shareholders?

23            MR. BALBER:  Object to the form of the

24      question.  It calls for a hypothetical.

25            MR. LYNCH:  Objection.
```

```
                                             Page 74
 1                    Yavorsky - Confidential
 2      this buyer?  Do we think their stock is too
 3      expensive or not too expensive?  Does it have good
 4      prospects or not?
 5                    All of these things are considered when
 6      stock is part of the consideration.
 7           Q.    Was the CME deal a stock-for-stock
 8      deal?
 9                    MR. LYNCH:  Objection.  Ultimately?
10           A.    The CME -- the deal that was announced
11      with the CME that didn't close --
12           Q.    Yes.
13           A.    -- involved receiving -- involved
14      receiving CME shares.
15           Q.    Was that because the buyer determined
16      it wanted to provide its consideration in stock or
17      is that because the seller asked for stock?
18           A.    I think it evolved over the course of
19      discussions in part based on tax considerations.
20      I think mostly based on structuring and tax
21      considerations.
22           Q.    Were those tax considerations more
23      prominent for the JPI shareholders or for the
24      public shareholders?
25                    MR. LYNCH:  Objection.
```

                                                    Page 75

 1                     Yavorsky - Confidential

 2                 MR. BALBER:   Object to the form of the

 3        question.

 4        A.    Well, I never worked -- I never

 5   discussed -- I never had the opportunity to

 6   discuss this with each individual public

 7   shareholder the way that I did GFI, because

 8   obviously Mickey Gooch and Colin Heffron were

 9   members of JPI -- sorry, I meant JPI.  I meant

10   JPI, not GFI, if I said GFI.

11                 So I can't -- it's not an apples-to-

12   apples question.  But I will tell you that

13   generally speaking in this transaction having CME

14   pay in stock while providing tax efficiencies to

15   JPI, the largest shareholder of the company, was

16   not viewed as problematic by me as a banker.

17                 And, you know, I think ultimately the

18   board with respect to the other shareholders --

19   because CME at the time was a 30-some-odd-

20   billion-dollar company, highly liquid with a high

21   dividend yield, it was my supposition that many of

22   the shareholders of GFI were shareholders of GFI

23   because of its dividend yield.  And CME had a

24   dividend yield that was sort of as good or better.

25                 So anyone that wanted to get cash could

Page 76

```
 1                    Yavorsky - Confidential
 2    have sold it for cash instantaneously without any
 3    negative price impact, or they could have held
 4    onto it because CME stock was -- you know, had
 5    been performing well and had positive
 6    recommendations from equity analyses, is my
 7    recollection, and had an attractive dividend
 8    yield.
 9         Q.    Putting aside whether it was
10    problematic, did you identify a particular
11    advantage to receiving stock on behalf of the
12    public shareholders; "yes" or "no"?
13              MR. LYNCH:  Objection.
14              MS. KERNAN:  Objection.
15              MR. BALBER:  Same objection.
16         A.    I don't remember whether I did or
17    didn't.
18              MR. BALBER:  If we can take a break at
19         some point, Jack?
20              MR. ZWICK:  One more question.  No,
21         let's take a break.
22              THE VIDEOGRAPHER:  Going off the
23         record.  The time is 11:51.  This ends Disk 1.
24              (Recess taken from 11:51 to 12:20.)
25              THE VIDEOGRAPHER:  We are back on the
```

```
 1                    Yavorsky - Confidential
 2     the deal that made the entire deal possible.  I
 3     wouldn't say that from my point of view it was an
 4     objective of this deal.
 5          Q.    Do you know if Jefferies ever
 6     characterized it as an objective of the deal?
 7          A.    I don't know if we ever characterized
 8     it that way.  I know that that was something that
 9     Mickey expressed views on wanting to do; and
10     inasmuch as, you know, he was a very large
11     shareholder, it becomes objective reality you have
12     to consider so...
13          Q.    Who did he express that to?
14          A.    Over the course of the entire kind of
15     beginning to the end, just about everybody.
16          Q.    Including yourself; right?
17          A.    Yes.
18          Q.    And when you say it becomes a reality,
19     what do you mean by that?
20          A.    Well, it just becomes -- if -- if you
21     know that a large shareholder of the company
22     wants -- you know, is partial to a particular --
23     to a particular thing -- let's say I am not a
24     seller for a price less than X or I'm not, you
25     know -- I am not a seller to, you know, this
```

```
 1                  Yavorsky - Confidential
 2   company, for example, you have to weigh that as
 3   you are providing advice to your client, the
 4   client being in this case GFI, because, you know,
 5   we live in the real world, not in kind of an
 6   abstract world.  So you have to -- you have to
 7   just take that into account.
 8        Q.    Just using your words, what was the
 9   particular thing that you were referring to?  In
10   this case what was the particular thing that
11   Mr. Gooch expressed to you that sort of defined
12   the reality that you were operating in?
13        A.    Well, with respect to the IDB, he was
14   interested in acquiring the IDB.
15        Q.    Was he interested in a deal in which he
16   couldn't acquire the IDB?
17                MR. LYNCH:  Objection.
18                MS. KERNAN:  Objection.
19        A.    Was he interested in a deal?  I think
20   there came -- there came a point in the spring of
21   two thousand -- spring, summer of 2013, prior to
22   when we launched our process, where, you know, it
23   became clear the deal he wanted to focus on was
24   the one we ended up pursuing.
25        Q.    When you say "launched your process,"
```

Page 81

1                    Yavorsky - Confidential

2    can you explain to me what that means?

3         A.    Sure.  We approached, with the

4    permission of the company, a handful of buyers,

5    potential buyers.  I can tell you who they are --

6    who they were -- to gauge their interest in

7    exploring the acquisition of GFI structured in a

8    manner that we had by then analyzed and felt was

9    doable.

10        Q.    When you say analyzed by then and

11   doable, are you including the fact that the IDB

12   would be purchased by Mr. Gooch?

13        A.    Yes.

14             MS. KERNAN:  Objection.

15             MR. ZWICK:  Is that an objection?

16             MS. KERNAN:  That was an objection to

17        your question.

18        Q.    You offered to identify the names, just

19   for the record so we have them clear, I think I

20   know them, but can you tell me who those parties

21   were?

22        A.    The CME, Deutsche Börse, Thomson

23   Reuters, and the Hong Kong stock exchange.

24        Q.    So was it your understanding at that

25   time that none of the parties you just

Page 82

```
 1                 Yavorsky - Confidential
 2    enumerated -- just mentioned were interested in
 3    acquiring the IDB?
 4               MR. LYNCH:  Objection.
 5         Q.    Is that correct?
 6         A.    I was highly confident that that they
 7    would not be interested in the IDB part of it.
 8         Q.    Had you discussed those names with
 9    Mr. Gooch prior to launching your formal process?
10         A.    Yes.
11         Q.    When did you first discuss those names
12    with Mr. Gooch?
13         A.    I can't remember the exact circumstance
14    or date, but when we -- when we looked at the
15    business and began to think of it as a sum-of-the-
16    parts concept that we were talking about earlier,
17    which was the crux of the opportunity that the sum
18    of the parts was more valuable than the whole as
19    look at by the market, we laid out who we thought
20    would be reasonable buyers, buyers, you know, at a
21    high price for, you know, the various assets.
22         Q.    Did any of those names come from
23    Mr. Gooch?
24         A.    He might have -- he might have
25    suggested the Hong Kong stock exchange, which I
```

```
                                             Page 88
 1                  Yavorsky - Confidential
 2     them have X's and one has a check.
 3          A.     (Nods head.)
 4          Q.     In the first one, global -- it states,
 5     Global, economic, and financial market conditions
 6     have led to low volumes of volatility across all
 7     asset classes.
 8                  What does that mean and in particular
 9     what are all asset classes?
10          A.     Asset classes in which GFI
11     participates.
12          Q.     Does GFI participate alone or are you
13     referring to industry-wide conditions?
14          A.     Well, industry-wide, but I'm narrowing
15     it to GFI's industry and not...
16          Q.     Right.  So it would include GFI and its
17     competitors?
18          A.     Yeah.
19          Q.     You see the third -- that's an X, so
20     that X I'm assuming -- you'll tell me if I'm
21     incorrect -- indicates a negative?
22          A.     Correct.
23          Q.     You see the third line, third entry,
24     has a check?
25          A.     Yes.
```

```
                                         Page 89
 1                  Yavorsky - Confidential
 2        Q.     That indicates a positive?
 3        A.     Yes.
 4        Q.     What was positive about the operating
 5   environment?  What does it say there?  What does
 6   that mean?
 7                MR. LYNCH:  Read it?
 8                MR. ZWICK:  I can read it.
 9        A.     It says market conditions will
10   eventually improve.
11        Q.     Did Jefferies create this?
12        A.     Yes.
13        Q.     Was that with the input of Mr. Gooch or
14   on its own?
15        A.     On its own.
16        Q.     The meeting you described before at the
17   restaurant, did that take place before this
18   presentation was created?
19        A.     Yes.
20        Q.     Do you see the third block refers to
21   regulatory?
22        A.     Yes.
23        Q.     Again, there are two X's and one check.
24   The one check says voice and hybrid brokerage will
25   not go away.
```

```
                                              Page 90
 1                   Yavorsky - Confidential
 2              What does that mean?
 3       A.    Well, it -- it's in the context of the
 4   fact that regulation in the U.S. and in Europe is
 5   changing -- is having -- having and we're saying
 6   will continue to have an impact on the brokerage
 7   business.  However, as a positive, that impact
 8   isn't expected to go as far as call the very
 9   existence of this business model into question.
10       Q.    When you say "business model," are you
11   referring to interdealer broker model?
12       A.    Correct.
13       Q.    So you anticipated that the business
14   would continue; correct?
15       A.    Yes.
16       Q.    And that market conditions will
17   eventually improve?
18       A.    That's right.
19       Q.    Can you turn to or look at page 3?
20       A.    Yes.
21       Q.    So the heading on the page says,
22   opportunity to unlock value of GFI's technology
23   businesses and reap benefits and consolidation.
24              The way I read it -- and you'll tell me
25   if I'm wrong -- those are sort of two separate
```

```
                                                    Page 91
 1                  Yavorsky - Confidential
 2      points; is that correct?
 3           A.    That's correct.
 4           Q.    Is it fair to say the first part of
 5      that heading refers to Trayport and Fenics?
 6           A.    Yes.
 7           Q.    And is it also fair to say that the
 8      second part of that heading refers to the IDB?
 9           A.    Correct.
10           Q.    And then you have the current situation
11      block.  Do you see that right underneath that?
12           A.    Yes.
13           Q.    The fourth bullet point, is it fair to
14      say, highlights GFI's strong capability in
15      electronic brokerage?
16                  MR. BALBER:  Object to the form of the
17           question.
18           Q.    Well, I can read it.  It says, GFI has
19      a notably strong capability in electronic
20      brokerage.
21                  Now, that's -- is it not correct that
22      that is referring to the IDB?
23           A.    It's correct.
24           Q.    Thank you.
25                  Under "opportunity" Jefferies -- the
```

```
                                            Page 92
 1                  Yavorsky - Confidential
 2    first bullet point says, Jefferies estimates the
 3    sum-of-the-parts value of GFI at 5.41 a share --
 4    that's $5.41 a share -- and 64 percent premium to
 5    current price.
 6              Does that -- when you use the term
 7    "sum-of-the-parts value," does that reflect the
 8    sum of the parts in a sale of the company?
 9              MR. LYNCH:  Objection.
10        A.    No, it reflects -- I mean, we spent a
11    fair amount of our conversation earlier today
12    talking about how sum-of-the-parts analysis works
13    and -- it's an analysis; right?  It's you saying
14    what are these businesses worth on the basis of
15    prior transactions that may have taken place in
16    the industry on the basis of publicly traded comps
17    and so on.
18        Q.    The stock was trading at less than 5.41
19    a share; correct?
20        A.    Correct.
21        Q.    In order to achieve a sum-of-the-parts
22    value -- in order to have the stock trade at or
23    reflect the true sum-of-the-parts value, it would
24    require a sale of the company, would it not?
25        A.    I mean, it would require somebody to
```

Page 93

1                  Yavorsky - Confidential
2       pay you $5.41 for the various parts.
3            Q.    It would require a sale of those
4       assets; is that correct?
5            A.    Yeah.
6            Q.    You see under "opportunity" the second
7       bullet point?
8            A.    I see.
9            Q.    The robust performance and valuation of
10      Trayport and Fenics.  You then say, GFI can
11      receive significant cash consideration for these
12      businesses; is that correct?
13           A.    Yep.
14           Q.    Why are you referring to cash
15      consideration there as opposed to stock?
16           A.    Well, like I said before, it makes no
17      sense whatsoever for GFI to sell some of its
18      assets for stock of another company and then
19      simply own stock of another company.
20           Q.    Right.  I remember that testimony.  But
21      in the context of a sale of the whole company, is
22      there a particular benefit to cash consideration
23      for Trayport and Fenics as opposed to stock
24      consideration for Trayport and Fenics?
25                 MR. BALBER:  Object to the form of the

```
                                          Page 94
 1                  Yavorsky - Confidential
 2       question.
 3                  MR. LYNCH:  Objection.
 4       Q.    Do you understand the question?
 5       A.    This isn't talking about necessarily
 6   the sale of the entire company; this is talking
 7   about this -- this particular bullet is talking
 8   about the sale of Trayport and Fenics for cash.
 9       Q.    Let's look at the next bullet point.
10   The next bullet point addresses GFI's IDB
11   franchise; is that correct?
12       A.    Yes.
13       Q.    And it says, The true value -- I think
14   it's missing the word "of" -- but the true value
15   of GFI's IDB franchise should reflect the
16   synergies that can be unlocked in a strategic
17   combination with another IDB which can best be
18   achieved at the bottom of the cycle.
19             Can you explain to me what you mean by
20   "synergies" in this context?
21       A.    Yes.  It means mainly cost synergies,
22   so eliminating redundant expenses between the two
23   parties coming together and also capital
24   synergies, potentially.  And also it was my thesis
25   that in a merger of two IDBs -- to there were only
```

```
                                         Page 95
 1              Yavorsky - Confidential
 2    five --
 3         Q.    I'm listening.
 4         A.    There were only five major ones.  If
 5    two of them were to merge, it is a significant-
 6    enough event that the merged IDB I thought might
 7    have negotiating power with its brokers to
 8    permanently lower the payout ratio.
 9         Q.    Now, in order to eliminate these
10    redundancies, as you described them, wouldn't it
11    require a merger between -- or a sale to another
12    IDB as opposed to a sale of the company to a
13    non-IDB participant?
14              MR. LYNCH:  Objection.
15         A.    Yeah, synergies can only come from --
16    in this case the synergies are between one IDB and
17    another.
18         Q.    What do you mean, it can "best be
19    achieved at the bottom of the cycle"?
20         A.    Well, what I meant by that, it has to
21    do with that last point I mentioned to you, which
22    is at the bottom of the cycle the bargaining power
23    of individual brokers -- I'm talking about human
24    beings -- is just reduced; right?  Where are they
25    going to go, so to speak?
```

```
                                    Page 98
 1              Yavorsky - Confidential
 2   described the optimal approach.  The way I read
 3   this, this describes an approach to a sale of the
 4   entire company; is that correct?
 5       A.    The first bullet?
 6       Q.    Yes.
 7       A.    Yes.
 8       Q.    Can you explain that?  Let me read it
 9   first, instead of asking you to read it, and then
10   explain it.
11       A.    Yeah.
12       Q.    Optimal approach may be to engage with
13   an IDB -- and it has ICAP or Tullet in
14   parentheses -- to sell the entire company for
15   either cash or stock while retaining the option to
16   sell Trayport and Fenics for cash to another
17   strategic buyer.
18            Can you give me a description of what
19   you were trying to convey in this bullet point?
20       A.    That --
21       Q.    Can you focus -- I apologize.  Scott is
22   frustrated with my question, and that's fine.  But
23   can you focus on the "optimal approach" part of
24   that sentence in the context of giving your
25   answer?  Why would that be an optimal approach?
```

```
                                        Page 99
1                 Yavorsky - Confidential
2              MR. LYNCH:  Objection to form.
3       A.    Because it would give GFI the most
4    strategic flexibility whereby you would -- because
5    by going with -- it's optimal because by going
6    with this approach you're not foregoing the
7    ability to go with a different approach, is why
8    it's optimal.
9              So you would engage with the company
10   like ICAP or Tullet who might buy all of GFI but
11   would always maintain the option either in driving
12   price in these discussions higher or simply moving
13   in an altogether different direction to sell
14   Trayport and Fenics for cash to a complete new
15   group of buyers.
16      Q.    Right.  So when you say "strategic
17   flexibility," you mean strategic flexibility so
18   that the company could achieve the highest price;
19   is that correct?
20              MR. LYNCH:  Objection.
21      A.    Yeah, that's right.
22      Q.    And the third bullet point in the
23   possible outcomes is sort of a variation of that;
24   is that not correct?
25      A.    You said the third bullet point?
```

Page 105

1              Yavorsky - Confidential
2     the significance of them and what it means.
3              Can you tell me what it means here?
4         A.    What what means?
5         Q.    What does commercial segment buyers
6     mean?  Let me back up.  This morning I asked you
7     whether commercial segment refers to Trayport and
8     Fenics.  Isn't it true that looking at this now
9     when you use the term "commercial segment buyers"
10    you're referring to buyers of Trayport and Fenics?
11        A.    Yes.
12        Q.    And not the IDB?
13        A.    Correct.
14        Q.    Can you look at page 14.
15        A.    Yep.
16        Q.    Again this is titled high-level
17    brokerage segment valuation.  This is referring to
18    the IDB, is it not?
19        A.    Yeah.
20        Q.    You see there are -- there is like a
21    bar chart in the middle of the page and the second
22    entry is synergies?
23        A.    Yep.
24        Q.    And doesn't that reflect an input into
25    the valuation of the company to be achieved from

```
                                        Page 106
 1              Yavorsky - Confidential
 2   synergistic savings as a result of merger with
 3   another IDB; is that correct?
 4        A.    That is correct.
 5        Q.    And you see the number is $98 million?
 6        A.    Yep.
 7        Q.    Was that Jefferies' estimate?
 8        A.    Yes.
 9        Q.    Now we're going to skip ahead for into
10   2015 or somewhere there.  Are you aware that BGC
11   has publicly touted significant savings as a
12   result of synergies it achieved when it acquired
13   GFI and merged it with its own IDB business?
14              MR. LYNCH:  Objection.
15        A.    Am I aware that they touted thusly?
16        Q.    Yeah.
17        A.    Yeah, I seem to recall reading a press
18   release.
19        Q.    Did it surprise you?
20        A.    No.
21        Q.    Isn't it true that Jefferies had
22   identified these savings all the way back in
23   February 2013?
24              MR. LYNCH:  Objection.
25        A.    We identified savings in this
```

```
                                         Page 110
 1              Yavorsky - Confidential
 2   going to pay you for 100 percent of those savings
 3   because they're meant to get something for it too.
 4   So we're assuming it's split 50-50.  That's the
 5   divided by two.
 6        Q.    And what you come up with after
 7   conducting the equation is $98 million?
 8        A.    Right.  We only got off on this tangent
 9   because I didn't want you to think it was $98
10   million of savings.
11        Q.    I understand.  But -- okay.  As a
12   general -- is it fair to say that a buyer who
13   could achieve synergistic savings will pay more
14   for a company than a buyer that can't?
15        A.    It is true.
16        Q.    Can you look at page 17, please.
17        A.    I'm there.
18        Q.    Here again we see the stage in between
19   commercial process and entire process
20   participants; correct?
21        A.    Yes.
22        Q.    And the entire process participants are
23   the IDBs; is that correct?
24        A.    Yep.
25        Q.    And the reason that is is because they
```

```
                                      Page 111
```

1              Yavorsky - Confidential
2    would be acquiring the IDB in addition to
3    acquiring Trayport and Fenics; is that correct?
4         A.    Correct.
5         Q.    And the synergy analysis applies to
6    these buyers; correct?
7         A.    Yes.
8         Q.    Can you look at the key points on the
9    left.  Is this just a duplication of what we saw
10   earlier where you have the optimal approach in the
11   fourth bullet point and then the two possible
12   outcomes on the bottom, or is this meant to
13   indicate a different analysis?
14              In other words, I understand this is
15   sort of, you know, as a sum-up.  I just want to
16   make sure it's not a separate point from what we
17   discussed earlier.
18              I directed your attention earlier --
19        A.    I know.  If it's the same text, then
20   it's the same text.  I don't know what you're
21   trying to get at.
22        Q.    Under "possible outcomes," under either
23   of the two possible outcomes, you're always
24   selling -- you're always advising selling the IDB
25   to a competitor; is that correct?

```
                                      Page 114
 1               Yavorsky - Confidential
 2        Q.    Is this one day after your meeting at
 3   which you presented the document that was the
 4   previous exhibit?
 5        A.    Correct.
 6        Q.    Can you generally describe to me what
 7   the purpose of this e-mail was?
 8        A.    Yes.  We are expected -- I don't
 9   actually do it, but I did in this case -- to enter
10   call reports.  This is when we have an interaction
11   with a client, we have a tracking database, and
12   these call reports go in there.  So I sent her
13   these notes so she would enter the call report.
14        Q.    You see at the top where it says Mickey
15   Gooch?
16        A.    Yes.
17        Q.    Does this reflect points that you
18   either learned from or discussed with Mr. Gooch
19   the previous day?
20        A.    This reflects what I learned from my
21   meeting with Mickey Gooch.
22        Q.    What does an EL mean?  The first bullet
23   point has EL.
24        A.    Engagement letter.
25        Q.    And BAML, is that Bank of America
```

```
                                                Page 115
 1               Yavorsky - Confidential
 2   Merrill Lynch?
 3        A.    Yes.
 4        Q.    And does JV mean joint venture?
 5        A.    Yes.
 6               Just for -- it's supposed to be or JV.
 7        Q.    Right.  I figured that, because --
 8   okay.  Thank you.
 9               Do you see the fifth bullet point says,
10   wants to keep IDB and run it as a debt-free, well-
11   capitalized company?
12        A.    Yes.
13        Q.    So is it correct you learned that at
14   the meeting the day before?
15        A.    Yes.
16        Q.    You see the last bullet point:
17   follow-up - evaluate structures for achieving
18   above objectives?
19        A.    Yes.
20        Q.    Is that a note for the system to
21   indicate what's to happen in the future?
22               MR. LYNCH:  Objection.
23        A.    I'm just recording what I think the
24   follow-up is, what I'm going to -- what I'm going
25   to be focusing on.
```

Page 124

1                    Yavorsky - Confidential
2    document?
3         A.     It depends on what you're going to ask
4    me.
5         Q.     Okay.  We'll find out.  I'm not sure I
6    know yet.
7                Look at page 1 under the title
8    transaction objectives.  Whose objectives were
9    these?
10        A.     It's what we, Jefferies, understand the
11   objectives to be.
12        Q.     And would those be objectives of
13   Mr. Gooch?
14        A.     Well, they would be objectives of GFI.
15        Q.     Do you have any independent knowledge
16   of what GFI's objectives would be other than what
17   you got from Mr. Gooch?
18                MR. LYNCH:  Objection.
19        A.     Well, again, we're comparing a legal
20   entity with a human being.  But Mickey is the
21   executive chairman, is the management of GFI.  All
22   right?  So he -- in speaking with him and his
23   team, the executive vice president of strategy,
24   Chris Giancarlo, to me that's GFI.
25        Q.     Did you have any access to GFI other

```
                                        Page 125
 1              Yavorsky - Confidential
 2    than through Mr. Gooch and Mr. Giancarlo at this
 3    point, by April 2013?
 4         A.    No.
 5         Q.    So when it says transaction objectives,
 6    are you including Mr. Gooch's objectives?
 7              MR. BALBER:  Object to the form of the
 8         question.
 9              MR. LYNCH:  Same.
10         A.    As a shareholder?  As a C -- as an
11    executive chairman?
12         Q.    Is there a difference to you?  Does it
13    make a difference in answering the question?
14              MR. BALBER:  Object to the form of the
15         question.
16              MR. LYNCH:  Objection.
17         A.    These are the objectives of all the
18    relevant constituencies of getting a transaction
19    done.
20         Q.    Is Mr. Gooch one of the relevant
21    constituencies?
22         A.    Sure.
23         Q.    Did you say why?
24         A.    Sure.
25         Q.    Is that based on conversations that you
```

Page 126

1              Yavorsky - Confidential
2   had with Mr. Gooch and follow-up after the
3   February 12th, 2013, presentation?
4        A.    Is my understanding of what the
5   objectives are based on my prior interactions with
6   Mickey?  Yes.
7        Q.    Point number 1 says, receive full value
8   for GFI's assets.
9              Does that include the IDB?
10       A.    Yeah.
11       Q.    Can you describe point 3 for me?  And
12  let me just read it first.  Charter clear, least
13  cumbersome path to creating a private, well-
14  capitalized, stand-alone IDB entity.
15             Does this mean an entity owned by
16  Mr. Gooch and the management consortium?
17       A.    It does.
18       Q.    Number 4 says, minimize process
19  complexities by creating a structure that has
20  both -- and "both" is underlined -- the substance
21  and the appearance of treating all shareholders
22  equally favorably.
23             What does that mean?
24       A.    What it means is most likely that so
25  long as the option to own the IDB alongside CME --

```
                                       Page 127
```

1                    Yavorsky - Confidential

2    I keep using CME as an example -- is available to

3    all shareholders and not just some but not others,

4    I felt -- and I'm not sure whether this would have

5    been right or wrong.  But I felt at the time that

6    it obviated the need, for example, for a special

7    committee, and all else being equal, that would

8    have been a simpler process than one with a

9    special committee.

10             The reason a special committee needs to

11   exist is because of the appearance of existence of

12   a conflict, and therefore I'm saying to the extent

13   that there is not that appearance and not that

14   substance, then the process ought to be simpler.

15        Q.    Are you speaking as an investment

16   banker or as a lawyer?

17             MR. LYNCH:  Objection.

18             MR. BALBER:  Objection.  Come on.

19        Q.    You're not a lawyer; right?

20        A.    No.

21        Q.    So did you seek legal counsel in

22   preparing this or is that just your understanding

23   at the time?

24        A.    It's my understanding at the time.

25        Q.    So this doesn't represent a legal

```
                                        Page 128
1                Yavorsky - Confidential
2   opinion, does it?
3        A.    No.
4        Q.    Can you turn to page 2, please?  You
5   see the caption on the top of the page is
6   illustrative transaction structure?
7        A.    Yes.
8        Q.    And below it there's a list of
9   assumptions?
10       A.    Yeah.
11       Q.    The first bullet point has four
12  assumptions.  The first of them is IDB business
13  valuation is assumed at $100 million; is that
14  correct?
15       A.    Correct.
16       Q.    Where did that assumption come from?
17       A.    From our -- from our work.
18       Q.    How did you determine $100 million to
19  be an appropriate assumption?
20       A.    Well, let's see.  For that we have to
21  turn to page 3.  If you see in on the right-hand
22  side of the top table it says part valuation
23  method.  So the IDB is valued at one times its
24  capital.  Essentially an approach similar to a
25  book value valuation.  So it's worth one times its
```

```
                                          Page 129
 1                  Yavorsky - Confidential
 2    book value.
 3         Q.    Does it actually say one times
 4    estimated regulatory capital?
 5         A.    Yes.
 6         Q.    What's the difference between
 7    regulatory capital and capital?
 8         A.    Well, the regulators have a certain
 9    formula for how they calculate capital.  It's
10    pretty similar to capital, but it's a more
11    conservative valuation.
12         Q.    Is it anyway actual capital is higher
13    than regulatory capital?
14         A.    It depends on what you mean by
15    "capital."  Different people use different terms
16    for it.  It's fair to say that regulatory capital
17    is usually -- well, not necessarily.  Regulatory
18    capital can be less than tangible equity, which is
19    what I would describe as probably the best proxy
20    for capital.  However, subordinated debt,
21    qualifying subordinated debt, is part of
22    regulatory capital but isn't part of tangible
23    equity.
24              So it just depends.
25         Q.    Right.  In this case did GFI have
```

```
                                          Page 130
 1                Yavorsky - Confidential
 2   capital that was more or less than its regulatory
 3   capital?
 4             MR. BALBER:  Object to the form of the
 5        question.
 6             MS. KERNAN:  Same.
 7        A.    There was no way of knowing that at
 8   this stage.  Are you talking about GFI -- all of
 9   GFI or the IDB?
10        Q.    Is it fair to say that regulatory
11   capital referred to capital that was attributed to
12   the IDB?
13             MR. LYNCH:  Objection.
14        A.    Regulatory capital referred to
15   regulatory capital at the IDB.
16        Q.    Right.  Did GFI have any other capital
17   at the IDB in addition to its regulatory capital?
18             MR. BALBER:  Object to the form of the
19        question.
20        A.    There is no way of knowing because the
21   IDB hadn't been split out from the rest of -- from
22   the rest of the company.  The only reason that I
23   know what the regulatory capital is is because
24   it's something that's disclosed in their
25   financials.
```

```
                                              Page 131
 1                  Yavorsky - Confidential
 2              And this hundred here isn't even
 3    necessarily what it had at the time.  It's what it
 4    was assumed it would have kind of pro forma for
 5    this transaction as the amount that was needed to
 6    operate.
 7          Q.    Can you go back to page 2.
 8          A.    Yes.
 9          Q.    Under the assumptions for the other
10    business units, Fenics and Trayport, was a
11    different valuation method used?
12          A.    Yes.
13          Q.    What was the valuation method that was
14    used for Trayport and Fenics?
15          A.    An enterprise value multiple of EBITDA.
16          Q.    Could you have conducted an enterprise
17    value multiple of EBITDA in valuing the IDB
18    business on April 23rd, 2013?
19              MR. BALBER:  Object to the form of the
20          question.
21          A.    I could have.
22          Q.    Do you know what result that would have
23    yielded?
24          A.    I don't.
25          Q.    Sitting here today do you think it
```

```
                                          Page 132
 1                Yavorsky - Confidential
 2   would have been more or less than $100 million?
 3        A.    It depends on what multiple one would
 4   have chosen.
 5        Q.    Was there a multiple that you were
 6   using in your valuations of the company at this
 7   point, I would should say for -- I'll correct it,
 8   for the IDB?
 9        A.    Ask your question again.
10        Q.    Was there a multiple that you were
11   using in valuing the IDB at this point?
12        A.    We had looked at some multiples
13   previously, for example, in estimating
14   potential -- that six times multiple we were
15   looking at for synergies.
16        Q.    Correct.
17              And would you have used that same
18   multiple here?
19              MR. LYNCH:  Objection.
20        A.    I didn't in this deck value the IDB
21   business on the basis of EBITDA, so that's kind of
22   a hypothetical that didn't happen.
23        Q.    Is there a reason that you didn't and
24   you chose to use regulatory capital?
25        A.    There is.  Mainly because a valuation
```

```
                                           Page 133
 1                Yavorsky - Confidential
 2    of a business of this type as a book value
 3    multiple is a perfectly appropriate valuation.
 4    Many of these companies -- the market doesn't tell
 5    you how it values the company; it just says the
 6    stock price is this.
 7                You can say, well, if the market looks
 8    at this valuation methodology, then it implies
 9    this multiple.  And if it's looking at a different
10    one, then it implies that multiple.  So book value
11    multiple for, you know, a business that requires
12    capital is perfectly appropriate, number one.
13                Number two, I think there is -- at this
14    stage a big open question as to what EBITDA is for
15    the IDB and what it would be.  There is not
16    perfect clarity into it because there are
17    corporate -- GFI is a corporation.  There are
18    corporate -- significant corporate expenses.  What
19    becomes of them.  That may or not strictly
20    speaking be part of the IDB business.
21                So what the EBITDA of the IDB is a
22    murky question just from a disclosure point of
23    view.  But also I think there's some uncertainty
24    as to the direction of that EBITDA.  And a book
25    valued-based multiple is not a bad approach.
```

```
                                            Page 134
 1                  Yavorsky - Confidential
 2       Q.    Would the same limitation you just
 3   described have applied to valuing Trayport and
 4   Fenics using EBITDA?
 5       A.    No.
 6       Q.    Why not?
 7       A.    Because those assets are separately
 8   disclosed.  They are completely separate from the
 9   rest of GFI.  They have no book value, and there's
10   absolutely no controversy as to the manner in
11   which what the right valuation methodology is for
12   those -- for those companies.
13       Q.    Do those companies hold their cash on
14   their own balance sheets?
15       A.    Trayport and Fenics?
16       Q.    Yeah.
17       A.    They really don't hold any cash.
18       Q.    So is it fair to say that the holding
19   company cash is attributed -- attributable to the
20   IDB?
21       A.    The holding company cash is
22   attributable to the holding company, because were
23   it to be attributable to the IDB it would be
24   within the IDB.
25       Q.    But in a breakup of the company, cash
```

Page 135

```
 1                  Yavorsky - Confidential
 2   has to be allocated somewhere, doesn't it?
 3              MR. LYNCH:  Objection.
 4       A.    In the -- it depends on the mechanics
 5   of the breakup of the company.  The company also
 6   has debt; right?  So cash could be used to pay
 7   down that debt.
 8              All of the assets and all of the
 9   liabilities of the company equally belong to all
10   of the shareholders of the company.  It's --
11   ultimately all of the value that's there gets
12   distributed to the shareholders of the company.
13       Q.    I wasn't focusing on the shareholders;
14   I was focusing on allocation to business segments.
15              MR. BALBER:  Object to the form of the
16         question.
17              MR. LYNCH:  Objection.
18       Q.    That wasn't the question.
19       A.    The cash of the holding company is
20   already not -- the reason it's been put at the
21   holding company is it wasn't necessary in
22   Trayport -- in the operating entities.
23       Q.    Let me ask you a question.  Had this
24   been -- had you been contemplating a sale of the
25   IDB to another IDB, would you have also used
```

```
                                            Page 136
 1                Yavorsky - Confidential
 2    regulatory capital as opposed to a multiple EBITDA
 3    in preparing your assumptions?
 4                MR. LYNCH:  Objection.
 5        A.    We would have done a different
 6    valuation in the context of a sale to another IDB
 7    because there we would have also looked at
 8    synergies, both cost and capital.
 9        Q.    Thank you.
10        A.    And any dissynergies.
11        Q.    Could you take total GFI EBITDA and
12    subtract Trayport and Fenics EBITDA to determine
13    IDB EBITDA?
14        A.    You could.  It would be an
15    approximation.  You could.  The reason that it
16    would be an approximation is because -- I mean, it
17    would most likely understate the EBITDA of the
18    IDB.
19        Q.    Why would that be?
20        A.    Because there would be certain expenses
21    at the holding company -- well, it depends; right?
22    It depends on -- if you had EBITDA for Trayport
23    and Fenics that had -- that included an allocation
24    of corporate overhead expenses in it, then you
25    would come to a different answer than if it
```

Page 137

1                 Yavorsky - Confidential

2      different.

3                 If you started with just a pure

4      Trayport and Fenics EBITDA without any

5      allocations, that would mean that all of the

6      corporate functions from director fees to filing,

7      to all of that, has been allocated to the IDB, if

8      that's all that's left and you're using what's

9      left as the proxy for the IDB.

10         Q.    Here's what I don't understand.   In

11     figuring out a formula to do that, wouldn't you

12     have to make a proper allocation between the

13     segments for the overall costs?  In other words,

14     if you were going to allocate costs of the whole

15     company to a particular business segment, wouldn't

16     you then do the same thing for the IDB as you

17     would for Trayport?

18         A.    I'm not sure I'm fully understanding

19     what you're asking me.  What we are doing is we're

20     saying, Okay, Trayport has the following EBITDA.

21     That's disclosed in the financials.  My guess is

22     most likely that does not have much in the way of

23     corporate allocations.  I could be wrong, sitting

24     here today, but I don't think that it did.

25                 Then you're saying, okay, that business

```
 1                   Yavorsky - Confidential
 2     is going to be separated and the buyer will pay X
 3     multiple of that EBITDA.  And we're doing the same
 4     thing for Fenics.  And then we're applying a one
 5     times regulatory capital multiple to the IDB.
 6                   I feel like I'm not answering your
 7     question.
 8          Q.    You're not.  You're not.  And if it's
 9     my fault, I'm going to clarify.
10                   I asked you could you take total GFI
11     EBITDA and subtract Trayport and Fenics EBITDA and
12     get the IDB EBITDA as a result.
13          A.    And I answered it.
14                   MR. LYNCH:  That's what he's just
15          answered.
16          Q.    Right.  You identified -- you said that
17     doesn't account for allocating corporate expenses.
18          A.    I said that it would understate the
19     EBITDA -- all else equal, it would understate the
20     EBITDA for the IDB.
21          Q.    Right.  And I believe you said that
22     because it was your understanding the EBITDA
23     disclosed in GFI's finances for Trayport and
24     Fenics does not include corporate costs; is that
25     correct?  Is that your answer?
```

```
                                              Page 139
 1                   Yavorsky - Confidential
 2         A.     That is my answer.
 3         Q.     So what is your understanding of the
 4    IDB EBITDA that is disclosed by GFI with respect
 5    to whether or not it includes corporate costs or
 6    not?
 7         A.     I don't know what my understanding is,
 8    because I don't -- it comes down to whether GFI
 9    separately discloses corporate overhead in its own
10    line or not.  I just don't remember what their --
11    I have been spared the need to look at them for
12    the last four years.
13         Q.     I understand that, and I'm glad for
14    you.  I'm glad for you.
15                Do you have any reason to believe that
16    GFI would report Trayport and Fenics EBITDA
17    differently than it would report IDB EBITDA?
18         A.     There could be -- there could be
19    reasons for reporting it differently or reporting
20    it the same.  I don't know how they were doing it.
21    It's a knowable fact, but I don't know it.
22         Q.     I'll try one last question.  In the
23    context of allocating corporate expenses to
24    determine EBITDA of a particular segment, do you
25    have any reason to believe that GFI was
```

Page 140

1                    Yavorsky - Confidential
2      attributing or allocating corporate expenses to
3      the IDB EBITDA and not to Trayport and Fenics
4      EBITDA?
5                    MR. LYNCH:   Objection.
6           A.    I can -- I don't know how they were --
7      I don't remember how they were doing it.  They
8      could have done it the way you described and been
9      justified in doing it this way, or they could have
10     done it a different way.
11          Q.    Do you recall whether you made that
12     analysis in connection with preparing this
13     presentation?
14          A.    I don't remember whether I did or
15     didn't.
16          Q.    And is it fair to say that this
17     presentation does not reflect that analysis?
18          A.    I don't see the analysis of splitting
19     out corporate allocations out of the IDB or into
20     the IDB, from this presentation.
21          Q.    Thank you.
22                    MR. ZWICK:   I'll ask the reporter to
23          mark the next exhibit.  I don't believe this
24          was marked at a previous deposition either, so
25          let's just continue with the number.

```
                                                Page 141
 1                  Yavorsky - Confidential
 2                  (Exhibit 149, presentation by Jefferies
 3          dated 6/6/13, marked for identification.)
 4          Q.    Mr. Yavorsky, take your time in looking
 5   at the exhibit, and let me know when you're
 6   comfortable answering questions.
 7                  (Pause.)
 8          A.    Okay.
 9          Q.    Is this presentation a presentation
10   that was made on June 6, 2013?
11          A.    Yes.
12          Q.    Is this the same -- was it presented at
13   a meeting with GFI management?
14          A.    Yep.
15          Q.    Is this the same meeting that you
16   identified Wachtell's participation in?
17          A.    That I don't know.
18          Q.    Do you know if there was more than one
19   meeting on June 6, 2013, with GFI management?
20          A.    I don't think so.
21          Q.    Can you turn to page 1, please.
22          A.    Yep.
23          Q.    Was this presentation distributed at
24   the meeting?
25          A.    That would have been very typical, yes.
```

```
                                          Page 142
 1                 Yavorsky - Confidential
 2        Q.     Did you restrict any of the
 3   participants at that meeting from having the
 4   presentation or was it shared with everybody at
 5   the meeting?
 6        A.     I don't remember restricting anyone.
 7        Q.     Under "transaction structure
 8   objectives," point 2 is tax efficiency.  Now just
 9   I'm going to point out there's all checks.  There
10   are no more X's left; right?  Made a lot of
11   progress in here; correct?
12             MR. LYNCH:  Objection.
13             MR. BALBER:  Objection.
14        A.     They're all checks, that's correct.
15        Q.     Does that mean you eliminated the
16   negatives from the objectives?
17             MR. BALBER:  Are you saying that these
18        are the identical things as in the prior draft
19        or --
20             MR. ZWICK:  I'm not saying anything.
21             MR. BALBER:  Object to the form of the
22        question.  Move on.
23             MR. LYNCH:  Objection just so it's
24        we're, objection for one party an objection
25        for all?
```

```
                                            Page 143
 1                  Yavorsky - Confidential

 2              MR. ZWICK:  Yes.

 3              MR. LYNCH:  Thank you.

 4      Q.    Under "tax efficiency" there are two

 5   entries; is that correct?

 6      A.    Yes.

 7      Q.    And the first one says, minimize the

 8   impact of taxable event on JPI's continuing

 9   shareholders that will be shareholders of the IDB.

10              Does that include Mr. Gooch and the

11   management consortium?

12      A.    Yes.

13      Q.    Is that who that's referring to?

14      A.    JPI's continuing shareholders are

15   Mickey, Colin, Nick, I forgot his name, his last

16   name.

17              MR. BALBER:  Brown.

18      A.    Nick Brown.  That's basically who it

19   is.

20      Q.    And the second entry says, special

21   considerations related to the S corporation

22   structure of JPI.

23              Is the second point connected to the

24   first one?  Is it the same --

25      A.    Yeah.
```

```
                                            Page 144
 1                   Yavorsky - Confidential
 2        Q.      It impacts the same people?  It's one
 3   group?
 4        A.      Well, no, because the first -- the
 5   people in the first group are a subset of the
 6   people in the second group.
 7        Q.      That's what I'm getting to.  The people
 8   in the second group also includes JPI's
 9   noncontinuing shareholders; is that correct?
10        A.      That's correct.
11        Q.      And those people were not continuing
12   with the ownership of the IDB; is that correct?
13        A.      That's correct.
14        Q.      Is there any indication that there was
15   an analysis of the tax efficiency that would be
16   achieved by outside public shareholders in this
17   presentation?
18        A.      In this particular presentation --
19   yeah, there is evidence of that, because the
20   public shareholders, like all the shareholders,
21   are majorly benefitting from the fact that the
22   overall structure has no tax leakage or other
23   forms of leakage associated with the sale of all
24   the different assets.
25        Q.      Right.  You know that because you
```

```
                                        Page 145
 1                  Yavorsky - Confidential
 2   turned to a different page in the presentation; is
 3   that correct?
 4        A.    No, that is not correct.
 5        Q.    Is what you just described contained
 6   within this -- is that analysis contained within
 7   this presentation anywhere?
 8             MR. LYNCH:  Objection to form.
 9        A.    This presentation is about the deal
10   structure as -- or three specific structures.  In
11   each of those structures, the tax leakage and
12   other impediments that I described a few hours ago
13   are being dealt with in a very efficient form.
14   And so that fact does not continue to be called
15   out on every page that looked -- but the
16   structures are the structures in order to have
17   achieved that.
18        Q.    In each of those structures is it
19   contemplated that the IDB would be purchased by
20   the management consortium?
21        A.    Let's see.
22             Yes.
23        Q.    Nowhere on the first page that's
24   captioned transaction structure objectives is
25   there any discussion about tax efficiency that
```

Page 146

                    Yavorsky - Confidential

1    would be achieved by public shareholders; is that

2    correct?

3        A.    That's correct.

4        Q.    So at this time within the context of

5    this presentation, the only tax efficiency being

6    presented as an objective of the deal was tax

7    efficiency on behalf of the JPI shareholders; is

8    that correct?

9            MR. LYNCH:  Objection.

10       A.    There are two bullet points under "tax

11   efficiency" that are relevant at that point in the

12   evolution of our discussions.  These are

13   unresolved issues -- or these are issues that had

14   to be resolved that are now resolved and

15   structured for.

16            That does not mean that the overall

17   transaction didn't go to great lengths to deliver

18   tax -- tax efficiency for all shareholders.

19       Q.    Did you ever quantify the dollar value

20   of the tax efficiencies for the non -- for the

21   public shareholders of GFI?

22            MR. BALBER:  Object to the form of the

23       question.

24       A.    The type of tax efficiencies that the

                                                          Page 147

 1                  Yavorsky - Confidential
 2   public shareholders received were received by all
 3   of the shareholders.  And, yes, we did quantify
 4   that.
 5        Q.    What was that number?
 6        A.    Well, that number was the difference --
 7   was the -- roughly speaking it would have been a
 8   couple hundred million dollars.
 9        Q.    Can you explain how you got to that?
10        A.    It's basically taking the difference
11   between the tax basis of Trayport and Fenics --
12   right? -- and subtracting that number from the
13   assumed sale price of Trayport and Fenics and
14   multiplying the difference by let's call it 35
15   percent.
16              And then separately, separately,
17   although I wouldn't put that in the category of
18   tax efficiency, but it's another kind of
19   efficiency, it's not having to pay the roughly $80
20   million of make-whole premium on the bonds.
21        Q.    The two things you just described,
22   neither of them apply in the case of a sale of the
23   whole company; is that correct?
24              MR. BALBER:  Object to the form of the
25        question.

Page 148

1              Yavorsky - Confidential

2              MR. LYNCH:  Same.

3     A.    If you were to sell the entire company,

4  you wouldn't have to think about these things.  Of

5  course if you were to sell the entire company, you

6  also wouldn't necessarily be -- you wouldn't

7  proactively be realizing the sum of the parts,

8  because you wouldn't be selling the parts.

9     Q.    So at this point in the transaction

10 lifetime, along the timeline, the only deal being

11 contemplated was a deal for the sale of the whole

12 company; is that correct?

13             MR. LYNCH:  Objection.

14    A.    Well, remember, it's -- no, I don't

15 think that's correct, because although from a

16 structuring point of view in two of the three

17 alternatives the whole company changes ownership,

18 the transaction ultimately is predicated upon the

19 splitting up of the -- of the technology and the

20 brokerage assets.

21             And so it is more of a sum-of-the-parts

22 type of transaction than simply selling the whole

23 company to a single buyer who then ends up keeping

24 the whole company.

25    Q.    But you were not contemplating selling

```
                                              Page 149
 1                  Yavorsky - Confidential
 2    Trayport and Fenics as assets of GFI to a third-
 3    party buyer; is that correct?
 4         A.    That's correct.
 5         Q.    Thank you.
 6               So the 250 or whatever number you
 7    described as tax benefits did not apply to the
 8    transaction --
 9         A.    Absolutely it applied.  It 100 percent
10    applied, as I keep telling you.  It applied
11    because ultimately this transaction ends up in us
12    selling Trayport and Fenics to a specific buyer --
13    that's -- let's say that's the CME -- without
14    having to incur the 200 plus or 300 million
15    dollars of costs.
16         Q.    But not as an asset of the company; is
17    that correct?  You sold the entire company -- is
18    it true you achieved that by selling the entire
19    company to the buyer?
20               MR. BALBER:  Object to the form of the
21         question.
22         A.    And that's the whole point.
23         Q.    Could you --
24               MR. BALBER:  Whoa.  Let him finish his
25         answer.
```

```
                                          Page 150

 1                  Yavorsky - Confidential

 2        Q.      Go ahead.

 3        A.      That's the whole point.  We found a

 4   structure that -- the fact that that structure

 5   mechanistically for a nanosecond involved them

 6   owning an entire company is irrelevant.  It's just

 7   our structuring brilliance of which this is a

 8   characteristic.

 9              It ends up the case that they own

10   Trayport and Fenics, just like as if they had

11   bought them as assets, but in a much more

12   efficient manner for all sides.

13        Q.      Would that structuring brilliance have

14   shown the same way if you were to have sold the

15   whole company to another IDB?

16        A.      If you sold the whole company to

17   another IDB, you would in the be separately

18   isolating the value of Trayport and Fenics from

19   that of the brokerage company.

20        Q.      And therefore you would achieve the

21   same tax benefit; is that correct?

22              MR. BALBER:  Object to the form of the

23        question.

24              MR. LYNCH:  Objection.

25        A.      No, you would not achieve the same tax
```

Page 151

1                    Yavorsky - Confidential
2    benefits because you wouldn't be selling Trayport
3    and Fenics at a premium valuation.  There -- it's
4    just apples and oranges; right?  Right?  If --
5    because you wouldn't be selling Trayport and
6    Fenics to a buyer that is prepared to pay the kind
7    of multiple that a different kind of buyer is
8    prepared to pay, you wouldn't have the taxable
9    gain on which you would pay the tax and therefore
10   you're just in a different situation where the
11   problem -- you don't have the high-class problem
12   of the gain that does or does not attract tax
13   leakage.
14        Q.    How do you know it was not possible to
15   sell it to an IDB at the same value?
16             MR. BALBER:  Object to the form of the
17        question, calls for speculation.
18        Q.    It's your testimony, Mr. Yavorsky.  I
19   didn't say it.
20             MR. BALBER:  Say that again.
21             MR. ZWICK:  It was Mr. Yavorsky's
22        testimony.
23             MR. BALBER:  What was his testimony?
24        That wasn't his testimony.
25             MR. ZWICK:  Well, then let's go back

```
                                        Page 152
 1                  Yavorsky - Confidential
 2        and read his last answer.
 3               (Record read.)
 4        Q.    Did the sale of the company to BGC
 5   achieve the premium valuation you described in
 6   your last answer?
 7               MR. LYNCH:  Objection.
 8        A.    It did.
 9        Q.    Is BGC an IDB?
10        A.    BGC is an IDB.
11        Q.    Did the company therefore realize the
12   same tax efficiency or benefits in the sale to BGC
13   as what you're describing here?
14               MR. LYNCH:  Objection.
15        A.    It did, but the one rather important
16   detail that you're failing to take into account is
17   the fact that BGC paid what it paid because there
18   was already a sale at a premium valuation to the
19   CME; right?  That's a very important fact.
20        Q.    Did BGC tell you that?
21        A.    BGC didn't tell me that.
22        Q.    So how do you know that?
23        A.    It's my opinion.
24        Q.    Okay.  That's fine.  But they didn't
25   tell it to you, did they?
```

Page 153

```
  1                Yavorsky - Confidential
  2           MR. BALBER:  Asked and answered.
  3           MR. LYNCH:  Objection to the
  4      argumentation, especially with a third-party
  5      witness.
  6      A.    It's my opinion.
  7      Q.    Thank you.
  8           MR. BALBER:  Are you almost done or --
  9           MR. ZWICK:  I don't think we're almost
 10      done.
 11           MR. BALBER:  You've got to get moving.
 12      This is really --
 13           MR. ZWICK:  We're moving.
 14           MR. BALBER:  Your not moving fast
 15      enough.
 16           MR. ZWICK:  Well, we're moving as fast
 17      as we can.
 18           THE VIDEOGRAPHER:  There's about ten
 19      minutes left.
 20           MR. ZWICK:  Okay.  We'll complete the
 21      tape, and then we'll take a break.
 22      Q.    Can you turn to page 2, please.  In the
 23  description of transaction structure alternatives,
 24  there's the tax question that's described in
 25  this -- on this page.  Just very generally who
```

```
                                          Page 154
 1                Yavorsky - Confidential
 2    figured out the tax aspects on page 2?  Was it
 3    Willkie, Wachtell, Jefferies, or somebody else?
 4         A.    It was between Jefferies and Wachtell.
 5         Q.    So by April -- I'm sorry, by June --
 6    scratch.  Withdraw.
 7                Look at alternative three.  Is that the
 8    structure that was ultimately chosen for the deal?
 9         A.    No.
10         Q.    How was the structure that was chosen
11    different than alternative three?
12                MR. LYNCH:  Objection.
13         A.    Step three under "mechanics" ended up
14    also being tax inefficient.  And so instead of
15    doing it this way, the acquirer -- or rather
16    continuing shareholders, the structure with which
17    we ended up going, were going to raise debt and
18    buy the IDB for cash rather than by means of
19    surrendering an equal number or an equal value of
20    acquirer shares.
21         Q.    Other than that, is the deal that was
22    chosen the same as alternative three?
23         A.    Other than that, it is.
24         Q.    Can you look down to the cons section.
25    Under alternative three, bullet point two says,
```

```
                                            Page 155
```

1            Yavorsky - Confidential

2    Would require indemnification against legal

3    issues.

4            What does this mean?

5            MR. BALBER:  I thought you just

6        explained -- made the point on the record that

7        he's not a lawyer.

8            MR. ZWICK:  I didn't read this

9        document.

10           MR. BALBER:  You're asking him now,

11       what, what the legal implications are of this

12       bullet point?

13           MR. ZWICK:  No.

14           What was the question?

15           (Record read.)

16           MR. LYNCH:  Object.

17       A.    The -- my supposition of what it means

18   is that this is the only transaction in which JPI,

19   the entity itself, the JPI entity, ends up being

20   subsumed by the acquirer, let's say the CME, and

21   whatever legal issues in history -- because there

22   are more assets than just CME stock in JPI.  They

23   had a bunch of other small things.  And that

24   entity has its own legal history.

25           I realize that's probably not what

```
                                          Page 169
```

                    Yavorsky - Confidential

1

2       A.    Can you please ask --

3             MR. ZWICK:  Can you read the question

4       back.

5             (Record read.)

6             MR. LYNCH:  And there was a step three

7       the same except for the change?

8             MR. ZWICK:  I think that's what the

9       question is.

10      Q.    If you didn't understand the

11   question --

12            MR. LYNCH:  Objection.

13      A.    No, I understood.  The deal with the

14   CME was like what's described in alternative three

15   with the important change that step three on this

16   page is not what was done.

17      Q.    Right.  But in all other respects it

18   was the same; correct?

19      A.    Correct.

20      Q.    So in all other respects the management

21   consortium remained the buyer of the IDB; is that

22   correct?

23      A.    That is correct.

24      Q.    Did there ever come a time when

25   Jefferies was asked to consider the possibility of

```
 1              Yavorsky - Confidential
 2  involving another IDB in the transaction?
 3       A.    Yes.
 4       Q.    When was that?
 5       A.    That was subsequent to BGC's bid, let's
 6  call it, so in the fall of 2014.
 7       Q.    Does approximately September 10th sound
 8  right, 2014?
 9       A.    It doesn't sound any more right than
10  the 15th, but I suspect you have some reason for
11  using that date.
12       Q.    How did that come about?
13       A.    It came about at Mickey's direction.
14       Q.    And what was Mickey's direction?
15       A.    Well, Mickey had had dialogue with
16  Tullet and with ICAP and with I think Tradition at
17  that point, and also Tradeweb.  And he had asked
18  me to reach out to or that they would be reaching
19  out to me or I should reach out to them, one of
20  those things.
21       Q.    What was the purpose of reaching out to
22  them at that point?
23       A.    It was to see whether or not they would
24  be interested in effectively partnering with the
25  continuing shareholders or even taking their place
```

```
                                          Page 171
 1                  Yavorsky - Confidential
 2    in order to increase the price of the CME bid.  So
 3    it would have been in the context still of the CME
 4    structure, which of course was the structure that
 5    the board voted for.
 6         Q.    Was the intention to be able to raise
 7    money so that it could compete with BGC's bid?
 8         A.    Yes.
 9         Q.    And why did Mickey identify other IDBs
10    at this point?
11              MR. LYNCH:  Objection.
12         A.    I don't -- you'd have to ask Mickey
13    that question, but --
14         Q.    Well, okay.  Was there a discussion
15    about synergies at that point?
16              MR. LYNCH:  Objection.
17         A.    When we -- when Mickey asked to
18    involve -- to reach out or to be in communication
19    with these other IDBs, it was understood and
20    probably explicitly discussed that there would be
21    synergies between them and -- depending on whether
22    they bought the whole thing or not, if they only
23    bought a piece, then there would not be synergies;
24    but if they bought the whole, then there would be.
25         Q.    Is that concept similar to the concept
```

Page 172

```
 1              Yavorsky - Confidential
 2    that Jefferies had presented in February of 2012?
 3              MR. LYNCH:  Objection.
 4        Q.    I'm sorry, February of 2013.
 5              MR. LYNCH:  Still objection.
 6        A.    Well, inasmuch as we discussed
 7    synergies then between one IDB and another -- and
 8    here we're talking about synergies between one IDB
 9    and another -- yes, it's the same concept of
10    synergies.
11        Q.    So does Mickey's direction at that
12    point indicate a return to Jefferies' original
13    thinking when it presented on February 12th, 2013?
14        A.    It's kind of a melodramatic way of
15    putting it.  But as a factual matter inasmuch as
16    you've got one kind of buyer buying Trayport and
17    Fenics and an IDB potentially buying the IDB piece
18    of it, you know, it is something that we had as
19    part of our thinking in February of 2013.
20        Q.    So the answer to my question would be
21    yes?
22        A.    The answer to your question would not
23    be yes because I don't agree with the form of your
24    question, as it's a return to our -- it's kind
25    of --
```

Page 173

                        Yavorsky - Confidential

1
2          Q.     Other than the --
3                 MR. LYNCH:  Let him finish his answer,
4          please.
5          Q.     In substance is the answer that --
6          A.     Yeah, in substance we contemplated,
7      among other things, having -- selling Trayport and
8      Fenics to one type of buyer and the IDB to another
9      IDB.  And that could have been the consequence of
10     these conversations that were, again, getting
11     started with these other IDBs.
12         Q.     And the impetus for that was BGC's bid;
13     is that correct?
14         A.     That is correct.
15         Q.     In a moment I'm going to show you a
16     document and ask you to look at it, as soon as we
17     mark it as an exhibit.
18                (Exhibit 151, e-mail dated 9/10/14 from
19         Troy to Levy, et al., marked for
20         identification.)
21         Q.     Mr. Yavorsky, can you take a look at
22     what's just been marked as Exhibit 151.  It's an
23     e-mail from James Troy to Ron Levy, and you're
24     copied on it.
25                Have you ever seen this before?  I'm

```
                                          Page 175
 1                Yavorsky - Confidential
 2        Q.    Is this e-mail --
 3        A.    This is talking about potential
 4   synergies between GFI and other IDBs, verbatim.
 5        Q.    The reason I ask is you said that --
 6   you said before that Mickey instructed.  Was this
 7   the e-mail in which you meant Mickey instructed?
 8             MR. BALBER:  Object to the form of the
 9        question.
10             MR. LYNCH:  Objection.
11        A.    Mickey?  No, it's not.
12        Q.    Okay.
13        A.    We were talking before about Mickey
14   instructing us to be in touch with other IDBs.
15   This is an e-mail to Ron Levy, who is a GFI
16   employee so...
17        Q.    Is that to implement the instructions
18   to talk to other IDBs?  Was his involvement
19   required for that?
20        A.    I don't know.
21             (Exhibit 152, e-mail dated 9/10/14 from
22        Levy to Troy, marked for identification.)
23        Q.    What you've just been given is Exhibit
24   152.  It's an e-mail from Ron Levy to James Troy
25   later that same day, September 10th, 2014.
```

Page 176

1              Yavorsky - Confidential

2          Do you see in Ron Levy's e-mail where

3  he writes, Please send me any numbers you are

4  looking to.  I suggest that we start with the cost

5  per function which you should have.

6          Do you know -- and you're copied on

7  this e-mail.  Do you know if the purpose of

8  gathering these numbers was to perform an analysis

9  of synergies?

10      A.    That's what -- that's what we wanted --

11  that's what we asked him to help us with.  So yes,

12  I mean, this -- unless Ron had some other devious

13  plan in his mind which was not what we asked him,

14  it would seem to --

15      Q.    "Him" is Ron Levy, can we clarify?

16      A.    Yes.

17      Q.    Thank you.

18          (Exhibit 153, cash in Project Genesis

19      IDB comparison, marked for identification.)

20      Q.    Mr. Yavorsky, take a look at it, and

21  let me know when you're comfortable discussing it.

22      A.    Yep.

23      Q.    What is this document?

24      A.    This is a document that on one page has

25  some summary information about the five IDBs,

```
                                          Page 180
 1                Yavorsky - Confidential
 2       Q.     That's what I thought, and I want to
 3   talk about the financing.
 4       A.     Okay.
 5       Q.     Generally what is the financing that
 6   you're referring to?
 7       A.     It's for the continuing shareholders to
 8   pay to the CME an amount of money that was equal
 9   to the price for which they were buying from the
10   CME the brokerage business.
11       Q.     And where was that money coming from?
12       A.     Well, we -- Jefferies Finance, our
13   affiliate, provided committed financing.  And the
14   intent was to syndicate that loan in the
15   syndicated loan market.
16       Q.     Is it accurate to say that these
17   projections were created for the purpose of
18   obtaining financing from Jefferies?
19       A.     Not just from Jefferies.  Ultimately
20   Jefferies was the provider of committed financing.
21   They were talking to a number of different
22   providers.
23       Q.     Do you know who else they were talking
24   to?
25       A.     I know they were talking to BMO, Bank
```

```
                                            Page 181

 1                  Yavorsky - Confidential
 2    of Montreal, and Bank of America, possibly others.
 3        Q.    When you say "they," you're referring
 4    to the management consortium, including Mr. Gooch?
 5        A.    As well as the CF -- management more
 6    broadly, the CFO of the company, Jim Peers, played
 7    quite an active role in that process as well.
 8        Q.    Was Mr. Peers seeking financing on
 9    behalf of GFI?
10        A.    No, of the continuing shareholders.
11    But he was going to continue to be an employee of
12    the company that that was to be owned by the
13    continuing shareholders.
14        Q.    Is it fair to say that the role he
15    played was on behalf of the management consortium
16    and not on behalf of GFI the company?
17        A.    Yeah, I think so.
18            MR. BALBER:  I'm sorry, I need to
19        object to this.  I mean, I'm trying to give
20        you a lot of latitude.  We've been going on a
21        long time.  But I think Alex and I are the
22        only two people in his room who were actually
23        here for his deposition in the Delaware breach
24        of fiduciary duty case, which I understand
25        settled and as to which this testimony would
```

Page 184

1              Yavorsky - Confidential

2        A.    That process began -- I can't say

3    exactly, but I would say maybe May -- April/May,

4    is my -- that's just a guess.  Say May of 2014.

5        Q.    I'm going to show you a document.

6    Maybe it will help you narrow the time frame.

7              (Exhibit 154, e-mail dated 4/3/14 from

8        Bader, Bates-stamped JEF_GROSS016295 through

9        16308, marked for identification.)

10       Q.    Mr. Yavorsky, I gave you a document

11   which is an e-mail from Raymond Bader dated April

12   3rd, 2014, to several individuals.  I won't read

13   them.  It bears the Bates number JEF_GROSS016295.

14   It attaches a document called Project Genesis DR C

15   memo, which is the document that follows.  It

16   begins on 16296 and runs through 16308.  Do you

17   see that?

18       A.    Yep.

19       Q.    What is this document?

20       A.    This attachment is a debt review

21   committee memo.  When we -- we have a process at

22   Jefferies for approving and proceeding with debt

23   financing transactions.  And every time we have a

24   committee, there is a memo that is prepared that

25   outlines the transaction and all the other

```
                                              Page 185
 1                Yavorsky - Confidential
 2    relevant information.
 3         Q.    Do you know whether this document was
 4    the first document in that process, judging by the
 5    time and the nature of the document?
 6              MR. LYNCH:  Objection.
 7         A.    Early in the process there may have
 8    been -- I wouldn't be surprised if the discussions
 9    around the financing would have begun earlier than
10    that, not by a lot but...
11         Q.    Can you look at page 4 of that
12    document?  It's the page that's captioned IDB
13    purchase mechanics.
14         A.    Yep.
15         Q.    Do you see point number two, the second
16    and third -- I'm sorry, the third and fourth
17    bullet points.  The third one says, IDB business
18    being acquired has approximately 225 million in
19    tangible book value.  The fourth one says,
20    purchase price implies estimated one times price
21    tangible book value multiple.
22         A.    Uh-huh.
23         Q.    Is that the same multiple that we
24    discussed earlier today when we estimated -- when
25    I showed you a document that was -- that had the
```

Page 189

1                    Yavorsky - Confidential

2        Q.    Okay.

3        A.    -- so therefore I don't know when it

4   was or wasn't.

5        Q.    I understand.  You suggested it may

6   have been shared.  I'm asking when it may have

7   been shared with Greenhill.

8              MR. LYNCH:  Objection.

9        A.    At some point.  If it had been, it

10   would have been at some point around this time.

11        Q.    Can you just take a look at the first

12   entry, which is total net brokerage revenue?

13        A.    Yeah.

14        Q.    This refers to net brokerage revenue of

15   the IDB; is that correct?

16        A.    Correct.

17        Q.    And in fact does the projection

18   increase for every year from 2014 to 2018?

19        A.    Yeah.

20        Q.    Looking at pretax profit, does it

21   similarly increase for each year from 2014 through

22   2018?

23        A.    It increases.

24              MR. LYNCH:  Isn't this is a place where

25        the document speaks for itself --

```
                                          Page 193
 1                  Yavorsky - Confidential
 2    optimism depending on our overall knowledge of the
 3    situation, management, and industry dynamics and
 4    the rest.
 5         Q.    Is it fair to say that the underwriters
 6    at Jefferies had to have some level of comfort in
 7    the management projections?
 8         A.    It's fair.  In order to provide the
 9    financing?
10         Q.    Yes.
11         A.    I think that's a fair statement.
12         Q.    Look at page 11, please.  Just very
13    quickly, does this graph -- well, it's captioned
14    historical and projected brokerage revenue growth
15    and composition.  Does the composition part refer
16    to the product and region at the bottom of the
17    page?
18         A.    Yes.
19         Q.    You see the box on the right-hand side
20    for the year 2014?
21         A.    Yes.
22         Q.    And it shows 647 million, 4.9 percent
23    year-over-year growth.  Does that refer to year-
24    over-year growth and for what period of time does
25    that refer to?
```

```
                                            Page 196
 1                 Yavorsky - Confidential
 2   so this is June -- yeah, this is June 11.  This is
 3   April.
 4             Yeah, so obviously JFIN is now working
 5   with, you know, call it GFI, the continuing
 6   shareholders, to potentially provide financing,
 7   and the model is being -- that's the driver of the
 8   creation of the model, and so that's -- evidently
 9   is not a hundred percent finished.  We're simply
10   saying finish that process first before you send
11   it to RBS so there is not some interim model that
12   RBS has while this model -- that is really
13   speaking to the same company is continuing to
14   evolve.
15        Q.    And is RBS a third -- you identified
16   two potential banks before.  Is RBS a third bank
17   now?
18        A.    I guess, yeah.
19        Q.    Okay.  Thank you.
20             I'm going to show you the credit
21   committee memo I think you referred to before
22   dated July 29th, 2014.
23        A.    Okay.
24             (Discussion off the record.)
25             (Exhibit 156, cover sheet and credit
```

Page 197

1              Yavorsky - Confidential

2          committee memorandum, marked for

3          identification.)

4          Q.    Mr. Yavorsky, what you've just been

5      handed looks like a cover sheet for a document

6      called credit committee memorandum.  It looks like

7      a transmittal sheet of some sort, or a cover sheet

8      for that document.  And it looks like it was sent

9      by Andrew Esposito to a list of required attendees

10     on July 29th, 2014; is that correct?

11         A.    Yes.

12         Q.    What is the document it's attached?

13         A.    It's the Jefferies credit committee

14     memo for GFI.

15         Q.    What is the Jefferies credit committee

16     memo used for?

17         A.    To decide whether or not to actually

18     provide a committed financing.

19         Q.    So is this the most comprehensive

20     document, most complete document, that Jefferies

21     uses when it's underwriting a potential loan?

22         A.    Yes.

23              MR. LYNCH:  Just for the record,

24         there's two attachments to this.  I'm not sure

25         that's intentional.

```
                                           Page 199
 1               Yavorsky - Confidential
 2               THE VIDEOGRAPHER:  Going off the
 3          record.  The time is 3:33.
 4               (Recess taken from 3:33 to 3:40.)
 5               THE VIDEOGRAPHER:  We are back on the
 6          record.  The time is 3:40.
 7          Q.    Mr. Yavorsky, before we broke I
 8     handed -- you were handed a document called the
 9     credit committee memorandum dated December -- I'm
10     sorry, July 29, 2014.
11          A.    Yes.
12          Q.    And I asked you, I believe, if this was
13     the comprehensive document used internally at
14     Jefferies when underwriting a loan; is that
15     correct?
16          A.    That's correct.
17          Q.    Does looking at the cover page, is the
18     amount of the loan $225 million?
19          A.    Yes.
20          Q.    And was that -- was this the loan --
21     was the loan discussed in this document actually
22     the loan that was approved?
23          A.    Yes, I think so.  I don't remember
24     anything changing so...
25          Q.    July 29th was the day before the deal
```

```
                                         Page 200
 1                 Yavorsky - Confidential
 2   was announced.
 3        A.    So yes.
 4        Q.    What does marketing of the loan mean?
 5        A.    The syndication process.  So this is
 6   where we go out to the market and actually find
 7   people that want to hold this loan, because our
 8   intention is never to actually fund this loan
 9   ourselves.
10        Q.    Does Jefferies commit to provide the
11   money whether or not it finds other banks that
12   want to participate?
13        A.    Yes, in a committed financing, yes.
14        Q.    Is this committed financing?
15        A.    Yes, it is.
16        Q.    In connection with the marketing aspect
17   of it, are there any presentations or documents
18   that are prepared to show prospective
19   participants?
20        A.    Yes.
21        Q.    Is there a name for that document?
22        A.    Lender presentation, usually, as well
23   as potentially what's called a SIM-A confidential
24   information memorandum.
25        Q.    Is the lender presentation ever
```

Page 204

1          Yavorsky - Confidential

2   mitigating factor?

3        A.    GFI management?

4        Q.    I'm sorry, I said Jefferies again.   I

5   keep doing that.   GFI.

6        A.    Yeah, we would have -- we would have --

7   this would have been part of our diligence.

8        Q.    And were you involved in that

9   diligence?

10        A.    I was generally involved in diligence.

11   I wasn't involved in all aspects of diligence.

12   It's ultimately the job of the underwriting team

13   at JFIN to do their own diligence.

14        Q.    Do you recall a discussion about broker

15   turnover on the issue of poaching?

16        A.    The topic -- not in any kind of a

17   prominent way.   It sounds like a topic we would

18   have brought up as part of our diligence, but I

19   don't remember anything about it one way or

20   another.

21        Q.    Can you turn to page 12, please.

22   Again, the numbers, you know, that we discussed

23   before, do they find their way finally into this

24   document at this point?

25              MR. LYNCH:   Objection.

Page 205

```
              1              Yavorsky - Confidential
              2       Q.    Okay.  I'll explain it.  The numbers we
              3  discussed before as being the projections created
              4  by management with Jefferies for the years 2014 in
              5  this case through 2019, do they finally make their
              6  way into this document?  Is this the final set of
              7  numbers?
              8              MR. BALBER:  Object to the form of the
              9       question.
             10              MR. LYNCH:  Objection.
             11       A.    These are historicals and projections
             12  for the IDB business that came from management.
             13       Q.    Okay.  Just look down towards the
             14  middle of the page right before the gray bar.  And
             15  again we have discussion of cash, restricted cash,
             16  and cash on the balance sheet.
             17       A.    Uh-huh.
             18       Q.    Can you tell me whether restricted cash
             19  refers to the regulatory capital?
             20              MR. LYNCH:  Objection.
             21       A.    Restricted cash is more than -- is a
             22  broader concept here than regulatory capital
             23  because -- so you've got to have cash equal to the
             24  amount of regulatory capital, but in their case
             25  they also had cash that they need to deposit with
```

```
                                            Page 208
 1                 Yavorsky - Confidential
 2        doing.  I'm sorry, I don't know what this has
 3        to do with your case.
 4                 MR. ZWICK:  Okay.
 5        Q.     Can you just look at the top of page 13
 6    where it refers to financial performance.  Can you
 7    explain to me what the top bullet point means?
 8        A.     Management expects the industry to
 9    trough in full year '14 and projects a revenue
10    decline of 1.9 percent from full year '13.
11                 It means that management thinks that
12    '14 will be, you know, will be down from '13 but
13    '15 onward ought to see, you know, a reversal of
14    the downward trend.
15        Q.     The trough refers to the low point?
16        A.     Yes.
17        Q.     Can you just tell me a little bit about
18    page 15 where it refers to exit strategy and
19    funding considerations?  Did any of this
20    information come from Mr. Gooch?
21        A.     I don't think so.
22        Q.     Who determines the exit strategy?
23        A.     Well, the actual exit strategy
24    obviously is determined by the owners of the
25    company.  This is a section of our memo, and it's
```

```
                                          Page 217

                       Yavorsky - Confidential
 1
 2       A.    I have it.
 3             MR. LYNCH:  Just because we have
 4       another staple here, can we get the Bates
 5       numbers in the record.  It's going to be
 6       bedlam eventually.  The documents will start
 7       falling apart, and we won't know what the
 8       exhibits are.  Maybe if you take another
 9       deposition we can go with a stapler, just as a
10       suggestion.
11             MR. ZWICK:  At the previous deposition,
12       people wanted to staple it there.
13             MR. LYNCH:  Because you showed up with
14       paper clips and they prefer to have them
15       stapled.
16             MR. ZWICK:  That's different.
17             The Bates number is -- of the first
18       document is JEFF_GROSS049737 through 049748.
19       And the next document bears consecutive Bates
20       numbers beginning at 049749 through 049753.
21       Q.    Mr. Yavorsky, can you tell me what
22     these two documents are?  And I'll just preface by
23     saying the reason I included them together is it
24     looks like they were created on the same day.
25       A.    Okay.  Well, this is a credit committee
```

Page 218

1              Yavorsky - Confidential

2    addendum, and it is followed by a capital markets

3    opinion.  I think what's happening here is the

4    amount of -- the financing structure is being

5    increased and split into a first lien and a second

6    lien package.

7         Q.    In addition to being split into two

8    separate parts, is it also -- is the total number

9    being increased?

10        A.    Yes, I thought that was part of my

11   answer, but yes.

12        Q.    What was purpose of increasing the

13   total number -- the total dollar number of

14   financing being provided?

15             MR. LYNCH:  Objection.

16        A.    To allow the management consortium to

17   pay a higher price for the IDB so as to then have

18   the CME bid become a higher bid.

19        Q.    Was that in response to BGC's offer?

20        A.    Yes.

21        Q.    Can I just ask you to look at one page

22   in this document, which is page 4.

23             MR. LYNCH:  Page 4 of which of your two

24      documents?

25             MR. ZWICK:  The first document.

Page 260

1                Yavorsky - Confidential
2    any more or less valuable or the probably from the
3    CME is any more or less attractive.  But it just
4    as a factual matter puts -- makes it on the margin
5    more difficult.
6        Q.    Going back to the time period from the
7    time the special committee was formed in January
8    of 2015 until the time the deals was announced,
9    were you in contact with Wachtell during that
10   period?
11       A.    No.
12       Q.    When did Mr. Gooch tell you that he
13   received a letter from BGC?
14       A.    The day prior to the press -- us
15   announcing the CME deal.
16           MR. ZWICK:  I think that that concludes
17       our portion of the deposition.  I thank you
18       very much for your patience.
19           THE WITNESS:  Thank you.
20           MR. ZWICK:  For your time.
21   EXAMINATION BY
22   MR. LYNCH:
23       Q.    Just a few questions, Mr. Yavorsky.
24   I'll be asking you about Exhibits 147 and 149.
25   Maybe Mr. Balber can help you get your hands on

Page 264

1              Yavorsky - Confidential

2    meeting about any potential transaction with CME?

3              MR. ZWICK:  Objection.

4       A.    No, there was no discussion about any

5    specific concrete transaction with the CME.

6    Inasmuch as a transaction might be discussed, we

7    might have brought up who the buyers generally

8    might be.  But there was no specific -- there was

9    nothing with the CME in actuality.

10      Q.    From the date of this meeting forward,

11   from June 6th, 2013, up until, let's say,

12   September 8th, 2014, do you recall speaking to

13   anyone at Wachtell, Lipton at all about a

14   transaction for GFI?

15      A.    No.

16              MR. LYNCH:  No further questions.

17              MR. ZWICK:  I have one follow-up.

18   EXAMINATION CONTINUED BY

19   MR. ZWICK:

20      Q.    Are you testifying that there was no

21   discussion of the potential buyers you identified

22   earlier in the day which included CME at the June

23   6th meeting?

24              MR. BALBER:  Object to the form of the

25       question.