# EXHIBIT 18

Subject to Protective Order

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BENJAMIN GROSS, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br> GFI GROUP, INC., COLIN HEFFRON, and MICHAEL GOOCH, <br><br> Defendants. | Case No. 1:14-cv-09438-WHP <br><br> **Hon. William H. Pauley, III** |

**EXPERT REPORT OF WILLIAM H. PURCELL**

**August 7, 2017**

TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    QUALIFICATIONS ............................................................................................ 3

III.   SUMMARY OF OPINIONS ............................................................................... 6

V.     TIMELINE AND BASES FOR FINDINGS ...................................................... 8

       A.    Events Before 2013 ................................................................................. 8

       B.    2013 ......................................................................................................... 9

       C.    Beginning of 2014 Through July 30, 2014 ........................................... 14

       D.    September 8, 2014 into 2015 ................................................................. 25

       E.    Evaluations by Independent Advisory Firm**s** ...................................... 32

V.     FINDINGS ....................................................................................................... 40

VI.    SIGNATURE AND RIGHT TO SUPPLEMENT AND/OR MODIFY ............ 43

## I.  INTRODUCTION

I have been retained by Plaintiff's Counsel in the putative class action[1] litigation entitled

*Gross v. GFI Group, Inc. et al.*, Case No. 1:14-cv-09438-WHP, pending in the United States

District Court for the Southern District of New York.  The Defendants in the action are GFI

Group, Inc. (the "Company" or "GFI"),[2] Colin Heffron ("Heffron"),[3] and Michael "Mickey"

Gooch ("Gooch").[4]  Specifically, I have been asked to serve as an investment banking expert and

to opine, based on investment banking industry standards, customs, and practice and my

expertise, on the following issues:[5]

   (i)    The importance, and generally accepted investment banking methodology, in a
          merger and acquisition ("M&A") selling process of optimizing shareholder value
          by finding buyers willing to pay the highest possible price for the company,

---

[1]     The Second Amended Complaint in this Class Action asserts claims on behalf of all persons (other than the defendants) who sold their GFI shares after a statement was made by Michael Gooch, the Executive Chairman of GFI Group, Inc., on July 30, 2014 (when a merger transaction with CME Group, Inc. ("CME") was announced) but before BGC Partners, Inc. ("BGC") announced its tender offer for GFI shares on September 9, 2014 at $5.25 per share.

[2]     Prior to its acquisition by BGC Partners, Inc. ("BGC"), GFI, headquartered in New York City, was a leading intermediary and provider of trading technologies and support services to the global over-the-counter and listed markets.  GFI had two principal business segments: (a) an inter-dealer broker business which included its brokerage and trade execution services and clearing business (the "Brokerage Business" or "IDB") and (b) proprietary software products businesses called Trayport and FENICS (the "Software Business").  Trayport licensed multi-asset class electronic trading and order management software to brokers, exchanges, and traders in the commodities, fixed income, currencies, and equities markets. FENICS provided software primarily for foreign exchange option markets, which provided customers with technology to control and monitor the lifecycle of their foreign exchange options trades.  The Brokerage Business accounted for almost 90% of GFI's total 2013 revenues.

[3]     Mr. Heffron was GFI's Chief Executive Officer ("CEO") and a director of the Company. Mr. Heffron had served as a director of the Company since 2001, he became the Company's president in 2004, and he became the Company's CEO in 2013.

[4]     Mr. Gooch founded GFI in 1987 and served as the Company's CEO from 1987 to 2013. In 2014-2015, he was a GFI director and its Executive Chairman.  Mr. Gooch indirectly controlled approximately 38% of GFI's common shares through Jersey Partners, Inc. ("JPI").

[5]     The sources for the information and facts set forth in this Expert Report are from the documents listed in Exhibit 2, other sources cited in this Report, or my industry knowledge.

including its components or assets, and including the importance of conducting a thorough and complete "market check" as part of the selling process;

(ii)     The heightened importance of employing a generally accepted investment banking methodology in undertaking an M&A selling process to optimize shareholder value when conflicts of interest involving the senior management of a company exist in a proposed deal; and

(iii)     Based on the above principles, an evaluation of the M&A selling process undertaken by GFI which led to the announcement on July 30, 2014 of the proposed CME merger transaction[6] that valued GFI's common shares at $4.55 per share (the "CME Deal"),[7] including the statement made by Defendant Gooch (the "Statement")[8] in the press release jointly issued by CME Group, Inc. ("CME") and GFI (the "Press Release"), and how that Statement related to the above.

---

[6]     CME, based on the July 30, 2014 Press Release, claims to be the world's leading and most diverse derivatives marketplace.  CME describes itself as follows:  "CME, through its future exchanges and clearing houses, serves the risk management and investment needs of customers around the globe.  CME offers the widest range of global benchmark products across all major asset classes, based on interest rates, equity indexes, foreign exchange, energy, agricultural commodities, metals, weather and real estate.  CME's products include both exchange-traded and over-the-counter derivatives.  CME brings buyers and sellers together through its CME Globex electronic trading platform across the globe and its open outcry trading facilities in Chicago [where it is headquartered] and New York City, and provides hosting, connectivity and customer support for electronic trading through its co-location services.  CME Direct technology offers side-by-side trading of exchange-listed and over-the-counter markets. . . . CME offers a wide range of market data services – including live quotes, delayed quotes, market reports and a comprehensive historical data service."  *See* CME Registration Statement (Form S-4) (Oct. 16, 2014) ("CME Merger Proxy Statement") at 14.  Based on the Merger Proxy Statement, CME continues to expand into the index services business.  CME's total revenue in 2013 was $2.9 billion and its net income was $976.8 million.  *Ibid* at 36. CME's shareholders' equity at year-end 2013 was approximately $21.2 billion. *Ibid*.

[7]     The press release issued on July 30, 2014 (the "Press Release") was entitled as follows: "CME Group and GFI Group Announce Plan for Strategic Transactions.  CME Group to Acquire Trayport and FENICS from GFI Group; GFI Group Stockholders to Receive $4.55 per GFI Group Share in CME Group Stock Creating Substantial Stockholder Value; GFI Group's Wholesale Brokerage to be Acquired by Private Consortium of Current GFI Group Management."

[8]     The Statement made by Defendant Gooch on July 30, 2014 as part of the Press Release was:  "Optimizing GFI's value for stockholders has been a goal of management since becoming a public company in 2005 and this transaction [the CME Deal] represents a singular and unique opportunity to return value."   The lead-in sentence to Gooch's Statement was: "GFI Group Executive Chairman, Michael Gooch, commented:  We are very pleased to announce this transaction with CME Group and the substantial premium and liquidity it delivers to our stockholders."

## II.     QUALIFICATIONS

1.      I graduated from Princeton University *cum laude* with a B.A. in Economics in 1964 and from New York University Graduate School of Business with honors with an MBA in 1966.

2.      I have been an investment banker for more than 45 years.  During my career, I have worked in all areas of corporate finance and investment banking, including public and private corporate financings of all types; various merger and acquisition related transactions, including the acquisition financings related to such transactions; various valuation projects, including the issuance of fairness opinions and solvency opinions; and a number of investment-related activities, including venture capital transactions and leveraged buyouts.

3.      I began my career in 1966 at the firm of Dillon, Read & Co. Inc. ("Dillon Read"). I was elected a Managing Director of Dillon Read in 1982 and continued to be a Managing Director until I left Dillon Read in November 1990.  I am currently a Senior Director of Seale & Associates ("Seale"), an investment banking firm in the Washington, DC area.  With Seale, I provide advice and assistance to companies and organizations and their senior executives (including chief executive officers and chief financial officers) with respect to, among other things, M&A issues, financing issues, valuations, fairness opinions, and general financial planning matters.  I also occasionally consult for certain other investment banking firms.

4.      As a result of my experience in the investment banking industry, I have worked with almost all of the leading investment banks in the U.S., a number of regional investment banks, and various commercial banks.  Accordingly, I am familiar with the quality of investment banking work and investment banking principles, including all aspects of the capital markets.[9]

---

[9]      I have also served as a board member on a number of Boards of Directors and as Chief Executive Officer of a company going through bankruptcy proceedings.  In addition, I have

5.      In the area of mergers and acquisitions, I have worked on more than 100 M&A transactions as an investment banker, including mergers, divestures, leveraged buyouts, going private transactions, reorganizations and recapitalizations, joint ventures, and private investments.  Accordingly, I am familiar with the M&A process of merging companies and/or selling and buying companies, as well as the standards of care and procedures that should be followed in regard to both M&A transactions and financing transactions.[10]

6.      In the area of corporate financings, I have worked on more than 100 equity and debt issuances as an investment banker, both public offerings (including initial public offerings) and private placements.  Such financings have included issues with debt (credit) ratings of investment grade and below investment grade, subordinated debt issues, commercial bank loans, convertible debt issues, mezzanine debt, bridge financings, and off-balance sheet debt, including lease financings and joint venture financings.  For a period of time, I served as co-head of Dillon Read's private placement department.[11]

7.      I have performed valuations on numerous companies and their securities, both public and private, in many different industries and contexts.  In regard to the broker-dealer-industry, I have been a participant in this industry for my entire career.  When at Dillon Read, I signed the fairness opinion on behalf of the board of directors of The First Boston Corporation

---

represented more than 20 Special Committees of Boards of Directors in regard to such issues as the M&A process being undertaken and M&A strategic considerations, financing considerations and issues, conflict of interest issues, valuation issues, and fairness issues.  Accordingly, I am familiar with the duties and responsibilities of a board member and the basic principles of corporate governance, full disclosure, and due diligence.

[10]     I have worked with counsel in preparing M&A proxy statements as well as M&A financing documents.

[11]     I have worked with counsel on both the preparation of public prospectuses and private placement memorandums.  In all of my financing transactions, I have been responsible for and/or have participated in the due diligence investigation of the companies involved.

("First Boston") when Credit Suisse purchased the minority shares outstanding of First Boston that it did not already own.  In addition, I have been an expert witness in certain litigation matters involving broker-dealer valuations.  In regard to the financial services industry generally, I have worked on advising certain commercial banks, finance companies, insurance companies, and various other financial service companies.

8.      I have also been involved in a number of complex corporate situations as an expert, including issues involving the failures of Enron, Refco, and Indy Mac.  In addition, I have been retained as an expert by various U.S. government regulatory agencies, including the Securities and Exchange Commission (the "SEC"), the Department of Justice, and the Internal Revenue Service.

9.      I have been accepted as an expert witness related to litigation matters since 1976. In that role, I have testified in a number of federal and state courts and in arbitration forums.[12] My testimony has encompassed a wide range of investment banking matters, including numerous cases involving M&A process issues, as well as M&A financing issues, M&A entire fairness

---

[12]      Courts in which I have testified as an expert witness include the following federal and state courts: the United States District Court for the Southern District of New York; the United States District Court for the Eastern District of New York; the United States Bankruptcy Court for the Southern District of New York; the United States Bankruptcy Court for the District of Massachusetts (Eastern Division); the United States Bankruptcy Court for the District of Colorado; the United States District Court for the Eastern District of Virginia (Norfolk Division); the United States Tax Court in both Washington DC and Atlanta; the Federal Court of Claims; the Supreme Court of the State of New York; the Court of Chancery of the State of Delaware; the Superior Court of New Jersey Law Division, Morris County; the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida; the Circuit Court of the 11th Judicial Circuit Miami-Dade County, Florida; the Superior Court of the State of California, in both Los Angeles and Orange County; the Cuyahoga County Court of Common Pleas, Ohio; and the Circuit Court of Pulaski County, Arkansas.  I have also testified before FINRA and other arbitration forums.

issues, Special Committee issues, other financing issues, material adverse change ("MAC")

issues, disclosure issues, and due diligence issues.[13]

10.     I have authored no publications or articles during the past four years or during my

career.  My compensation in this matter is based on my standard hourly rate of $600 per hour.

11.     My opinions, which are stated within a reasonable degree of professional

certainty, are based on documents referred to in Exhibit 2 to this report, as well as my experience

as an investment banker.  I reserve the right to amend and/or supplement this report in the future

if additional information comes to my attention that may affect the views and opinions I express

herein.

## III.     SUMMARY OF OPINIONS

12.     A summary of my opinions is as follows:

(i)     The M&A selling process undertaken by GFI and directed by Defendant
Gooch was not designed to maximize value for GFI's public shareholders
and did not do so.  It was conflicted.  That conflict drove the process to
benefit Defendant Gooch and is inconsistent with the basic principles of
an M&A selling process.  As a result, the Statement was misleading.

(ii)    From February 2013 through January 15, 2014, when a special committee
of the board of directors of GFI was formed (the "Special Committee"),
Defendant Gooch was conflicted and the process was compromised.  First,
the process failed to attempt to find a bidder for the Brokerage Business
portion of GFI other than Defendant Gooch and other senior management
of GFI (the "Management Consortium").  Based on Defendant Gooch's
personal preference, which involved potential significant monetary
benefits for him, he would only agree to negotiate with CME because
CME would agree to his preferred structure of immediately selling the
Brokerage Business back to the Management Consortium.  If, in fact,
CME was the highest bidder for the Trayport-FENICS portion of GFI's

---

[13]     My curriculum vitae is attached as Exhibit 1 hereto.  It includes examples of the cases in
which I have testified as an expert witness at trial and/or by deposition during my career (over
170 cases), as well as various merger and acquisition transactions and financing transactions in
which I have participated during my career.

business,[14] the circumstances would have dictated that a proper M&A selling process would have included attempting *to find the highest bidder for the Brokerage Business*.   Such a process was not, however, undertaken.   Second, Defendant Gooch negotiated the price range for Trayport and FENICS with CME *before* establishing and involving the Special Committee.

(iii)    From January 15, 2014 through July 30, 2014, the Special Committee was unable to correct the flaws in the GFI M&A selling process *because Defendant Gooch interfered with the process*, making it impossible for the Special Committee to undertake its responsibilities as recommended by Greenhill & Co. ("Greenhill"), its financial advisor investment bank, of ensuring that a thorough pre-signing "market check" was undertaken to optimize the value of the Company.

(iv)    The events after July 30, 2014 *confirmed* that the M&A selling process for GFI failed to optimize or maximize GFI's value, contrary to Defendant Gooch's Statement in the July 30, 2014 Press Release that: "Optimizing GFI's value for stockholders has been a goal of management since becoming a public company in 2005 and this transaction [the CME Deal] represents a singular and unique opportunity to return value."   Most important, the events after July 30, 2014 demonstrated that Gooch and the Management Consortium were willing to invest *an additional approximate $150 million* of their own money to acquire the Brokerage Business, and Jefferies was willing to lend that money to do so.[15]   In addition, the winning bid by BGC was in part possible because BGC was able to take advantage of the significant cost saving synergies of approximately $90 million per year, *which the financial advisor to Gooch, Jefferies & Company ("Jefferies"), had told Gooch in February 2013 were probably achievable if GFI was sold to another broker-dealer through a thorough M&A selling process*.

---

[14]      While the CME Deal valued GFI significantly above the pre-announcement share price of GFI (by 46.3 percent), it clearly failed to "optimize" or "maximize" the value of the Brokerage Business (as discussed throughout this Report) and it also failed to "optimize" or "maximize" the value of even the Trayport and FENICS businesses.   Indeed, after BGC purchased GFI, when topping the initially announced CME Deal by over 34%, it was able to sell the Trayport business for a higher price than valued by CME ($650 million for Trayport alone) and it kept the FENICS business, which CME would have acquired along with Trayport.   (Refer to BGC's Nov. 17, 2015 8-K, Lutnick Deposition Ex. 123.)

[15]      In the bidding auction process versus BGC during which the CME Deal price for GFI was increased from $4.55 per share to $5.85 per share, the incremental monies needed for the revised CME bid was approximately $150 million and this amount was to be paid *almost entirely by Gooch and the Management Consortium*.

V.    **TIMELINE AND BASES FOR FINDINGS**

A.    <u>**Events Before 2013**</u>

13.    GFI became a publicly-traded company during January 2005.  The initial public offering ("IPO") price for GFI was $21 per share and the offering at that time was successful as indicated by the fact that the underwriters exercised in full their over-allotment option.  The managing underwriters for the IPO were Citigroup Global Markets and Merrill Lynch, with co-managing underwriters being Banc of America Securities, J.P. Morgan Securities, and Jefferies.

14.    During recent years, primarily after the 2008-2009 worldwide financial crisis, which generally adversely affected financial firms including GFI and its competitors, the Company's common stock rarely traded as high as $6 per share.  During 2011, the stock's high price was $5.75 per share (with a low of $3.64 per share) and, during 2012, the stock's high price was $4.93 per share (with a low of $2.20 per share).[16]  During 2013, GFI's common stock traded as high as $4.58 per share during the third quarter of 2013 (with a low of $3.07 per share during the first quarter of 2013) and, during 2014 (through June 30), the stock's high price was $4.19 per share and its low was $3.23 per share.[17]  At the market's close prior to the July 30, 2014 Press Release, GFI's stock traded at $3.11 per share.[18]  Despite reported losses in 2012, 2013, and the first six months of 2014, the Company continued to pay quarterly dividends on its common stock.[19]

---

[16]    Refer to, among other sources, GFI's Annual Report for the year ending December 31, 2012 (Form 10-K) (Mar. 1, 2103).

[17]    Refer to the CME Merger Proxy Statement, at page 43.

[18]    With Gooch being a large owner of GFI's common stock, his annual dividend income was significant.

[19]    For the year ended December 31, 2013, GFI's total revenues were $901.45 million and its net loss of the year was approximately $20 million.  GFI also had a net loss in 2012 (approximately $9.9 million) and 2011 (approximately $3.2 million), but a profit in both 2010

15.    Although the brokerage business is generally cyclical, the 2008-2009 financial crisis negatively impacted Wall Street firms, including GFI, particularly hard.   However, Defendants Gooch and Heffron, together with their advisors, *anticipated as of 2013-2014*, prior to signing the CME Deal, that the business *would soon improve*.[20]   Accordingly, the time was opportune for Defendants Gooch and Heffron to purchase GFI's Brokerage Business at a favorable price from their point of view.

**B.    2013**

16.    The above point of view of Defendant Gooch attempting to purchase the Brokerage Business of GFI at a favorable price to him is confirmed by a number of factors: (a) the statements made by Jefferies in a February 12, 2013 presentation made to GFI Management including, *i.e.*, to Gooch (the "Jefferies Presentation"), (b) follow-up comments later made by Defendant Gooch in the first quarter of 2014, and (c) the fact that, during the period from September 9, 2014 into February 2015, Defendant Gooch and the Management Consortium

---

and 2009 (approximately $25.6 million and $16.3 million, respectively).   GFI's stockholders' equity as of December 31, 2013 was $407.3 million and, as of September 30, 2014, was $300.9 million.   GFI's cash and cash equivalents as of September 30, 2014 were $165.85 million, approximately the same amount as the Management Consortium was to pay for the Brokerage Business under the CME Deal.   As of February 12, 2013, when Jefferies gave a presentation to GFI, GFI's cash position at that time was $209.8 million (JEFF00019428).   For the nine months ending September 30, 2014, GFI reported a loss of $101.5 million.   Refer to Amendment No. 1 to Form S-4 Registration Statement under the Securities Act of 1933 of CME Group, Inc., as filed with the SEC on December 5, 2014 (the "Merger Proxy Amendment") at pages 16 and 37-40.

[20]    *Prior* to the July 30, 2014 Press Release, GFI management had actually prepared projections for the Brokerage Business in order to borrow the money to buy the Brokerage Business.   Those projections showed that, in Gooch's belief, which he shared with his bankers, 2014 would be the "trough" or low point for the business, and revenues and earnings would rise thereafter.   (Refer to Deposition of Alex Yavorsky at page 208.)   Reference is made to the Jefferies Credit Committee Memorandum dated April 2014 at JEFF00016325.   The projections given to Jefferies showed Adjusted EBITDA (earnings before income tax, interest charges, and depreciation and amortization) of $97.4 million for actual 2013 results, growing in 2014 to an estimated $127.3 million (an increase of 30.7%) and continuing to grow as follows:   $137.2 million for 2015, $147.9 million for 2016, $156.6 million in 2017, and $165.4 million in 2018.

increased the price they were willing to pay for the Brokerage Business by over 70% from that originally presented to GFI stockholders at the time of Gooch's Statement on July 30, 2014 when he proclaimed that the CME Deal represented "a singular and unique opportunity to return value" to GFI stockholders - - and Gooch's bankers significantly raised the amount they were willing to lend to do so.

17.    Indeed, in the February 12, 2013 presentation, Jefferies presented its views as follows:

(i)    That the industry and its regulatory backdrop *favor consolidation*;

(ii)    That Jefferies suggested to GFI that its view was that *market conditions will eventually improve*;[21]

(iii)    That both the Brokerage Business and Trayport and FENICS were undervalued;[22]

(iv)    That Jefferies *suggested synergies could be achieved*[23] *by a strategic combination with another IDB* (inter-bank broker dealer), and that an "optimal approach" [to create value] might be to first engage with such firms;

(v)    That: "*Opportunity…The true value* of GFI's IDB franchise [its Brokerage Business] *should reflect the synergies that can be unlocked in a strategic combination with another IDB* [broker dealer] *which can best be achieved at the bottom of the cycle*";[24] (Emphasis added); and

(vi)    That Jefferies assessed the ability and attractiveness of the *four major IDBs  [broker dealers]to pursue an acquisition of GFI, i.e.,* ICAP, Tullett, BGC, and Tradition;[25] and

---

[21]    Refer to pages 2-3 of the Jefferies presentation (JEFF00019419-420).

[22]    Refer to Yavorsky deposition at page 103.

[23]    The synergies that might be achieved could be as much as $98 million annually.  (Refer to the Yavorsky deposition at pages 107-111 and JEFF00019430.)   As discussed later herein, after BGC acquired GFI, *BGC in fact did achieve cost savings in the combined brokerage business of approximately $90 million per year.*  (Refer to Lutnick Deposition page 52.)

[24]    Refer to JEFF00019420.

[25]    Refer to JEFF00019428.

18.     Moreover, in Jefferies's February 12, 2013 presentation,[26] Jefferies estimated "the sum-of-the-parts value of GFI at $5.41 [per] share," a figure 18.9% above the CME Deal which valued GFI at $4.55 per share.[27]   In addition, Jefferies accurately concluded that: The "optimal approach [in the M&A selling process] may be to engage with an IDB [a broker-dealer such as ICAP, Tullett, BGC or others] to sell the entire company (for cash/stock) while retaining the option to sell Trayport and FENICS to another strategic buyer."[28]

19.     *Defendant Gooch chose to ignore this advice.*   Instead, he told Jefferies in February 2013 that he wanted the Brokerage Business for himself.   In this regard, he directed Jefferies to initiate discussions with five strategic buyers believed to be uninterested in the Brokerage Business to assess interest in a possible transaction with GFI.[29]   Defendant Gooch's preferred structure was to find a buyer that did not want the Brokerage Business and, accordingly, would agree to immediately sell that business back to the Management Consortium at a favorable price.   CME agreed to move forward with the proposed structure.

20.     While Jefferies listed CME as a potential counterparty, it did not own an IDB and had no interest in acquiring GFI's IDB.   Thus, while it might offer a premium for Trayport and FENICS, it could not offer a synergy-based premium for the IDB.   However, that made it a perfect counterparty for Gooch's proposed structure, in which he would acquire the IDB for himself.   Gooch directed Jefferies to enter into discussions with CME.

---

[26]     Refer to JEFF00019416-439, and Exhibit No. 145 to Yavorsky's June 22, 2017 deposition.

[27]     Refer to JEFF00019420.  Refer also to footnote 34 herein.

[28]     *Ibid*.

[29]     Refer to the deposition of Alex Yavorsky at pages 81-82 and Frank Fanzilli, Jr. taken on June 6, 2017 ("Fanzilli Depo," at pages 59-63).

21.     On October 8, 2013, GFI and CME entered into a non-disclosure agreement in order to begin serious negotiations about the possibility of acquiring GFI.  Entering into a non-disclosure agreement with another party regarding a possible M&A transaction is generally considered within the investment banking industry as an important event since such an agreement is not generally signed unless there is the possibility of serious negotiations taking place.  Given Gooch's conflicted position, it would have been appropriate at the time of such an event, at the latest, to fully inform the Board about Gooch's intentions so that the Board could then consider establishing a Special Committee to oversee the process. However, this procedure was not undertaken by Gooch.

22.     If Defendant Gooch had informed the Board at the time of his intentions, the Board, given the potential conflicts of interest that could arise given Defendant Gooch's large indirect stock interest in the Company, should have immediately formed a Special Committee of the Board to ensure that a *proper* M&A selling process took place to optimize or maximize the value to be received by *all* of the shareholders of the Company.

23.     Once it has been decided to attempt to sell a company, *i.e.,* in investment banking industry practice "putting the company in play," it is a generally accepted investment banking industry practice for a board of directors to then do everything possible to maximize the value of the company for the benefit *of all* stockholders.[30]  In addition, if any potential conflicts of interest are potentially possible, it is a generally accepted investment banking industry practice to appoint

---

[30]     In the presentation given to the Special Committee by Greenhill, one of the points made was as follows:  "If an [M&A] process is deemed optimal, maintain competitive tension to maximize likely offer prices."  As stated by Robert Smith ("Smith"), a Managing Director of Greenhill responsible for financial services M&A transactions, in regard to this point:  "Having a competitive process generally will result in a better outcome than otherwise, generally speaking." Smith also agreed that the CME only strategy lacked the element of competitive tension. (Deposition of Robert Smith taken on June 7, 2017, the "Smith Depo," at pages 9, 22-23 and 60).

a Special Committee of independent directors, with its own financial and legal advisors, to direct the M&A selling process.[31]

24.    On October 17, 2013 during a regularly scheduled meeting of the GFI Board, Gooch and Heffron did inform the Board of "their interest in pursuing a strategic transaction involving GFI" and about "various discussions" with Jefferies and "potential strategic acquirors, and their belief that a potential transaction with CME could be in the best interests of GFI Stockholders."[32]  As discussed later herein, however, Mr. Fanzilli, a GFI director who was later appointed to the Special Committee in January 2014, testified that such discussions were ideas and not specific deals.

25.    If a Special Committee had been formed in 2013, it is highly likely that more specific instructions would have been given to Gooch and Jefferies in regard to the M&A selling process to be undertaken after the Special Committee had retained its own financial advisor and legal advisor.  Indeed, in my opinion, it is highly likely that the Special Committee's recommendation would have been *similar to Jefferies' February 2013 Presentation recommendation*, *i.e.*, the "Optimal approach may be to engage with an IDB [broker-dealer] to

---

[31]    Mr. Smith of Greenhill basically agreed with this position as he stated in response to the following question of "What is the significance of an M&A selling process leading to an offer being appropriate and thorough":

> "[T]here was and is…a long line of cases in the law, and the best advice from the legal advisors to investment bankers as well as to companies when there is a control situation…is to make sure that the process that is undertaken by the board in evaluating any transaction….be appropriate and thorough; and have other elements to it, but those are the essential ones." (The Smith Depo, at page 14).

[32]    Also at this point, according to the Merger Proxy (at page 61), Gooch consulted with Willkie Farr as the Company's legal counsel about Gooch's preferred acquisition structure. Willkie Farr represented both GFI in its sale to CME and represented the Management Consortium in its purchase of the IDB.  Likewise, Jefferies, which understood the conflict and took it into consideration in negotiating its own fee (Yavorsky pages 230-231), represented both GFI and the Management Consortium.

sell the entire company (cash/stock) while retaining the option to sell Trayport and FENICS for cash to another strategic buyer." In addition, Jefferies had stated in its Presentation that: "The *true value* of GFI's IDB [Brokerage Business] franchise should reflect the synergies that can be unlocked in a strategic combination with another IDB [broker-dealer] which can best be achieved at the bottom of the cycle."

### C.    Beginning of 2014 Through July 30, 2014

26.     On January 15, 2014, over three months after the non-disclosure agreement with CME was signed and almost one year after the Jefferies Presentation was made to Defendants Gooch and Heffron, the GFI Board finally formed a Special Committee of independent directors to consider proposals from CME, as well as possible proposals from any other parties.   The independent directors comprising the Special Committee were Frank Fanzilli, Jr. ("Fanzilli"),[33] Richard Magee ("Magee"), and Marisa Cassoni.

27.     Mr. Fanzilli testified, based on his experience, that the purpose of a Special Committee hiring an investment banker was "to try to determine *how to optimize the value to shareholders*, look at alternative deal structures, look at alternative acquirers, all that kind of stuff."[34]   (Emphasis added).   He also testified that the Special Committee should attempt to obtain a transaction price "as high as reasonably possible"[35] and that retaining an investment bank to assist the Special Committee was essential to pursuing alternative transactions."[36] Finally, he testified that Defendants Gooch and Heffron were not independent and could have

---

[33]     Mr. Fanzilli testified that he was experienced with Special Committees and was familiar with the responsibilities involved because he had previously served on such committees as a board member.  (Fanzilli Depo at pages 40-44).

[34]     Refer to the Fanzilli Depo at page 70.

[35]     *Ibid*, at page 77.

[36]     *Ibid*, at page 82.

potential conflicts of interest.[37]   In terms of the structure for a GFI transaction, Mr. Fanzilli testified that: "I think the whole nature of the transaction was they [Gooch and the Management Consortium] wanted to buy the IDB [the Brokerage Business]….  Mr. Gooch wanted to acquire the IDB."[38]

28.    Mr. Fanzilli also testified that when the CME Deal was presented to him and the Special Committee it was "presented to us as something fairly concrete…what I would call a serious inquiry."[39]

29.    At the January 15, 2014 Board meeting with the Special Committee, Jefferies was in attendance and made a presentation about CME's proposal and other companies that had been contacted by Jefferies.[40]   In this presentation, it was indicated that the Management Consortium (Gooch, Heffron, and Nick Brown) were interested *in buying the Brokerage Business for $125 million*.[41]

30.    The investment banking firm, Greenhill, was retained by the Special Committee to act as its financial advisor.  White & Case was retained by the Special Committee to act as its legal advisor.

---

[37]     *Ibid*, at pages 42-46.

[38]     *Ibid*, at pages 62-63.  Mr. Fanzilli also testified that, when a possible transaction with CME was presented to the Special Committee, it was "presented to us as something fairly concrete…." (*Ibid*, at page 17).

[39]     *Ibid*, at page 17. Mr. Fanzilli also testified, as to previous 2013 Board meetings, his recollection was that ideas were presented to the Board and they were discussed, but they did not involve deals.  (*Ibid*, at pages 18-19).

[40]     *Ibid*, at pages 67-69.  Also, the CME Merger Proxy Statement, at page 62.

[41]     *Ibid*, at page 68, and based on the minutes for the Board meeting on January 15, 2014 (Exhibit 1 to the Fanzilli Depo).  The $125 million price, also mentioned in the CME Merger Proxy Statement at page 64, included the assumption by the Management Committee of approximately $65 million of RSU liabilities.

31.    Finally, the GFI Board adopted resolutions that are reasonably standard in the investment banking industry and which created the Special Committee as well as authorizing the Committee to (i) investigate any proposal submitted by CME or other potential strategic alternatives by other parties; (ii) evaluate the terms of any proposal submitted by CME or other parties; (iii) negotiate any element of any proposal submitted by CME or other parties; (iv) negotiate the terms of any definitive agreement as to CME or other parties; (v) report to the GFI Board its recommendations and conclusions with respect to any CME proposal, or other proposal, as to whether it was fair to, and in the best interests of, the unaffiliated GFI Stockholders; and (vi) elect *not to pursue* any proposal submitted by CME or another party.[42]

32.    The resolutions further provided that the Special Committee was authorized to pursue possible strategic alternatives other than any proposal submitted by CME and that the GFI Board would not approve a proposal from CME *without a favorable recommendation by the Special Committee.*[43]

33.    On February 25, 2014, GFI signed an engagement letter with Jefferies to be its financial advisor.[44]

34.    Based on investment banking industry custom and practice, a Special Committee of independent directors *would have the responsibility to make the final recommendation about an acquisition proposal or proposals.* This is because the Special Committee, with its independence, will represent *all* of the shareholders of a company and, as a result, be better

---

[42]    *Ibid*, at page 37.

[43]    *Ibid*, at page 53.

[44]    *Ibid*.

positioned to ensure that an M&A selling process will most likely optimize or maximize the value of their shares.[45]

35.   In addition, such a process is designed to minimize any conflicts of interest that might exist with senior management of the company or any large shareholders of the company. Given the conflict present here and the history of Gooch's pre-Special Committee negotiations, one of the important techniques a Special Committee can employ to ensure that the M&A selling process maximizes shareholder value is to provide for a thorough competitive pre-signing "market check" to find those counterparties that could best maximize shareholder value.   The benefits derived from undertaking a thorough "market check" is well discussed in an article dated about the same time as Defendant Gooch's July 30, 2014, *i.e.*, May 2014, and is entitled "The Board's Role in M&A Transactions" by Holly J. Gregory, a partner in the law firm of Sidley Austin (in the publication entitled <u>Opinion, Corporate & Securities</u>).  It states:

> "Given these [various] factors, *it is critical that the process the board follows during its consideration of a M&A transaction is sound*.   Informed board deliberation and a process untainted by conflict are key.  …   The board should understand *why* management seeks to pursue (or oppose) a transaction…   The board should consider *whether a market check should be undertaken. Canvassing the market is prudent where real or potential conflicts are presented* but may not be necessary, for example, where the board is extremely knowledgeable about the company and its industry, and is not conflicted."  (Emphasis added.)

36.   Consistent with these principles, as directed by the Special Committee, Greenhill attempted to conduct a market check.  On March 14, 2014, Greenhill identified 22 entities for the Special Committee that might be interested in pursuing a strategic transaction with GFI.  These entities were divided into Tier 1, Tier 2, and Tier 3 groups in the order to be contacted. Greenhill's Tier 1 group consisted of nine companies that Greenhill considered most likely to

---

[45]   As discussed in previous footnotes, Greenhill (Robert Smith) generally agreed with this principle.

pursue a transaction with GFI; the Tier 2 group consisted of four companies, *including BGC*, that competed with GFI's Brokerage Business; and the Tier 3 group consisted of nine companies that were considered much less likely to be interested in or capable of completing a transaction with GFI.[46]

37.     Only six parties, however, were actually contacted by Greenhill.   One party indicated interest in pursuing a possible transaction and two other parties indicated that they might be interested, but needed additional information to review.[47]   Greenhill's outreach was, however, stopped by Defendant Gooch 24 hours after it started, at which time Gooch told the Special Committee that he was afraid of information leaks and of scaring away CME.[48]

---

[46]     The Merger Proxy, at page 64.   On March 13, 2014, Greenhill and White & Case, together with Jefferies and CME's advisors, met to discuss due diligence items related to Trayport and FENICS.   (*Ibid*, at page 63).   On March 14, 2014, Greenhill met with the Special Committee to advise the members about that meeting and to discuss Greenhill's understanding of what had occurred *prior* to its engagement regarding discussions that had been held with third parties involving GFI.   Greenhill then reviewed for the Special Committee "a range of possible strategic alternatives and sale processes alternatives." (*Ibid*).   Robert Smith of Greenhill testified that a number of aspects of a potential CME transaction had been negotiated before Greenhill's retention, *i.e.*, "they had reached an agreement or an understanding on the overall price that…CME would offer.   They had reached agreement on the basic nature of the deal…to provide for… an acquisition of all of GFI shares for stock of CME.   And then shortly after closing…there would be a subsequent sale of the interdealer broker business…to the management team." (Smith Depo, at pages 35-36).   Smith also testified that the initial inquiries made by Jefferies were to firms who were not likely to be willing to participate in a transaction reflecting the Gooch preferred structure.   (Smith Depo, at page 42).   Finally, Smith testified that Greenhill believed that there were additional parties that should have been contacted, in addition to those contacted by Jefferies, "for the purposes of the Special Committee evaluating any transaction." (Smith Depo, at page 57).

[47]     *Ibid*.

[48]     Refer to Smith Depo, at page 71.

38.     At a meeting of the Special Committee on March 19, 2014, to which Gooch was invited, Gooch stated that his views to be expressed at this meeting were solely in his capacity as a stockholder and representative of JPI.  He stated the following:[49]

(i)     He would respect any decision made by the Special Committee regarding a transaction with CME and he would support a stockholder vote requiring a majority of the outstanding GFI shares, *excluding* shares owned by JPI;

(ii)    He also believed that a transaction with CME would maximize the value for GFI stockholders;

(iii)   He was concerned, however, that discussions with third parties other than CME could result in information leaks that might jeopardize any potential transaction with CME; and

(iv)    Although JPI respected the Special Committee's ability to say "no" to any transaction, the Special Committee should understand that, if CME raised its current offer price for GFI, JPI (as GFI's largest stockholder) presently intended to *vote against any other transaction* presented to GFI stockholders.

39.     The Special Committee, after Gooch left the meeting, discussed the implications of stopping all discussions with third parties other than CME.[50]

40.     Given Gooch's stated position and his control of approximately 38% of GFI's outstanding shares, Greenhill advised the Special Committee that a "market check" would not be possible.

41.     Accordingly, the Special Committee instructed Greenhill *to stop* all discussions with third parties other than CME.[51]

42.     Although Greenhill's mandate from the Special Committee was to conduct a "market check,"[52] Greenhill was unable to do so because Gooch stated to the Special Committee

---

[49]    The Merger Proxy, at page 65.

[50]    The Merger Proxy, at page 65.

[51]    Refer to Smith Depo at pages 73-76.

[52]    Refer to Fanzilli Depo, at pages 89-90.

that JPI (the holding S-corporation whose GFI shares Gooch had voting power over) would vote its GFI shares against any transaction not involving CME.  As Mr. Fanzilli testified, Greenhill's process of reaching out to the universe of potential buyers came to an end when Gooch told the Special Committee that he was "a buyer, not a seller, and that he would not be in favor [would not vote for] some of these transactions [other than the CME transaction] and I think Greenhill advised us [the Special Committee] that they would have to disclose that [statement] to any potential acquirers and that would sort of put a lot of cold water on their enthusiasm for working up a bid for the Company….I'm quoting something I heard him say, and I asked for clarification. And that meant *he would not vote his shares in favor of a transaction other than the CME transaction*."[53]  (Emphasis added).

43.     Accordingly, as stated by Mr. Fanzilli, the "market check" to be conducted by Greenhill came to an end, *i.e.*, "Gooch's insistence on being a buyer and not a seller is what dampened the market check."[54]  According to Mr. Fanzilli, Defendant Gooch's above statement to the Special Committee occurred "probably a week after we had first reached out to people."[55] Finally, Mr. Fanzilli answered "Yes" to the following question:  "Is it fair to say that Greenhill stated that they could not conduct an effective process related to the market check [given Gooch's statement]"?[56]

44.     Notably, at approximately the same time he was thwarting the market check, Defendant Gooch, in a series of text messages to Alex Yavorsky of Jefferies on March 26-27, 2014, noted that (i) he expected conditions in the Brokerage Business to improve and (ii) if he

---

[53]     *Ibid*, at pages 119-121.

[54]     *Ibid*, at pages 128, 133-134, and 138-139.

[55]     *Ibid*, at page 142.

[56]     *Ibid*, at page 156.

didn't do a deal soon, the Brokerage Business might improve so much that he (we) would not be able to afford doing it. Specifically, Defendant Gooch stated the following:

> "I think it went well with Bemo [Bank of Montreal] … They wanted to know my expectations for the future of the brokerage business. And they were like why now with this deal…I told them *if we don't do it now* [a deal]-*we won't be able to do it in the future because the brokerage business will improve so much we won't be able to afford it!!!...* And I said. Obviously *I'm bullish* or why would I risk my entire investment in taking this position. I'm concentrating my risk on a leveraged basis into the brokerage business… The transaction is almost done and *the pendulum is going to start swinging the other direction*." (Emphasis added.)[57]

45. On April 17, 2014, CME made a non-binding proposal for the acquisition of all outstanding shares of GFI for $4.49 per share, which represented a premium of 23% over GFI's closing stock price that day of $3.65 per share.

46. Just prior to the above date, on or about April 3, 2014, Jefferies's Credit Committee met to discuss financing the proposed acquisition of the Brokerage Business by Defendant Gooch and the Management Consortium. A "Debt Review Committee Memorandum" dated April 2014 set forth the following information, among other things:[58]

> (a) The Management Consortium, *i.e.*, Gooch's newly established company, would borrow from Jefferies the money needed to buy the IBD in the form of a senior secured loan;
>
> (b) The funds would be used to fund the purchase price of the Brokerage Business, pay related fees and expenses, and add cash to the business' opening balance sheet;[59]
>
> (c) Based on the Credit Committee Memorandum, the Continuing JPI Shareholders' Indication of Interest expressed to Jefferies was an implied value of $225 million;[60] and

---

[57]     Gooch Depo Ex. 69.

[58]     Refer to JEFF00016315-328.

[59]     Refer to JEFF00016318.

[60]     *Ibid*.

(d)     The Management Consortium would support the loan by contributing its CME stock received into a collateral account at Jefferies.[61]

47.     On May 18, 2014, the Special Committee made a counter-offer to CME at $4.85 per GFI share.

48.     On July 3, 2014, CME made a proposal, among other things, increasing its proposed acquisition price for GFI to $4.55 per share.  The closing stock price for GFI shares on July 3, 2014 was $3.34 per share.

49.     On July 29, 2014, the Special Committee met with its various advisers. Greenhill explained its valuation analysis of the CME Deal to the Special Committee and thereafter rendered its fairness opinion orally to the Committee.[62]  After this meeting, the GFI Board met, together with all the various advisors retained by GFI and the Special Committee, and the Special Committee unanimously recommended approval of the CME Deal.  The GFI Board then also voted to approve the CME Deal.[63]

50.     It should be noted however, that, in approving the CME Deal, it was stated in the October 2014 Merger Proxy Statement that, among the factors considered by the Special Committee, was the following:  "that its determination and recommendations were supported by its belief that there were *limited strategic alternatives* for enhancing value for GFI Stockholders,

---

[61]     *Ibid*.

[62]     It is noted, based on Robert Smith's testimony, that when Greenhill did a discounted cash flow analysis using GFI's projections given to Jefferies Credit Committee, which Greenhill viewed as optimistic, its valuation of GFI ranged from $5.89 per share to $8.35 per share. (Smith Depo, at pages 131-132.)  It is also noted that, when Greenhill issued its fairness opinion, it was *not* aware of the letter sent by BGC to GFI on that day.  (Smith Depo, at page 62).

[63]     Refer to the Merger Proxy Amendment, at page 72.

especially in light of JPI's statement that it would not consider selling its stake in GFI or vote in favor of any such alternative transactions…"[64]

51.     Also on July 29, 2014, BGC, which had *not* been contacted by Defendant Gooch, Jefferies, or Greenhill and which at that point in time owned 13.5% of GFI's common stock, delivered a letter to the GFI Board expressing its interest in a potential strategic transaction with GFI.  Although the letter did not provide a price, it noted that BGC was "confident [it could] offer a price per share substantially in excess of GFI's current trading price" and that "the combination of our businesses is compelling from both an *operating synergy* and growth perspective." (Emphasis added).[65]   BGC's letter was read to the GFI Board, which then concluded in its judgment that BGC was unlikely to pay a higher premium for GFI than CME. In addition, Gooch, in his capacity as a representative of JPI, stated once more that *JPI intended to vote against any transaction involving GFI with any party other than CME*.  After further discussion, the GFI Board, including the members of the Special Committee, but with Gooch and Heffron abstaining, unanimously voted to approve the CME Deal.[66]

52.     The letter from BGC was not publicly disclosed by GFI or the Special Committee. It was later publicly disclosed on September 9, 2014 by BGC.

53.     On July 30, 2014, before the start of trading, CME and GFI issued a press release in which it was revealed that GFI had entered into a stock-for-stock merger agreement with CME which valued GFI's shares at $4.55  per share[67] ($0.06 per share above CME's April 17, 2014

---

[64]     *Ibid*, at page 77.

[65]     Gooch Depo. Ex. 73.

[66]     Refer to the Merger Proxy Amendment at page 72.

[67]     The CME-GFI merger agreement included a voting agreement by Gooch committing him to vote the JPI shares in favor of the CME Deal and, if the CME Deal was terminated for any

offer, but $0.30 below the counter-offer by the Special Committee of $4.85 per share).[68]

According to the Press Release, the CME Deal was approved by GFI's board of directors "upon the unanimous recommendation of a Special Committee comprised solely of independent and disinterested directors."[69]   As part of the CME Deal, the Management Consortium would immediately buy back from CME the GFI Brokerage Business[70] "for $165M [million] in cash and the assumption, at closing, of approximately $63M [million] of unvested deferred compensation and other liabilities."[71]

54.     GFI shares prior to the merger announcement closed at $3.11 per share and thus the CME Deal at $4.55 per share represented a market premium of approximately 46.3 percent.

---

reason, to continue *to vote against any alternative transaction for up to a year*.  (Refer to Annex E of the Merger Proxy Amendment.)

[68]     As of September 30, 2014, GFI had fully diluted common shares outstanding of 124,237,643 (refer to page 38 of the Merger Proxy Amendment).  Thus the total value of the CME Deal, based on the Press Release, was approximately $580 million.  In addition, CME would assume $240 million of GFI outstanding debt, making the total enterprise value of the transaction approximately $820 million.

[69]     As set forth in Mr. Fanzilli's Depo (at pages 207-208) and elsewhere, including in CME's Merger Proxy Statement, "The Special Committee also considered that its determination and recommendations were supported by its belief that *there were limited strategic alternatives for enhancing value for GFI stockholders*, especially in light of JPI's statement [as well as Gooch's statement] that it would not consider selling its stake in GFI or vote in favor of any such alternative transactions as well as the risks and uncertainties to GFI stockholders associated with such alternatives."  (Emphasis added).

[70]     GFI's stockholders' equity at September 30, 2014 was $300.9 million (down from $407.3 million as of year-end 2013) and its cash and cash equivalents position as of September 30, 2014 was $165.85 million.

[71]     During the week prior to signing the CME merger agreement, CME requested that the Special Committee provide a fairness opinion relating to the Management Consortium's purchase of the Brokerage Business from CME.  However, Greenhill told the Special Committee they would not issue a fairness opinion in regard to that transaction as a matter of policy, as Greenhill also was not a party to the transaction.  (Fanzilli Depo, at pages 251-253.)  In my opinion, CME was correct in asking for such an opinion given the potential conflicts of interest involved in the transaction.  However, the proper party to render such a fairness opinion, if appropriate, would be its own retained investment banker, not Greenhill.

Following the merger announcement, the GFI stock closed on July 30, 2014 at $4.47 per share and the volume of trading was almost 11.2 million shares.  On July 31, 2014, the GFI stock closed at $4.53 per share and the volume of trading was almost 3.1 million shares.

    **D.**    **September 8, 2014 into 2015**

55.    On September 9, 2014, BGC publicly announced that it would make a fully-financed cash tender offer for GFI shares at $5.25 per share.  This price was approximately 15.4 percent higher than the CME Deal's proposed merger price of $4.55 per share.

56.    In the press release announcing its tender offer, BGC noted that, in its opinion, GFI's proposed transaction with CME and the Management Consortium "*deprives GFI shareholders of the appropriate value of their investment.*"[72]  (Emphasis added).

57.    BGC's press release also disclosed that:

> BGC "has over the course *of several years repeatedly expressed an interest in acquiring GFI*, and on July 29, 2014 [one day prior to the Statement] delivered a letter to Messrs. Michael Gooch and Colin Heffron *detailing its interest in acquiring 100% of GFI.  We had expected to engage in a discussion*, and therefore we were surprised to read the press release announcing your agreement with CME Group, Inc."  (Emphasis added).[73]

58.    The press release noted that BGC expected a combination to yield "meaningful synergies and significant cost savings."[74]

59.    On October 22, 2014, BGC commenced its tender offer for 100% of GFI's common shares.

---

[72]    BGC, like GFI, owned an inter-dealer brokerage business.  BGC was, however, a significantly larger firm in terms of total revenue.

[73]    Refer to Lynn Depo Ex. 98.

[74]    *Ibid*.

60.     On December 2, 2014, it was announced that the Management Consortium would increase its offer for the Brokerage Business of GFI by $89 million.  This increase would be passed on to GFI stockholders through a $0.70 increase in the CME Deal offer – to $5.25 per share in cash and CME stock, thus matching the BGC offer of $5.25 per share.  This revised offer now valued the Brokerage Business to be purchased by Defendant Gooch and the Management Consortium at $254 million versus their original offer of $165 million (with both offers assuming between $65 to $72 million of various Brokerage Business liabilities including employee RSUs).

61.     On December 11, 2014, BGC sent a letter to the GFI Board and the Special Committee announcing its intention to increase its tender offer to $5.45 per share.

62.     On December 12, 2014, the Special Committee met with its advisors to review the new BGC proposal.  The Special Committee then unanimously determined that the revised BGC proposal could reasonably be expected to lead to a "superior proposal," and accordingly resolved to recommend that the GFI Board accept this recommendation.

63.     On the same day, the Special Committee requested that GFI hold a Board meeting to act on the Special Committee's recommendation.

64.     However, once the Special Committee made its recommendation to the full GFI Board, only the remaining two independent directors on the Special Committee voted in favor of the BGC offer.  The two management directors, *Defendants Gooch and Heffron*, and the remaining independent director (Marisa Cassoni, who had previously *resigned from the Special*

*Committee*) voted against the BGC offer based on their belief that the higher BGC offer was "highly conditional and presents significant execution risks."[75]

65.    On January 8, 2015, after BGC had filed preliminary materials to solicit against the CME Deal, BGC sent another letter to the GFI Board noting that, although its July 29, 2014 letter of interest to the Board stated that BGC would "offer a price per share substantially in excess of GFI's current trading price, BGC received no response to this letter."[76]  In this letter, BGC also raised questions about *various obstacles and delaying tactics* which, in its opinion, were the result of actions being taken by Gooch and Heffron.[77]

66.    On January 14, 2015, just two weeks prior to the scheduled GFI stockholders meeting, BGC again increased its tender offer price to $5.60 per GFI share, and issued a press release designed to appeal to GFI employees, which stated that "GFI employees with unvested RSUs [an equity interest security] can choose to receive the same offer price available to all other shareholders in cash per RSU without any change to their pre-existing vesting schedules."

67.    On the very next day, January 15, 2015, GFI and CME issued a press release announcing that they had entered into revised definitive agreements to increase the consideration payable to GFI stockholders from $5.25 per share (payable in CME stock) to $5.60 per share (payable in a mix of CME common stock and cash).  As part of this arrangement, Defendant Gooch and the Management Consortium agreed *to further increase* the purchase prices for GFI's Brokerage Business from $254 million to $281.8 million (versus its July 30, 2014 proposal being

---

[75]    The two remaining conditions involving the BGC offer did not, however, seem to be very conditional or present much execution risk.  BGC required a minimum tender of 45% of GFI's outstanding shares (including the 13.5% of shares already owned by BGC) and an agreement to appoint BGC nominees to represent two-thirds of the GFI Board.

[76]    Refer to Lutnick Depo Ex. 140.

[77]    *Ibid*.

only $165 million).  CME agreed to contribute an additional $9.5 million of common stock toward the revised offer.[78]

68.    Later that afternoon, BGC increased its tender offer once more to $5.75 per share. In addition, BGC announced that it had committed to the GFI Board to raise its offer by an additional $0.10 per share under certain conditions.[79]

69.    During the morning of January 20, 2015, CME announced it would increase the CME Deal price to $5.85 per share to match BGC's earlier bid at $5.85 per share, payable in a mix of CME stock and cash - - the increase to be entirely financed by Gooch and the Management Consortium agreeing to forego approximately $40 million of the consideration due for their GFI shares.[80]  Several hours later on the same date, BGC increased its cash tender offer once more to $6.10 per share.  In addition, BGC again provided the GFI Board an executed agreement committing to raise its offer by an additional $0.10 per share, provided that the Special Committee and Board moved expeditiously towards a deal with BGC.[81]

70.    Despite the significant gap between his offer of $5.85 per share and BGC's offer of $6.10 per share, on January 27, 2015, the day after the filing of an amended 14D-9 by JPI on January 26, 2015, Defendant Gooch issued a public letter urging GFI shareholders to support the CME Deal.  However, this letter was *not* issued on behalf of GFI's Board of Directors or the Special Committee, but in Gooch's capacity as the controlling partner of JPI (which owned 37.8% of GFI's shares).

---

[78]    Refer to ISS Report dated January 21, 2015.

[79]    *Ibid.*

[80]    Refer to ISS Report dated January 21, 2015 and Glass Lewis Report also dated January 21, 2015.

[81]    *Ibid.*

71.     At the January 30, 2015 GFI stockholders meeting, the GFI stockholders voted against the CME Deal.  Prior to the GFI stockholders meeting, *i.e.*, on January 22, 2015, a well-recognized independent proxy advisory firm, Glass Lewis & Co. ("Glass Lewis"), in a reasonably detailed report (discussed in detail later herein in paragraphs 83-85), criticized GFI's flawed and conflicted M&A selling process and recommended that stockholders should vote against the CME Deal.

72.     On January 30, 2015, following the shareholder vote, Gooch in effect admitted in a GFI press release that his Statement on July 30, 2014 was false and misleading to GFI's stockholders.  In a January 30, 2015 press release, Gooch was quoted as stating that, while the GFI Board of directors and management were disappointed that shareholders had rejected the CME Deal with the Management Consortium, the Board and management would "*now work tirelessly* to find a strategic alternative that offers the Company's shareholders the chance to maximize the value of their investment."[82]  (Emphasis added.)  From an investment banking perspective, this is what should have been done *before* the CME Deal was selected as the only path forward.  This new statement by Gooch was also inconsistent with his rejection of Jefferies' initial advice to pursue a synergistic acquisition of the Brokerage Business.

73.     Notably, it was later revealed that the Special Committee had *not* authorized management to either issue the January 30, 2015 press release or for Gooch to make the statement therein.

74.     On February 2, 2015, GFI issued another press release that stated, among other things, the following:  "The GFI Board urges shareholders to take no action on the BGC tender offer at this time.  As announced on Friday [January 30, 2015], the GFI Board is [now, after

---

[82]     GFI press release dated January 30, 2015.  Reference is also made to Exhibit 1 of the Second Amended Complaint.

stockholders rejected the CME Deal] actively engaged in a process to explore strategic alternatives with any and all interested parties to maximize shareholder value for *all* shareholders." (Emphasis added). Again, from an investment banking perspective, this is what should have been done earlier. In addition, that GFI at this point thought that $6.10 per share might not maximize shareholder value provides further support for the conclusion that: (a) the M&A process leading to the $4.55 per share CME did not optimize or maximize shareholder value; and (b) such an M&A process could not have optimized or maximized shareholder value given Defendant Gooch's interference with the process and his insistence on buying the Brokerage Business for himself.[83]

75.    On February 19, 2015, GFI and BGC announced that they had entered into a tender offer support agreement in which GFI's Board of directors unanimously agreed to support BGC's tender offer for all of the outstanding shares of GFI common stock at $6.10 per share in cash. As part of this agreement, it was stated that Defendants Gooch and Heffron "will continue

---

[83]    Based on Exhibit 1 to the Second Amended Complaint, when a partner from a law firm, involved in a different class action, on February 2, 2015 contacted counsel to the Special Committee (*i.e.*, White & Case) in order to inquire about the Board's statements made in the January 30 and February 2, 2015 press releases, he received the following responses:

(i)     The Special Committee did not vote to issue the February 2, press release;

(ii)    The Special Committee never saw a draft of the February 2, press release;

(iii)   The Special Committee did not know that GFI intended to issue the February 2 press release;

(iv)    The Special Committee did not vote to urge stockholders to not tender into the BGC tender offer etc.; and

(v)     The Special Committee did not vote on January 30, 2015 to explore new strategic alternatives as described in both the January 30, 2015 and the February 2, 2015 press releases.

Based on my experience of having represented more than 20 Special Committees, these types of responses from the GFI Special Committee are both unprecedented and demonstrate, in my opinion, Mr. Gooch's complete lack of interest in following a proper and generally accepted M&A selling process.

to have management responsibilities at GFI and will enter into employment agreements and receive retention and non-competition bonuses based on certain non-GAAP financial results for GFI."

76.     On February 26, 2016, BGC completed its tender offer for GFI shares at $6.10 per share.

77.     On March 20, 2015, GFI filed a press release attached to its Form 8-K in which it announced its intention to voluntarily delist and deregister its common stock from the NYSE. On or about April 9, 2015, GFI's common stock ceased trading on the NYSE.

78.     Notably, after a competitive process did take place, BGC acquired GFI on or about April 9, 2015 at a price of $6.10 per share and, but for the continuing interference by Gooch in the M&A selling process, the acquisition price might have been as much as $6.20 per share.[84]  As previously mentioned, BGC had an actual offer of $6.20 per share on the table if GFI approved it by a certain deadline.  However, GFI did not do so.

79.     The final GFI acquisition price of $6.10[85] per share was 34.1% above the CME Deal price of $4.55 per share, which transaction Mr. Gooch on July 30, 2014 told GFI

---

[84]     Indeed, as reported on February 26, 2016 by *Law 360 Legal News & Analysis*, a Delaware Chancery court Chancellor, Vice Chancellor Laster, approved a settlement of $10.75 million (*about $0.10 per GFI share*) in a different shareholder class action versus GFI.  During a court hearing, Vice Chancellor Laster stated that the GFI shareholders had some "strong claims" in their case which accused GFI executives of trying to reach a deal with CME that would benefit the executives while steering away from a more shareholder-friendly transaction with BGC.  He said during the hearing that, had the litigation gone to trial, there was a good chance the suing stockholders could have potentially obtained even more compensation.  According to Vice Chancellor Laster: "There is a lot of evidence to support that there was *bad behavior going on here.*" (Emphasis added.)

[85]     In addition to the above litigation, Mr. Fanzilli testified that he, as a Special Committee member, believed that JPI was obligated to make up the difference in the 10 cents per share that was lost by the public stockholders of GFI.  (Fanzilli Depo, at pages 242-243.)

stockholders "represent[ed] a singular and unique opportunity to return value."[86]   The $6.10 share price also represented a premium of 96.1 percent over GFI's stock price of $3.11 per share prior to the July 30, 2014 CME merger announcement.

80.   Between September 9, 2014 and January 20, 2015, eight bids were made between the two parties of CME together with the Management Consortium and BGC - - with CME and the Management Consortium generally playing catch-up with the BGC bids.   In this regard, it should be noted that the increased bids from CME and the Management Consortium *were almost totally financed by the Management Consortium*.

### E.   Evaluations by Independent Advisory Firms

81.   The well-regarded shareholder advisory firm Glass Lewis made the following observations and criticisms, among other comments, about GFI's flawed and conflicted M&A selling process in a January 22, 2015 report[87] - - comments which in my opinion were extremely strong in terms of criticizing the GFI M&A selling process.[88]   These comments, which are discussed in additional detail later herein, provide further evidence that the July 30, 2014 Statement by Gooch, from an investment banking point of view, was not truthful to GFI's stockholders, especially to those stockholders who sold their GFI shares after the Statement was made but before September 9, 2014 when BGC announced its tender offer for GFI shares at $5.25 per share.   Among other things, Glass Lewis stated that:

---

[86]   With 124,237,643 GFI shares outstanding as of September 30, 2014, the value of the BGC transaction at $6.10 per share was approximately $758 million versus approximately $565 million for the CME Deal, *i.e., a difference of approximately $193 million.*

[87]   The Glass Lewis report is Exhibit 189 to the deposition of Colin Ruegsegger taken on June 29, 2017.

[88]   In rendering this Expert Report, I had access to much material that Glass Lewis and the other independent advisory firms did not have.   Therefore, my opinions and conclusions expressed herein are stronger than their opinions.

(a)     "In hindsight, it seems readily apparent the *GFI board's flawed and conflicted process failed to extract any significant semblance of maximum value or a favorable price, and further failed to fully incorporate those bidders willing to offer decidedly greater value to GFI investors...*"[89] (Emphasis added.)

(b)     "The purchase price for the management-led buy-out of GFI's existing wholesale brokerage business has increased fully 70.8% - - from $165.0 million to $281.8 million [a difference of $116.8 million] - - between execution [of the CME Deal merger agreement] and market close on January 21, 2015"; and

(c)     "We believe the sum of these factors *overwhelmingly suggest* investors should have little – if, truly any – confidence the present arrangement represents, within reasonable doubt, the most attractive value available to GFI and its shareholders."[90]  (Emphasis added.)

82.     Based on my experience, I am in total agreement with the independent assessment made by Glass Lewis in its January 2015 report that, among other things, stated that *GFI's M&A process was in effect flawed and conflicted and, accordingly, failed to get maximum value for the GFI stockholders.*  Moreover, I agree with Glass Lewis' policy in analyzing proposed M&A transactions, as set forth below, and believe that they reflect the elements of a generally accepted investment banking M&A selling process.

83.     I am also in general agreement with the criticisms about the GFI M&A selling process made by Institutional Shareholder Services ("ISS") in its report issued at about the same time (also discussed later herein).

---

[89]     This statement from Glass Lewis was included in a press release issued by BGC on January 22, 2015.

[90]     *Ibid*.

84.     The Glass Lewis report was prepared by Colin Ruegsegger, a senior M&A research analyst at Glass Lewis.[91]   The issues about GFI's flawed and conflicted M&A selling process, as discussed by Mr. Ruegsegger, are set forth below:

(a)     Glass Lewis' policy in analyzing proposed M&A transactions[92] specified four basic hallmarks that would generally be found in "a good transaction," *i.e.*, a proper M&A selling process.[93]

(b)     The four hallmarks are: (i) An independent board of directors or committee of the board which recommends the transaction; (ii) The process used to develop the transaction was one that was likely to yield the best deal; (iii) An independent financial advisor has rendered a fairness opinion that is economically and financially sound; and (iv) An appropriate price, *i.e.*, valuation, has been offered to the shareholders.[94]

(c)     In regard to the GFI-CME Deal as it related to the four hallmarks, Ruegsegger stated the following:

(i)     Glass Lewis had no reason to believe that the Special Committee was not independent, *but* Glass Lewis had cause to believe that the Special Committee's efforts to act in a manner that Glass Lewis would describe as independent *were significantly blunted by Gooch's involvement because he could block any deal he did not want*.   Therefore, the process was not independent of Gooch's interests.[95]

(ii)     As for the GFI M&A process being one that was likely to yield the best deal, Glass Lewis believed that *this hallmark constituted the most significant failure in terms of the proposed transaction*.   The involvement of Gooch, together with his stated ownership position,

---

[91]     Mr. Ruegsegger, who had approximately 11.5 years of experience at Glass Lewis, had supervisors who edited and commented as needed on his report, *i.e.,* Jason McCandless and Warren Chen at the time.   Mr. Ruegsegger stated that he issued 300 to 350 reports a year.   Refer to deposition of Colin Ruegsegger taken on June 29, 2017, the "Ruegsegger Depo," at pages 13, 14, 21, and 23.

[92]     It should be noted that Glass Lewis' report about the proposed GFI-CME Deal was based on publicly available information, such as SEC filings, press releases and articles.   (Ruegsegger depo, at pages 38-39.)

[93]     The Ruegsegger Depo, at page 76.   Mr. Ruegsegger was referring to "Glass Lewis' Approach to Financial Transactions."   Exhibit 190 to Ruegsegger's deposition.

[94]     *Ibid*, at pages 76-78.

[95]     *Ibid*, at pages 76-77.

and his effective refusal to enter into alternative agreements, his determination to provide advice to the Special Committee as to who they should speak to - - all together constituted poor structures in terms of soliciting the greatest possible interest.[96]

(iii)    In regard to a sound fairness opinion, Glass Lewis focused on this issue only briefly.  It did think, however, that the analyses and assumptions employed were exceedingly conservative in terms of GFI's value.[97]

(iv)    As for an appropriate price or valuation for the CME Deal, Glass Lewis believed that the M&A process failed to yield the greatest possible price to investors, especially because it lacked the presence of an alternative legitimate bidder willing to pay more to investors.[98]

(d)    Ruegsegger also made a number of additional comments during his deposition testimony, some of which are set forth below:

(i)    Glass Lewis believed that Gooch should have established a Special Committee much earlier because Gooch was negotiating with CME at an early stage "for a lengthy period before involving the Board."[99]

(ii)    Glass Lewis' opinion was that it generally favored that a "market check" be undertaken in an M&A process, *i.e.*, preferably that an independent board would undertake an effort to solicit interest from as many interested buyers as they believe are relevant that might be prepared to offer some value.[100]

(iii)    It was not particularly common for Glass Lewis to disagree with a board's recommendation of a proposed M&A transaction - - as it did in regard to the GFI-CME Deal in advising GFI shareholders to vote against the transaction.[101]

---

[96]    *Ibid*, at pages 77-78.

[97]    *Ibid*, at page 78.

[98]    *Ibid*, at pages 78-79.

[99]    *Ibid*, at page 81.

[100]    *Ibid*, at pages 35-36.

[101]    *Ibid*, at page 39.

(iv)     In advising the GFI shareholders to vote against the CME Deal, Glass Lewis' primary concern was that the Board's M&A process "was conflicted and largely inadequate for purposes of our own standards."[102]   There was neither an independent nor a thorough M&A process.   *There was an active effort by Gooch to blunt the market check process from occurring*.   Also, Gooch contributed to this impression by "expressly stating he would oppose any arrangement that was not executed with CME.  And given his voting interest in the Company, Glass Lewis believed that this knowingly indicated he was telling the Company that no other transaction would be possible."[103]

(v)      Glass Lewis, to the best of Ruegsegger's recollection, believed that Gooch was allowed to run a process of evaluating his preferred transaction for nearly a year before informing the Board expressly that he was seeking that type of transaction.[104]  It appeared to Glass Lewis that Gooch's preferred structure was an arrangement where the buyer of the Company would allow him and certain other executives to repurchase the Company's Brokerage Business immediately, effectively contemporaneous with the transaction.[105]

(vi)     Glass Lewis believed that Gooch's actions functionally deprived the Special Committee from really being able to undertake a market check that might create more value.[106]

85.     Another well-regarded shareholder advisory firm, ISS, in its report, recommended that GFI shareholders vote *against* the proposed CME Deal for the reasons set forth below, but

---

[102]     *Ibid*, at page 40.

[103]     *Ibid*, at pages 41.

[104]     *Ibid*, at pages 41-42.

[105]     *Ibid*, at page 42.

[106]     *Ibid*, at page 43. Glass Lewis' Approach to Financial Transactions memorandum also stated the following:  "Selling shareholders should consider whether the company is pursuing such an agreement in time of good health or under operational or financial duress.  In our view, a sale of a company *that has recently struggled* operationally [such as GFI] may *not* garner the highest valuation in a quick sale, and investors should consider whether more value could be achieved as a stand-alone entity."

recommended a *for* vote regarding the GFI Board's ability to adjourn the stockholders' meeting:[107]

(i)     "The sale includes a related party transaction…  Investors holding 38.7 percent of outstanding shares, including the Chairman's 36.7 percent stake, … should this transaction fail to win shareholder approval, [will] *vote against any alternative transaction* for up to a year following termination of the CME transaction."  (Emphasis added.)

(ii)    "Given that GFI charter requires the approval of 66.7% of votes cast to approve any merger, Gooch, through his beneficial ownership of 36.7% of the total issued and outstanding shares of GFI common stock *is able to prevent any extraordinary business transaction, including the GFI merger*." (Emphasis added)

(iii)   BGC, a 13.5% owner, has a bid that "currently stands at $6.10 per GFIG share, *with a commitment to raise the offer by an additional $0.10 per share if the GFI board commences the 'match period' provided by the terms of the CME merger agreement by midnight Jan. 20, 2015*."  (Emphasis added.)

(iv)    As for the fairness opinion issued by Greenhill, the financial advisor to the Special Committee, the "merger consideration, which was within the indicative ranges of the fairness opinion but generally toward the lower end at announcement, now *exceeds* the indicative ranges for three of the four valuation methods used in the fairness opinion."[108]  (Emphasis added.); and

(v)     In the rest of its report, ISS described the facts relating to GFI's M&A selling process, including the negative aspects of that process, all of which have been previously discussed earlier herein.

86.     In addition, in a separate article by ISS, dated January 27, 2015 and entitled "GFI Group (GFIG): What's So Special About That Special Committee?", the following was stated:

---

[107]   ISS believed support for the Company's proposal to allow the GFI Board to adjourn the stockholders' meeting would enable the favorable bidding process "to play out as long as both parties are able."  Glass Lewis, however, had recommended a "no vote" in regard to the GFI Board's ability to adjourn the stockholders meeting.

[108]   The high end of Greenhill's four valuation ranges for the fairness opinion were as follows: $5.44, $6.12, $4.13 and $5.38, with an average of $5.27 per share.  The low end of the valuation ranges were $4.55, $5.09, $3.50 and $3.35 per share, with an average of $4.12 per share.  The average of the high end and the low end is $4.70 per share.

(i)     "A new SEC filing in the slowly unraveling buy-out at GFI Group, by contrast [to a generally accepted M&A selling process] *discloses some compelling differences* between the processes of its Special Committee and full board which reinforce why the Special Committee mechanism itself, and director independence from management more generally, are *critical to the interests of unaffiliated shareholders* - - even despite the fact that all directors, independent of management or not, have a fiduciary duty to all shareholders."  (Emphasis added.); and

(ii)    "A newly-amended 14D9 filed with the SEC yesterday (*i.e.*, January 26, 2017) now reveals that the CME deal may not have had the full-throated support of the board…"

87.     Egan-Jones Proxy Services ("Egan-Jones"), generally has a lesser reputation than both Glass Lewis and ISS.   Egan-Jones issued a report dated January 9, 2015, which recommended that shareholders vote *for* the CME Deal, for the following concluding reason:

"Based on our review of publicly available information on strategic, corporate governance and financial aspects of the proposed transaction, Egan-Jones views the proposed transaction to be a desirable approach in maximizing shareholder value…"

88.     In making this recommendation, Egan-Jones seemed to place much importance in its report and recommendation on Greenhill's fairness opinion rendered to the Special Committee, as well as the significant premium that $5.85 per share (the outstanding offer at that time by both CME and BGC) represented over GFI's share price before the July 30, 2014 announcement of the CME Deal – but Egan-Jones did also set forth some of the negative aspects of the transaction, including specifically that (a) "the restrictions in the GFI Merger Agreement regarding GFI's ability to accept a Superior Proposal received by GFI" and (b) "the fact that the GFI Supporting Stockholders agreed to vote their shares of GFI Common Stock against any alternative business combination transaction during the Tail Period pursuant to the GFI Support Agreement."   In my opinion, the analysis by Glass Lewis and ISS was more thorough, and more accurate, than that of Egan-Jones.

89.     In terms of helping to summarize many of Gooch's inappropriate actions relating to what would be considered a proper and generally accepted investment banking M&A selling process, it is informative to refer to certain statements made in a Verified Complaint filed in the Delaware Chancery Court on November 23, 2015 (the "Complaint") against GFI *by the Special Committee members, Fanzilli and Magee, who were intimately involved with the GFI M&A selling process and dealing with Gooch*.[109]

> (a)     "GFI's insiders embarked on a vigorous campaign to interfere with the work of the Special Committee when the Special Committee began to engage with another bidder."[110]
>
> (b)     "One facet of the campaign was to just stop paying their [the Special Committee's] legal fees and expenses incurred in connection with the sales process and subsequent litigation."
>
> (c)     "Gooch had voting control over the shares of GFI held by JPI."[111]
>
> (d)     "Once the Insiders realized that the Special Committee was engaging with BGC to maximize value for GFI and its disinterested stockholders, and was not going to support the Insiders deal unless it was superior, GFI tried to *interfere with the Special Committee's work* by stopping payment of the Special Committee's legal fees and expenses.  The Insiders commenced a campaign of outrageous conduct to interfere with the Special Committee's work to maximize value for the disinterested stockholder's which included efforts to mobilize GFI's employees to work against BGC, blocking Board meetings to consider potentially superior proposals, blocking votes on Special Committee recommendations, excluding the Special Committee's counsel from Board Meetings, *issuing incorrect disclosures*, threatening the Special Committee members for pursuing superior proposals, and

---

[109]     GFI (and Defendant Gooch) had refused to pay the fees and expenses of the Special Committee members, including its legal advisors.  White & Case, the Special Committee's legal advisor, was involved in filing the Complaint.

[110]     This statement was in the opening paragraph of the Complaint and was also referred to in the Fanzilli Depo, at page 233.

[111]     Footnote 1 of the Complaint.

voting on the competing proposals even though they were admittedly conflicted and had recused themselves from such votes in the past."[112]

## V.    FINDINGS

90.    The interplay of investment banking principles with the facts of this case yield the following findings:

(a)    First, for a company's board of directors and management to be able to "optimize" or "maximize" the value of the company's common shares for the benefit of all shareholders, processes must be, and typically are, put into place to ensure that conflicts of interest do not deprive shareholders of value.

(b)    Given the above, the investing public understands and expects that a company's board of directors and senior management will generally follow this accepted M&A selling process to do the best job possible to optimize or maximize the value of their shares. This expectation and assumption by reasonable investors would be particularly strengthened when the senior executive, Defendant Gooch, represents at the time of a transaction announcement that the transaction "[o]ptimiz[es]" shareholder value and "represents a singular and unique opportunity to return value" to stockholders.

(c)    Undertaking an appropriate M&A selling process is particularly important if there are any potential conflicts of interest that could affect the process, either potential conflicts involving senior management, certain directors, or control shareholders.  In each situation, the M&A selling process is generally strengthened by establishing a Special Committee of independent directors, who retain their own financial advisors and legal advisors and have the final say in recommending for or against any proposed transaction;

(d)    If the M&A selling process has been contaminated in any meaningful way, from an investment banking perspective it would be improper and probably misleading for any senior management person or director to state that the company's real goal was to optimize or maximize shareholder value.

(e)    The M&A selling process undertaken by GFI, as set forth in some detail in this Report, was clearly flawed and conflicted based on the available evidence.  Those flaws and conflicts resulted in Gooch's attempting to buy

---

[112]    Refer to Paragraph 5 of the Complaint.  As stated in paragraph 6 of the Complaint the Insiders negotiated an insurance policy buy-out to fund their settlement of *the breach of fiduciary duty claims against them*.

the Brokerage Business for far less than it was worth, both to him, and to a competitor who could have realized synergies from the combination. Given that, it was in my opinion misleading to state that the transaction "optimized" shareholder value and that it was a "singular and unique opportunity to return value." The flaws are illustrated by the following facts.

(f)     Jefferies initially told Defendant Gooch how to unlock value in a sale of the Company. Both the Brokerage Business and Trayport and FENICS were undervalued by the market. As to the Brokerage Business, Jefferies identified possible sales to a synergistic buyer as the way to unlock value. This advice was sound, because synergies allow for a higher price.

(g)     Gooch immediately rejected this approach stating that he wanted the Brokerage Business for himself, *i.e.*, he wanted his Management Consortium to take the Brokerage Business private.

(h)     This created a conflict. Under standard investment banking practice, such a conflict would call for establishing a Special Committee of the board of directors consisting solely of disinterested directors, who would be empowered to evaluate conflicted and unconflicted proposals. This allows the Special Committee to either confirm that the conflicted proposal maximizes shareholder value, or that a competing alternative would do so.

(i)     Jefferies, recognizing the reality of the situation, in that they were trying to get business from Gooch, who rejected their value-maximizing approach, charted a course consistent with Gooch's preferences and only approached buyers who they believed had no interest in the Brokerage Business. The Special Committee, with its own investment bankers, should have had full authority to explore other alternatives at the same time that Jefferies was trying to arrange a deal according to the preferences of the Management Consortium.

(j)     Contrary to that principle, throughout this process, the GFI Board, other than Defendants Gooch and Heffron, was kept in the dark. Meanwhile, Defendant Gooch and Jefferies negotiated a price range for the non-Brokerage Business assets with CME, the only counterparty willing to accept Gooch's structure. In addition to being willing to sell back the Brokerage Business to the Management Consortium as part of the deal, CME was willing to engage in a stock-for-stock transaction, which was relevant to the insiders who held their shares at a very low pre-IPO basis. These deal points were important to Defendant Gooch, but did not necessarily help maximize value for disinterested shareholders, and because they were deal points insisted on by Gooch, they tended to detract from shareholder value, because those structural points were in effect part of the price CME was paying for the assets. This excluded parties who could have paid more but were unwilling to engage in the structure.

41

Again, proper investment banking procedure would have obtained offers from parties who were unwilling to do Gooch's preferred structure.

(k)   Only once the CME Deal was put into concrete form did Gooch hand it off to a Special Committee.  Again, the Special Committee should have been brought into the process much earlier, to develop alternatives and to ensure that the deal points were not to Gooch's private benefit to the detriment of the public shareholders.  Now that it was involved, the Special Committee's duty was to ensure the best possible deal for disinterested shareholders.  When the Special Committee began to take certain steps to do so, Gooch interfered with the committee' process.

(l)   The Special Committee hired lawyers and bankers.  The bankers told them to do a "market check" and identified potential buyers.  Competing brokerage businesses were included because of their synergy-driven attributes.  But, under various pretexts, Gooch convinced the Special Committee to pause the process shortly after it started.  Then, Gooch unambiguously declared that he would use his blocking shareholder position to prevent the consummation of any deal but the CME deal, and that he was a "buyer, not a seller," *i.e.*, he was insisting that he, not a third party, purchase the Brokerage Business.  Under those circumstances, the Special Committee's investment bankers advised them that it would be commercially unreasonable to perform the "market check" and thus the Special Committee was unable to do so.

(m)   Then, as the CME deal was about to get signed, a competitor, BGC, informed Gooch and Heffron by letter that it was interested in a premium priced deal with GFI and that interest was based in part on the synergies that could be realized by such a combination.  Notably, Defendant Gooch had specifically excluded BGC from the process, and BGC was not part of any market check.

(n)   BGC then made its interest and intentions known to the public by stating that it had expressed its interest for years and that it would make an offer directly to GFI shareholders at a substantially higher price.  In fact, this confirms that it did not make sense to exclude BGC from the entire M&A selling process geared towards maximizing value.

(o)   A bidding war then ensued.  Several things happened:  (i) BGC repeatedly articulated why Gooch's offer to buy the Brokerage Business was conflicted and undervalued the business; (ii) Gooch and the Management Consortium agreed to contribute an additional approximately $150 million to the CME bid; (iii) Gooch took many inappropriate steps to thwart BGC's higher offers; and (iv) nonetheless, BGC won, and GFI shareholders received $6.10 per share, a far higher price than CME and Gooch's initial offer.

(p)     In sum, in my opinion, the M&A selling process that Gooch drove, and Gooch's interference with the Special Committee, that culminated in the July 30, 2014 announcement and Gooch's Statement, was not designed to maximize shareholder value.

## VI.    SIGNATURE AND RIGHT TO SUPPLEMENT AND/OR MODIFY

91.     Since discovery may continue in this case and/or if additional information becomes known and/or available, I expressly reserve the right to amend and/or supplement this Report.

Dated:   _August 7, 2017_

By:     _William H. Purcell_

WILLIAM H. PURCELL
Executed in Bedminster, NJ  07921

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and complete copy of the foregoing and accompanying exhibits was served this 7th day of August, 2017, via email upon the following:

John F. Lynch
Joshua J. Card
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
(212) 403-1000
jlynch@wlrk.com
jjcard@wlrk.com

*Attorneys for Defendant GFI Group, Inc.*

Christopher D. Kercher
Lyndsey Keenan
QUINN EMANUEL URQUHART &SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
christopherkercher@quinnemanuel.com
lindseykeenan@quinnemanuel.com

*Attorneys for Defendants Colin Heffron and Michael Gooch*

/s Joseph D. Cohen
Joseph D. Cohen
GLANCY, PRONGAY & MURRAY, LLP

# EXHIBIT 1

August 1, 2017

### William H. Purcell:  Business Background Resume and
### Summary of Certain Transactions and Expert Testimony Work

Office:     225 Cedar Ridge Road
              Bedminster, NJ  07921

              908-781-1803(office) (cell phone:  908-581-1203) (fax: 908-781-5865)
              email: WilliamPurcellConsulting@gmail.com
              website: www.PurcellBanking.com

| _Index_: | | _Page_ |
|---|---|---|
| (I) | Personal Short-Form Resume | 2-4 |
| (II) | Selected M&A, Financing, and Advisory Transactions | |
| | 1) Dillon Read 1966-1990 | 4-7 |
| | 2) Since Dillon Read | 7-11 |
| (III) | Expert Testimony Work | |
| | 1) Dillon Read clients: 1976-1990 | 11-12 |
| | 2) Other:  1992-2017 | 12-31 |
| (IV) | Courts Accepting as Expert | 32-33 |
| (V) | Corporate Executive Positions | 33 |
| (VI) | Lawyers/Law Firms that William H. Purcell has worked with | 33-43 |

# WILLIAM H. PURCELL
**225 Cedar Ridge Road**
**Bedminster, New Jersey 07921**

**(office: 908-781-1803) (cell phone: 908-581-1203) (fax: 908-781-5865)**


**BORN:**          July 18, 1942, Kingston, Rhode Island


**EDUCATION:**

Boston Latin School - 1960
Princeton University - 1964 B.A. Degree, graduated with honors in Economics
New York University Graduate School of Business - 1966 MBA (graduated at top of class)
Pace University Law School (Night Program, 1996, one year)


**BUSINESS CAREER:**

Present          Seale & Associates, Investment Bank, Washington, DC area, Senior Director: 2000 – 2017
Additional investment bank working relationships: M.M. Dillon & Co (CT) and Gordian Group (NYC)
Member of Independent Franchise Advisory Committee of Eggland's Best, Inc.: 2005 – 2017
Financial advisor to South American Homes, the managing participant of a coalition of companies
  providing government supported low-income housing in the Philippines and Brazil: 2007-2017
Expert witness work and testimony for law firms and litigation support firms in various litigation cases:
  over 170 cases from 1976-2017
Director and financial advisor, previously Vice Chairman, Business Talk Radio Network (Blue Star
  Media): 2001-Oct. 2009
Member of Independent Committee of Bedminster, NJ Township re: Sewerage Authority: 2005-2006
Special Advisor to Board of Directors and the CEO of Magnitude Information Systems  (Nasdaq);  2003
Taylor Strategic Divestitures, Managing Director: 1997-2000
Board of Directors of AMDG, Inc. (a diabetes biochem company): 1997 - 2000
AmBase Corporation, Senior Consultant: 1991-2001; Director 1993-1995
Gruntal Capital Markets, Senior Advisor to Corporate Finance Department on project basis: 1991-1998
Senior Advisor on project basis to corporate finance departments of smaller-medium sized investment banks
Occasional guest lecturer on investment banking and finance (George Washington University Graduate
  School of Business and Monmouth University)
President of Stanford Court Group Inc. (broker firm), from January 1996 through August 1996
Gulf USA Corporation (Nasdaq), President and Chief Executive Officer, Director and Director of Gulf
  Resources Pacific (New Zealand) from October 1993 through February 1995
Member (1991-1992) of Governor Florio's N.J. Economic Development Task Force
Vice Chairman of Whitehill Capital (NASD member firm) from November 1990 through May 1991

November 1990          Resigned from Dillon, Read & Co. Inc. in November 1990 to initiate and to organize a 13D group to put a new
management team into AmBase Corporation and Carteret Savings Bank,, a subsidiary of AmBase.  The 13D
group included an ex Senior Managing Director of Dillon Read, the Chairman of NAC Re Insurance Company,
Augustine Asset Management, Inc, Lindner Management Corp., and others.

1966 – Nov. 1990    Investment Banker at Dillon, Read & Co. Inc., NY, NY
- Joined as an Associate in June 1966; elected Vice President in January 1973; elected Senior Vice President in January 1979; elected Managing Director in January 1982

Worked in all areas of Corporate Finance during the 24 year period, including mergers & acquisitions, various Court testimony regarding fairness opinions, public offerings of equity and debt in both the taxable and tax-exempt areas, private placements, lease financings, real estate financings, securitization and structured financings, limited partnership financings, venture capital and general financial advisory. In addition, performed a number of firm administrative and coordinating functions, including the review and work allocation of Dillon, Read's 50 plus Corporate Finance Associates and Analysts. Client coverage of such companies as Anheuser-Busch, Hoechst Celanese, Volkswagen and Metropolitan Life. Projects of last two years at Dillon, Read and other interesting assignments are as follows:  Dow-Marion merger representing Mr. Kauffman, Healthcare International Special Committee of Board representation, Ausimont-Montedison Special Committee of Board, Quantum ReCap and Bridge Loan, workout of Federated Bridge Notes, Horsehead Industries Purchase of Minority Interest, Dillon Read Purchase of Viking Office Products and subsequent IPO, MacMillan situation representing the ESOT, Foodmaker Special Committee of Board, Owens Corning Fiberglass Board representation, Dreyfus Tax Exempt Fund Organization, Gates Learjet Special Committee of Board, Hilton Foundation, Tampa Bay - Steinbrenner race track sale, Sprint-United Telecommunications merger, Guilford-Southern Pacific negotiations, AT&T-Pacific Telephone Special Committee of Board, Twentieth Century Fox Special Committee of Board.

## CLUB AFFILIATIONS:

    Baltusrol Golf Club, Springfield, New Jersey
    Hamilton Farm Golf Club, Gladstone, New Jersey
    Ocean Reef Club, Key Largo, Florida
    Tiger Inn, Princeton, New Jersey
    Princeton Club of New York

## AREAS OF EXPERT TESTIMONY
- Due Diligence
- Disclosure Issues
- Mergers & Acquisitions
- Merger process issues
- Fairness Opinions
- Entire Fairness M&A Issues
- Leveraged buyouts and recapitalizations
- Bankruptcy issues, including fraudulent conveyance
- Solvency opinions
- Valuations
- Advice to Special Committees of Boards
- Fiduciary issues
- Fee issues and compensation issues
- Damage issues and analysis
- Lender liability
- Venture capital
- Leasing and real estate financing
- Financing transactions of both debt and equity, both public and private, taxable and tax-exempt, including structured financings.
- MAC and MAE issues
- Document interpretation from an investment banking point of view

- Criminal cases involving alleged securities violations, insider trading, and bank fraud
- Retained as an expert by the SEC, DOJ, and IRS.
- Over 170 expert cases and retained by over 150 law firms.

## WHP:  Certain Client Transactions and Testimony

**(II) M&A Transactions Listed (Various Financing Transactions were also completed for most of these and other Companies) (Fairness Opinion often also involved)**

1) Dillon Read 1966-1990 / Managing Director

   - Anheuser Busch acquisition of Campbell Taggert.

   - Anheuser Busch acquisition of Busch Stadium Inc. and Civic Center Redevelopment Corp.

   - Anheuser Busch acquisition of Sea World.

   - Anheuser Busch divestiture of its industrials products division.

   - Hoechst divestiture of its Calbiochem subsidiary.  Also, divestiture of its stool-softening products.

   - Hoechst acquisition of polyester film business of Celanese.

   - Hoechst acquisition of Celanese Corp.

   - Hoechst acquisition of Foster Grant.

   - Hoechst valuation study of Marion Labs and Upjohn.

   - Roussel Uclaf purchase of Foster Grant Sunglass Corp.

   - Volkswagen divestiture of Triumph-Adler subsidiary.

   - Volkswagen acquisition of major car manufacturing facility in Pennsylvania (first investment in U.S.A.).

   - Metropolitan Life acquisition of Century 21 Real Estate.

   - Dow Chemical acquisition of Marion Labs (representing largest independent shareholder).

- International General Industries acquisition of Kliklok Corp.

- International Bank acquisition of International General Industries.
- International Bank acquisition of outstanding minority interest of Globe Industries.

- Mergers of Hawkeye Insurance and Northeastern Insurance of Hartford into Financial Security Group, with International Bank as control shareholder.

- Merger of Bankers Security Life with United Services Life, with International Bank as control shareholder.

- Healthcare International reorganization, representation of Special Committee of the Board.

- Montedison acquisition of Ausimont, representation of Special Committee of the Board.

- Quantum Recapitalization and bridge loan, representation of Special Committee of the Board.

- Horsehead Industries, purchase by management group, representation of Special Committee of the Board.

- Dillon Read LBO Fund purchase of Viking Office Products.

- MacMillan Publishing, purchase by ESOT and management group, representation of Special Committee of the Board.

- Foodmaker, purchase by management group, representation of Special Committee of the Board.

- Owens Corning Fiberglass, purchase by ESOT and management group, representation of Special Committee of the Board.

- Owens Illinois recapitalization, representation of Special Committee of the Board.

- Gates Learjet recapitalization, representation of Special Committee of the Board.

- Hilton Hotels and Hilton Foundation recapitalization and valuation of assets, representation of Special Committee of the Foundation.

- Issued back-up fairness opinion to that of Lehman Brothers to the Board of Directors of UOP in regard to the merger with Signal Corp.

- Sale of Tampa Bay racetrack for Steinbrenner family and Thayer family.

- Purchase of Pacific Telephone minority interest by AT&T, representation of Special Committee of the Board.

- Twentieth Century Fox, purchase by Marvin Davis and relative valuations, representation of Special Committee of the Board.

- The Hillman Co. acquisition of outstanding minority interest of Edgewater Corp.

- MASCO Corp. acquisition of Evans-Aristocrat Industries.

- Purex Industries, purchase by management group.

- United Telecommunications acquisition of Aero-Flow Dynamics, with simultaneous purchase of an Aero-Flow subsidiary by management, representation of Special Committee of the Board of Aero-Flow Dynamics.

- United Telecommunications acquisition of the 50% of Sprint not owned, from GTE Corp.

- Superior Oil acquisition of outstanding minority interest of Canadian Superior Oil Ltd.

- Marcona Corp.'s purchase of Ocean Industries, a subsidiary of Dillingham Corp.

- Foremost McKesson's purchase of Provident Securities, the Crocker family holding company.

- The reorganization of Interpublic Advertising Co.

- The Henry B. Gilpin Co. acquisition of Mooney-Mueller-Ward Co. and Kiefer Stewart Co.

- SKW Trostberg AG purchase of Airco's silicon and manganese divisions.

- Cellu Craft Inc., purchase by management group, representation of Special Committee of the Board.

- Workout of Federated Department Stores bridge financing notes.

- General Mills divestiture of Izod Corp, Footjoy, Monet, and Chrystal Brands.

- Inmont Corp. merger into Carrier Corp.

- Issued back-up fairness opinion to that of Morgan Stanley to the Board of Directors of Texaco in regard to Bass takeover attempt of Texaco.

- Acquisition of Laura Scudder Snack Foods by Dillon Read LBO Group.

- Acquisition of Charleson Publishing Co. by Dillon Read LBO Group.

- Acquisition of Viking Office Products by Dillon Read LBO Group. (This acquisition, for $65 million, was initiated by Purcell and became Dillon Read's most profitable investment by a wide margin, going public and growing to a market capitalization of over $2 billion before being acquired.)

2) <u>Since Dillon Read (1991 to present)</u>

- Represented AmBase Corp. in 1992 in the purchase of Augustine Asset Management, and also in 1996 in the sale of Augustine Asset Management to management. Rendered fairness opinion to the AmBase Board of Directors in both cases.

- Represented AmBase Corp. in negotiations with the following companies: Freeman Securities (brokerage), Discount Corp. of New York (government bond trading), Eurobrokers (money brokerage), Fidelity Insurance (life insurance), U.S. Quotes, Specialty Meats Inc. and others.

- Rendered a fairness opinion to the AmBase Board of Directors regarding the proposed purchase of Imperial Premium Finance Corp. from Carteret Savings Bank.

- Rendered a fairness opinion to the AmBase Board of Directors regarding a proposed recapitalization of Carteret Savings Bank through an investment by AmBase and American Stock Transfer Corp.

- Participated in capital raising activities for Carteret Savings Bank/AmBase Corp., including decisions relating to real estate assets.

- Rendered a fairness opinion to the AmBase Board of Directors regarding the proposed acquisition of Marcus Schloss & Co., Inc.

- Represented AmBase Corp. in its in investments in two biotech companies, AMDG (diabetes) and SDG (asthma and hepatitis). Was a Director of AMDG.

- Rendered a valuation opinion to the Management Committee of Behringwerke AG in Germany (100% owned by Hoechst AG) in connection with PB Diagnostic Systems, Inc., a company owned 50% by Behringwerke AG and 50% by Polaroid Corp. Also helped to select a mediator/investment bank in regard to the above valuation.

- Rendered a fairness opinion to the Board of Directors of Community First Bank (Jacksonville, Florida) in connection with the sale of American Surety & Casualty Holding Co.

- Together with Shareholder Communications Corp., advised AmBase Corp. regarding a complex escheat program involving past acquisitions closed as far back as the late 1970's.

- Rendered a solvency opinion to the Board of Directors of C&W Acquisition Corp. and Meriwether Capital Corp. (a Rockefeller affiliated investment company) in connection with the leveraged acquisition of C&W Fabricators, Inc.

- As Managing Director of Taylor Strategic Divestitures, represented Moore Corporation in its sale of its business forms European subsidiaries.

- Rendered a valuation opinion to the Board of Directors of AMDG, Inc. in connection with a stock valuation.

- Represented AmBase from a financial point of view in U.S. Bankruptcy Court in connection with a reorganization of Home Holdings by Zurich Insurance.

- As Managing Director of Taylor Strategic Divestitures, represented Atlantic Richfield (ARCO) in the sale of its subsidiary, Union Texas Petrochemicals (ethylene), to the Williams Company.

- As Managing Director of Taylor Strategic Divestitures, represented Shell Chemicals (Shell Oil) in the restructuring and sale of its Polyketone/Carilon Polymers business.

- Advised 10% shareholder of NextHealth, Inc. about possible dissenting or appraisal positions and other alternatives regarding proposed management led going-private transaction.

- As Senior Advisor to Gruntal Capital Markets, oversaw various financings for clients and M&A related transactions.

- As Senior Director of Seale & Associates, advised an investment group about the possible purchase and financing of Belcher Foundry Company, a portfolio company and divestiture of Citicorp Venture Group.

- Advised certain outside Directors of Fisher Communications Inc. about the advantages and disadvantages of certain strategic alternatives proposed by the management of the Company.

- As Senior Director of Seale & Associates, advised Honeywell in regard to the divestiture of Honeywell Tensor (a provider of precise measuring tools) to GE.

- As Senior Director of Seale & Associates, advised American Standard on both the restructuring and subsequent sale of Wabco Braking Systems to the German company, Linnemann Schnetzer, and the sale of Cal-o-Rex (a leading manufacturer of water heaters) to Grupo Industrial Saltillo, a leading Mexican industrial company.

- Advised Board of Directors of Kliklok Corporation about a combination transaction between its English subsidiary and another related English company.

- As Senior Director of Seale & Associates, advised owners regarding the sale of a private nickel plating business, the Houston Plating Co.

- As Senior Director of Seale & Associates, advised a subsidiary of a large east coast utility company (Pepco Energy Services) regarding a possible acquisition of another utility's ESCO (energy services company).

- As Senior Director of Seale & Associates, advised Williams Companies regarding certain aspects of its divestiture program.

- Advised Best Access Systems about a tax-valuation issue and certain other strategy issues in connection with the auction sale of the Company.  Sold to The Stanley Works Co. for $310 million.

- As Senior Director of Seale & Associates, advised about Groupo Industrial Saltillo's (Mexico) divestiture of a foundry tooling subsidiary (di Temsa) to a U.K. company (NPL Technologies).

- Advised PenneCom B.V. about certain M&A issues, including issues regarding its Polish Telecom investment.

- Was one of the finalist candidates considered for the Creditors Committee of United Airlines bankruptcy reorganization.

- As Senior Director of Seale & Associates, advised Special Committee of a Board regarding various business options available to the Company, i.e., going-private versus refinancing, etc.

- As Senior Director of Seale & Associates, advised buyout group about financing options, and obtained commitments (both debt, mezzanine, and equity), for the approximate $180 million purchase of certain Mid Atlantic gas stations of a major oil company.

- As Senior Director of Seale & Associates, acted as financial advisor to joint venture of large U.S. chemical company and large European chemical company (Basell Holdings) about project financing alternatives. Company sold in 2005 to a private equity group for $5.7 billion.

- As Senior Director of Seale & Associates, acted as a financial advisor to the City of Houston about a possible $4.5 billion electric utility rate increase and the City's dealings, i.e., adversary proceedings, with both CenterPoint Energy and Texas Genco.

- As Senior Director of Seale & Associates, part of the team that advised Tec-Lac Consultores, S.A. de C.V. (Mexico) about the divestiture of the cheese, yogurt, butter and dairy cream business of its subsidiary Grupo Chen to Sigma Alimentos, owned by Alfa, S.A. de C.V. (Mexico).

- As Senior Director of Seale & Associates, advised regarding the sale of Lockheed Martin's Commercial Flight Training Center (business) in Orlando, FL to a subsidiary of Boeing Company.

- As Senior Director of Seale & Associates, part of the team that advised the shareholders of Continental Fire Sprinkler Company and Continental Alarm & Detection Company (Omaha, Nebraska) regarding sale to Peter Kiewit Sons', Inc. (the seventh largest construction firm in the U.S.)

- As Senior Director of Seale & Associates, part of the team that advised Amkor Technology, Inc. on the divestiture of its Amkor Test Services business unit ("ATS") to Integra Technologies, LLC.  ATS, based in Wichita, Kansas, provides semiconductor test services for military, avionics, and commercial grade applications.

- As Senior Director of Seale & Associates, part of the team that advised WGL Holdings, Inc. (the parent company of Washington Gas) on the divestiture of American Combustion Industries, Inc., an HVAC installation and construction company, to Milestone Capital Management, LLC.

- As Senior Director of Seale & Associates, part of the team that advised Celanese Corporation on both the sale of its Pampa, Texas, facility to Babcock & Brown, and the sale of its AT Films business to British Polythene Industries.

- As Senior Director of Seale & Associates, advised Media General on various corporate finance issues, including dividend policy.

- Part of a team which formed and financed South American Homes, a consortium company to provide government-supported low-income housing in Brazil and Peru.

- Advised Business Talk Radio Inc. in regard to the purchase of radio stations in Boston, Pittsburgh, and Las Vegas. Also advised regarding the recapitalization of company and name change to Blue Star Media.

- As Senior Director of Seale & Associates, part of the team that advised Cryptologic Limited (Ireland) in regards to financial planning and defensive strategies regarding an activist shareholder and a potential proxy contest.

- As Senior Director of Seale & Associates, have advised on certain fairness opinions.


## III) **Expert Testimony Work**

1) Dillon Read clients: 1976-1990

- Adolph Coors Co.: estate valuation, testimony to the IRS.

- Montana Power Co.: testimony before the Montana Public Utility Commission.

- Expert witness for Signal Corp. in Weinberger v. UOP, litigation in Delaware Chancery Court regarding Signal purchasing the minority interest in UOP and which important case established the basic guidelines for "fairness" in going-private transactions, i.e. the concept of entire fairness, encompassing both fair price and fair dealing. (1980 and 1984)

- Witness for International General Industries in Tanzer v. International General Industries, litigation in Delaware Chancery Court regarding IGI purchasing the minority interest in Kliklok Corp. and which important case established the basic guidelines for "business purpose". (1976)

- Testimony before the Department of Insurance in Conn. and Iowa in connection with the mergers of Hawkeye Insurance and Northeastern Insurance Co. into Financial Security Group.

- Expert witness for Metropolitan Life Ins. Co. in Arkansas State Court in connection with whether Met Life or Sun Life Guaranty Corp. should be allowed to buy the reorganized Baldwin United business in that state. (1986)

- Expert witness for Marathon Oil / U.S. Steel in Ohio Federal Court (Cincinnati) and in Ohio State Court (Findlay) in connection with shareholder litigation. (1983)

- Expert witness for Pepsico (Friedman, Wang & Bleiberg) in Delaware State Court in connection with Pizza Hut franchise litigation. (1987)

- Testimony before the California Public Utility Commission in connection with the purchase of the Pacific Telephone minority interest by AT&T.

- Other various fact witness testimony in connection with certain merger transaction litigation for which Dillon, Read & Co. Inc. served as investment banker. (1970-1990)

2) <u>Other: 1992 to Present</u>

- Witness for AmBase Corp. (Friedman, Wang & Bleiberg) in Bowne of New York City, Inc. v. AmBase Corp., in New York Federal Court (1992), in connection with missed mailing date for proxy statement litigation.

- Witness for AmBase Corp. (Wilentz, Goldman & Spitzer) in Richard L. Braun v. AmBase, in N.J. State Court (1993), in connection with employment litigation.

- Investment banking expert in rendering a solvency opinion to the Boards of Directors of C&W Acquisition Corp. and Meriwether Capital (counsel being Satterlee Stephens Burke & Burke) in connection with the leveraged acquisition of C&W Fabricators, Inc. (1996)

- Expert witness for Shared Technologies, Inc. (McCarter & English) in United States District Court, Southern District of New York in connection with merger fee litigation with the investment banking firm of Gerard Klauer Mattison & Co. LLC. (1997)

- Expert witness for NL Industries, Inc. and Harold C. Simmons (Bartlit Beck Herman Palenchar & Scott) in Superior Court of New Jersey, Chancery Division, in connection with litigation about NL's 1991 stock repurchase and tender program (Plaintiff being Frank David Seinfeld). (1997 and 1998)

- Fact witness and expert witness in five subject areas for AmBase Corporation (Pryor, Cashman, Sherman & Flynn) in United States Bankruptcy Court, Southern District of New York, as creditor in connection with the Chapter 11 reorganization of Home Holdings Inc. (owner of Home Insurance Company, controlled by Zurich Insurance). (1998)

- Expert witness for the United States Securities and Exchange Commission (enforcement division) regarding the matter of David Barr, Administrative Law Judge Hearing in Miami, Florida. (1998)

- Expert witness for counsel of beneficiaries (Rucci, Burnham, Carta & Edelberg, LLP), Guardian ad litem for Trusts Under the Will of E. Cotton Rawls, Greenwich Probate Court, District of Greenwich, CT., in connection with trustee fiduciary responsibilities. (1998)

- Expert witness for Quickturn Design Systems, Inc. (Wilson Sonsini Goodrich & Rosati, and Morris, Nichols, Arsht, & Tunnell) in reviewing adequacy opinion rendered by Hambrecht & Quist to the Board of Directors of Quickturn in connection with a hostile tender offer made by Mentor Graphics Corporation; also rendered an independent adequacy opinion; Delaware State Chancery Court. (1998)

- Fact and expert witness for AmBase Corp. (Pryor, Cashman, Sherman & Flynn) in AmBase v. Zurich SF Holdings, Inc. in Supreme Court of New York in connection with a breach of contract and solvency issues. (1999-2000)

- Expert witness for Ernst & Young (Wiggin & Dana) in Share America, Inc. and Share America LP v. Ernst & Young in connection with a failed initial public offering; State of Connecticut, Superior Court. (1998 - 2001)

- Expert witness for Octavian, Inc. (Levin & Associates) in Octavian, Inc. et al. vs. McDonald & Company Investments, Inc. et al. in connection with a failed financing transaction and breach of "best efforts" undertaking; Cuyahoga County Court of Common Pleas, Ohio. (1999-2000)

- Expert witness for the United States Securities and Exchange Commission (enforcement division) regarding the matter SEC v. Erdman; Southern District, Florida. (1999)

- Expert witness for defendants, Berlin et al. (Morris, James, Hitchens & Williams) in Emerald Partners v. Berlin, et al (Hall Real Estate Co. and May Petroleum); Delaware State Chancery Court, in connection with a merger fairness opinion of Bear Stearns and the updating thereof; also due diligence issues. (1999- 2000) (Remanded in 2002)

- Consulting expert for defendants, Arbor Drugs, Inc. et al. (Davis Polk & Wardwell) in Richard Nodel et al. v. Arbor Drugs, Inc. et al. in connection with reviewing a merger fairness opinion of Goldman Sachs; Circuit Court, Oakland County, Michigan. (1999 – 2000)

- Expert witness for defendants, Bally Entertainment, Hilton Hotels, Arthur Goldberg et al. (Cadwalader, Wickersham & Taft; and Latham & Watkins) in Linda Parnes v. Bally Entertainment Corp. et al in connection with reviewing aspects of the merger transaction and the fairness opinions of Goldman Sachs and Merrill Lynch; Delaware State Chancery Court. (2000)

- Expert witness for defendants Hambros PLC et al (Schulte Roth & Zabel) in Kevin D. Shea et al v. Hambros PLC et al in connection with reviewing valuation of the investment banking business and other matters; Supreme Court of the State of New York. (2001)

- Expert witness for defendants Del Monte Foods Company and Morgan Stanley & Co. Inc. (Cleary Gottlieb, and Shearman & Sterling) in PPI Enterprises (U.S.), Inc. versus the above in connection with the valuation of a preferred stock and proper disclosure during a corporate restructuring to a seller of that preferred stock security; United States District Court Southern District of New York.  (2001)

- Expert witness for individual defendant (Curtis, Mallet-Prevost) in arbitration with an investment banking firm in connection with valuation issues and fee issues relating to the sale of a luxury goods company.; American Arbitration Association, State of New York. (2001)

- Expert witness for plaintiff Prison Acquisition Company L.L.C. (The Blackstone Group, L.P.; Fortress Investment Group, LLC; and Bank of America Corporation) (Skadden Arps) in Prison Acquisition Company L.L.C. versus Prison Realty Trust, Inc., Corrections Corporation of America et al in connection with a fee dispute and breach of contract; United States District Court Southern District of New York.  (2001)

- Expert witness for plaintiff The Statutory Creditors' Committee on behalf of the Estates of Sabratek Corporation et al.  (The Bayard Firm and Weil, Gotshal & Manges) versus Ralin Medical, Inc. and versus LaSalle Bank N.A. in connection with valuation and solvency issues, and also due diligence issues; United States Bankruptcy Court for the District of Delaware.  (2001)

- Expert witness for defendants IKON Office Solutions, Inc. et al. (Harkins Cunningham) in Whetman versus the above in connection with the valuation and investment attractiveness of IKON; United States District Court for the Eastern District of Pennsylvania.  (2001)

- Expert witness for defendant Mead Johnson & Co. (Skadden Arps) in PBM Products, Inc. versus Mead Johnson & Co. in connection with valuation, projections, and damages issues; United States District Court of Virginia, Richmond Division.  (2001)

- Expert witness for certain defendants in an alleged criminal securities fraud matter (Lankler Siffert & Wohl; and Manatt, Phelps & Phillips) in United States v. Black, Gardell et al; United States District Court Southern District of New York. (2001 - 2002) (Acquittal)

- Expert witness for individual plaintiff in severance agreement litigation (Skadden Arps and Lowey Dannenberg) in Rizzo v. The MacManus Group, Inc., et al in connection with valuation and disclosure issues; United States District Court Southern District of New York. (2001 - 2002)

- Expert witness for defendants, Best Lock Corp., Best Universal Lock Co. and Frank E. Best, Inc. (Morris Nichols) in IN RE Best Lock Corporation Consolidated Shareholder Litigation in connection with valuation and fairness opinion issues; Delaware State Chancery Court. (2002)

- Consulting expert for defendant K12, Inc. (Sandler and Rosen) in Thomas Weisel Partners, LLC vs. K12, Inc. in connection with a fee dispute; United States District Court Northern District of California. (2002)

- Expert witness for defendant Ernst & Young (Skadden Arps) in ILM II Senior Living, Inc. et al versus Ernst & Young in connection with material adverse change termination of merger agreement; financing issues; and damage issues; American Arbitration Association, Washington, DC. (2002)

- Expert witness for defendant KPMG Consulting, Inc. (McKool Smith) in Equaterra, Inc. versus KPMG Consulting, Inc. and KPMG Consulting, LLC in connection with issues of good faith negotiations and valuation; District Court, Harris County, Texas. (2002)

- Expert witness for plaintiff (cross defendant) (Paul Hastings and Lee, Goddard & Duffy) in Pacific Coin Management et al v. BR Telephony Partners, L.P. et al in connection with issues of disclosure, due diligence, valuation, financing and damages. Los Angeles County Superior Court, Central District, California. (2002)

- Consulting expert for defendant Jefferies & Company, Inc. et al (Quinn Emanuel Urquhart Oliver & Hedges) in Kimberly Herring v. Jefferies & Company, Inc. et al in connection with employment termination issues. San Francisco County Superior Court, California. (2002)

- Expert witness for certain defendant in an alleged criminal securities fraud matter (Law offices of Gerald L. Shargel and Law offices of Maurice Sercarz) in United States v. Ilan Arbel; United States District Court Eastern District of New York. (2002 - 2003) (Hearing to have bail re-instated; successful prison release; follow-up trial with agreement amongst parties during trial.)

- Expert witness for plaintiff (Cadwalader, Wickersham & Taft) in Techmer PM v. Poly One Corporation (as successor of M.A. Hanna Company) in connection with issues of valuation, projections, good faith, rescission issues, and damages.  American Arbitration Association, Chicago.  (2002)

- Consulting expert for defendant (cross plaintiff) (law offices of Ronald P. Mysliwiec, and of David J. Aronstam) in Markav, Inc. et al v. Mark Eisen in connection with issues of valuation, damages, and disclosure.  Supreme Court of the State of New York County of New York.  (2002 - 2003)
- Consulting expert for plaintiff (Fieldman Hay & Ullman) in a Telecom Co. v. an Investment Banking Firm et al in connection with issues of M&A termination, due diligence, disclosure and valuation.  United States District Court Southern District of New York.  (2002 - 2004)

- Expert witness for defendant (Cozen O'Connor) in Compex Legal Services, Inc. v. Uniscribe Professional Services, Inc. et al in connection with issues of disclosure, projections, due diligence, and valuation.  Superior Court of the State of California for the County of Los Angeles, Southwest District.  (2002 - 2003)

- Expert witness for defendant (Davis Polk & Wardwell) in In re Independent Energy Holdings PLC Securities Litigation (CSFB, DLJ et al) in connection with due diligence and disclosure issues.  United States District Court Southern District of New York.  (2002 - 2003)

- Expert witness for plaintiff (Conrad & Scherer) in Ginsburg et al v. GAMBRO AB and Cobe Laboratories, Inc. in connection with issues of disclosure, fairness considerations, valuation, damages and Special Committee procedures.  Circuit Court of the 17th Judicial Circuit In And For Broward County, Florida.  (2002 - 2003)

- Consulting expert for defendant (law offices of Laura Brevetti, and Budoff & Ross) in an alleged criminal securities fraud matter in United States v. Ralph Jarson et al; United States District Court Southern District of New York.  (2003)

- Expert witness for plaintiff (Lowey Dannenberg) in Doft & Co. et al v. Travelocity.Com Inc. et al in connection with valuation, fairness, and Special Committee issues; Delaware State Chancery Court.  (2003-2004)

- Consulting expert for defendant Ernst & Young Corporate Finance Inc. (Dickinson Wright) in Groupe Deltec-Vespromar et al v. E&Y Corporate Finance in connection with M&A investment banking standards regarding a divestiture project.  United States District Court Eastern District of Michigan Northern Division.  (2003)

- 16 -

- Expert witness for plaintiff (Gary, Williams, Parenti et al; Bassman Mitchell & Alfano; law offices of Geoffrey Gitner) in DAG Enterprises, Inc. et al v. ExxonMobil Corp. et al in connection with issues of financing feasibility and credit rating analysis.  United States District Court for the District of Columbia.  (2003-2005)

- Expert witness for defendant (Miller & Wrubel) in EGW Partners, L.P. v. Prudential Insurance Company of America and Prudential Securities, Inc. in connection with investment banking industry standards regarding certain disclosures.  The Court of Common Pleas of Philadelphia County, First Judicial District of Pennsylvania Civil Trial Division. (2003)

- Expert witness for defendant (Cadwalader, Wickersham & Taft) in Chapter 11 Trustee of Molton Metal Technology, Inc. et al v. CBS Corporation (f/k/a Westinghouse Electric Corporation) et al in connection with valuation and solvency issues.  United States Bankruptcy Court for the District of Massachusetts (Eastern Division).  (2003-2004)

- Expert witness for plaintiff (Helms Mulliss & Wicker) in Banc of America Securities LLC v. Shoney's, Inc. in connection with a fee dispute.  United States District Court for the Western District of North Carolina (Charlotte Division).  (2003-2005)

- Consulting expert for individual defendant (Sills Cummis Zuckerman Radin Tischman Epstein & Gross) in an insider trading case. (2003)

- Expert witness for plaintiff (Sayles, Lidji & Werbner) in Harward et al v. PricewaterhouseCoopers L.L.P. and UBS Warburg L.L.C. in connection with IPO and M&A due diligence issues and other issues.  In the District Court of Dallas County, Texas; 44th Judicial District.  (2003-2004)

- Expert witness for defendant (Paul Hastings) in Robert Kahn v. Financial Management Advisors, Inc. in connection with the standard investment banking meaning of certain Agreement terms.  JAMS Arbitration in Los Angeles, CA. (2003)

- Expert witness for plaintiff (Kirby McInerney & Squire), In re AT&T Corp. Securities Litigation, AT&T Wireless Shareholder Litigation in connection with IPO issues, tracking stock issues, and disclosure issues.  In the United States District Court District of New Jersey.  (2003-2006)

- Expert witness for defendant (Dechert; and Lomurro Davison Eastman and Munoz) in Allison Williams Co. et al v. ViaSource Funding Group in connection with fee dispute and industry practices regarding engagement letters, indemnification, securitization and other issues.  In the United States District Court for the District of New Jersey.  (2003-2006)

- Consulting expert for plaintiff (Conrad & Scherer) in Bank Atlantic Bancorp et al v. Henry Edward Asher et al in connection with certain damage issues. Circuit Court of the 17th Judicial Circuit In And For Broward County, Florida. (2003)

- Consulting expert for defendant (Powell Goldstein Frazer & Murphy) in United States of America v. John B. Torkelsen et al in connection with certain SBIC and SBA issues. Both civil and criminal proceedings. In the United States District Court for the Eastern District of Pennsylvania. (2004)

- Expert witness for plaintiff (Cleary Gottlieb) in Fresh Del Monte Produce Inc. et al v. Eastbrook Caribe et al in connection with certain damage issues. Supreme Court of the State of New York County of New York. (2004-2005)

- Expert witness for defendant (Jenner & Block) in VSI Holdings, Inc. et al v. SPX Corporation et al in connection with merger termination, material adverse change analysis, disclosure issues, and damage issues. In the United States District Court for the Eastern District of Michigan Southern Division. (2004-2006)

- Expert witness for City of Houston (Epstein Becker Green Wickliff & Hall) regarding application of CenterPoint Energy and Texas Genco to determine "stranded costs" and other true-up balances (potential $4 - $5 billion rate case), before the Public Utility Commission of Texas; Many issues were involved, including valuation, fairness, and minority issues. PUC Docket No. 29526. (2004-2005)

- Expert witness for plaintiff (Ogletree, Deakins, Nash, Smoak & Stewart) in Jim R. Sapp, individually and as trustee of various trusts, versus counsel that represented his company in a purchase transaction; in connection with securitization and refinancing issues. In the Marion County Superior Court State of Indiana. (2004-2005)

- Expert witness for defendants (Briggs and Morgan) in Steven Rupp et al v. L. Daniel Thompson et al in connection with fairness opinion issues and certain other issues. Lyon County District Court for the District of Minnesota. (2004-2005)

- Consulting expert for defendant (Law offices of Gerald B. Lefcourt) in an alleged criminal securities conspiracy matter in United States v. Paul Stark. United States District Court Southern District of New York. (2004-2005)

- Consulting expert for defendant (Wilson, Elser, Moskowitz, Edelman & Dicker) in Ashton v. Valley Brook Farms v. J.H. Reid Recycling in connection with damage and other issues. Superior Court of New Jersey, Law Division: Hunterdon County. (2004-2005)

- Expert witness for defendant (Dechert) in Cornell Capital Partners v. Eagle Broadband, Inc. in connection with convertible debenture terms and certain other issues.  United States District Court for the District of New Jersey.  (2004-2005)

- Consulting expert for plaintiff (Futterman & Howard) in Harry Berger et al v. Jasmine Ltd., et al in connection with issues of due diligence and insolvency.  United States District Court for the District of New Jersey, Camden Vicinage.  (2004-2005)

- Expert witness for defendant (Jenkens & Gilchrist; Troutman Sanders) in Highland Capital Management v. Leonard Schneider et al v. RBC Dominion Securities in connection with terms and standards of a certain private transaction and the authority of an advisor.  United States District Court Southern District of New York. (2004-2008)

- Expert witness for third-party defendant, Banc of America Securities, in Bank of America et al v. J.P. Morgan (Chase) Securities et al in connection with due diligence, disclosure, securitization (Commercial Financial Services, Inc.) and good faith issues (Helms Mulliss and Day Edwards).  In the District Court of Tulsa County, State of Oklahoma.  (2004-2005)

- Expert witness for plaintiff (Padova & Lisi) in Joseph A. Robinson et al v. Berwind Financial Securities et al in connection with engagement contract, best efforts, proper advice and other issues.  In the Court of Common Pleas Philadelphia County.  (2004-2006)

- Expert witness for defendant (Skadden Arps and Kirkpatrick & Lockhart) in Baker et al v. SG Cowen et al in connection with M&A due diligence issues, M&A advisory issues and certain research issues.  United States District Court, District of Massachusetts. (2005)

- Consulting expert for plaintiff (Clyde & Co., and Nixon Peabody) in Petrobras (Petroleo Brasileiro S.A.) v. El Paso Energy et al in connection with contract modifications.  The American Arbitration Association, The International Centre for Dispute Resolution, UNCITRAL Arbitration Rules.  (2005)

- Expert witness for defendant (Law office of Joel H. Holt, St. Croix, Virgin Islands) in Rural Telephone Finance Cooperative et al v. Jeffrey J. Prosser, Innovative Communication Corp., Virgin Islands Telephone Corp. et al in connection with certain financing issues, certain fiduciary duty issues, and certain damage issues. In the District Court of the Virgin Islands Division of St. Thomas and St. John.  (2005-2006)

- Expert witness for plaintiffs (Sonnenschein Nath & Rosenthal) in Triton Partners et al v. William E. Simon & Sons et al in connection with certain fee dispute issues.  In The Superior Court of the State of Delaware In And For New Castle County.  (2005)

- 19 -

- Expert witness for defendants (Turner Padget Graham & Laney) in Sun One Price v. C. Burt Duren et al in connection with due diligence and financial viability issues.  In the United States District Court for the Southern District of Florida.  (2005)

- Expert witness for defendants (Kirkpatrick & Lockhart) in Re: Philip Services Corp. Securities Litigation in connection with damage issues.  United States District Court Southern District of New York.  (2005-2006)

- Expert witness for defendants (Foley & Lardner) in John J. Aquino, Trustee for First Knowledge Partners v. Amadeus Capital Corp. et al in connection with fee issues, fair value and solvency issues.  United States Bankruptcy Court District of Massachusetts (Eastern Division).  (2005-2006)

- Expert witness for Petitioner (McKee Nelson) in GlaxoSmithKline Holdings (Americas) Inc. & Subsidiaries v. Commissioner of Internal Revenue in connection with tax and M&A issues.  United States Tax Court (Washington, D.C.).  (2005-2006)

- Expert witness for plaintiffs (Wollmuth Meyer & Deutsch and Sayles/Werbner) in State of Arkansas Teacher Retirement System et al v. Merrill Lynch & Co., Inc. et al in connection with due diligence and disclosure issues, among other things, regarding the placement of limited partnership interests of LJM 2 Co. Investments, L.P., a special purpose entity of Enron.  In the District Court of Dallas County, Texas; 193rd Judicial District.  (2006)

- Expert witness for plaintiffs (Spencer & Associates) in Kevin Lamkin et al v. UBS Paine Webber, Inc. et al and Samuel GianCarlo et al v. UBS Financial Services, Inc. et al in connection with due diligence and disclosure issues, among other things, regarding the placement of certain Enron securities.  In the United States District Court for the Southern District of Texas, Houston Division; Cause No. H-02-0851 and H-03-4359; (2006 - 2014)

- Expert witness for plaintiffs (Greer, Herz & Adams; Pepe & Hazard; Grant & Eisenhofer, and Cotchett, Pitre & McCarthy) in American National Insurance Company et al. v. Citigroup, JP Morgan Chase, Merrill Lynch, CSFB, and Deutsche Bank; In Re Enron Corp. Securities Litigation, Mark Newby et al (Consolidated); in connection with due diligence and disclosure issues and other matters.  In the United States District Court for the Southern District of Texas, Houston Division.  (2006 - 2008)

- Expert witness for defendants (Sullivan & Worcester) in Drulias et al. v. ADE Corp. et al.; in connection with fairness opinion issues, fees and merger procedure issues, and corporate governance issues.   In the United States District Court District of Massachusetts.  (2006)

- 20 -

- Consulting expert for defendants (law offices of Gerald L. Shargel) in connection with possible indictment of a CEO by the United States alleging securities fraud and insider trading (United States District Court Eastern District of New York); and, in addition, in the matter of United States v. Robert McAllister alleging securities fraud (United States District Court Southern District of New York.) (2006 - 2007)

- Expert witness for plaintiffs (Catanzarite Law Corporation) in Kaiser et al v. Roth Capital Partners et al; in connection with due diligence and disclosure issues.  In the Superior Court of the State of California In and For the County of Orange, Central Justice Center. (2006 - 2007) Also, a separate arbitration proceeding. (2010)

- Expert witness for plaintiff (G.W. Merrick & Associates, LLC) in D.E. Frey Group, Inc. v. FAS Holdings, Inc.; in connection with valuation, disclosure and fairness issues.  In the United States Bankruptcy Court for the District of Colorado. (2006 - 2007)

- Expert witness for plaintiff (Kasowitz, Benson, Torres & Friendman) in Murray Capital Management, Inc. v. Deutsche Bank Securities, Inc. et al in connection with due diligence and disclosure issues regarding the placement of certain Exide Technologies securities. United States District Court Southern District of New York. (2006 - 2007)

- Consulting expert for plaintiff and law firm of Walter & Haverfield (Cleveland) regarding the review and analysis of certain client trusts. (2007 - 2009)

- Expert witness for plaintiff (Kasowitz, Benson, Torres & Friedman; Kelley Drye & Warren; and Goulston & Storrs) In re: Bank of New England Corporation, Debtor in connection with issue of payments due senior creditors v. junior creditors. In the United States Bankruptcy Court for the District of Massachusetts Eastern Division. (2007 - 2008)

- Expert witness for plaintiff (Smith, Chapman & Campbell; and Julander, Brown & Bollard) in Decision Warehouse Consultoria E Importacâo LTDA (Brazil) vs. Business Objects Americas et al in connection with issues of valuation, due diligence and breach of contract. Superior Court of the State of California County of Santa Clara. (2007)

- Expert witness for plaintiffs (law firms of Chimicles & Tikellis; Green Welling; The Rosen Law Firm; Catanzarite Law Corp., Gold Bennett Cera & Sidener; Abraham Fruchter & Twersky; Wolf Haldenstein Adler Freeman & Herz; Labaton Sucharow & Rudoff; and Glancy Binkow & Goldberg): In re Textainer Financial Services Corporation et al; Class Action; in connection with fiduciary issues and issues of fairness, disclosure, and valuation. In the Superior Court of California, San Francisco County. (2007 - 2009)

- Expert witness for defendant (Roemer Harnik & Nethery) in The Fansler Foundation vs. American Realty Investors, Inc. et al in connection with fairness and disclosure issues, including valuation and preferred dividend issues. United States District Court Eastern District of California Fresno Division. (2007)

- Expert witness for Commissioner of Internal Revenue, as Respondent, v. Santa Fe Pacific Gold Company and its successor in interest, Newmont USA Limited, as Petitioner, in connection with M&A process issues, hostile vs. non-hostile transactions, termination fee and certain other issues. United States Tax Court. (2007)

- Expert witness for plaintiff (Catanzarite Law Corporation and The Rosen Law Firm) in Mike Alexandros et al vs. Kor Electronics, Inc. as derivative defendant and vs. New Enterprise Associates IV, L.P. as direct defendant in connection with fairness, disclosure, valuation and fiduciary issues. In the Superior Court of California for the County of Orange, Central Justice Center; Case No. 06-CC-07881. (2007 - 2010)

- Expert witness for defendant and counter-claim plaintiff (Mintz Levin, Cozen O'Connor and Fox Rothschild) in Gemini Investors v. Ches-Mont Disposal in connection with duty of care issues, financing issues, damage issues and fee issues. In the United States District Court for the District of Massachusetts) (2007 – 2009)

- Expert witness for defendant (Stradling Yocca Carlson & Rauth) in Candlewood Partners, LLC v. Koosharem Corp. et al in connection with private placement financing issues, duty of care issues, and fee dispute issues. In the United States District Court, Central District of California Western Division (2008)

- Expert witness for plaintiff The Mafco Litigation Trust per the Marvel bankruptcy (Friedman Kaplan Seiler & Adelman) versus Ronald O. Perelman et al in connection with holding company financing issues and the importance of restrictive covenants on operating company in its debt financings and overall financing flexibility; also fiduciary issues and the issue of damages.  United States District Court for the District of Delaware. (2002-2008). This case was decided in favor of the defendant at the District Court level and was reversed by the Third Circuit Court of Appeals based almost solely on the expert report of Purcell, quoted in the Opinion. A major settlement followed.

- Expert witness for defendant (Cleary Gottlieb and Cadwalader Wickersham & Taft) in Calpine Corporation vs. Rosetta Resources Inc. in connection with solvency, financial condition, and valuation issues. United States Bankruptcy Court, Southern District of New York. (2007 - 2008)

- Expert witness for plaintiff (Sonnenschein; andCovington & Burling) in an American Arbitration Association Case (California) in connection with due diligence issues in an acquisition, contract issues, and asbestos claim issues; Confidential arbitration; American Arbitration Assoc. Case No. 74-489-Y-01220-07-JRJ. (2008-2010)

- Expert witness for plaintiff (Catanzarite Law Corporation and The Rosen Law Firm) in Meruelo Capital Partners 2, LLC vs. Dijji Corp. et al in connection with disclosure, due diligence, and damage issues. In the Superior Court of the State of California In the County of Los Angeles (2008-2009)

- Consulting expert for defendant (law offices of Gerald L. Shargel) in alleged securities fraud in United States v. Joseph Lando et al. In the United States District Court Eastern District of New York. (2008)

- Expert witness for plaintiffs (Donovan & Associates, Cahill & Associates, and Sills Cummis & Gross) in CC Investors III, L.P. et al v. Alfred C. Eckert III et al in connection with certain best interests duties and certain damage issues to limited partners in investment funds.  Superior Court of New Jersey, Law Division: Morris County.  (2004-2008)

- Expert witness for defendant (Frost Brown Todd) in Friedman, Billings, Ramsey & Co., Inc. vs. Energy Coal Resources, Inc. in connection with financing and registration issues. In the Superior Court of the State of Delaware In and For New Castle County (2008)

- Expert witness for defendant (Thorp Reed & Armstrong) in Etkin & Company, Inc. vs. Winner Steel, Inc. in connection with retention letter contract and fee issues. American Arbitration Association, Pittsburg (2008-2009)

- Expert witness for defendant (Katsky Korins and Sonnenschein) in Coburn Group, LLC vs. Whitecap Advisors LLC in connection with third party marketing fee issues, contract issues, and damage issues. In the United States District Court Northern District of Illinois Eastern Division; Case No. 07CV2448; (2008-2010)

- Expert witness for defendant (Rubinstein & Corozzo) in alleged securities fraud in United States v. Andrew Caccioppoli. In the United States District Court Eastern District of New York. (2008-2010)

- Expert witness for plaintiff (Winget, Spadafora & Schwarzberg) in Gordon Levey vs. Brownstone Investment Group, LLC at al in connection with valuation and other issues. FINRA arbitration, NYC (2009).

- Expert witness for defendant (Law Offices of Herbert Beigel & Associates) in 1989 LLC v. Icahn et al in connection with damage issues, valuation issues, market effect issues, and certain other issues. In the Supreme Court of the State of New York, County of New York; Index No. 6004 24/08; (2009-2017)

- 23 -

- Consulting expert for defendant (Jones Day and Boies Schiller) in Reed Elsevier Inc. et al v. Henry E. Asher et al in connection with damage issues and counter-claim issues. In the Circuit Court of the Fifteenth Judicial Circuit, In And For Palm Beach County, Florida. (2009)

- Consulting expert for plaintiff (Lindabury, McCormick, Estrabrook & Cooper) in Roughton v. Pouschine in connection with disclosure and damage issues. United States District Court for the District of New Jersey. (2009)

- Expert witness for defendant (Jacob, Medinger & Finnegan) in Oppenheimer & Co., Inc. v. Metal Management, Inc. in connection with fee issues, disclosure issues and M&A issues. United States District Court Southern District of New York; Index No. 08-CIV-3697 (LTS)(FM); (2009-2010)

- Consulting expert for plaintiff (Law offices of A. Richard Golub) in regard to certain damage issues. (2009-2010)

- Expert witness for plaintiff (The Rosen Law Firm) in Apollo Capital Fund, LLC et al v. Roth Capital Partners et al in connection with disclosure and due diligence issues. Superior Court for the State of California Los Angeles County. (2009-2011)

- Consulting expert for defendant (Murchison & Cumming) in Convergence Ethanol, Inc. v. Daniel Moscaritolo in connection with proposed venture capital financing issues and damage issues. United States District Court for the Central District of California, Western Division. (2009)

- Expert witness for plaintiff (Lindabury, McCormick, Estrabrook & Cooper) In the matter of Estate of Herman J. Koehler, III, Deceased, Sharon G. Koehler, Plaintiff v. Karovic & Rodriguez, Defendants in connection with fiduciary and damage issues. Superior Court of New Jersey Chancery Division – Probate Part Morris County; Docket No. MRS-P-1894-96 and MRS-L-3264-03; (2009-2010)

- Expert witness for defendant (Curtis Mallet) in Charles Severs vs. CRT Capital Group in connection with certain compensation issues. FINRA arbitration, NYC; FINRA Case No 09-03923; (2010)

- Expert witness for plaintiff (The Rosen Law Firm) in Donna Press et al v. Delstaff LLC, Koosharem Corp. et al in connection with fiduciary issues, fairness issues and valuation issues. Superior Court of the State of California County of Contra Costa. (2009-2010)

- Expert witness for plaintiff (Lindabury, McCormick, Estrabrook & Cooper) in Robert Nissen and Arthur Blumenthal v. Theodor Rozsa and TR Strategic Group in connection with M&A issues and fee issues. United States District Court for the District of New Jersey; Civil Action No. 08-5563 (JLL); (2010-2012)

- Consulting expert for defendant in criminal trial in connection with various securities issues. Superior Court of the State of California. (2010-2012)

- Expert witness for plaintiff (Kellogg, Huber, Hansen, Todd, Evans & Figel) in Thomas H. Lee Equity Fund V, L.P. et al v. Mayer Brown et al in connection with M&A issues and due diligence issues. United States District Court Southern District of New York; Case No. 07 CIV. 6767 (GEL); (2010-2011)

- Expert witness for plaintiff (Jenner & Block) in WRS Holding Company v. Jonathon Markoff, Edgewater Growth Capital Partners, L.P. et al in connection with MAE/MAC issues in M&A Purchase Agreement, disclosure issues, and reps and warranties issues. In Circuit Court of Cook County, Illinois County Department, Law Division; Case No. 2008L007973; (2010 - 2011)

- Expert witness for plaintiff (U.S. Department of Justice) in United States of American v. Wachovia Bank, N.A. as Personal Representative of the Estate of Ralph W. Hughes in connection with various financing and solvency issues. United States District Court for the Middle District of Florida, Tampa Division; Civil No 8: 09-CV-01443-EAK-AEP; (2011-2013)

- Expert witness for plaintiff (Reed Smith) in Chrysalis Ventures, III, L.P. et al v. Mobile Armor, Inc. et al in connection with recapitalization financing issues, entire fairness issues, and damage issues. Court of Chancery of the State of Delaware; Arbitration, in fact first filed arbitration in Court of Chancery under new rules; Arbitration No. 001-A-2011-VCLASTER; (2011)

- Consulting expert for plaintiff (Robins, Kaplan, Miller & Ciresi) in DeMoulas Profit Sharing Plan & Trust DTD 3/27/63 et al v. Goldman, Sachs & Co. in connection with due diligence and disclosure issues regarding securities underwritten for Fannie Mae. FINRA arbitration. (2011-2013)

- Expert witness for defendant (Curtis Mallet) in Charles Baltic vs. CRT Capital Group in connection with certain compensation issues. FINRA arbitration, NYC; FINRA Case No. 10-00221; (2011-2012)

- Expert witness for plaintiff (Robins, Kaplan, Miller & Ciresi) in Liberty Mutual Insurance Company et al vs. Goldman, Sachs & Co. in connection with due diligence and disclosure issues regarding securities underwritten for Fannie Mae. United States District Court Southern District of New York; Case No. 09-MD-02013-PAC and Case No. 10-CV-09184-PAC; (2011-2013)

- Expert witness for plaintiff (Levin & Associates and Thomas C. Wagner, LLC) In Jaimini H. Mehta vs. Goldman, Sachs & Co. in connection with disclosure, investment, and fiduciary issues. FINRA arbitration, Miami; FINRA Case No. 11-03149; (2011-2013)

- Expert witness for defendant (Cleary Gottlieb) in Bryanston Group, Inc. et al vs. Empire Resorts, Inc. in connection with certain financial issues and contract issues. Supreme Court of the State of New York, County of New York; Index No. 650881/2010; (2011-2013)

- Expert Witness for plaintiff (Buckley Sandler) in In Re IndyMac Bancorp, Inc. in connection with officer and director issues of the duties of care, loyalty, and good faith and for corporate waste, financial planning issues and other matters on behalf of the Bankruptcy Trustee. United States Bankruptcy Court Central District of California Los Angeles Division; Case No. 2-08-BK-21752; (2011-2012)

- Expert Witness for plaintiff (The Rosen Law Firm) in Mike McGee et al vs. China Electric Motor, Inc., Westpark Capital, Inc., Roth Capital Partners et al in connection with due diligence and disclosure issues. United States District Court, Central District of California Western Division, Los Angeles; CV-11-2794R(AGRX); (2011-2013)

- Expert Witness for plaintiff (The Rosen Law Firm) in Dan Katz et al vs. China Century Dragon Media, Inc., Westpark Capital, Inc., Joseph Gunnar & Co. LLC, I-Bankers Securities, Inc., et al in connection with due diligence and disclosure issues. United State District Court, Central District of California Western Division, Los Angeles; No. 11-CV-2769 (JAK) (SSX); (2011-2013)

- Expert Witness for plaintiff (Glancy Binkow & Goldberg, The Rosen Law Firm, and Pomerantz Haudek Grossman & Gross) in Salomon Querub et al vs. Puda Coal, Inc., Macquarie Capital (USA), Brean Murray, Carret & Co., Newbridge Securities et al in connection with due diligence and disclosure issues. United States District Court, Southern District of New York; (2012-2014)

- Expert Witness for plaintiff (The Rosen Law Firm) in Richard Yee et al vs. NIVS Intellimedia Technology Group, Inc., Westpark Capital, Inc. et al in connection with due diligence and disclosure issues. United States District Court, Central District of California; Case No. 11-CV-08472DMG-AJW; (2012-2013)

- Expert witness for defendant (Morris, Manning & Martin) in Scientific Consulting v. Serious Energy in connection with venture capital financing and valuation issues. In the Superior Court of Cobb County, State of Georgia (2012)

- Expert witness for plaintiff (Klafter Olsen & Lesser; Zwerling, Schachter & Zwerling; and Rosenthal Monhait & Goddess) in In Re IMH Secured Loan Fund Unitholders Litigation in connection with valuation and fairness issues. In the Court of Chancery of the State of Delaware; Consolidated Civil Action No. 5516-CS; (2012-2013)

- Expert witness for plaintiff (Cleary Gottlieb) in Player v. Hockey Club in connection with contract and valuation issues in regard to a deferred compensation payment. National Hockey League Players Association Confidential Arbitration Proceeding (2012)

- Consulting expert for plaintiff (Klafter Olsen & Lesser; and Rosenthal Monhait & Goddess) in Craig Smith et al v. Living Independently Group, Inc, General Electric Company et al in connection with fiduciary issues and valuation issues. In the Court of Chancery of the State of Delaware (2012-2013)

- Expert witness for plaintiff (Reynolds APC and Solomon Ward Seidenwurm & Smith) in T&S Enterprises v. Sumitomo Corporation of America, Sumitomo Heavy Industries, Ltd et al in connection with retention issues, fee issues and/or quantum meruit issues. United States District Court Southern District of California; Case No. 3:11-CV01318-BEN-MDD; (2012)

- Expert witness for defendant (Reilly Pozner) in Jefferies & Company v. Ascent Solar Technologies, Inc in connection with retention issues and fee issues. New York State Supreme Court; Index No. 652862/2011; (2012-2013)

- Expert witness for plaintiff (The Rosen Law Firm) in Vanleeuwen et al vs. Keyunan Petrochemicals, Inc. et al in connection with disclosure issues. United States District Court Central District of California; No: CV-11-09495-PSG (JCGX); (2012-2013)

- Expert witness for plaintiff (Torkin Manes) in Karmen Equities Limited vs. Globalive Communications Corp. et al in connection with fee dispute. Superior Court of Justice, Ontario, Canada; Court File No. CV-09-382551; (2012-2014)

- Expert witness for plaintiff (Rosenthal, Monhait and Goddess) in Gordian Group, LLC vs. North Atlantic Holding Company, Inc. et al in connection with retention issues, fee issues, and valuation issues. In the Superior Court of the State of Delaware In and For New Castle County; C.A. No. 12C-06-276(JRJ)-CCLD; (2012-2013)

-   Expert witness for plaintiff (Robins, Kaplan, Miller & Ciresi) in Liberty Mutual Insurance Company et al v. Goldman, Sachs & Co. in connection with due diligence and disclosure issues regarding securities underwritten for Freddie Mac. United States District Court Southern District of New York; Case No. 09-MD-02072-MGC-ECF case; also 11-CV-05484-MGC; (2013-2015)

-   Expert witness for plaintiff (The Rosen Law Firm) in Ming Yang et al vs. Tibet Pharmaceuticals, Inc. et al in connection with due diligence issues. United States District Court of the Virgin Islands Division of St. Croix; Case No. 12-CV-0054-WAL-GWC; (2013)

-   Consulting expert for defendants (Law offices of Gerald L. Shargel) in an alleged criminal securities fraud matter in United States vs. David Levy et al; United States District Court Southern District of New York (2013)

-   Consulting expert for plaintiff (Canadian law firm) in contemplated litigation vs. Chinese company and underwriter in connection with due diligence and disclosure issues; Ontario Superior Court of Justice (2013)

-   Expert witness for defendants (Barnes & Thornburg) in an alleged criminal bank fraud matter in United States vs. Edward J. Woodard, Stephen G. Fields et al; United States District Court for the Eastern District of Virginia Norfolk Division; Case No. 2:12 CR-105-RAJ-DEM; (2013)

-   Expert witness for plaintiff (Coti & Sugrue) in 220 Laundry LLC and Eliot Spitzer vs. B&M Linen, Miron Markus and Boris Markus in connection with breach of contract damage issues. United States Bankruptcy Court Southern District of New York; Case No. 12-11560(ALG), Adv. Pro No. 12-1885-ALG; (2013)

-   Expert witness for defendant (Olshan Frome Wolosky) in Vector Capital Corporation vs. Ness Technologies, Inc. in connection with breach of contract M&A issues. United States District Court Southern District of New York; 11 Civ. 6259(PKC); (2013)

-   Expert witness for plaintiff (J.T. Riker Co., L.P.A.) in Great Water Capital Partners vs. Down-Lite International, Inc. et al in connection with alleged fraud in the inducement and fee dispute. Court of Common Pleas Hamilton County, Ohio; Case No. A1300424; (2014-2016)

-   Expert witness for defendant taxpayer (The Law Offices of Michael J. Desmond) in IRS Commissioner v. Michael Tricarichi in connection with M&A due diligence issues. United States Tax Court, Washington, DC; Docket No. 23630-12; (2014)

- Expert witness for plaintiff (Peters Berger Koshel & Goldberg and Law Office of Randolph T. Lovallo) in M.M. Dillon & Co. Group, LLC f/k/a IB Separation LLC d/b/a CRT Investment Banking LLC v. Ambre Energy Ltd et al in connection with a fee dispute. Supreme Court of the State of New York County of Kings; Index No. 13241/2011; (2014)

- Expert witness for plaintiff (Patterson Belknap Webb & Tyler) in Ambac Assurance Corporation et al v. Countrywide Home Loans, Inc., Countrywide Securities Corp., Countrywide Financial Corp. and Bank of America in connection with various M&A issues. Supreme Court of the State of New York, New York County; Index No. 651612/2010; (2014-2016)

- Expert witness for defendant (Johnson Winter & Slattery, Australia) in Brosnan et al v. Katke, Metagenics Australia Pty Ltd., Metagenics, Inc. et al in connection with various financing and M&A issues. In The Federal Court of Australia, Queensland District, General Division; Case No. QUD 384-2012; (2014)

- Expert Witness for plaintiffs (The Rosen Law Firm and Lifshitz & Miller) in Berkowitz and Porretti et al v. Sino Gas International Holdings, Inc. et al in connection with process undertaken by Special Committee of Board of Directors and certain M&A issues. In The Third Judicial District Court, In And For Salt Lake County, State of Utah; Case No. 140902517 and 140902654; (2014)

- Expert Witness for plaintiff (Benesch, Friedlander Coplan & Aronoff) in Gulfco Holding Corp. vs. Prospect Capital Corporation et al in connection with lender liability and certain other issues. In the District Court of Jefferson County, Texas, 60th Judicial District; Cause No. B195691; (2014-2015)

- Expert witness for defendant taxpayer (McGuireWoods) in United States of America v. B&D Video, Inc. et al in connection with M&A due diligence and certain other issues. United States District Court for the Eastern District of Virginia, Richmond Division; Civil Action No. 3:13-CV-724. (2014)

- Expert witness for plaintiff (Law offices of Herbert Beigel) in CVR Energy, Inc. (controlled by Carl Icahn and affiliated funds) vs. Wachtell Lipton Rosen & Katz et al in connection with M&A engagement agreement issues and certain other issues. In the United States District Court for the Southern District of New York; C.A. No. 14 CV 06566 (RJS); (2014-2017)

- Expert witness for Class Action plaintiffs (Glancy Prongay & Murray, The Rosen Law Firm, Pomerantz, Kaplan Fox & Kilsheimer, and Kirby McInerney) in In Re: Puda Coal Securities Inc. et al Litigation in connection with due diligence and disclosure issues. In the United States District Court for the Southern District of New York; Case No. 1:11: CV-2598 (DLC); (2015-2016)

- Expert valuation opinion for IRS purposes for a shareholder placing his shares of a privately-owned company into a Trust (Fein, Such, Kahn & Shepard) (2015)

- Expert witness for plaintiff (Seiller Waterman) in Christopher Carmicle v. BJI Holdings, LLC, Brown Jordan International, Inc. et al in connection with M&A process issues, fiduciary issues, and certain other issues. In the United States District Court for the Southern District of Florida; Case No. 14-CV-61415-RLR (2015)

- Expert witness for defendant (Coppersmith Brockelman) in Armorworks Enterprises v. The Cavanagh Law Firm et al in connection with certain M&A issues. In the Superior Court of Arizona, Maricopa County; Case No. CV 2008-014160 and 014305, Consolidated (2015-2016)

- Expert witness for plaintiffs (Bryan Cave and McDermott Will & Emery) in Indian River County, Florida et al vs. Peter M. Rogoff et al and Martin County, Florida et al vs. US Department of Transportation in connection with certain financial planning and financing issues. In the United States District Court for the District of Columbia; Case Nos. 1:150-cv-00460 (CRC) and 1:150-cv-00632 (CRC) (2016-2017)

- Consulting expert for plaintiff (Kasowitz, Benson, Torres & Friedman) in U.S. Bank National Association, as Trustee for Harborview Mortgage Loan Trust, Series 2005-10 v. Countrywide Home Loans, Inc. (d/b/a Bank of America Home Loans), Bank of America Corporation et al in connection with various M&A issues. Supreme Court of the State of New York, County of New York; Index No. 652388/2011; (2016-2017)

- Consulting expert for defendant (Clayman & Rosenberg) in alleged securities fraud in United States v. Talman Harris. In the United States District Court for the Northern District of Ohio Eastern Division; Case No. 1:15CR335; (2016)

- Expert witness for plaintiff (SEC) in Securities and Exchange Commission vs. Stiefel Laboratories, Inc. and Charles W. Stiefel in connection with valuation issues, M&A issues, and disclosure issues. United States District Court Southern District of Florida; Case No. 11-CV-24438-WJZ; (2012-2017)

- Expert witness for plaintiff (Hogan Lovells) in Plummer et al v. Scharg et al in connection with various M&A issues. In The Circuit Court of the 17th Judicial Circuit, In and For Broward County, Florida; Case No.: CACE 15-001127 (2016-2017)

- Expert witness for defendant (Hogan Lovells) in LaDove, Inc. v. Carolyn Plummer, It's A "10", Inc. et al and It's A "10", Inc, Counterclaim-Plaintiff v. LaDove, Inc. in connection with various fiduciary issues and damage issues. In The Circuit Court of the 11th Judicial Circuit, In and For Miami-Dade County, Florida; Case No.: 2015-011239 CA-40 (2016-2017)

- Expert witness for plaintiff (Robbins Geller Rudman & Dowd) in Beaver County Employees Retirement Fund et al v. Cyan, Inc. et al in connection with due diligence issues. In the Superior Court of the State of California, County of San Francisco; Lead Case No.: CGC-14-538355 Class Action (2016-2017)

- Expert witness for defendant (Foley & Lardner) in Saybrook Tax Exempt Investors, LLC et al v. Lac du Flambeau Band of Lake Superior Chippewa Indians et al, including Stifel Nicolaus & Co., Inc. and the law firm, Godfrey & Kahn, in connection with conflict of interest issues, disclosure issues and certain financing issues. State of Wisconsin, Circuit Court Civil Division, Waukesha County; Case No. 12CV00187 (2016-2017)

- Expert witness for plaintiff (Pomerantz; Glancy Prongay & Murray; and The Rosen Law Firm) in Keith Thomas, Oklahoma Police Pension & Retirement System et al v. Avenue Capital Management II, L.P. in connection with control issues, due diligence issues and insider trading issues. United States District Court Northern District of California; Class Action, Case No. 3:14-cv-01160-JST (2016-2017)

- Expert witness for plaintiff (Shiner Law Group) in Karl Makovsky, as Personal Representative of the Estate of Jean Irene Makovsky, and as Agent for Keith Makovsky et al as Beneficiaries v. Bank of America, N.A. in connection with lost or misplaced certificate of deposit. In the Circuit Court of the 15th Judicial Circuit, In and For Palm Beach County, Florida; Case No: 2013 CA 018966 (2017)

- Expert witness for plaintiff (Scott & Scott, Zwick Law Firm, and Glancy Prongay & Murray) in Benjamin Gross et al v. GFI Group, Inc., Colin Heffron, and Michael Gooch in connection with material misstatement issues and M&A process issues. United States District Court for the Southern District of New York; Case No. 1:14-cv-09438-WHP (2017)

- Expert witness for defendants and counterclaim plaintiffs (Duane Morris and Blank Rome) in Rice Drilling B LLC v. International Assets Advisory LLC, HarborLight Capital Group, LLC, and Dean G. Tanella in connection with various fee dispute issues. In the Court of Common Pleas of Washington County, Pennsylvania, Civil Division; Case No. 2013-4153 (2017)

- Expert witness for plaintiffs (Yetter Coleman and Halling & Cayo) in Stark Master Fund Ltd et al v. Credit Suisse Securities (USA) LLC in regard to M&A financing issues, commitment letter issues, and disclosure issues in connection with the planned acquisition of Huntsman Corp. by Hexion-Apollo. United States District Court For the Eastern District of Wisconsin; Case No. 14-CV-00689 (RTR) (2017)

**IV) Courts Accepting as Expert**

- Mr. Purcell has testified in various courts (for both plaintiffs and defendants) regarding a wide range of investment banking and capital markets issues. He has been accepted as an expert witness for the purpose of offering trial testimony in the following courts:

  - the United States District Court for the Southern District of New York;

  - the United States District Court for the Eastern District of New York;

  - the United States Bankruptcy Court for the Southern District of New York;

  - the United States Bankruptcy Court for the District of Massachusetts (Eastern Division);

  - the United States Bankruptcy Court for the District of Colorado;

  - the United States District Court for the Eastern District of Virginia (Norfolk Division);

  - the United States Tax Court (both Atlanta and Washington, DC);

  - the Court of Chancery of the State of Delaware;

  - the Supreme Court of the State of New York, County of New York;

  - the Superior Court of New Jersey Law Division, Morris County;

  - the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida;

  - the Circuit Court of the 11th Judicial Circuit Miami-Dade County, Florida;

  - the Superior Court of the State of California, in both Los Angeles and Orange County;

  - the Cuyahoga County Court of Common Pleas, Cleveland, Ohio; and

  - the Circuit Court of Pulaski County, Arkansas.

- Mr. Purcell has also testified at the Federal Court of Claims (Washington, DC) and has appeared before a number of mediation and arbitration panels, including FINRA and the National Hockey League Players Association. In addition, he has testified as an expert before various regulatory agencies, including on behalf of the U.S. Securities and Exchange Commission (the "SEC"), the U.S. Department of Justice, and the Internal Revenue Service.

## V) <u>Corporate Executive Positions</u>

- From October 1993 through February 1995, served as President and CEO of Gulf USA Corporation, as it went through a reorganization process, and as a Director of Gulf Resources Pacific in New Zealand, a 90% owned subsidiary and one of the largest commercial real estate companies in New Zealand.

- Vice Chairman of the Board, and then Director and financial advisor for Business Talk Radio Inc., name change to Blue Star Media (2001 – October 2009)

- Directorships: Gulf USA, Gulf New Zealand, AmBase Corp, AMDG Biotech, Business Talk Radio, Independent Franchise Dispute Committee of Eggland's Best, Dillon Read & Co. Inc., and Seale & Associates

## VI) <u>Lawyers/Law Firms That William H. Purcell Has Worked With</u>

<u>New York City</u>

1) Bryan Cave, NYC (Philip Karmel, J. Kevin Healy)

2) Cadwalader, Wickersham & Taft, NYC (Dennis Block, Jonathan Polkes, Keith Miller, Martin Seidel, John Bae, Peter Friedman)

3) Clayman & Rosenberg, NYC (Denis Kelleher, Ramsey Hinkle)

4) Cleary, Gottlieb, Steen & Hamilton, NYC (Howard Zelbo, Bob Greig, Boaz Morag, Tom Maloney, Jeff Rosenthal)

5) Curtis, Mallet-Prevost, Colt & Mosle, NYC (Jacques Semmelman; Nancy Delaney; Myles Bartley)

6) Davis Polk & Wardwell, NYC and DC (M. Carr Ferguson, John Corry, Laura Barzilai, tax NYC; Dennis Glazer, NYC, & Tom Haroldson, DC; Larry Portnoy, Helen Harris, and Chris Garcia, NYC; Amy Starr, NYC)

7) Fieldman Hay & Ullman, NYC (Anthony Ullman)

8)    Friedman Kaplan Seiler & Adelman, NYC (Ed Friedman, Andy Goldwater, Dan Rapport)

9)    Friedman, Wang & Bleiberg, NYC (Peter Wang)

10)   Jacob, Medinger & Finnegan (Keelin Kavanagh, Wendy Michaels)

11)   Jenkens & Gilchrist Parker Chapin, NYC (Al Stein, Katherine Ash)

12)   Kasowitz, Benson, Torres & Friedman, NYC (Chris Johnson, David Friedman, Howard Schub, Dan Zinman, Jim Stricker, Tom Kelly)

13)   Katsky Korins, NYC (David Katsky, Adrienne Koch)

14)   Kelley Drye & Warren (Bill Escobar, Sarah Reid, Alison MacGregor)

15)   Kirby McInerney & Squire (Kirby McInerney), NYC (Jeffrey Squire, Ira Press, Dan Hume)

16)   K&L Gates (Kirkpatrick & Lockhart), NYC (Gerry Novack, Dave Versfelt, Mike Gerard)

17)   Lankler Siffert & Wohl, NYC (Frank Wohl, Laura Stasior)

18)   Law offices of Ronald P. Mysliwiec, and of David J. Aronstam, NYC

19)   Law offices of Gerald L. Shargel, NYC (Gerry Shargel and Henry Mazurek)

20)   Law Offices of A. Richard Golub, NYC (Richard Golub)

21)   Law offices of Gerald B. Lefcourt, NYC (Gerry Lefcourt and Sheryl Reich)

22)   Law offices of Laura Brevetti, NYC

23)   Miller & Wrubel, NYC (Joel Miller)

24)   Nixon Peabody, NYC (Chris Papperalla; now at Hughes Hubbard)

25)   Olshan Frome Wolosky (Tom Fleming, Renee Zaytsev)

26)   Patterson Belknap Webb & Tyler, NYC (David Dykhouse, Josh Kipness, Catherine Geddes)

27)   Peters Berger Koshel & Goldberg, Brooklyn (Richard Goldberg)

28)  Pomerantz, NYC and Chicago (Joshua Silverman, Jeremy Lieberman, Leigh Smollar)

29)  Pryor, Cashman, Sherman & Flynn, NYC (Peter Wolfson, Art Ruegger, Steve Rabinowitz)

30)  Reed Smith, NYC and Delaware (Larry Reina, Brian Rostocki, Elizabeth Fenton)

31)  Rosen (The) Law Firm, NYC (Larry Rosen)

32)  Rubinstein & Corozzo, NYC (Joe Corozzo)

33)  Satterlee Stephens Burke & Burke, NYC (Bob Hubbard)

34)  Schulte Roth & Zabel, NYC (Alan Glickman, Marc Elovitz, Steven Perlstein)

35)  Scott & Scott, NYC (Joseph Guglielmo)

36)  Sercarz & Riopelle, NYC (Maurice Sercarz)

37)  Shearman & Sterling, NYC (Ken Kramer, Simon Malko)

38)  Skadden, Arps, Slate, Meagher & Flom, NYC (Edward Yodowitz, Jerome Hirsch and Steven Kolleeny; Kayalyn Marafioti; Connie Huttner and Ken Plevan; Christopher Malloy, Thomas Schwarz and Kelly Park; Dana Freyer and Jeremy Berman; George Zimmerman and Jonathan Frank)

39)  Sonnenschein Nath & Rosenthal, NYC, Washington D.C., Chicago and San Francisco (Dan Barnowski, Peter Wolfson, Tiffany Lacker, Michael Hultquist, Lex Brainerd)

40)  Troutman Sanders, NYC (Al Stein, Katherine Ash)

41)  Weil, Gotshal & Manges, NYC (Miranda Schiller, Johnson NG)

42)  Willkie Farr & Gallagher, NYC and Washington D.C. (Rich Bernstein, Frank Scaduto)

43)  Winget, Spadafora & Schwartzberg, NYC (Michael Schwartzberg, Seven Mellen)

44)  Wollmuth Meyer & Deutsch, NYC (David Wollmuth, Vince Chang, Richard Vuernick)

45)   Zwerling, Schachter & Zwerling, NYC (Hillary Sobel)

46)   Jack Zwick, NYC

Washington, DC

47)   Arnold & Porter, Washington, DC (Mel Garbow, Ed Sisson)

48)   Buckely Sandler, Washington, DC (Ben Saul, Adam Miller)

49)   Bassman Mitchell & Alfano, Washington, DC (Al Alfano)

50)   Barnes & Thornburg, Washington, DC (Sol Wisenberg)

51)   Burnham and Gorokhov, Washington, DC (Eugene Gorokhov)

52)   Cooper, Carvin & Rosenthal; Cooper & Kirk, Washington, DC (Chuck Cooper, Mike Kirk, Hamish Hume)

53)   Gibson, Dunn & Crutcher, Washington, DC (John Millian, Paul Blankenstein)

54)   Kellogg, Huber, Hansen, Todd, Evans & Figel, Washington, DC (Jim Webster, Kevin Huff)

55)   Latham & Watkins, Washington, DC (Michele Rose, Curtis Lu, Mary Britton)

56)   Manatt, Phelps & Phillips, Washington, DC (Abbe Lowell, Steve Reich, Julie Campbell, Barrie Berman)

57)   McDermott Will & Emery, Washington, DC (Stephen Ryan, Sam Neel)

58)   McKee Nelson LLP., Washington, D.C. (Sanford Stark)

59)   Powell Goldstein Frazer & Murphy, Washington, DC (Bill Crenshaw)

60)   Scribner, Hall & Thompson, Washington, DC (Peter Winslow, Greg Oyler)

61)   Law offices of Geoffrey Gitner, Washington, DC

62)   U.S. Department of Justice, Tax Division, Washington, DC (John Bilheimer, Michelle Abroms Levin, Michael May)

63)   United States Securities and Exchange Commission, Washington, DC (Boston Office, David Marder; and Miami Office, Chris Martin and Jim Carlson)

64)   Internal Revenue Service, Washington, DC (New York City office, Curt Rubin and Michael Wilder)

Boston

65)   Foley & Lardner, Boston (Michael J. Tuteur)

66)   Goulston & Storrs, Boston (Doug Rosner)

67)   McCarter & English, Boston (Bill Zucker)

68)   Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, Boston (Peter Biagetti, Steve Ganis)

69)   Robins, Kaplan, Miller & Ciresi, Boston and Minneapolis (David Marder, Chris Sullivan, Thomas Hatch, Jim Safley)

70)   Silverglate & Good, Boston (Harvey Silverglate)

71)   Sullivan & Worcester, Boston (Paul Summit, Barry Pollack)

72)   Prof. Laurence H. Tribe, Harvard Law School, Boston

Chicago

73)   Barnes & Thornburg, Chicago, Illinois (Trace Schmeltz, Chicago; Sol Wisenberg, Washington, DC; and Meredith Rieger, Indianapolis)

74)   Futterman & Howard, Chicago, Illinois (Ron Futterman, Michael Behn)

75)   Jenner & Block, Chicago, Illinois (Ross Bricker, David Bradford, John Ward, Dan Winters, Tom McCarthy)

76)   Pomerantz, Chicago, Illinois (Joshua Silverman)

White Plains, NY Area

77)   Bader & Bader, White Plains, NY (I. Walton Bader)

78)   Collier, Halpern, Newberg, Nolletti & Bock, White Plains, NY (Phil Halpern, Scott Salant)

79)   Klafter Olsen & Lesser, Rye Brook, NY (Jeff Klafter)

80)   Lifshitz & Miller, Garden City, NY (Josh Lifshitz)

81)   Lowey Dannenberg Bemporad & Selinger, White Plains, NY (Steve Lowey, Tom Skelton, William Ban)

New Jersey

82)   Dechert, Princeton, NJ (David Kotler); also Dechert, Palo Alto, CA (Bryan Sinclair)

83)   Donovan & Associates, Holmdel, NJ (now W.J. Cahill & Associates) (Michael Donovan, Bill Cahill, and Susan Kennedy)

84)   Fein, Such, Kahn & Shepard (Steven Loeb)

85)   Lindabury, McCormick, Estrabrook & Cooper, Westfield, NJ (Peter Burke; John Schmidt)

86)   Lomurro Davison Eastman and Munoz, Freehold, NJ (Michael D. Schottland)

87)   Sills Cummis & Gross, Newark, NJ (Clive Cummis, Jack Wenik, Larry Horn, Joe Buckley, and Rich Epstein)

88)   Wilentz, Goldman & Spitzer, Woodbridge, NJ (Fred Becker)

89)   Wilson, Elser, Moskowitz, Edelman & Dicker, Newark, NJ (Carolyn O'Connor, Joseph Hanlon)

Connecticut and Rhode Island

90)   Coti & Sugrue, New Canaan, CT (Stephen Sugrue)

91)   Law Office of Randolph T. Lovallo, Ridgefield, CT (Randy Lovallo)

92)   Pepe & Hazard, Hartford, CT (Jim Green, Richard Goldstein)

93)   Rucci, Burnham, Carta & Edelberg, Darien, CT (Mark Carta, Paul Burnham)

94)   Scott & Scott, Colchester, CT (Joe Guglielmo)

95)    Wiggin & Dana, New Haven, CT (Shaun Sullivan, Phyllis Pari, Kevin Dean)

96)   Edwards & Angell, Providence, RI (Bernie Buonanno)

Delaware

97)    The Bayard Firm, Wilmington, DE (Kurt Heyman, Ted Johnson, Vernon Proctor, Patricia Enerio)

98)    Grant & Eisenhofer, Wilmington, DE (David Sellinger, Laurie Wagner Pederson)

99)    Morris, James, Hitchens & Williams, Wilmington, DE (Clark Collins, Lewis Lazarus, Joe Schoell)

100)    Morris, Nichols, Arsht & Tunnell, Wilmington, DE (Gil Sparks, Alan Stone)

101)    Potter Anderson & Corroon, Wilmington, DE (Bob Payson)

102)    Proctor Heyman, Wilmington, DE (Kurt Heyman)

103)    Reed Smith, Wilmington, DE (Brian Rostocki)

104)    Richards, Layton & Finger, Wilmington, DE (Frank Balotti)

105)    Rosenthal, Monhait & Goddess, Wilmington, DE (Norman Monhait)

Pennsylvania

106)    Blank Rome, Pittsburgh, PA (Joseph Moran)

107)    Chimicles & Tickellis, Haverford, PA (Jim Malone)

108)    Cozen O'Connor, Philadelphia, PA and Los Angeles (Michele Ledo, Huey Cotton, Jeff Pasek, Aaron Krauss)

109)    Duane Morris, Pittsburgh, PA (Joel Walker and Gerald Schirato)

110)    Fox Rothschild, Lansdale, PA (Josh Hummel)

111)    Harkins Cunningham, Philadelphia, PA (Steven Reed, Eleanor Morris Illoway, Barbara Denys)

112)    Padova & Lisi, Philadelphia, PA (Nicholas Lisi)

113)    Thorp Reed & Armstrong, Pittsburgh, PA (Joseph Katarincic, Stuart Gaul, Alex Hershey)

Ohio

    114)    Benesch, Friedlander Coplan & Aronoff, Cleveland, Ohio (David Mellott, Trevor Covey, Mike Meyer)

    115)    Levin & Associates, Cleveland, Ohio (Joel Levin)

    116)    J.T. Riker Co., L.P.A., Cincinnati (Tim Riker)

    117)    Thomas C. Wagner, LLC, Cleveland, Ohio (Thomas Wagner)

    118)    Walter & Haverfield, Cleveland, Ohio (John Schiller, John Heer, James Conroy)

Michigan and Indiana

    119)    Dickinson Wright, Bloomfield Hills, Michigan (Richard Paul, Benjamin Dolan)

    120)    Ogletree, Deakins, Nash, Smoak & Stewart, Indianapolis, Indiana (Todd Kaiser, Andrea Southern)

Minnesota and Wisconsin

    121)    Briggs and Morgan; Saint Paul, MN (Patrick Williams, Scott Knudson)

    122)    Foley & Lardner, Milwaukee, Wisconsin (Jim Clark, Max Meckstroth)

    123)    Halling & Cayo, Milwaukee, Wisconsin (Michael Schaelman)

    124)    Robins, Kaplan, Miller & Ciresi, Minneapolis, MN (Tom Hatch & Jim Safley)

Colorado

    125)    Bartlit Beck Herman Palenchar & Scott, Denver, CO (Don Scott, Alan Littman)

    126)    G.W. Merrick & Associates, Greenwood Village, CO (Ryan Kirchoff)

    127)    Reilly Pozner, Denver, CO (Jason Lynch)

Arizona

    128)    Budoff & Ross, Phoenix, Arizona (Marc Budoff)

    129)    Coppersmith Brockelman, Phoenix, Arizona (John DeWulf)

130) Law Offices of Herbert Beigel, Tucson, Arizona (Herb Beigel)

Virginia, North and South Carolina, Georgia and Kentucky

131) McGuireWoods, Norfolk office, VA. (John Adams); Charlotte office, NC (Peter Covington); and Richmond office, VA (Craig Bell and Brad Ridlehoover)

132) Sacks & Sacks, Norfolk, VA (Stanley Sacks)

133) Frost Brown Todd, Lexington, Kentucky (Barry Hunter, Lee Norman)

134) Seiller Waterman, Louisville, Kentucky (Glenn Cohen)

135) Helms Mulliss & Wicker, Charlotte, NC (Peter Covington, Corby Anderson)

136) Turner Padget Graham & Laney, Charleston and Florence, SC (John Wilkerson, Julie Moose)

137) Morris, Manning & Martin, Atlanta, Georgia (Simon Malko)

Oklahoma

138) Day Edwards Propester & Christensen; Oklahoma City, Oklahoma (Joe Edwards, Joel Harmon)

Texas

139) Epstein Becker Green Wickliff & Hall, Houston, Texas (Alton Hall and Tammy Shea)

140) Spencer & Associates, Houston, Texas (Bonnie Spencer, Dawn Meade)

141) McKool Smith, Dallas, Texas (Robert Manley, David Anderson)

142) Sayles Werbner, Dallas, Texas (Mark Werbner and John Conway)

143) Greer, Herz & Adams, Galveston, Texas (Andy Myltelka, Joe Fulcher, Steve Windsor)

144) Yetter Coleman, Houston, Texas (Bryce Callahan)

Florida

 145) Boies, Schiller & Flexner, Ft. Lauderdale, Florida (Sashi Boruchow)

 146) Conrad & Scherer, Fort Lauderdale, Florida (Bill Scherer, Jim Carroll, Al Frevola)

 147) Gary, Williams, Parenti et al, Stuart, Florida (Willy Gary)

 148) Hogan Lovells, Miami, Florida (John O'Sullivan & Allen Pegg)

 149) Robert B. Miller Law, Miami Beach, Florida (Bob Miller)

 150) Shiner Law Group, Boca Raton, Florida (David Shiner and Ronnie Gotti)

California

 151) Catanzarite Law Corporation, Anaheim, CA (Ken Catanzarite)

 152) Cotchett, Pitre & McCarthy, San Francisco, CA (Steve Williams)

 153) Covington & Burling, San Francisco, CA (Lawrence Hobel)

 154) Glancy Prongay & Murray, Los Angeles, CA (Lionel Glancy, Josh Crowell, Joseph Cohen)

 155) Green Welling, San Francisco, CA (Robert Green, Chuck Marshall)

 156) Heller Ehrman, San Francisco, CA (Lex Brainerd, Lawrence Hobel, Brian McDonald)

 157) Law Offices of Michael J. Desmond, Santa Barbara, CA (Michael Desmond)

 158) Law Offices of Alexandria C. Phillips, Laguna Beach, CA (Alexandria Phillips)

 159) Lee, Goddard & Duffy, Irvine, CA and The Duffy Law Firm, Newport Beach, CA (Anthony Duffy)

 160) Murchison & Cumming, Los Angeles, CA (Jonathan Dennis)

 161) Paul, Hastings, Janofsky & Walker, Los Angeles and San Diego, CA (Ron Oster, Geoffrey Thomas and Dennis Ellis in LA; Mary Dollarhide in San Diego)

162)   Quinn Emanuel Urquhart Oliver & Hedges, San Francisco, CA (Scott Lawson, Sam Shepherd, and Rachel Herrick)

163)   Reynolds APC and Solomon Ward Seidenwurm & Smith, San Diego, CA (Paul Reynolds)

164)   Robbins Geller Rudman & Dowd, San Francisco, CA (John Grant)

165)   Roemer Harnik & Nethery, Indian Wells, CA (Martin Nethery and Mary Gilstrap)

166)   Stradling Yocca Carlson & Rauth, Newport Beach, CA (Jeremy Suiter, Stephen Ram)

167)   Wilson Sonsoni Goodrich & Rosati, Palo Alto, CA (Jamie DiBoise)

## Canada

168)   Siskinds LLP, Toronto, Canada (Doug Worndl)

169)   Torkin Manes LLP, Toronto, Canada (Darryl Mann)

## Great Britain

170)   Clyde & Co., London, United Kingdom (Robert Wilson)

## U.S. Virgin Islands

171)   Law office of Joel H. Holt, Christiansted, St. Croix, U.S. Virgin Islands

## Australia

172)   Johnson Winter & Slattery (Christopher Beames and John Powell)

# EXHIBIT 2

Exhibit 2

List of Materials Reviewed and Relied Upon

1)   The Second Amended Complaint filed on or about July 8, 2015, including the exhibits thereto;

2)   Memorandum & Order dated February 9, 2016 by District Judge, William H. Pauley III;

3)   Press release dated July 30, 2014 by CME Group and GFI Group Announcing Plan for Strategic Transactions;

4)   Articles and texts referred to in footnotes of this Report;

5)   Deposition of Colin Ruegsegger, senior analyst of M&A research at Glass Lewis, taken on June 29, 2017, including exhibits;

6)   Glass Lewis report recommending voting against the CME Deal, dated on or about January 22, 2015 (Exhibit 189 to the Colin Ruegsegger deposition);

7)   Glass Lewis' Approach to Financial Transactions memorandum (Exhibit 190 to the Ruegsegger deposition);

8)   ISS (Institutional Shareholder Services) reports, including a report recommending voting against the CME Deal (GFI-MERGER-00010925-937) and a report (article) entitled "GFI Group: What's So Special About That Special Committee?";

9)   Egan Jones Proxy Services report dated January 9, 2015 recommending voting for the CME Deal (GFI-MERGER-00011621-629)

10)   Form S-4 Registration Statement of CME Group Inc. filed with the SEC on October 16, 2014 (the CME Proxy Statement);

11)   Schedule 14D-9 of GFI Group Inc. filed with the SEC on November 4, 2014;

12)   Amendment No. 1 Form S-4 Registration Statement of CME Group Inc. filed with the SEC on December 5, 2014;

13)   Schedule 14D-9 of GFI Group Inc. and Jersey Partners Inc. et al filed with the SEC on January 27, 2015;

14)   Deposition of Frank J. Fanzilli, Jr., member of the Special Committee, taken on June 6, 2017, including exhibits;

1

15) Verified Complaint filed in the Court of Chancery of the State of Delaware on November 25, 2015 by Plaintiffs, Frank Fanzilli, Jr., and Richard Magee (Members of the Special Committee) vs. GFI Group Inc., Defendant;

16) Deposition of Shaun Lynn, President of BGC, taken on June 19, 2017, including exhibits;

17) Deposition of Alexander Yavorsky, Managing Director of Jefferies, taken on June 22, 2017, including exhibits;

18) Deposition of Robert Smith, Greenhill investment banker, taken on June 7, 2017, including exhibits;

19) Deposition of Michael A. Gooch, Chairman of GFI, taken on June 13, 2017, including exhibits;

20) Deposition of Howard W. Lutnick, Chairman of BGC, taken on June 21, 2017, including exhibits;

21) Deposition of Colin Heffron taken on June 15, 2017;

22) Public filings regarding GFI.