UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
BENJAMIN GROSS, *Individually and on* :
*Behalf of Others Similarly Situated*, :
                                       :
                      Plaintiffs,      :
                                       :          14cv9438
          -against-                    :
                                       :      OPINION & ORDER
GFI GROUP, INC., *et al.*,             :
                                       :
                      Defendants.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, Senior United States District Judge:

              GFI Group, Inc. ("GFI"), Colin Heffron, and Michael Gooch (collectively,

"Defendants") move for summary judgment dismissing this securities class action.  Defendants

argue that Plaintiffs fail to establish triable issues of fact on falsity, scienter, reliance, and loss

causation.  Defendants' motion for summary judgment is granted.

## BACKGROUND

              Benjamin Gross filed this action on behalf of a class of investors who sold GFI

stock between July 30, 2014 and September 9, 2014 ("Plaintiffs").  At the time of the events

giving rise to this lawsuit, GFI was a publicly traded company with two principal business units:

(1) an inter-dealer broker ("IDB") business, which provided trading services; and (2) a software

unit, which licensed financial software products.  (Second Am. Compl. for Violations of the

Federal Securities Laws, ECF No. 29 ("SAC") ¶ 38.)

              In early 2013, Jefferies LLC advised GFI Executive Chairman Michael Gooch

that GFI might be able to optimize shareholder value by selling itself to another inter-dealer

broker.  (Defendants' Response to Plaintiffs' Local Rule 56.1 Statement, ECF No. 130 ("Defs.'

Response") ¶¶ 115–116; Decl. of Joseph P. Guglielmo in Supp. of Plaintiff's Opp. to Defendants' Mot. for Summary Judgment, ECF No. 124 ("Guglielmo Decl."), Ex. 25 ("Jefferies Presentation"), at 3 ("Optimal approach may be to engage with an IDB . . . to sell the entire company . . . .").) Gooch was also GFI's largest shareholder, owning approximately 38% of its outstanding shares. (Defs.' Response ¶ 107.) Jefferies estimated GFI's "sum-of-the-parts" value at $5.41/share, a 64% premium over GFI's current trading price. (Jefferies Presentation, at 3.)

Gooch rejected Jefferies's advice, and expressed interest in selling only GFI's software business, while retaining the IDB business for himself. (Guglielmo Decl., Ex. 26 ("Yavorsky Email").) In an October 2013 Board meeting, Gooch recommended that GFI explore a potential sale of its software unit to CME Group ("CME"). (Guglielmo Decl. Ex. 85 ("Proxy Statement"), at 61.) Under the terms of that proposal, CME would acquire GFI, after which a private consortium—including Gooch and Heffron (GFI's Chief Executive Officer)— would purchase back the IDB business from CME at a substantial discount. (Proxy Statement, at 61; Defs.' Response ¶¶ 122–127.) CME understood that Gooch's repurchase of the IDB business was a prerequisite to any transaction with GFI. (Defs.' Response ¶ 127.)

BGC Partners ("BGC"), another inter-dealer broker, had long expressed interest in purchasing GFI. (Guglielmo Decl. Ex. 100 ("BGC Tender Offer"), at *9.) Gooch rebuffed BGC's overtures and forged ahead with the proposed CME transaction. In October 2013, GFI and CME entered into a non-disclosure agreement. (Proxy Statement, at 61.) In January 2014, Gooch presented a proposed deal to the GFI Board. (Guglielmo Decl. Ex. 48 ("Jan. Board Meeting Minutes"), at 1–3.) Under its terms, CME agreed to purchase all of GFI's outstanding stock for $4.55/share. (Guglielmo Decl. Ex. 61 ("Press Release"), at 1.)

The GFI Board appointed a special committee to evaluate the terms of the proposed CME transaction and explore potential alternative transactions.  (Jan. Board Meeting Minutes, at 3; Ex. A.)  The special committee retained Greenhill & Co., LLC ("Greenhill") as its financial advisor and directed Greenhill to conduct a "market check" for potentially better deals.  (Proxy Statement, at 63; Defs.' Response ¶ 158.)  However, in March 2014, Gooch informed the special committee that he would vote against any transaction other than the CME proposal.  (Proxy Statement, at 64–65.)  Given Gooch's substantial ownership of GFI, the special committee concluded that a "market check" would be a futile exercise, and directed Greenhill to stop discussions with other potential purchasers.  (Defs.' Response ¶¶ 166–167; Proxy Statement, at 65.)

On July 29, 2014, the special committee voted to recommend approval of the CME transaction.  (Guglielmo Decl. Ex. 95 ("July Special Committee Meeting Minutes"), at 3.)  Five minutes after that vote, the GFI Board met to act on the special committee's recommendation.  (Guglielmo Decl. Ex. 51 ("July Board Meeting Minutes"), at 1–2.)  At that meeting, Gooch informed the Board that in an email earlier that day BGC had proposed acquiring GFI.  (July Board Meeting Minutes, at 2; Declaration of John F. Lynch, ECF No. 118 ("Lynch Decl.") Ex. X ("BGC Letter"), at 2.)  Reading from that email, Gooch informed the Board that BGC had expressed confidence that it could "offer a price per share substantially in excess of GFI's current trading price."  (BGC Letter, at 2.)  Gooch made clear that he would not support a transaction with BGC.  (July Board Meeting Minutes, at 2; Proxy Statement, at 72.)  After Gooch and Heffron recused themselves, the remaining members of the Board unanimously voted to approve the CME transaction.  (July Board Meeting Minutes, at 2.)

On July 30, 2014, GFI and CME issued a joint press release (the "Press Release") announcing the proposed merger. The Press Release explained that CME would acquire GFI's software business and that GFI stockholders would receive $4.55/share. (Press Release, at 1.) It described that following CME's acquisition, a private consortium of GFI management would acquire GFI's IDB business. (Press Release, at 1.) The claims in this case stem from a single sentence on the second page of that Press Release, in which Gooch opined on the proposed CME transaction. Specifically, Gooch stated: "Optimizing GFI's value for stockholders has been a goal of management since becoming a public company in 2005 and this transaction represents a singular and unique opportunity to return value." (Press Release, at 2.)

The Press Release noted that the proposed transaction was subject to shareholder and regulatory approval, and that a registration statement with more information would be forthcoming. (Press Release, at 1.) GFI shareholders were urged to read the registration statement and all proxy materials, as they would contain important information about the proposed transaction. (Press Release, at 6.) The Press Release noted that the transaction would likely not close until early 2015. (Press Release, at 1.)

On July 31, 2014, GFI and CME publicly filed the proposed merger agreement. (Lynch Decl. Ex. H ("Merger Agreement").) The Merger Agreement stated that the deal would not close without approval of GFI's shareholders. (Merger Agreement § 3.4.) On that same day, Gross sold 770 shares of GFI stock for $4.52/share. (SAC ¶ 22.)

Undeterred, BGC purchased millions of GFI shares in the ensuing weeks as a prelude to making a competing bid. (Lynch Decl. Ex. J ("BGC Form 13D"), at 15.) On September 9, 2014, BGC announced that it would make an all-cash tender offer for GFI for

$5.25/share.  (BGC Tender Offer, at *8.)  BGC simultaneously disclosed that it had acquired

13.5% of GFI's common stock.  (BGC Tender Offer, at *8.)  With the prospect of an all cash

tender-offer, GFI's share price skyrocketed from $5.03/share to $6.02/share.  (Defs.' Response

¶ 217.)

   Thereafter, BGC and CME traded escalating bids for GFI.  (Defs' Response

¶¶ 237–255.)  In the midst of that bidding war, GFI released its Proxy Statement, which

contained a 14-page description of the process and events leading up to the CME proposed

transaction.  (Proxy Statement, at 59–73.)  On January 2015, the bidding culminated with BGC's

cash offer of $6.10/share.  (Defs.' Response ¶ 255.)

   On January 30, 2015, GFI shareholders rejected the CME deal.  (Guglielmo Decl.

Ex. 108 ("WSJ Article"), at 1.)  GFI and CME terminated the proposed merger, and BGC

completed its tender offer, obtaining a controlling interest in GFI.  (Lynch Decl. Exs. FF ("Jan.

Press Release"); GG ("Feb. Press Release").)

   Gross represents a class of GFI investors who sold their stock after the July 30,

2014 Press Release, but before BGC announced its tender offer on September 9, 2014.  (SAC

¶¶ 1, 30.)  Gross claims that Gooch's statement misleadingly implied that the CME transaction

was the best available deal for GFI, meaning that it represented the best opportunity for GFI

shareholders to attain value.  (Defs.' Response ¶ 200.)

<u>LEGAL STANDARD</u>

   Summary judgment is only appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>see</u> <u>Davis v. Blige</u>, 505 F.3d 90, 97 (2d Cir. 2007). The moving party has the burden to demonstrate the absence of any genuine dispute of material fact. <u>Adickes v. S. H. Kress & Co.</u>, 398 U.S. 144, 157 (1970).

"A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment [as] [m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." <u>Hicks v. Baines</u>, 593 F.3d 159, 166 (2d Cir. 2010) (internal citation, quotation marks, and alterations omitted). Instead, "the nonmoving party must come forward with specific facts showing that there is a <u>genuine issue for trial</u>." <u>Niagara Mohawk Power Corp. v. Jones Chem. Inc.</u>, 315 F.3d 171, 175 (2d Cir. 2003) (internal citation and quotation marks omitted, emphasis original). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) (internal citation and quotation marks omitted). "In reviewing a motion for summary judgment, [the court] construe[s] all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." <u>Dickerson v. Napolitano</u>, 604 F.3d 732, 740 (2d Cir. 2010).

DISCUSSION

Rule 10b-5, as promulgated under Section 10(b) of the Securities Exchange Act, prohibits the "mak[ing] [of] any untrue statement of a material fact" in connection with the purchase or sale of a security. 17 C.F.R. § 240.10b-5(b). To maintain a claim under Rule 10b-5, "a plaintiff must prove (1) a material misstatement or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security;

(4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008). Here, Defendants focus on four elements: falsity, scienter, reliance, and loss causation. Each is analyzed in turn.

I.      Falsity

Defendants maintain that Plaintiffs cannot demonstrate falsity, meaning that Gooch's statement was either a misrepresentation or an omission. "To state a claim under Section 10(b), a complaint must allege material misstatements or omissions . . . ." Luce v. Edelstein, 802 F.2d 49, 55 (2d Cir. 1986). "An allegedly material misstatement must have been false at the time that it was made." In re Magnum Hunter Res. Corp. Sec. Litig., 26 F. Supp. 3d 278, 290 (S.D.N.Y. 2014). "[W]ithout contemporaneous falsity, there can be no fraud." In re Magnum Hunter, 26 F. Supp. 3d at 290. An omission is actionable under Rule 10b-5 "only when the corporation [was] subject to a duty to disclose the omitted facts." Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 101 (2d Cir. 2015) (internal citation omitted). But such a duty can arise if, absent the omitted information, a statement "would . . . be inaccurate, incomplete, or misleading." Stratte-McClure, 776 F.3d at 101 (internal citation and quotation marks omitted); see also In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008) ("[E]ven an entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it . . . materially misleading.").

According to Defendants, Gooch's statement was entirely true: optimizing shareholder value was a goal of GFI management and the CME deal did provide a "singular" and "unique" opportunity to GFI shareholders, in at least one sense of those words. Defendants

contend that Plaintiffs have contorted that sentence into implying the CME deal was the <u>best possible</u> deal for GFI shareholders. But because no other company had made a competing offer for GFI (BGC had not specified how much it would pay), Defendants argue that at the time of Gooch's statement, CME's deal was indeed "singular" and "unique."

Webster's defines singular as being "of or relating to a separate person or thing." (<u>Webster's Third New International Dictionary</u> 2124 (1993).) It defines unique as "being the only one" or "being without a like or equal." (<u>Webster's Third New International Dictionary</u> 2500 (1993).) This Court held in its prior Opinion & Order that "a reasonable person could [have] conclude[d] [from Gooch's statement] that the proposed transaction would provide them with the best possible share price." <u>Gross v. GFI Group, Inc.</u>, 162 F. Supp. 3d 263, 269 (S.D.N.Y. 2016).

The factual record developed on this summary judgment motion does not alter this Court's prior assessment. Defendants fail to establish that Plaintiffs' proffered reading of Gooch's statement—that it implied the CME deal was the best opportunity for GFI shareholders to optimize value—is unreasonable as a matter of law. Plaintiffs could have understood Gooch's statement to imply that the proposed CME transaction was without like or equal, and that therefore no alternative deal would have been better. Indeed, Defendants only posit that the CME "transaction was singular and unique <u>in at least one sense of those terms</u>." (Hr'g Tr., ECF No. 144, at 7:4–6. (emphasis added).)

It would not be unreasonable for a jury to find that such a representation was misleading based on what GFI and Gooch knew at that time. The evidence demonstrates that the

price of $4.55/share was neither "singular" nor "unique," or that, at a minimum, GFI and Gooch could not definitively state that this was so.

Jefferies had estimated GFI's "sum-of-the-parts" value at $5.41/share, an amount much higher than what CME proposed. (Jefferies Presentation, at 3.) And Gooch shut down the special committee's "market check" for better offers, making it unknown what other companies would have paid. (Defs.' Response ¶¶ 166–167.) Although BGC had not disclosed how much it would be willing to pay, it had reached out to discuss a potential deal. (Proxy Statement, at 72.) Gooch turned down that invitation. (Proxy Statement, at 72.) Further, BGC's acquisition of GFI for $6.10/share, a huge premium over CME's original offer, suggests that Gooch knew or should have known that CME's offer was not "unique." (Defs.' Response ¶¶ 252, 255.)

This evidence presents a quintessential jury question, namely, whether Gooch's statement in the context of the Press Release was misleading. "Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." McMahan & Co. v. Wherehouse Entm't, Inc., 900 F. 2d 576, 579 (2d Cir. 1990); see also In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 366 (2d Cir. 2010) ("The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context.") (internal citation and quotation marks omitted).

The parties' diverging interpretations of Gooch's statement reinforces that this facet of Defendants' motion is ill-suited for summary judgment. Whether a statement would give an investor a false impression is "generally a question reserved for the trier of fact." In re Inv. Tech. Grp., Inc. Sec. Litig., 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017). In fact, this

determination is only appropriate for judicial resolution if "reasonable minds could not differ on the question of whether the statements alleged . . . were misleading in light of the circumstances under which they were made." In re Par Pharm., Inc. Sec. Litig., 733 F. Supp. 668, 677 (S.D.N.Y. 1990).

Plaintiffs also characterize their claim as an omission because additional information was necessary to make Gooch's statement not misleading. Defendants argue that they were under no obligation at the time of the Press Release to reveal the details of the negotiations leading up to the proposed CME transaction. Rather, they argue such information only needed to be disclosed in the Registration Statement and proxy materials.

"[T]here can be no fraud absent a duty to speak." Chiarella v. United States, 445 U.S. 222, 235 (1980). "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988). However, a duty to speak arises when necessary to make existing statements not materially misleading. See Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011). "[T]he lack of an independent duty is not . . . a defense to Rule 10b-5 liability because upon choosing to speak, one must speak truthfully about material issues." Caiola v. Citibank, N.A., N.Y., 295 F.3d 312, 331 (2d Cir. 2002).

A reasonable juror could conclude that omitting certain details about the process leading up to the CME merger agreement may have made Gooch's statement misleading. Again, Gooch was aware through both Jefferies' presentation and BGC's email that the CME transaction may not have been "singular" for GFI shareholders. Characterizing the proposed transaction with superlatives, without revealing information suggesting otherwise, could be seen as being inaccurate and incomplete. See Caiola, 295 F.3d at 331 ("Once [a defendant] choose to

discuss [something], it ha[s] a duty to be both accurate and complete.").  For instance, the Press

Release explained that the CME deal was approved by a special committee, but did not reveal

that Gooch strong-armed the committee into giving up its "market check" because of his

insistence that he would not support any other deal.  (See Proxy Statement, at 64–65; July Board

Meeting Minutes, at 2.)  Accord Ackerman v. Schwartz, 947 F.2d 841, 848 (7th Cir. 1991)

(Although a company need not issue a press release, once it does it "must tell the truth about

material issues.").

In a last ditch effort, Defendants assert that Gooch's statement was forward-

looking, and therefore within the Private Securities Litigation Reform Act's ("PSLRA") safe

harbor.  The securities laws exempt from liability a forward-looking statement "accompanied by

meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the forward-looking statement."  15 U.S.C. § 78u-5(c)(1).

"Forward-looking statements are contingent statements as to future events."

Credit Suisse First Bos. Corp. v. ARM Fin. Grp., Inc., 2001 WL 300733, at *5 (S.D.N.Y. Mar.

28, 2001).  Gooch's statement did not forecast future events.  Instead, it commented on the

merits of the CME transaction as it existed at that time—that it presented a singular and unique

opportunity for GFI shareholders.  See In re Regeneron Pharm., Inc. Sec. Litig., 2005 WL

225288, at *13 (S.D.N.Y. Feb. 1, 2005) ("Representations of historical or current fact do not

qualify for the PSLRA's safe harbor.").  And even if Gooch's statement was forward-looking,

the PSLRA's safe harbor does not insulate "a defendant from liability if a statement was

knowingly false when made."  In re Alliance Pharm. Corp. Sec. Litig., 279 F. Supp. 2d 171, 192

(S.D.N.Y. 2003).  As described above, a reasonable juror could come to such a conclusion.

II.     Sciener

        Scienter refers to "a mental state embracing intent to deceive, manipulate, or

defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007) (internal

citation omitted).  A plaintiff must "allege facts that give rise to a strong inference of fraudulent

intent." Acito v. IMCERA Grp., Inc., 47 F.3d 47, 52 (2d Cir. 1995).  This can be done in one of

two ways: "either (a) by alleging facts to show that defendants had both motive and opportunity

to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of

conscious misbehavior or recklessness." Chill v. Gen. Elec. Co., 101 F.3d 263, 267 (2d Cir.

1996) (internal citation omitted).

        Motive and opportunity requires showing "concrete benefits that could be realized

by one or more of the false statements and wrongful nondisclosures alleged" as well as "the

means and likely prospect of achieving concrete benefits by the means alleged." Shields v.

Citytrust Bancorp, Inc., 25 F.3d 1125, 1130 (2d Cir. 1994).  "Motives that are generally

possessed by most corporate directors and officers do not suffice; instead plaintiffs must assert a

concrete and personal benefit to the individual defendants resulting from the fraud." Kalnit v.

Eichler, 264 F.3d 131, 139 (2d Cir. 2001).

        Plaintiffs posit that Gooch and Heffron had a motive to push through their

preferred transaction with CME "to allow them to take GFI's Brokerage Business private at a

discounted price."  (SAC ¶ 97.)  The concrete benefits that Gooch and Heffron stood to gain

from that transaction—acquiring GFI's IDB business at a substantial discount—is beyond the

pedestrian and qualifies as sufficient motive under this standard.  See In re MCI Worldcom, Inc.

Sec. Litig., 93 F. Supp. 2d 276, 284 (E.D.N.Y. 2000) ("[B]eing able to acquire a company for a

12

significantly reduced price is a sufficient economic benefit to satisfy the motive requirement for scienter.").

Parrying Plaintiffs' motive argument, Defendants focus their attack on opportunity. They argue that Gooch's statement could not have helped him or GFI secure shareholder approval of the CME transaction because all shareholders received the Proxy Statement prior to casting their vote. That Proxy Statement described the process leading up to GFI's decision to recommend the CME transaction. (See Proxy Statement, at 59–73.) Thus, Defendants argue that it does not matter whether Gooch's opinion was right or wrong, as GFI shareholders had all of the information necessary to evaluate the transaction for themselves prior to casting their proxy.

Defendants rely on In re GeoPharma, Inc. Securities Litigation, 399 F. Supp. 2d 432 (S.D.N.Y. 2005), in which the plaintiffs alleged that GeoPharma issued a misleading press release "that caused investors to believe that the Food and Drug Administration ("FDA") had granted GeoPharma approval for a new drug, when in fact the FDA had merely approved a (much less potentially lucrative) medical device." In re GeoPharma, 399 F. Supp. 2d at 435. The GeoPharma court held that the alleged scheme had no chance of succeeding because "[t]he FDA approval of [the medical device] was public information." In re GeoPharma, 399 F. Supp. 2d at 449. In other words, when publicly available information contradicts a misleading statement, there is no opportunity for a defendant's scheme to succeed.

The situation here is analogous. The proposed CME transaction could not close without the majority approval of GFI's shareholders, and that vote could not take place until the proxy materials were distributed. The Proxy Statement's 14-page detailed description of the

13

process culminating in the CME merger agreement fully disclosed the machinations behind the proposed transaction.  (Proxy Statement, at 59–73.)  Importantly, it disclosed that Greenhill had initiated a "market check" and "identified 22 third parties that might be interested in" a transaction with GFI.  (Proxy Statement, at 64.)  The Proxy Statement also revealed that in March 2014 Gooch informed the special committee that he would "vote against any other transaction presented to GFI Stockholders." (Proxy Statement, at 64.)  Following Gooch's rebuke, the special committee and Greenhill abandoned the "market check."  (Proxy Statement, at 64–67.)

The Proxy Statement described Gooch's presentation of BGC's email at the July 29, 2014 Board meeting, and his reiteration to the Board that he "intended to vote against any transaction involving GFI with any party other than CME."  (Proxy Statement, at 72.)  Plaintiffs' expert acknowledges that there was nothing misleading in the Proxy Statement, and that it was in fact "quite detailed."  (Lynch Decl. Ex. K ("Purcell Depo."), at 149:18–22.)

Like in GeoPharma, the inevitable release of the Proxy Statement, which publicly provided the pros and cons of the CME transaction, as well as GFI's due diligence (or lack thereof) in approving it, demonstrates that shareholders and analysts had all confounding information to Gooch's statement prior to voting.  Accordingly, there was no opportunity to foist Gooch's preferred deal on shareholders.

Even if Gooch's statement was misleading, "a short respite from an inevitable day of reckoning" does not demonstrate scienter.  See Shields, 25 F.3d at 1130; see also In re Crown Am. Realty Trust Sec. Litig., 1997 WL 599299, at *13 (W.D. Pa. Sept. 15, 1997) ("Thus, while plaintiffs can and do allege that defendants' misstatements 'fooled' the Wall Street analysts for a

few months, they do not allege that there existed any opportunity to continue the deception permanently, nor . . . that defendants could obtain any benefit . . . from perpetrating this alleged fraud on a short-term basis.").

Scienter can also be shown through conscious misbehavior or recklessness. "Intentional misconduct is easily identified since it encompasses deliberate illegal behavior . . . ." Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000). Recklessness requires demonstrating "strong circumstantial evidence of that recklessness . . . such that it gives rise to a strong inference of fraudulent intent." Chill, 101 F.3d at 269 (internal citations omitted). More than mere negligence is required—plaintiffs must show "at the least, . . . an extreme departure from the standards of ordinary care . . . ." ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009) (internal citation omitted).

But even under this standard, a plaintiff must establish that a material benefit could have been obtained through the misstatement. See In re N. Telecom Ltd. Sec. Litig., 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000) (even under recklessness, a plaintiff must demonstrate concrete benefits that could have been realized by the false statements); In re GeoPharma, 399 F. Supp. 2d at 452–53 ("Surely if such alleged misbehavior is incapable of defrauding investors, that, in itself, negates the inference of intent to defraud. The same must be true for allegations of reckless conduct."). Accordingly, Plaintiffs' claim of scienter under the conscious misbehavior or recklessness test fails for the same reason—the Proxy Statement demonstrates that any fraudulent scheme was doomed to fail.

III.     Reliance

         "Reliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury."  Basic Inc., 485 U.S. 224, 243 (1988).  "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—e.g., purchasing common stock—based on that specific misrepresentation."  Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 810 (2011).  The fraud-on-the-market theory creates a rebuttable presumption of reliance if a plaintiff can show that the "defendant has (1) publicly made (2) a material misrepresentation (3) about stock traded on an impersonal, well-developed (i.e., efficient) market."  In re Smith Barney Transfer Agent Litig., 884 F. Supp. 2d 152, 162 (S.D.N.Y. 2012) (internal citation omitted); see Basic Inc., 485 U.S. at 250.

         Defendants focus their attack on the second requirement of the fraud-on-the-market presumption: whether Plaintiffs can show that Gooch's statement was material.  See Basic Inc., 485 U.S. at 248 n.27.  They argue that Plaintiffs proffer no evidence demonstrating that Gooch's statement, in isolation, materially affected any investor's decision on whether to sell their GFI stock.

         Materiality of a statement is a "mixed question of law and fact."  TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976).  It "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact."  TSC Indus., 426 U.S. at 450 (comparing this to the reasonable person standard).  This Court is to consider

"[t]he total mix of information available and the relevant circumstances." Press v. Chem. Inv. Serv. Corp., 166 F.3d 529, 538 (2d Cir. 1999).

Here, there is sufficient evidence of materiality to withstand summary judgment. "Material facts include those that affect the probable future of the company and that may affect the desire of investors to buy, sell, or hold the company's securities." Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 180 (2d Cir. 2001) (internal citation, alteration, and quotation marks omitted). The Supreme Court has specifically recognized the importance attached to "a statement of belief by corporate directors about a recommended course of action, or an explanation of their reasons for recommending it . . . ." Va. Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1090–91 (1991).

The statement in question came from GFI's Chairman, its highest corporate officer, and provided his opinion on the proposed CME transaction. A merger is one of the most significant events in a corporation's existence. See Castellano, 257 F.3d at 181 ("A merger is often of tremendous significance to shareholders . . . ."); S.E.C. v. Mayhew, 121 F.3d 44, 52 (2d Cir. 1997). "Material facts include those . . . which in reasonable and objective contemplation might affect the value of a corporation's stock or securities." Mayhew, 121 F.3d at 52 (emphasis original).

Plaintiffs also point to evidence that GFI itself believed Gooch's statement material to winning approval from GFI shareholders. (See Guglielmo Decl. Ex. 59 (GFI's General Counsel explaining the importance of Gooch's quote in the Press Release).) "[A] major factor in determining whether information was material is the importance attached to it by those who knew about it." Mayhew, 151 F.3d at 52. Accordingly, this Court cannot say at this stage

that Gooch's statement did not alter the "total mix" of information that shareholders considered in determining whether to sell their shares during the class period.  See TSC Indus., 426 U.S. at 449.

Finally, Defendants contend that the Affiliated Ute presumption of reliance does not apply to this case because Plaintiffs' claims do not arise primarily from omissions.  See Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153–54 (1972) (positive proof of reliance is not required in a "failure to disclose" case; a plaintiff may instead show that "facts withheld [would] be material in the sense that a reasonable investor might have considered them important").  Plaintiffs offer no rebuttal to this argument, and the Second Circuit recently made clear that Affiliated Ute only applies to cases "involving primarily omissions, rather than affirmative misstatements."  See Waggoner v. Barclays PLC, 875 F.3d 79, 93 (2d Cir. 2017). Here, Plaintiffs' claims arise primarily out of Gooch's statement and involve omissions only to the extent that omitted statements were necessary to make Gooch's opinion not misleading. Based on Waggoner's guidance, this Court agrees that Affiliated Ute does not apply to this case.

IV.    Loss Causation

Causation under Rule 10b-5 "is two-pronged: a plaintiff must allege both transaction causation, i.e., that but for the fraudulent statement or omission, the plaintiff would not have entered into the transaction; and loss causation, i.e., that the subject of the fraudulent statement or omission was the cause of the actual loss suffered."  Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001) (emphasis original).  "Transaction causation is akin to reliance, and requires only an allegation that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental

securities transaction.'" Gross, 162 F. Supp. 3d at 269 (citing Lentell v. Merrill Lynch & Co., 396 F.3d 189, 196–97 (2d Cir. 2005)).

Defendants contend that Plaintiffs fail to establish the second causation prong—loss causation. "Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." Lentell, 396 F.3d at 172. Plaintiffs have the burden of proving loss causation. 15 U.S.C. § 78u-4(b)(4); Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 346 (2005).

"To prove loss causation, plaintiffs must distinguish the alleged fraud from the tangle of other factors that affect a stock's price." In re Omnicom Grp., Inc. Sec. Litig., 541 F. Supp. 2d 546, 553 (S.D.N.Y. 2008) (internal citation and alteration omitted), aff'd 597 F.3d 501 (2d Cir. 2010). In Dura Pharmaceuticals, the Supreme Court recognized that changes in a company's stock price could reflect "not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." Dura Pharm., 544 U.S. at 343.

Here, Plaintiffs contend that Gooch's misstatement was corrected by the news on September 8 and 9, 2014 that BGC intended to make a tender offer of $5.25/share. Plaintiffs aver that this announcement undermined the Press Release because it revealed that the CME deal was neither "singular" nor "unique." (See Lynch Decl., Ex. E ("Coffman Report"), ¶ 9; Defs.' Response ¶ 217.) Consequently, Plaintiffs contend that BGC's tender offer caused the spike in GFI's share price.

The problem with Plaintiffs' theory is that they cannot disaggregate corrective information in BGC's tender offer from the other "new industry-specific or firm-specific facts"

that it revealed.  See Dura Pharm., 544 U.S. at 343.  The market learned that GFI shares were valued higher than the proposed CME transaction, and that BGC intended to launch a tender offer.  Investors also learned that BGC was offering $5.25/share, and that a bidding war might ensue.  (See Lynch Decl., Ex. CC ("Morningstar Report"), at 26.)  In that regard, BGC also disclosed that it had acquired a 13.5% stake in GFI, another factor that investors could expect would propel the bidding.  (BGC Tender Offer, at *8; Lynch Decl., Ex. G ("Coffman Depo."), at 207:17–208:25.)

This mix of new information likely spawned the surge in GFI's share price over the next few days.  As in Omnicom, Plaintiffs have not "demonstrate[d] that the market reacted [] to the disclosures, rather than to other information simultaneously released to the market." Omnicom, 541 F. Supp. 2d at 553 (plaintiffs could not disentangle information revealed through news article from "highly negative commentary about facts already known to the market," meaning there was "no way for a juror to determine whether the alleged fraud caused any portion of [p]laintiffs' loss").

The analysis performed by Plaintiffs' expert, Chad Coffman, does not alter this Court's conclusion.  Coffman does not attempt to attribute any portion of the increase in GFI's share price to a corrective disclosure as opposed to other simultaneously released information. Instead, Coffman opines that "no additional confounding news was revealed on [the day of BGC's offer] that could have been an alternate explanation for the market price movement." (Coffman Report, ¶ 64.)  But this ignores the other information embedded in BGC's offer, including the substantial position that BGC had taken in GFI and that it intended to wage a

hostile takeover. Such information could not have been disclosed by GFI at the time of the Press Release. (See Guglielmo Decl., Ex. 21 ("Jarrell Report"), ¶ 131.)

Typically, loss causation is demonstrated through a corrective disclosure that reveals the falsity of previous information. See In re Vivendi Universal, S.A. Sec. Litig. ("Vivendi I"), 634 F. Supp. 2d 352, 363–64 (S.D.N.Y. 2009). But it may also be shown "by the 'materialization of risk' method, whereby a concealed risk . . . comes to light in a series of revealing events that negatively affect stock price over time." In re Vivendi Universal, S.A. Sec. Litig. ("Vivendi II"), 765 F. Supp. 2d 512, 555 (S.D.N.Y. 2011); see also Vivendi I, 634 F. Supp. 2d at 364. However, "[o]nce an event qualifies as a materialization of the risk, plaintiffs must still prove that their losses were caused by that event." Vivendi I, 634 F. Supp. 2d at 364; see also Omnicom, 597 F.3d at 514; Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 158 (2d Cir. 2007) (Plaintiffs must "allege[] facts that would allow a factfinder to ascribe some rough proportion of the whole loss to [Defendants'] misstatements"; In re Williams Sec. Litig., 496 F. Supp. 2d 1195, 1265–66 (N.D. Okla. 2007) (materialization of the risk "provides no warrant for dispensing with Dura's requirement that plaintiff prove a 'causal connection between the material misrepresentations and the loss.'") (citing Dura Pharm., 544 U.S. at 342).

Irrespective of Plaintiffs' theory (corrective disclosure or materialization of the risk), a jury would not be able to disaggregate that portion of the increase in GFI's share price attributable to a correction of Gooch's statement from that portion of the increase attributable to the other information simultaneously disclosed to the market.

V.      Section 20(a) Control Person Liability

        Defendants move for summary judgment on Plaintiffs' control person liability claims.  Because Plaintiffs fail to establish a primary violation of the federal securities laws, summary judgment on these claims is equally warranted.  See Omnicom, 541 F. Supp. 2d at 554; In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 272 F. Supp. 2d 243, 264 (S.D.N.Y. 2003) ("Because [p]laintiff has failed to state a claim against the [d]efendants for primary violation of the federal securities law, her claims for control person liability necessarily fail.").

CONCLUSION

        For the foregoing reasons, Defendants' motion for summary judgment is granted. The Clerk of Court is directed to terminate all pending motions and mark this case as closed.


Dated: April 20, 2018
        New York, New York


                        SO ORDERED:


                        _____
                        WILLIAM H. PAULEY III
                        U.S.D.J.